## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a THE
JAMES H. ANDERSON LIVING TRUST;
THE PRITCHETT LIVING TRUST;
CYNTHIA W. SADLER; SHIRLEY L.
SCANLON LIVING TRUST AND ROBERT
WESTFALL,

      Plaintiffs,

vs.                                        No. CIV 12-0039 JB/KBM

CONOCOPHILLIPS COMPANY, LLC,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Leave to File

Third Amended Complaint, filed December 10, 2015 (Doc. 165)("Motion").  The Court held a

hearing on February 17, 2016.  The primary issues are: (i) whether the United States Court of

Appeals for the Tenth Circuit's decision in Elliott Industries Ltd. Partnership v. BP America

Production Company, 407 F.3d 1091 (10th Cir. 2005)("Elliott Industries"), prevents the Court

from recognizing that the implied duty to market imposes obligations on the price that lessees of

oil-and-gas leases must obtain; (ii) whether the implied duty to market conflicts with any express

contractual provisions; (iii) whether plaintiffs must allege unjust enrichment to recover under the

implied duty to market; (iv) what the implied duty to market requires of lessees; and (v) whether

the Court should grant the Motion and allow the Plaintiffs to amend their Second Amended

Complaint for Underpayment of Oil and Gas Royalties, filed August 28, 2013 (Doc.

83)("ConocoPhillips Complaint"), pursuant to rule 15 of the Federal Rules of Civil Procedure.

Because the Tenth Circuit did not consider a situation similar to the one here, where the

Plaintiffs/lessors assert that the Defendants/lessees base the Plaintiffs' royalty payments off of low sales prices for all of the hydrocarbons in an affiliate sale, the Tenth Circuit's decision in Elliott Industries does not foreclose this Court from defining New Mexico's implied duty to market as bearing on the price that lessees must obtain when selling the hydrocarbons.  The Court will not, however, allow the Plaintiffs to include those portions of the Motion that seek to reiterate arguments that Elliott Industries foreclosed.  Second, under New Mexico law, the implied duty to market can coexist alongside the express royalty provisions in the Plaintiffs' leases.  Third, alleging unjust enrichment is not a prerequisite to a New Mexico implied-duty-to-market claim.  Because amending the ConocoPhillips Complaint does not involve undue delay or bad faith and it would not be futile, the Court will grant the Motion in part and deny it in part.

## FACTUAL BACKGROUND

The Court has summarized this case's facts in other opinions.  See, e.g., Memorandum Opinion at 5-9, filed June 28, 2013 (Doc. 76).  The Court will not repeat the facts here, but, rather, will outline only those facts that are relevant to the disposition of the Motion before it.  On October 20, 2011, two nearly identical groups of Plaintiffs,[1] represented by the same group of attorneys, filed two lawsuits in state court.  Compare Anderson Living Trust v. Williams Prod. Co., D-117-CV-2011-00511 (1st Jud. Dist. Ct., Cnty. of Rio Arriba, State of N.M.) (Raphaelson, J.), with Anderson Living Trust v. ConocoPhillips Co., LLC, D-117-CV-2011-00510 (1st Jud. Dist. Ct., Cnty. of Rio Arriba, State of N.M.)(Raphaelson, J.).  The two suits are similar in every way except that one of them, Anderson Living Trust v. WPX Energy Production, LLC ("WPX"), is against Defendants WPX Energy Production, LLC, Williams Production

---

[1]Five parties are Plaintiffs in both cases, three Plaintiffs are unique to WPX, and two Plaintiffs are unique to ConocoPhillips.  Compare WPX Fourth Amended Complaint for Underpayment of Oil and Gas Royalties ¶¶ 1-4(d), at 2, filed September 27, 2013 (Doc. 129)("WPX Complaint"), with ConocoPhillips Complaint ¶¶ 1-5(c), at 1-2.

Company, LLC, and WPX Energy Rocky Mountain, LLC (collectively, "the WPX Defendants"),
while the other, ConocoPhillips, is against Defendant ConocoPhillips Co., LLC.  Compare WPX
Fourth Amended Complaint for Underpayment of Oil and Gas Royalties, filed September 27,
2013 (Doc. 129)("WPX Complaint"), with ConocoPhillips Complaint.

Both suits are proposed class actions on behalf of landowners who executed long-term
leases with the Defendants.  See WPX Complaint ¶ 26, at 10-12; ConocoPhillips Complaint ¶ 24,
at 9-11.  The leases, which were largely executed in the 1940s, allow the Defendants to drill for
natural gas on the Plaintiffs' land in exchange for a royalty payment -- usually one-eighth of the
proceeds from sale.  See WPX Complaint ¶ 26, at 10-12; ConocoPhillips Complaint ¶ 24, at 9-
11.  The Plaintiffs contend that the Defendants have been underpaying the royalties in a number
of ways -- most notably by paying royalty on natural-gas liquids at the same price per MMBtu[2]
that they pay for natural gas, which is a cheaper product -- and they seek damages for this
underpayment going back to 1985.  See WPX Complaint ¶ 33, at 14; ConocoPhillips Complaint
¶ 19, at 7-8; id. ¶¶ 31-32, at 12-13.

The named Plaintiffs are individuals and trusts owned by individuals with no in-depth
knowledge of the oil-and-gas industry, although their levels of oil-and-gas sophistication vary
from Plaintiff to Plaintiff.  Owing to the leases' ages, no Plaintiff personally executed the lease
that now pays his or its royalty; rather, all of the named Plaintiffs inherited their royalty interests.
See WPX Complaint ¶ 26, at 10-12; ConocoPhillips Complaint ¶ 24, at 9-11.  The only

---

[2]An MMBtu is 1,000,000 Btus.  A Btu is a "British thermal unit," which is a unit of
energy equivalent to approximately 1,055 joules.  The joule (J) is the SI -- or International
System of Units -- unit of energy, and it is the amount of energy required to exert one Newton
(N) of force over a distance of one meter.  A Newton is the amount of force required to
accelerate one kilogram of mass by one meter per second-squared.  See Anderson Living Tr. v.
WPX Energy Prod., LLC, 306 F.R.D. 312, 326 (D.N.M. 2014)(Browning, J.)("Class
Certification MOO").

information that all of the Plaintiffs receive regarding their royalties is their monthly check stubs, which contain figures -- broken down by well, for those Plaintiffs who own royalty interests in more than one well -- for the total "price," "quantity," "value," "deductions," and "net [proceeds]" of all gas recovered from the Plaintiff's well over that payment period, and the "interest," "paid int[erest]," "value," "deductions," and "net share" of the Plaintiff's royalty. E.g., Check Stubs of James H. Anderson Living Trust (dated over numerous years), filed with the Court during the class-certification hearing in WPX as Plaintiffs' Ex. 1.   See WPX Complaint ¶¶ 86-87, at 26-27; id. ¶ 95, at 28-29; ConocoPhillips Complaint ¶¶ 81-82, at 24-25; id. ¶ 90, at 27.  The Plaintiffs also receive the checks, which contain only the final dollar figure of the royalty payout for that payment period.   See, e.g., Check Stubs of James H. Anderson Living Trust at 1-2.

The Defendants calculate the Plaintiffs' royalty interests using the sale price received from the Defendants' affiliated intermediaries for hydrocarbons from wells in which the Plaintiffs own royalty interests, mixed with hydrocarbons from other wells in which the Plaintiffs do not own royalty interests.  See Third Amended Complaint for Underpayment of Oil and Gas Royalties ¶ 36, at 23, filed December 10, 2015 (Doc. 165-1)("TAC").  The Plaintiffs contend that the Defendants' affiliated intermediaries sell the hydrocarbons downstream at a significant profit, but do not share this profit with the Plaintiffs, because the Defendants base the Plaintiffs' payment on the upstream transfers to the affiliated intermediaries.  See TAC ¶ 36, at 23.

**PROCEDURAL BACKGROUND**

The Defendants in both cases removed their cases to federal court on January 12, 2012, asserting federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").  WPX Notice of Removal, filed January 12, 2012 (Doc. 1); ConocoPhillips Notice of

Removal, filed January 12, 2012 (Doc. 1).  The Court had previously granted portions of the Defendants' earlier motions to dismiss.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979 (D.N.M. 2013)(Browning, J.)("June 28 MO"); Anderson Living Tr. v. ConocoPhillips Co., LLC, 2015 WL 3543011 (D.N.M. May 26, 2013)(Browning, J.)("May 26 MO").  In both opinions, the Court dismissed the Plaintiffs' implied-duty-to-market claim on the grounds that it actually asserted that the Defendants violated the marketable-condition rule, which is a corollary of the implied duty to market.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 6, 218 P.3d 75, 78; Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 423.  Although each state describes the marketable-condition rule in its own way, in general, the marketable-condition rule prohibits lessees from deducting certain post-production costs from lessors' royalty payments.  See Garman v. Conoco, Inc., 886 P.2d at 661; Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1992); Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602, 606 (1964).  In contrast, the implied duty to market is broader: it requires lessees to extract the minerals subject to a lease and to market them for the mutual benefit of the lessees and lessors.  See Elliott Indus., 407 F.3d at 1113.  The Court held that the Tenth Circuit's decision in Elliott Industries foreclosed their arguments.

On March 19, 2015, the Court denied class certification in WPX.  See Class Certification MOO at 1-2.  Of importance here, the Court did not consider whether to certify a class on the basis of the implied duty to market, because the Court had previously dismissed the Plaintiffs' assertion of that claim.  See Class Certification MOO at 2.  The Plaintiffs in WPX then filed a motion asking the Court to reconsider its denial of class certification on the basis of the implied duty to market.  See Plaintiffs' Motion for Reconsideration of Order Denying Class Certification, filed June 1, 2015 (Doc. 288)("Motion to Reconsider").  Although the Court concluded that the

implied duty to market imposes requirements on the price that lessees must obtain when selling hydrocarbons, it denied the Motion to Reconsider on the grounds that it had already dismissed the implied-duty-to-market claim.  See Memorandum Opinion and Order, filed December 31, 2015 (Doc. 306).  The Court had not yet ruled on the Motion to Reconsider when the Plaintiffs filed this Motion.

      1.      **The Motion.**

In this Motion, the Plaintiffs move the Court "for an Order permitting them to file Plaintiffs' Third Amended Complaint."  Motion at 1 (referencing the TAC).  The Plaintiffs assert that the TAC is necessary to: (i) incorporate the Court's May 26, 2015 rulings on the Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint; and (ii) add a new cause of action, which alleges a cause of action for breach of the implied covenant to market.  See Motion at 1.  The Plaintiffs describe the added seventh cause of action, which is "a stand-alone claim for breach of the implied covenant to market, *i.e.*, which is not inclusive of the marketable condition rule."  Motion at 1-2.  They note that the Seventh Cause of Action specifically alleges that this covenant: (i) is implied in law, not in fact; (ii) is implied into all of the Plaintiffs' and Class Members' instruments creating their royalty or overriding royalty interests; and (iii) includes both the activity of marketing, and alleges that the Defendant must accomplish that marketing for the benefit of both the lessor and the lessee.  See Motion at 2.

      The Plaintiffs also proposed some "alternate, narrowed class definitions."  Motion at 5.

      These consist of, in the first instance, two (2) different groups of lease types, which are categorized by variants in the royalty clause as contained in said leases; and in the second instance, two (2) alternative definitions by variants in the terms of the creation of overriding royalties in assignments or reservations of the affected federal leases.

Motion at 5.  They assert that they will require further limited discovery "to determine the numbers of Class Members involved, as well as whether any variance in the producing

characteristics of the oil and gas wells within those narrowed class definitions exists."  Motion at 6.  The Plaintiffs argue that, under rule 15 of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend] when justice so requires."  Motion at 6 (citing Fed. R. Civ. P. 15(a)(2)).  They contend that there has been no "undue delay, bad faith or dilatory motive" and that the Defendants would not suffer prejudice if the Court allows the amendment.  Motion at 6. Moreover, they state that the Court should grant them leave to amend, because doing so "would yield a meritorious claim."  Motion at 6.

    **2.**    **The Response**.

The Defendants responded on February 5, 2016.  _See_ Defendant ConocoPhillips' Response in Opposition to Plaintiffs' Motion for Leave to File Third Amended Complaint, filed February 5, 2016 (Doc. 171)("Response").  The Defendants contend that the Plaintiffs' proposed amendments are futile and would not survive a motion to dismiss, so the Court should deny the Motion.  _See_ Response at 1.  The Defendants describe how the Court previously dismissed the Plaintiffs' implied-duty-to-market claim, because it alleged that the Defendants violated that duty by taking impermissible cost deductions, which _Elliott Industries_ forecloses.  _See_ Response at 4-5.  They argue that the "Plaintiffs now dress up very similar allegations in different garb" by reiterating some of the same allegations that the Defendants cannot deduct certain costs. Response at 5.  They contend that the Court must dismiss these allegations.  _See_ Response at 5.

The Defendants recognize that the TAC contains new allegations that the Defendants breached the implied duty to market by failing to sell the hydrocarbons for the highest obtainable price.  _See_ Response at 6.  They assert that the Tenth Circuit's decision in _Elliott Industries_ forecloses the Plaintiffs' implied-duty-to-market claim.  _See_ Response at 1; _id._ at 5.  They argue that the "plaintiff in _Elliott did_ contend that the defendants had sold the hydrocarbons at unreasonably low prices."  Response at 7.  Accordingly, the Defendants state, when the Tenth

Circuit rejected the plaintiff's appellate arguments, it implicitly defined the implied duty to market to exclude any obligation to secure the highest obtainable price.  See Response at 7-8.

Second, the Defendants assert that "implied duties cannot coexist with express contractual obligations covering the same subject."  Response at 2.  They argue that every "duty encompassed by Plaintiffs' implied-covenant-to-market claim and allegedly breached by ConocoPhillips is the subject of express contract obligations."  Response at 8.  Specifically, the Defendants argue: the TAC alleges that the Defendants breached their implied duty through conduct that also constitutes a breach of contract.  See Response at 9-10.  They contend that, because the express contract provisions govern, the Court cannot allow the implied covenant to prevail.  See Response at 11.  Additionally, they argue that the Court cannot impose a legal duty on a contracting party in equity when the contract's express provisions are clear.  See Response at 12.  They sum up their argument by stating that, "[g]iven the allegations in Plaintiffs' Third Amended Complaint as to the meaning of the express terms in the parties leases, . . . this Court is without authority to consider Plaintiffs' implied duty to market claim."  Response at 13.

Third, the Defendants contend that "the Court cannot impose an implied-at-law duty on contracting parties in equity absent unjust enrichment."  Response at 2.  The Defendants state that the implied covenant to market "is an implied-at-law duty that is implied *in equity*" and that the "equitable principle on which the implication of that duty rests is *unjust enrichment*."  Response at 15 (emphasis in original).  They argue that "a court may not imply a legal duty on a party to a contract *unless* the implied duty is necessary as an equitable matter to prevent unjust enrichment."  Response at 15.

Finally, the Defendants argue that, even if the Court concludes that the Plaintiffs properly pled an implied-duty-to-market claim, "the duty must be narrower than one to obtain the 'highest

obtainable value.'"   Response at 2.   They argue that a duty to obtain the highest value "would engraft in to the implied duty an obligation to make the lowest possible *deductions*."   Response at 19 (emphasis in original).   The Defendants contend that the "duty is limited (i) to obtaining the best price *reasonably available* (ii) in order to ensure that sales prices are not unreasonably low due to *self-dealing via non-arm's-length transactions*."   Response at 19 (emphasis in original). They observe that the Court limited the implied duty in this manner in its Memorandum Opinion and Order on the Motion to Reconsider.   See Response at 20.

### 3.   The Hearing.

The Court held a hearing on February 17, 2016.   See Transcript of Hearing (taken February 17, 2016)("Tr.").[3]   The Plaintiffs began the hearing by arguing that, to certify a class action, they must amend the Complaint to abbreviate the class definition and add the implied-duty-to-market claim.   See Tr. at 4:6-18 (Brickell).   They recognized that the Court had previously dismissed the implied-duty-to-market claim because it was based on the "marketable-condition rule part," but they argued that their new claim "isolated in this case several factual instances of breaches of the implied duty to market as it exists to the exclusion of the marketable condition rule in New Mexico."   Tr. at 5:5-15 (Brickell).

The Plaintiffs clarified that they did not argue that the implied duty to market should govern when express contractual provisions apply to the same exact situation.   See Tr. at 8:19-20 (Brickell).   They stated instead that the royalty provisions at issue here do not govern the issue that the implied duty to market governs.   See Tr. at 8:21-9:13 (Brickell).   They argued their point through an example.   They proposed a situation in which an express royalty provision dictates

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

that the lessee must pay one-eighth of the proceeds it receives on sales of gas from the lessor's

well.  See Tr. at 8:24-9:2 (Brickell).

> If you have a lessee who, let's say, sells the gas -- and again this is a hypothetical,
> but I think it's a fairly simple one -- so let's say the lessee sells the gas to a wholly
> owned affiliate, and they sell that gas for $3.  The wholly owned affiliate then
> goes downstream and sells it for $4, but they pay Mr. Anderson $3.  Now, there is
> nothing in the express provision of that lease that says you have to make your best
> effort to market the gas.  It just says whatever the value is that you receive of that
> gas, you're going to pay Mr. Anderson an eighth.

Tr. at 9:2-13 (Brickell).   The Plaintiffs contended that these hypothetical royalty provisions,

which require payment on one-eighth of proceeds, say nothing about whether lessees must obtain

the best price on sales of that gas.  See Tr. at 9:11-25 (Brickell).  They argued that, accordingly,

the royalty provisions do not govern the same issue that the implied duty to market governs.  See

Tr. at 9:11-25 (Brickell). The Plaintiffs affirmed that they had read enough leases at issue here to

represent to the Court that the lease provisions at issue here do not conflict with the implied duty

to market as the Court has defined it.  See Tr. at 10:23-11:6 (Brickell, Court).

The Plaintiffs concluded by arguing that they comply with rule 15's requirements to

amend their Complaint.  See Tr. at 11:17-12:3 (Brickell).  They first noted that their claims were

not futile.  See Tr. at 11:17-22.  Second, they contended that they did not delay in amending.

Finally, they pointed out that the Defendants had not even alleged that they would suffer any

prejudice with this amendment.  See Tr. at 11:17-22.

The Defendants began by arguing that the Court cannot rely simply on Davis v. Devon

Energy Corp., 2009-NMSC-048, 218 P.3d 75, where the Supreme Court of New Mexico allowed

royalty-owner plaintiffs to pursue their implied-duty-to-market claims in the face of thousands of

different leases that contained royalty provisions.  See Tr. at 15:7-19 (Sheridan); id. at 27:5-12

("And you cannot read Davis or Lyons without reading an entire body of New Mexico case law

addressing the application or the inapplication of implied in law duties in the face of express contract terms."). The Defendants asserted that, instead, the Court must look at the authority on which the Supreme Court of New Mexico relied. See Tr. at 15:7-19 (Sheridan). This authority, they contended, shows that: (i) the Plaintiffs cannot pursue their implied-duty-to-market claim without alleging unjust enrichment; and (ii) implied covenants cannot coexist with express statements. See Tr. at 15:7-20 (Sheridan)("Corbin's Treatise makes clear that in order for a court to imply in equity through purely judicial construction, an implied in law obligation on a party to a contract, there must be unjust enrichment.").

The Court then asked the Defendants how they distinguished their case from Davis v. Devon Energy Corp. See Tr. at 26:8-16 (Court). The Defendants responded that the Court could ignore the Supreme Court of New Mexico's actions in Davis v. Devon Energy Corp., because the Supreme Court of New Mexico did not make the determination that the marketable-condition rule was implied in law. See Tr. at 29:1-15 (Sheridan); id. at 34:8-24 (Sheridan). The Defendants asserted that the Supreme Court of New Mexico simply accepted the district court's conclusion that the implied duty to market and the marketable-condition rule were implied in law. See Tr. at 29:15-17 (Sheridan); id. at 34:8-24 (Sheridan); id. at 52:15-23 (Sheridan)(stating that the district court entered a summary judgment order "finding that the marketable condition rule is implied in law in New Mexico under the implied duty to market").[4] The Defendants argued that, because the Supreme Court of New Mexico did not decide whether the marketable-condition rule exists within the implied duty to market, it did not imply a new duty upon the

---

[4]While the Supreme Court of New Mexico did not determine whether the marketable-condition rule exists as part of the implied duty to market, it also did not simply rely on the district court's conclusion that the implied duty to market is implied in law. See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 27, 218 P.3d at 84. Instead, the Supreme Court of New Mexico explained at length how the implied duty to market is implied in law. See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 27, 218 P.3d at 84.

plaintiffs and therefore never considered whether any express provisions conflicted with the marketable-condition rule.  <u>See</u> Tr. at 34:8-24 (Sheridan).  They contended that here, the Plaintiffs are expanding the duty to market, so the Court's first step must be to interpret the contract.  Interpreting the contract, they alleged, would mean that the contract's express terms would override the implied duties.  <u>See</u> Tr. at 42:5-25 (Sheridan).

Although the Defendants clearly articulated that implied duties cannot override express contractual obligations, the Defendants did not demonstrate how the royalty provisions here governed the same issues that the implied duty to market governs.  They appeared to argue that the royalty provisions broadly govern all issues relating to payment, so the implied duty to market therefore cannot apply.  <u>See</u> Tr. at 16:14-17:13 (Court, Sheridan).  The Court asked whether any express contract provisions state that the lessees can base the plaintiffs' royalty payments off of prices received in affiliate sales.  <u>See</u> Tr. at 40:2-5 (Court).  The Defendants could not provide the Court with an example of a lease with such a provision.  They concluded by explaining New Mexico's public policy of furthering the ability of parties to contract freely.  <u>See</u> Tr. at 50:1-25 (Sheridan).  The Court informed both parties that, even though it was inclined to allow the Plaintiffs to amend, it would "strip out some of the allegations that the plaintiffs have in their proposed complaint, particularly ones relating to the deductions."  Tr. at 71:3-12 (Court).

## **LAW REGARDING AMENDING THE PLEADINGS BEFORE TRIAL**

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading.  <u>See</u> Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the

court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading.  Rule 15(a) provides:

>    **(a)**    **Amendments Before Trial.**
>
>>    **(1)**    **Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:
>>
>>>    **(A)**    21 days serving it, or
>>>
>>>    **(B)**    if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>>
>>    **(2)**    **Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.
>>
>>    **(3)**    **Time to Respond.**  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.);  Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.);  Burleson v. ENMR-Plateau Tele. Co-op., No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182

(1962). Furthermore, the United States Court of Appeals for the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001). See also In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile." Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. An amendment is "futile" if the pleading, "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)). The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462. Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66. "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub.

Sch., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting

Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

If a party seeks to amend his or her pleading after the time for seeking leave for pleading

amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s

requirements, he or she must satisfy rule 16(b)(4)'s good-cause requirement.  See Gorsuch, Ltd.,

B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th Cir. 2014)(Matheson, J.)

("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good

cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule

15(a) standard.").  Rule 16(b)(4) states: "A schedule may be modified only for good cause and

with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "In practice, this standard requires the

movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent

efforts.'"  Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240.  The rule

"focuses on the diligence of the party seeking leave to modify the scheduling order to permit the

proposed amendment."  Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313

(D.N.M. 2010)(Browning, J.)("Properly construed, 'good cause' means that scheduling deadlines

cannot be met despite a party's diligent efforts.").  See Gerald v. Locksley, 849 F. Supp. 2d

1190, 1209-11 (D.N.M. 2011)(Browning, J.)(same).

The Court has previously stated that its rule 16(b) good-cause inquiry focuses on the

diligence of the party seeking to amend the scheduling order.  See Walker v. THI of N.M. at

Hobbs Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.); Guidance Endodontics, LLC

v. Dentsply Int'l, Inc., No. 08-1101, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29, 2009)

(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., Nos. 02-1146 and 03-

1185, 2007 WL 2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.).  The United States District

Court for the District of South Carolina has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient
> standard contained in Rule 15(a).  Rule 16(b) does not focus on the bad faith of
> the movant, or the prejudice to the opposing party.  Rather, it focuses on the
> diligence of the party seeking leave to modify the scheduling order to permit the
> proposed amendment.  Properly construed, "good cause" means that scheduling
> deadlines cannot be met despite a party's diligent efforts.  In other words, this
> court may "modify the schedule on a showing of good cause if [the deadline]
> cannot be met despite the diligence of the party seeking the extension."
> Carelessness is not compatible with a finding of diligence and offers no reason for
> a grant of relief.

Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co., 986 F. Supp. 959, 980 (D.S.C. 1997)(citations

omitted), aff'd, 129 F.3d 116 (4th Cir. 1997).  See Denmon v. Runyon, 151 F.R.D. 404, 407

(D. Kan. 1993)(O'Connor, J.)(affirming an order denying the plaintiff's motion to amend after

the deadline which the scheduling order established had passed and stating that, "[t]o establish

'good cause,' the party seeking to extend the deadline must establish that the scheduling order's

deadline could not have been met with diligence").  Cf. SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d

1507, 1518-19 (10th Cir. 1990)(affirming, under rule 16(b), denial of a motion to amend an

answer to include a compulsory counterclaim filed three months after the scheduling order

deadline).

In In re Kirkland, 86 F.3d 172 (10th Cir. 1996), the Tenth Circuit dealt with the definition

of "good cause" in the context of rule 4(j).[5]  The Tenth Circuit noted:

---

[5]The version of rule 4(j) that the Tenth Circuit discussed in In re Kirkland was the version
in effect after the 1983 amendments to rule 4(j).  That version of rule 4(j) provided:

> If a service of the summons and complaint is not made upon a defendant within
> 120 days after the filing of the complaint and the party on whose behalf such
> service was required cannot show good cause why such service was not
> made within that period, the action shall be dismissed as to that defendant without
> prejudice upon the court's own initiative with notice to such party or upon

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

In re Kirkland, 86 F.3d at 175 (emphasis omitted)(internal quotation marks omitted)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)).  The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"   In re Kirkland, 86 F.3d at 175.

Other courts within the Tenth Circuit have held that "the 'good cause' standard primarily considers the diligence of the party . . . seeking an extension[, who] must show that despite due diligence it could not have reasonably met the scheduled deadlines.   Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."   Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan.1996)(Rushfelt, J.)(alterations in original)(internal quotation marks omitted).   The Honorable Dale A. Kimball, United States District Judge for the District of Utah, found "good cause" existed to amend his scheduling order when he decided to permit the plaintiff's counsel to withdraw as counsel.   Kee v. Fifth Third Bank, No. CIV 06-0602 DAK/PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008).   Judge Kimball reasoned: "[I]n light of the court's decision to permit [counsel] to withdraw . . . the court has determined that good cause exists for amending the existing scheduling order."   Kee v. Fifth Third Bank, 2008 WL 183384, at *1.

---

motion.  This subdivision shall not apply to service in a foreign country pursuant to subdivision (i) of this rule.

Act of Feb. 26, 1983, Pub. L. No. 97-462, 96 Stat. 2527.

## ANALYSIS

The Defendants raise several arguments that the Plaintiff's implied-duty-to-market claim would be futile and that the Court should therefore deny the Motion.  All of these arguments fail. First, in rejecting the plaintiff's implied-duty-to-market claim in Elliott Industries, the Tenth Circuit did not implicitly define the implied duty to market to exclude any obligations on the price that lessees must obtain when selling hydrocarbons, because Elliott's claim was based on cost deductions and not on low sales prices.  The Tenth Circuit's decision therefore does not preclude the Court from recognizing that the implied duty to market imposes obligations on the price that lessees must obtain.  Second, because the Defendants have not demonstrated that the implied duty to market conflicts with any express contract provisions, the Plaintiffs may amend the Complaint to include some of their allegations.  Third, the Plaintiffs' failure to allege unjust enrichment does not preclude them from pursuing their implied-duty-to-market claims. Accordingly, the Court grants the Motion in part and denies it in part.

**I.  ELLIOTT INDUSTRIES DOES NOT PREVENT THE COURT FROM RECOGNIZING THAT THE IMPLIED DUTY TO MARKET IMPOSES OBLIGATIONS ON THE PRICE THAT LESSEES MUST OBTAIN.**

Elliott Industries does not prevent the Court from recognizing that the implied duty to market imposes obligations on the price that lessees must obtain when selling hydrocarbons.  As the Court previously stated, the plaintiff in Elliott Industries "did not argue that the defendants sold the products for an unreasonably low price per hydrocarbon," so the Tenth Circuit did not consider whether the defendant had a duty to secure the highest obtainable price.  Anderson Living Tr. v. WPX Energy Prod., LLC, 2015 WL 9703298, at *22-23 (D.N.M. Dec. 31, 2015)(Browning, J.)(emphasis added).  Rather, Elliott argued that the price the defendants received for the hydrocarbons was low, because the price reflected only sixty-one percent of the hydrocarbons produced.  See Appellant's Brief-in-Chief in the Appeal from the United States

District Court for the District of New Mexico at ¶ 17, at 13, filed March 16, 2004 in CIV. No. 04-2006 ("Elliott Brief in Chief").   The Defendants rely on a few sentences in the Elliott Industries' plaintiff's appellate brief to assert that Elliott "contend[ed] that the defendants had sold the hydrocarbons at unreasonably low prices."  Response at 7.  The Defendants take these sentences out of context, without observing the substantial material differences between Elliott's claim and the Plaintiffs' claim here.

The situation in Elliott Industries differed in important ways.  The Court will thoroughly describe these differences to explain why the Tenth Circuit did not consider the situation at issue in this case and how its opinion does not preclude the Court from recognizing that the implied duty to market imposes obligations on the price that lessees must obtain.  In Elliott Industries, the lessee defendants sold the refined products downstream and based Elliott's royalty off of that downstream price.[6]  The defendants therefore "based the plaintiffs' royalties on the price of the refined product sales, which were sold in arm's length transactions.  Accordingly, the Tenth Circuit could assume that the defendants would sell the products for the highest obtainable price, because their profits depended upon a high sales price as well."  Anderson Living Tr. v. WPX Energy Prod., LLC, 2015 WL 9703298, at * 22.

To derive the starting figure on which Elliott's royalties were based, however, the defendants deducted thirty-nine percent of the NGLs off the top as their processing fee, and then sold the sixty-one percent remaining and based Elliott's royalty off of the money received in that

---

[6]Under the "net-back" accounting method, "value at the point of valuation is determined by taking the downstream sales price and deducting from it the costs incurred by the working interest owner [] to move the gas from the point of valuation to the actual point of sale."  Anderson Living Tr. v. WPX Energy Prod., LLC, 2015 WL 9703298, at *22 (quoting Elliott Industries, 407 F.3d at 1100 n.2).

sale.[7]  The starting figure in the royalty calculation was low, therefore, because it represented only a fraction of the NGLs produced: The "volumes of NGLs on which [the defendants] paid [the plaintiff's] royalties represented only 61% of the NGLs recovered from their gas."  Elliott Brief in Chief ¶ 17, at 13.  Accordingly, the only reason Elliott argued that the defendants began its royalty calculation with "depressed prices" is because the calculation began by using sixty-one percent of the NGLs produced.  Although Elliott asserted that the defendants "fail[ed] to pay the Plaintiff and Plaintiff Class the best price or value reasonably possible under the circumstances," it did not allege, as the Plaintiffs do here, that the defendants sold the hydrocarbons at a low price per hydrocarbon through affiliate sales.  Compare Second Amended Complaint and Jury Demand ¶ 52, at 15-16, filed August 14, 2000 (Doc. 24 in CIV. No. 00-0655)("Elliott SAC")(alleging that the defendants breached the implied duty to market by deducting thirty-nine percent of the NGLs and then basing the plaintiff's royalty payment off of that number), with ConocoPhillips Complaint ¶ 51, at 17 (alleging that ConocoPhillips' non-arm's-length transactions "resulted in Plaintiffs receiving a small value per mcf of gas, liquids, condensate and/or other hydrocarbons sold" (emphasis added)).  Instead, Elliott alleged that the defendants did not pay the best price, because they calculated its royalty off of only sixty-one percent of the NGLs.

---

[7]Elliott described how the allegedly low NGL valuation was based on the lower NGL volumes: "The price reflected for each of the natural gas liquids (NGLs) were multiplied by Conoco's processing fee volumes (1/2 of 39% (converted to barrels)) of each product taken each year by Defendants . . . ."  Elliott Indus. Ltd. P'ship v. Conoco Inc., CIV No. 00-0655, Affidavit of Roy W. Williams ¶ 3, at 2, filed August 2, 2002 (Doc. 459-3)(cited in Elliott Indus. Ltd. P'ship v. Conoco Inc., CIV No. 00-0655, Plaintiff Class's Reply in Support of Motion for Partial Summary Judgment on Liability as to Third and Fourth Claims for Relief at 6, filed August 2, 2002 (Doc. 459)).  Conoco then calculated the actual cost of processing using expense reports plus depreciation and return on investment.  Elliott therefore alleged that the defendants violated the implied duty to market not by failing to sell the hydrocarbons at the highest reasonable price, but by impermissibly deducting costs.

Here, on the other hand, the Plaintiffs allege that the Defendants sell raw gas at low prices per hydrocarbon to affiliate producers and base the Plaintiffs' royalties off of that sale. See TAC ¶¶ 36-37, at 23.   Elliott did not allege that the defendants undervalued the hydrocarbons upstream, then sold them for a higher price downstream, like the Plaintiffs do here. See Elliott SAC ¶¶ 76-77, at 20 (arguing that the defendants were unjustly enriched because the defendants charged the plaintiff "with excessive and unreasonable processing and marketing fees and retain[ed] the value associated with such fees for themselves").   Elliott's argument that the defendants undervalued the hydrocarbons was a deductions claim.[8]

Elliott's lower court filings substantiate that its claim is a deductions claim, meaning that the Tenth Circuit never considered whether the implied duty to market imposes price obligations upon lessees.  See Elliott Indus. Ltd. P'ship v. Conoco Inc., CIV No. 00-0655, Motion for Partial Summary Judgment as to Third and Fourth Claims for Relief at 1, filed June 20, 2002 (Doc. 381)(asserting that the implied duty to market "mandate[s] that Defendants are under a duty to charge only and not more than their actually-incurred and reasonable processing costs against the royalties due to the Class"); Elliott Indus. Ltd. P'ship v. Conoco Inc., CIV No. 00-0655, Memorandum in Support of Motion for Partial Summary Judgment as to Third and Fourth Claims for Relief at 1, filed June 20, 2002 (Doc. 382)("Memo for Summary Judgment")(seeking "a ruling as a matter of law that, to the extent Defendants are able to charge *any* processing costs at all to Class members, they cannot charge more than their *actually-incurred* and *reasonable*

---

[8]To illustrate using a highly simplified example, assume that the Elliott Industries defendants could sell the NGLs for $1.00 per NGL and that the wells produced 100 NGLs.  The defendants could therefore sell all the NGLs for $100.00.  Because the defendants calculated Elliott's royalty using the net-back method, Elliott would be entitled to its proportionate share of the $100.00, less certain production-related costs.  Elliott alleged, however, that the defendants failed to obtain the best price on which to calculate his royalty by first deducting thirty-nine percent of the NGLs, and then determining Elliott's proportionate share of the remaining $61.00. Elliott's claim, therefore, was that the defendants improperly deducted certain costs.

costs"). Elliott summarized its implied-duty-to-market claim in one sentence: "The Class has requested a legal ruling on a very straightforward, well-accepted legal proposition: that Defendants, who are under an obligation to the Class to make royalty payments and who own and control all gas processing functions, cannot deduct more than their actual and reasonable processing costs from royalties." Elliott Indus. Ltd. P'ship v. Conoco Inc., CIV No. 00-0655, Plaintiff Class's Reply in Support of Motion for Partial Summary Judgment on Liability as to Third and Fourth Claims for Relief, filed August 2, 2002 (Doc. 459)("Reply to Summary Judgment"). See id. at 10 (stating that "the Class may utilize the doctrine of the implied duty to properly and reasonably limit the amount of processing costs that may be deducted from royalties"). Finally, and perhaps most notably, Elliott argued that the issue before the court on the implied duty to market was limited to questions related to cost deductions. See Reply to Summary Judgment at 2. It stated: "[T]he issue is: *if Defendants are going to make deductions for their processing costs, those costs need to be actually incurred and reasonable.*" Reply to Summary Judgment at 2. All of Elliott's filings make clear that it contended that the defendants underpaid its royalties by virtue of retaining a thirty-nine percent processing fee, as the defendants had admitted to paying royalties "net of the 39% Processing fee." Memo for Summary Judgment at 5. Any argument that the defendants did not obtain the highest reasonable price relates to Elliott's contention that the defendants retained thirty-nine percent of the hydrocarbons.[9]

_____

[9]The Court observes that Elliott's antitrust claim could also be construed to allege that the defendants sold the gas at low prices. In the antitrust claim, Elliott alleged that the defendants, who jointly owned the processing plant, "conspired to illegally fix the price charged to the Plaintiff and the Plaintiff Class for processing gas in the San Juan Basin." Elliott SAC ¶ 84, at 24. Elliott argued that this alleged conspiracy depressed the wellhead price of "gas produced in the San Juan Basin by charging the Plaintiff and the Plaintiff Class an exorbitant 39% fee for the processing of such gas." SAC ¶ 85, at 24. Notably, Elliott did not contend that the defendants

In sum, although Elliott asserted that the defendants began its royalty calculation with low prices, it argued that the low prices resulted from impermissible cost deductions, and not from low sales prices per hydrocarbon. Sales prices did not form the basis of Elliott's claim; cost deductions did. Because Elliott's argument was based on cost deductions, the Tenth Circuit did not consider whether the implied duty to market imposes obligations on the price lessees must obtain when selling hydrocarbons. Accordingly, when the Tenth Circuit rejected Elliott's arguments, it did not implicitly define the implied duty to market to exclude any obligation to secure the highest reasonable price. As an additional matter, the Tenth Circuit in other decisions has acknowledged that New Mexico courts may imply a covenant into mineral leases to market minerals at the highest price obtainable when the implied duty does not contradict a lease's express terms. See Kerr-McGee Corp. v. Bokum Corp., 453 F.2d 1067, 1073 (10th Cir. 1972).

---

conspired with upstream affiliate purchasers to sell the hydrocarbons at an artificially low upstream price, then conspire with downstream purchasers to sell the hydrocarbons at a higher price. Nor did Elliott assert that the defendants depressed the refined product price, on which their royalties were based, by virtue of affiliate sales; the depression was based on the "exorbitant 39% fee." SAC ¶ 85, at 24. The Tenth Circuit therefore had no reason to assume that the defendants would sell the refined products at an artificially low price. The Tenth Circuit acknowledged the nature of Elliott's claims when it stated that Elliott had not alleged that the defendants conspired to sell the refined products at artificially low prices, such that Elliott's resulting royalty payments were reduced. See 407 F.3d at 1125. It described Elliott's allegation as asserting that the defendants "improperly calculate[ed] the royalty payment due Elliott -- either by charging an unreasonable fee for a legitimate post-production cost or by charging a fee for an illegitimate post-production cost." 407 F.3d at 1125.

Again, therefore, Elliott's allegation that the defendants did not obtain the highest price was a deductions argument. Here, the Plaintiffs allege what Elliott did not: that the Defendants depressed the price on which their royalties were based by virtue of affiliate sales. Had the Tenth Circuit considered a situation in which the plaintiffs argued that the sale did not obtain the highest price per hydrocarbon, not because of deductions, but because of affiliate sales, it could have concluded that the defendants did not comply with the implied duty to market.

.

## II.    THE PLAINTIFFS MAY AMEND THEIR COMPLAINT TO MAKE SOME OF THE NEW ALLEGATIONS.

The Plaintiffs may amend the Complaint in part.  Because the Court already has dismissed some of the Plaintiffs' allegations, the Plaintiffs must abandon these allegations.  In particular, the Plaintiffs allege that the Defendants violate the implied duty to market by taking certain cost deductions.  See TAC ¶ 73, at 35-36.  The Court has held that New Mexico does not recognize the marketable-condition rule prong of the implied duty to market, which relates specifically to cost deductions.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 424-35.  The Court's recent decision denying the Motion to Reconsider in WPX does not change its prior conclusion.  Accordingly, any new allegations that the Defendants violate the implied duty to market through cost deductions are futile.  The Court would have to summarily dismiss them.  See Fed. R. Civ. P. 15(a).  Accordingly, the Plaintiffs cannot amend the Complaint to include the following allegations, which all assert that the Defendants violate the implied duty to market through cost deductions:

(a) Charging Plaintiffs a share of the New Mexico Natural Gas Processor's Tax.  See TAC ¶ 73(a), at 35;

(b) Assessing "the expenses, including mainline transportation reservation fees, it incurs for its own purchased gas against the value it pays to Plaintiffs and Class Members." TAC ¶ 73(b), at 35;

(c) Improperly using and permitting third parties to use (i.e., deducting) "gas produced from Plaintiff's wells."  TAC ¶ 73(c), at 35-36;

(d) "[F]ailing to credit revenues to Plaintiffs that represent the value of the produced drip condensate" from wells subject to their royalty interests.  TAC ¶ 73(d), at 36;

(e) "[P]aying Plaintiffs and the Class Members royalties based on a weighted average system in which ConocoPhillips averages sales of its own purchased gas with the gas produced from Plaintiffs' and the Class Members' well."  TAC ¶ 73(e);

(f) "[C]harging the Plaintiffs and Class Members interest on the cost of transporting ConocoPhillips' own purchased gas."  TAC ¶ 73(f), at 36.

These allegations use different language to repeat the same allegations that the Plaintiffs' First Amended Complaint for Underpayment of Oil and Gas Royalties, filed January 12, 2012 (Doc. 1-1)("First Amended Complaint"), alleges.  The First Amended Complaint's implied-duty-to-market claim alleges that the Defendants underpay royalty "as a result of deducting the cost (or in excess of the cost) of gathering, treating, compressing, processing and other expenses incurred in order to make the gas and other hydrocarbons, used or sold from the class well, marketable."  First Amended Complaint, ¶ 50, at 15.  The Court dismissed this deductions claim under Elliott Industries.  See Anderson Living Tr. v. WPX Energy Prod., 2015 WL 9703298, at *21-28.  Again, when the Plaintiffs recharacterized their implied-duty-to-market claim in the ConocoPhillips Complaint, the Court dismissed the allegations, because they once more argued that the Defendants impermissibly deducted certain costs from their royalties.  See ConocoPhillips Complaint, ¶ 98, at 30-31 (asserting that "certain expenses and deductions have been made against the Plaintiffs' and Class Members' share of revenues," and that "some of the expenses so charged were not actually incurred by ConocoPhillips, but in fact, were in excess of both reasonable expenses and the actual costs of such service(s)"); id. ¶ 99, at 31 ("ConocoPhillips has used intercompany transactions and/or contracts with affiliate companies to impose unreasonable expenses and deductions and/or for services not actually incurred.").

The above-listed portions of the Plaintiffs' TAC similarly argue that the Defendants underpay royalties by virtue of taking deductions and charging the Plaintiffs with excessive costs.  The biggest difference between the former claims and the current assertions is that now, the Plaintiffs allege which specific costs and deductions the Defendants took.  For instance, charging the Plaintiffs with a share of certain taxes and "transportation and reservation fees" is a straightforward deductions claim.  TAC ¶ 73(a)-(b), at 35.   Deducting a portion of the fuel by allowing third parties to use it again constitutes a deductions argument.  See TAC ¶ 73(c), at 35-36.  Failing to pay the Plaintiffs for all of the drip condensate mirrors Elliott's argument that the defendants did not base the plaintiff's royalty off of 100% of the NGLs.   In other words, it similarly argues that the Defendants deducted a portion of the hydrocarbons.  See TAC ¶ 73(d). As for the Plaintiffs' argument that the Defendants violate the duty to market by paying royalties using a weighted average calculation method, they recognize in other portions of their TAC that this argument is a deductions argument.   TAC ¶ 11, at 12 (arguing that the Defendants' comingling of sales proceeds from other wells results "in the Plaintiffs receiving an 'average' or 'pooled' price and 'average' cost deductions applied to their wells' production").   Finally, charging the Plaintiffs "interest on the cost of transporting ConocoPhillips' own purchased gas" again asserts a claim that the Defendants charged them with improper costs and deductions.  See TAC ¶ 73(f).  These new allegations would therefore be futile and the Court will not allow the Plaintiffs to include them in the TAC.

The Court will allow the Plaintiffs to amend the Complaint to include the remaining allegations, because these allegations: (i) do not prejudice the Defendants; (ii) are made without undue delay; and (iii) fit within New Mexico's implied duty to market.  See Foman v. Davis, 371 U.S. at 182 (holding that, in the absence of an apparent reason such as "undue delay, bad faith or

dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," courts should freely grant leave to amend); Curley v. Perry, 246 F.3d at 1284; (stating that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

To demonstrate how the remaining claims fit within New Mexico's implied duty to market, the Court will first clarify New Mexico's implied duty to market.  As the Tenth Circuit has defined New Mexico's implied duty to market in Elliott Industries, it does not include the marketable-condition rule.  See Elliott Industries, 407 F.3d at 1113.  Consequently, any argument that the Defendants violate the implied duty to market through deductions is untenable.  The implied duty to market has another component, however.  The duty requires lessees to secure the best reasonable sales price for gas being marketed.  See Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d 280, 284 (Tex. App. 1979)(concluding that the lessee breached the implied duty to market, even though it paid royalties based on the amount received pursuant to the lessors' lease agreements, because it did not obtain the best possible price); Bruce M. Kramer & Chris Pearson, The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's, 46 La. L. Rev. 787, 812 n.151 (1986).

The duty to obtain the best reasonable sales price is distinct from any duty to physically develop and market the product, but both are a part of every state's duty to market, even though New Mexico has not expressly stated so.  See Cabot Corp. v. Brown, 754 S.W.2d 104 (Tex. 1987)(stating that the implied duty to market is "two-pronged: the lessee must market the production with due diligence and obtain the best price reasonably possible"); Smith v. Amoco Prod. Co., 31 P.3d 255, 272 (Kan. 2001)(explaining that the "implied covenant to market pricing

obligation . . . is contained within its duty to act at all times as a reasonably prudent operator"); El Paso Nat. Gas Co. v. Am. Petrofina Co., 733 S.W.2d 541, 550 (Tex. App. 1986); 6 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 60.3, at 138 (1991 & Cum. Supp. 2002)(dividing the marketing duty into "situations where product is not marketed and those where it is marketed"); Byron C. Keeling & Karolyn King Gillespie, The First Marketable Product Doctrine: Just What is the "Product"? 37 St. Mary's L.J. 1, 11 (2005)(observing that the implied duty to market "embrace[s] two distinct elements – a 'timing' element and a 'pricing' element," and that, under the "pricing" element, the lessee owes a duty to market its production at the best reasonable price).  Along the same lines, the duty to obtain the best reasonable price is separate from the duty not to deduct post-production costs.  See Scott Lansdown, The Implied Covenant to Market: A Few Years Later, 4 Tex. J. Oil Gas & Energy L. 299, 334 (2008-09)("The Implied Covenant to Market").

The duty to market's obligation to obtain the best price serves to ensure that lessees do not unfairly enter into contract terms that would reduce the lessor's royalty payments in situations where "the amount of the royalty depends upon the price at which the product is marketed."  El Paso Nat. Gas Co. v. Petrofina Co., 733 S.W.2d 541, 550 (Tex. App. 1986).  See Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d at 284.  For instance, if a lease requires a lessee to pay the lessor's royalty on a proportional share of the "proceeds" that the lessee receives for its production, the lessee could not simply sell its oil or gas to any potential purchaser on any terms whatsoever.  See Martin v. Glass, 571 F. Supp. 1406, 1410 (N.D. Tex. 1983)(Belew, J.); Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d at 284 (concluding that the lessee breached the implied duty to market, even though it paid royalties based on the amount received pursuant to the lessors' lease agreements, because it did not obtain the best possible

- 28 -

price).  Instead, it must sell for the "best price reasonably possible."  Cabot Corp. v. Brown, 754

S.W.2d at 106.  See Craig v. Champlin Petroleum Co., 300 F. Supp. 119, 125 (W.D. Okla.

1969)(Bohanan, J.), rev'd on other grounds, 435 F.2d 933 (10th Cir. 1971).

The implied duty to market's requirement that the lessee must obtain the best price

reasonably possible protects lessors in a variety of situations.   For instance, royalty

underpayment can result when the lessee "sells" the products to its affiliate at one low price, but

then the affiliate sells the products in a true arm's-length sale at a much higher price than the

shift in the point-of-sale can explain.  See Texas Oil & Gas Corp. v. Hagen, 683 S.W.2d 24 (Tex.

App. 1984), aff'd in part, 1987 WL 47847 (Tex. 1987), judgment set aside by 760 S.W.2d 960

(Tex. 1988)(setting aside the judgment because the parties settled the case).  In Texas Oil & Gas

Corp. v. Hagen, a lessee sold its production to its wholly owned subsidiary, who sold it for a

significantly higher amount downstream in an arm's-length transaction.  See 683 S.W.2d at 27.

The Sixth Court of Appeals of Texas sustained the district court's finding that the lessee's sales

were a "sham," and that the lessee "used that arrangement and its relationship with its wholly

owned subsidiary to create an unfair device to deprive plaintiffs of their rightful royalties."  683

S.W.2d at 28.  In an opinion later withdrawn after the parties settled the case, the Supreme Court

of Texas agreed that, "[i]n light of the fact that the purchaser was a subsidiary, . . . [the lessee]

has failed to act as a reasonably prudent operator would have acted under the same or similar

circumstances."  1987 WL 47847, at *3.

Likewise, sham transactions may enable lessees to pay royalties on low prices, even

when the prices appear to be objectively measured.  In In re Lease Oil Antitrust Litigation (No.

II), 186 F.R.D. 403 (S.D. Tex. 1999)(Jack, J.), large national oil companies sold each other oil at

prices that each company internally computed and then published.  See 186 F.R.D. at 411-13.

See also Duhe v. Texaco, Inc., 779 So. 2d 1070 (La. Ct. App. 2001)(involving a substantially similar situation).  Although the transactions appeared to be arm's-length, the oil companies had allegedly entered into unwritten oral agreements that allowed them to base royalty payments off of low prices, then sell the oil for a higher, true market price in competitive market centers.  See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. at 411-13.  The proof that the lessees were allegedly not obtaining the highest price was that the listed prices sat far below actual market values downstream.  See 186 F.R.D. at 411-13.  In those market centers where numerous companies bought and sold oil, trading prices were significantly higher than the listed prices upstream; transportation costs could not explain the price discrepancies.[10]  See 186 F.R.D. at 411-13.  Requiring these lessees to secure the best price possible on the sales on which they pay the lessors' royalties protects the lessors from this type of situation.

Even for market-value leases, the implied duty to market requires lessees to get the best price.  The reason for implying the duty to market into market-value leases is again to protect the lessee from self-dealing transactions.  In competitive markets, a lessee who is not engaged in

---

[10]The Honorable Janis Jack, United States District Judge for the Southern District of Texas, provided a simplified example to illustrate the complicated situation:

> Suppose the NYMEX market price for WTI at Cushing is $15/barrel, that the value of moving the oil from the lease to Cushing is $1/barrel, and that the operator's posted price is $13/barrel.  On a particular day, the operator, an integrated oil company, produces 8 barrels on the lease and transports it to its refinery.  The class member, a royalty owner with a 1/8 interest in the production, is entitled to one barrel on this day.  The operator pays the posted price of $13 for the barrel, but the class member asserts that he should be paid $14 because, considering the price for oil at Cushing ($15) and the value of transportation ($1), he believes that $14 is the actual market value of the oil at the lease.  In short, the defendant wants to rely on its posted price, but the class member wants to rely on a price calculated by using the NYMEX price as the starting benchmark.

In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. at 411.

self-dealing should rationally seek the best price for oil and gas "comparable in time, quality, quantity, and availability of marketing outlets." Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d 69, 71 (Tex. 2003)(citing Heritage Res., Inc. v. Nationsbank, 939 S.W.2d 118, 122 (Tex. 1996)). As the gas supply counteracts with various purchasers' demand, the price generated is the market value. See John Burritt McArthur, A Minority of One? The Reasons to Reject the Texas Supreme Court's Recent Abandonment of the Duty to Market in Market-Value Leases, 37 Tex. Tech L. Rev. 271, 301 (2005)("A Minority of One"). Accordingly, when a fairly robust market exists, the starting point for determining market value should typically be the price received in an arm's-length sale. Compare Heritage Res., Inc. v. Nationsbank, 939 S.W.2d at 122 (observing that, when comparable sales are unavailable, courts can use the netback method of "subtracting reasonable post-production marketing costs from the market value at the point of sale").

Without a robust market with numerous buyers and sellers, however, a competitive market price can be difficult to establish. See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. at 410-11 (describing how a posted price may be "less than the oil's fair market value").[11] In a market that one major producer and its affiliates dominate, the lessee's sales of production can affect the market value, because market value is based on contemporaneous transactions. Similarly, where a lessee can sell its production in a price-regulated environment, its actions can affect the regulated price. See Shelton v. Exxon Corp., 719 F. Supp. 537 (S.D. Tex. 1989), aff'd in part and rev'd in part, 921 F.2d 595 (5th Cir. 1991); Smith v. Amoco Prod. Co., 31 P.3d at

---

[11]The Court recognizes that commodities are increasingly traded at more competitive market centers with prices that trade journals publish. See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. at 411. However, in less competitive locations where affiliate-sales transactions dominate, a competitive market price may not always exist. See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. at 411.

270-71.  Most importantly, when a lessee simply fails to make reasonably prudent efforts to market the gas, the implied duty to market compels the lessee to market the gas.  In these situations, lessors need the implied duty to market's protections, even in market-value leases.  See Lansdown, The Implied Covenant to Market, supra, at 311 (agreeing that, when lessees' action can affect the market value, the implied covenant to market should apply).

Lessors enter into leases with oil companies largely because they lack the expertise and equipment to produce minerals on their own.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 426-27 (describing other states' recognition that lessors lack bargaining power in oil-and-gas leases); Garman v. Conoco, Inc., 886 P.2d 652, 657 (Colo. 1994)(noting that lessors must defer to lessees regarding "where and when to drill, the formations to be tested and ultimately whether to complete a well and establish production").  For this same reason, lessors lack the sophistication to ascertain market prices for the minerals produced from their land.  See Garman v. Conoco, Inc., 886 P.2d at 426 ("The payment of royalties is controlled by lessees, and lessors have no ready means of ascertaining current market value other than to take lessees' word for it.").  They will not know if lessees' affiliate-sales transactions are influencing the market price or whether a nearby market hub would pay a higher price for the same products.  They will therefore be unable to effectively monitor the lessees and maintain accountability.  See Wood v. TXO Prod. Corp., 854 P.2d at 882-83 (describing the discrepancy in bargaining power between lessors and lessees in oil-and-gas leases).  Even for those royalty owners with sufficient knowledge and market sophistication, their small interests would not likely justify the large expense of suing a major oil company.  Compare Lansdown, The Implied Covenant to Market, supra, at 308 (asserting that, in the case of arm's-length transactions, if a "royalty owner does not believe that the price received by a lessee is sufficiently high," the royalty owner can research

- 32 -

nearby gas sales to argue that the amount the lessee received does not represent the true market value).  Imposing an implied duty to obtain the highest price, even in market-value leases, takes steps to prevent this injustice.

A comparable self-dealing situation arose in Union Pacific Resources Group, Inc. v. Hankins, where the lessee sold gas to its affiliate at one set of indexed prices, then almost immediately sold the gas to truly independent buyers at higher prices.  See 111 S.W.3d at 70.  The lessee structured its operations so that affiliates received the higher price rather than itself, because it had to pay royalties on the price that it received.  See 111 S.W.3d at 70.  The higher prices the lessee's affiliate receives serves as evidence that the true market price is higher than the price used to pay royalties.[12]  Similarly, in Duhe v. Texaco, 779 So. 2d 1070 (La. Ct. App.

---

[12]The Honorable Thomas R. Phillips, Justice of the Supreme Court of Texas, reasoned that the lessee's affiliate might obtain a higher price "simply through extraordinary negotiation and sales efforts that exceeded the results reasonably obtainable by an ordinary lessee."  Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d at 75.  Justice Phillips, however, provided no evidence showing that "extraordinary effort" could produce a strikingly higher price.  Furthermore, he did not explain why the lessor should not share in the benefits of the lessee's expertise in marketing, just as the lessor shares in the benefits of the lessee's exploration and development expertise.  The Court has previously predicted that the Supreme Court of New Mexico would conclude that lessors should share in the benefits of the lessee's expertise.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 2015 WL 3543011, at *42 (D.N.M. May 26, 2015)(Browning, J.).  The Court stated:

> The Court believes that, when the Supreme Court of New Mexico determines that the existence of the marketable condition rule is ripe for review, it will find the reasoning of Colorado, Kansas, Oklahoma, and Wyoming more persuasive than that of Texas.  Like Kansas and Colorado, which construe oil-and-gas leases against the lessees, the Supreme Court of New Mexico has established a "rule that an oil and gas lease is to be construed most strongly against the lessee."  Greer v. Salmon, 82 N.M. 245, 250, 479 P.2d 294, 299 (1970).

Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 426.  This reasoning similarly applies to this situation.  The Court therefore concludes that the Supreme Court of New Mexico would likely not follow the Supreme Court of Texas' determinations that: (i) lessees need not share the benefits of the their marketing expertise with lessors; and (ii) lessees and lessors have

2001), Texaco allegedly paid royalties based on a "posted" price on which it sold the oil to its affiliate.  The affiliate then resold the oil at a higher rate.  <u>See</u> 779 So. 2d at 1082.  The plaintiffs alleged that Texaco breached the implied duty to market, because the posted price was lower than market value.  <u>See</u> 779 So. 2d at 1082.  The Court of Appeal of Louisiana recognized: "Encompassed within the lessee's duty to market diligently is the obligation to obtain the best price reasonably possible."  779 So. 2d at 1082.  The Court of Appeal of Louisiana concluded that all class members had a common allegation that Texaco violated the duty to market by failing to obtain the highest price reasonably possible in their market-value leases.  <u>See</u> 779 So. 2d at 1082.

The Defendants assert that the "best price obtainable" includes a reasonableness component.  The Court agrees with this assessment.  Determining the highest or best obtainable price[13] requires ascertaining what a reasonably prudent operator would do in the same situation in marketing its oil.  <u>See</u> <u>Watts v. Atl. Richfield Co.</u>, 115 F.3d 785, 794 (10th Cir. 1997)(stating that, although a producer has a duty "to obtain the best price and terms available" under Oklahoma's implied duty to market, the producer need only exercise "that degree of diligence exercised by a prudent operator having regard for the interests of both the lessor and lessee"); <u>Cabot Corp. v. Brown</u>, 754 S.W.2d 104, 106 (Tex. 1987)(requiring the lessee to "market the production with due diligence and obtain the best price reasonably possible"); <u>Duhe v. Texaco</u>,

_____

equal bargaining power, diminishing the need to protect lessees through the implied duty to market.

[13]The "highest price" is different from the "highest <u>obtainable</u> price" or the "best price <u>available</u>."  Courts have recognized that the best obtainable or available price differs, because it encompasses an understanding that highest absolute price may not be available or obtainable in all factual circumstances in which the lessee must market the product.  <u>See</u> <u>Smith v. Amoco Prod. Co.</u>, 31 P.3d 255, 271 (describing the difference between the "<i>best</i> price" and the "best price <i>possible</i>, or stated another way, the best available price").

779 So. 2d at 1982 (describing Louisiana's implied duty to market as requiring the lessee to obtain "the best price reasonably possible").  In other words, the best price, or the highest obtainable price, is the price that the lessee could reasonably attain under existing market conditions.  It does not impose upon lessees a duty to get the highest price in a vacuum.  See Smith v. Amoco Prod. Co., 31 P.3d at 271-72 (explaining that, courts should determine whether a lessee complies with the duty to market with reference to the facts and circumstances surrounding the sale under the reasonably prudent operator standard); Judith M. Matlock, Payment of Gas Royalties in Affiliate Transactions, 48 Inst. on Oil & Gas L. & Tax'n § 9.06[3], at 9-48 (1997).  The above cited authority demonstrates, however, that in marketing the product, a reasonably prudent operator will get the best price possible under the circumstances so that operators cannot pay royalties at below market prices.[14]  See 5 Howard Williams & Charles Meyers, Oil & Gas Law §§ 806-08 (2001).

    In conclusion, the Plaintiffs may amend the Complaint to include the remaining allegations.  The Plaintiffs' remaining allegation in their implied-duty-to-market claim, see TAC ¶ 73(g), states a claim that would not be futile: they allege that the Defendants breached the duty by failing to sell the gas for the best possible price, because the Defendants based the royalties off of non-arm's length sales.  See Fed. R. Civ. P. 15(a); Curley v. Perry, 246 F.3d at 1284 (stating that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim).  Moreover, the Defendants have not asserted that amendment would be

---

[14]The Court will scrutinize non-arm's-length transactions more closely than ordinary sales.  In independent transactions, the Court can rely on the market price or the proceeds received as reliable evidence.  In self-dealing cases, the Court's inquiry will be more searching. See Howell v. Texaco Inc., 112 P.3d 1154, 1160 (Okla. 2004)("When the actual value is not obtainable because of a producer's self-dealing, the courts will carefully scrutinize the transactions on which the royalty payments are based."); Robbins v. Chevron U.S.A, Inc., 785 P.2d 1010, 1015 (Kan. 1990)(cautioning courts from "second-guessing an operator's marketing decision" when there is "no conflict of interest between lessor and lessee").

prejudicial or that the Plaintiffs' Motion is untimely.  See Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. at 182.  As the amendment is within the time to amend the pleadings, there is no undue delay.  Consequently, the Plaintiffs meet rule 15(a)'s standard to amend the Complaint.

### III.   THE IMPLIED DUTY TO MARKET CAN COEXIST WITH THE PLAINTIFFS' ROYALTY PROVISIONS.

The Defendants assert that the Court cannot imply duties in equity that alter the parties' agreement.  See Response at 8-9.  They contend that the contracts' provisions expressly govern the Defendants' obligations, so the implied duty to market cannot alter these agreements.  See Response at 9.  Accordingly, they argue that the Court should deny the Motion, because the Plaintiffs' implied-duty-to-market claim is futile.  See Response at 9-10.  The Defendants base their claim on the Supreme Court of New Mexico's holding in Continental Potash, Inc. v. Freeport McMoran, Inc., 1993-NMSC-039, ¶ 67, 858 P.2d 66, 83 ("Continental Potash").  There, the Supreme Court of New Mexico stated that, "when the contract between the parties speaks to the obligation sought to be implied, courts will not write that implied obligation into the contract."  Continental Potash, Inc. v. Freeport McMoran, Inc., 1993-NMSC-039, ¶ 57, 858 P.2d 66, 80.  The Defendants use this case to argue that the implied duty to market cannot apply here, where the contracts' express provisions govern how the Defendants will pay royalties.  See Response at 9.

Sixteen years after Continental Potash, in Davis v. Devon Energy Corp., 2009-NMSC-048, 218 P.3d 75, the Supreme Court of New Mexico clarified that Continental Potash's holding is "inapplicable to a determination of whether the marketable condition rule[15] may be implied in

---

[15]As described above, the marketable-condition rule is a corollary of the implied duty to market.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 6, 218 P.3d 75, 78; Anderson Living Tr. v. WPX Energy Prod., LLC, 306 F.R.D. at 423.  Accordingly, the Supreme Court of New Mexico's statements are informative on the implied duty to market's implication.

each royalty agreement."  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 218 P.3d at 86.

It explained that the implied duty to market is a covenant implied in law into every agreement.

See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶¶ 29-35, 218 P.3d at 83-86 (stating that

"Continental Potash . . . does not apply to covenants that impose legal duties upon contracting

parties as a matter of law"); id., 2009-NMSC-048, ¶ 35, 218 P.3d at 86 (stating that courts imply

the implied duty to market "on oil and gas producers in equity, without looking to the language

of the agreements or other evidence of the parties' intentions").   "Absent inconsistent express

lease provisions, this marketing duty arises under any lease in which royalty is payable in kind or

is based on the value of a fraction of the mineral produced."  Patrick H. Martin & Bruce M.

Kramer, 5 Williams & Meyers, Oil and Gas Law, § 853 at 394 (2005).  In other words, the

implied duty to market is implied in law into all leases absent express lease provisions that

govern the same subject matter.

That the lease instruments govern how the Defendants must pay royalties does not

necessarily mean the implied duty to market cannot similarly exist in the parties' agreement.  See

Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 37, 218 P.3d at 86.[16]  In Davis v. Devon

Energy Corp., the Supreme Court of New Mexico allowed the royalty-owner plaintiffs to pursue

claims for breach of the implied duty to market alongside their breach-of-contract claims.  See

Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 10, 218 P.3d at 79 (observing that the

plaintiffs alleged breach-of-contract claims); id. 2009-NMSC-048, ¶ 6, 218 P.3d at 79 (noting

---

[16]In the Defendant's Second Notice of Supplemental Authority, filed February 28, 2016 (Doc. 175)("Second Supplemental Authority"), the Defendants argue that the Court should not rely on Davis v. Devon Energy Corp. here, because the Supreme Court of New Mexico did not specifically consider the issues the Court addresses now.  See Second Supplemental Authority at 1-2.  Even though the Supreme Court of New Mexico's actions in Davis v. Devon Energy Corp. support the Court's holding here, the Court also concludes that, even in Davis v. Devon Energy Corp.'s absence, the Supreme Court of New Mexico would determine that a lease's pricing clause does not conflict with the implied duty to market's obligation to obtain the best price.

that the plaintiffs "offer a number of theories purporting to grant them relief," each founded upon the same "allegation that the Defendants have breached the royalty agreements by deducting from their royalty payments the costs of making the CBM gas 'marketable'"). Even though all leases contained royalty provisions that governed the royalty payment method, the Supreme Court of New Mexico did not conclude that implied duties could not coexist with royalty provisions. See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 26, 218 P.3d at 83 ("[T]here are at least nineteen different variations [of royalty provisions] in *Davis*, thirty-four variations in *Ideal*, and an undetermined number of variations in *Smith*."). In fact, it stated that "the provisions of each royalty agreement are irrelevant to the implication of the marketable condition rule in each contract because the district court is imposing a legal duty on Defendants."[17] Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 36, 218 P.3d at 86 (emphasis added). The plaintiffs argued that no express provisions -- including the royalty provisions -- contradicted the implied duty to market, asserting that none of the lease and royalty instrument language expressly allowed deductions to make the products marketable. See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 7, 218 P.3d at 79.

Although the Davis v. Devon Energy Corp. plaintiffs' individual contracts all included provisions governing royalty payments, the Supreme Court of New Mexico nonetheless allowed

---

[17]Despite the plain language, the Court does not understand this sentence to mean that implied duties can alter express contractual agreements. Even the Plaintiffs do not take this position. See Tr. at 10:8-11 (Brickell)(asserting that implied covenants cannot govern when an express provision "on that very topic or very exact substance" exists). Instead, the Court interprets this statement to mean that a lease's pricing clause (i.e., that the lessee must pay royalty on the market value or the proceeds/amount realized) is irrelevant to the marketable-condition rule's implication. This interpretation aligns with the rule in most major producing states that the implied duty to market applies in all oil-and-gas contracts, regardless of the pricing language used. See infra at 42-46. The Court notes, however, that lease language can and will affect the duty to market's contours, including whether the lessee breached the duty. See Foster v. Merit Energy Co., 282 F.R.D. 541, 558-59 (W.D. Okla. 2012).

the plaintiffs to pursue their implied-duty-to-market claims.  See 2009-NMSC-048, ¶ 37, 218 P.3d at 86.  Accordingly, the Supreme Court of New Mexico determined that the implied duty to market can coexist with provisions governing royalty payments, at least when the lessees pay all of the plaintiffs in the same way without regard to their individual royalty provisions.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 19, 218 P.3d at 81 (describing the "Defendants' standardized treatment of all class members in deducting certain costs").  Because the defendants paid the plaintiffs the same way regardless of each plaintiff's royalty provisions, the Supreme Court of New Mexico could also have determined that individual royalty provisions do not govern the subject matter that the implied duty to market covers when the defendants disregard that language.  Whether the Supreme Court of New Mexico relied on the defendants' common payment method, or determined that the royalty provisions did not govern the same subject matter that the implied duty to market governs, does not control this case's outcome.  Here, like in Davis v. Devon Energy Corp., the Defendants paid all of the Plaintiffs the same way, regardless of royalty language.

At the hearing, the Defendants did not demonstrate how their case materially differs from Davis v. Devon Energy Corp.  They asserted that the Court should not follow Davis v. Devon Energy Corp., because, according to the Defendants, the Supreme Court of New Mexico merely accepted the district court's conclusion that the implied duty to market is implied in law without making its own determination.  See Tr. at 29:15-17 (Sheridan); id. at 34:8-24 (Sheridan); id. at 52:15-23 (Sheridan)(stating that the district court entered a summary judgment order "finding that the marketable condition rule is implied in law in New Mexico under the implied duty to market").  This reading is incorrect.  The Supreme Court of New Mexico stated that it "review[ed] the district court's interpretation of *Continental Potash* and *Mark V* in light of the

requirements of interpreting Rule 1-023 de novo as questions of law." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 27, 218 P.3d at 84.  It reversed the district court, and "clarif[ied] the requirements of *Continental Potash* and *Mark V* as they apply to the implication of legal duties on one or more parties to a mining contract." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 28, 218 P.3d at 84.  The Supreme Court of New Mexico then proceeded to explain that the implied duty to market is implied in law, contrary to the district court's understanding.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 28, 218 P.3d at 84.  Moreover, it expressly stated that it "impl*ied* this legal duty on oil and gas producers in equity, without looking to the language of the agreements or other evidence of the parties' intentions," and cited Darr v. Eldridge, 1959-NMSC-093, 346 P.2d 1041, 1044.  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 218 P.3d at 86 (emphasis added).  By using the past tense and citing its 1959 opinion in Darr v. Eldridge, the Supreme Court of New Mexico indicated that it, not the district court, determined that the implied duty to market is an implied-in-law duty.  The Defendants' arguments are therefore unpersuasive.

The Defendants also argue that the Tenth Circuit's decision in Kerr-McGee Corp. v. Bokum Corp. supports their argument that the implied duty to market cannot be implied.  See Response at 9.  There, the plaintiff-lessor contended that the defendant-lessee had an implied duty to "market the ore at the highest price obtainable."  453 F.2d at 1073.  The plaintiff argued, however, that the implied duty to obtain the highest price required lessees to take specific actions to sell the minerals, even when those actions contradicted express lease terms.  See 453 F.2d at 1073.  Specifically, the plaintiff argued that the implied duty required the lessee to forgo selling processed and milled uranium, as it had always done, and instead sell unprocessed ore.  See 453

F.2d at 1069-70.  In short, the plaintiff contended that the implied duty to market dictated the precise method that the lessees must employ to market the minerals.

The Tenth Circuit acknowledged that New Mexico courts may imply a covenant to market minerals at the highest price obtainable into mineral leases.  Nevertheless, it stated that it could not allow implied duties to override express terms where "the parties have contracted otherwise."  453 F.2d at 1073.  The Tenth Circuit found that a provision expressly laid out several acceptable methods for determining ore value.  See 453 F.2d at 1073.  Accordingly, "no provision in the lease require[ed] that one method of calculating ore value be preferred over another."  453 F.2d at 1073.  The Tenth Circuit concluded that "the conclusion is inescapable that the parties intended that the manner of disposing of the ore be within the sole discretion of Kerr-McGee."  453 F.2d at 1073.  The implied duty that the plaintiff sought to impose -- a duty to sell unprocessed ore -- would conflict with the lease's express terms giving the lessee the "exclusive right" to determine the method of disposing the minerals.  453 F.2d at 1073.  The Tenth Circuit concluded that the implied duty to market, at least in the mining context at issue, cannot control where the parties expressly contract around the duty.  See 453 F.2d at 1073.

Notably, the plaintiff in Kerr-McGee Corp. v. Bokum Corp. argued that the implied duty overrode express lease terms.  See Kerr-McGee Corp. v. Bokum Corp., 453 F.2d at 1073.  Here, the Defendants do not point to any express provisions that contradict the implied duty to market, exclusive of the marketable-condition rule.[18]  They point only to the pricing clauses in royalty

_____

[18]The Defendants do point to express contractual provisions that allegedly conflict with the Plaintiffs' deductions arguments, i.e., that the Defendants violate the marketable-condition rule.  See Response at 10-11.  As stated above, however, any new allegations that argue that the Defendants violate the duty to market through deductions and costs are excluded.  This portion of the opinion, therefore, relates solely to those allegations which assert that the Defendants must sell the hydrocarbons for the best reasonable price.  The Defendants do not point to any express

provisions.  The Court understands Davis v. Devon Energy Corp. to suggest that the implication

of the implied duty to market does not conflict with a lease's pricing clauses.  Specifically, the

statement that "the provisions of each royalty agreement are irrelevant to the implication of the

marketable condition rule in each contract," Davis v. Devon Energy Corp., 2009-NMSC-048, ¶

36, 218 P.3d at 86, suggests that a lease's pricing clause does not conflict with the duty to

market's implication.[19]   This interpretation aligns with the substantial majority of other major

producing states.

Most major producing states have determined that the implied duty to market is implied

in both market-value and proceeds leases.  See Howell v. Texaco, 112 P.3d 1154, 1160 (Okla.

2004)(affirming that the duty to market applies in market-value leases and proceeds leases alike);

Tara Petroleum Corp. v. Hughey, 630 P.2d 1269, 1273 (Okla. 1981)(holding that lessees in

market-value leases have a duty to market the gas at "the best price available"); Smith v. Amoco

Prod. Co., 31 P.3d 255, 269, 272 (Kan. 2001)(applying the implied duty to market to a market-

value lease and rejecting the argument that market-value leases preclude any implied duty to

market); Rogers v. Westerman, 29 P.3d 887, 903 (Colo. 2001)(en banc)(determining that the

implied duty to market applies to every lease, including market-value leases); Fawcett v. Oil

Producers, Inc. of Kan., 352 P.3d 1032, 352, 366 (Kan. 2015)(affirming that the implied duty to

market exists in both market-value and proceeds leases to protect lessors); SEECO v. Hales, 22

S.W.3d 157 (Ark. 2000)(concluding that the duty to market applied in a class action involving

market-price leases as well as fixed-rate and proceeds leases); Lansdown, The Implied Covenant

_____

provisions that allegedly conflict with the duty to market's obligation to obtain the best
reasonable price.

[19]Although it may not take much to give rise to the implied duty to market, the duty's
contours -- the lease language can and will affect the circumstances that will amount to a breach
of the covenant.  See Foster v. Merit Energy Co., 282 F.R.D. at 558-59.

to Market, supra, at 335 (observing that courts outside of Texas have continued to imply the duty

to market into all leases, regardless of the pricing clause's language).  In contrast, the Supreme

Court of Texas has determined that the implied duty to market's obligation to obtain the best

reasonable price does not apply in leases that pay royalty on "market value."  Yzaguirre v. KCS

Res., Inc., 53 S.W.3d 368, 370 (Tex. 2001).  The reasoning is that a lease's express market-value

provision sets the sole measure of value.  See Yzaguirre v. KCS Res., Inc., 53 S.W.3d at 373

(stating that "there is no implied covenant when the oil and gas lease expressly covers the subject

matter of an implied covenant").  The Supreme Court of Texas held that, in market-value leases,

"the lease provides an objective basis for calculating royalties," so "the lessor does not need the

protection of an implied covenant."  53 S.W.3d at 374.

       With good reason, the other major producing states have not held that the implied duty to

market does not apply in market-value leases.[20]  See Frankhouser v. XTO Energy, Inc., 2012 WL

601415, at *2 (W.D. Okla. Feb. 23, 2012)(Leonard, J.)(rejecting the lessee's argument that the

implied duty to market did not apply to certain types of leases under both Kansas and Oklahoma

law); id. at *2 ("Likewise, Kansas cases that hold the duty to market requires providing a

marketable product without cost to the lessor involve royalty clauses providing for payment

based on the market price or value at the well or for payment on gas as such.").  If taken literally,

Texas' notion that the market sets an objective value measure would limit rules against self-

_____

       [20]The Fifth Circuit recognized Texas' departure from other states by finding "significant
variations in state law" that would defeat the predominance of common class questions.  Stirman
v. Exxon Corp., 280 F.3d 554, 562 (5th Cir. 2002).  On remand, the United States District Court
for the Western District of Texas certified a class action with most major producing states in one
subclass, and a separate Texas subclass that would distinguish between proceeds and amount-
realized leases.  See Hunter v. Exxon Corp., 2004 WL 2397574, at *4 (W.D. Tex.
2004)(Rodriguez, J.)("While it is true that certain states within Subclass I cited and/or relied
upon Texas authorities in adopting the implied covenant to market, it [is] not entirely clear that
each state within Subclass I would adopt the rule set forth in Yzagruirre and applied in
Hankins.").

dealing.  See McArthur, supra, at 287.  For instance, in Union Pacific Resources Group, Inc. v. Hankins, 111 S.W.3d at 74, the plaintiffs alleged that the lessee sold gas to its affiliates "at preferential index prices" that the lessee used to pay royalties, even though the affiliates "sold the gas to third parties at higher prices."  Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d at 70. The Supreme Court of Texas noted that, even if the affiliate sales were a sham, "these inter-affiliate transactions do not determine the amount owed under market-value leases."  Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d at 74.  It stated that market value was the only issue.  See Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d at 74.  Nevertheless, the Supreme Court of Texas stated that, in proceeds leases, a sham affiliate sale would be actionable because it disguises the true, full price the lessees received.  See Union Pacific Res. Grp., Inc. v. Hankins, 111 S.W.3d at 74.

The Supreme Court of Texas did not address why a lessor would enter into a contract that would pay less than the price the lessee proves capable of achieving in an arm's-length sale. Accordingly, the Texas Supreme Court removed the traditional protection against self-dealing for lessors with market-value leases, but not those with proceeds leases.  The United States District Court for the Western District of Oklahoma emphasized the importance of implying the duty to market into both market-value and proceeds leases to protect against self-dealing.  See Frankhouser v. XTO Energy, Inc., 2012 WL 601415, at *2 (holding that the implied duty to market applies to both lease forms, especially in cases "between affiliates").  Texas' interpretation gives oil-and-gas leases a narrow, liability-limiting reading, contrary to the Supreme Court of New Mexico's statements in: (i) Davis v. Devon Energy Corp., where the Supreme Court of New Mexico proclaimed that the duty to market applied to the thousands of leases in the class action, including market-value leases, see 2009-NMSC-048, ¶ 10, 218 P.3d at

79; and (ii) Libby v. De Baca, where the Supreme Court of New Mexico held that lessees must

abide by the reasonably prudent operator standard, see 1947-NMSC-007, ¶ 7, 179 P.2d 263, 265;

and (iii) Greer v. Salmon, where the Supreme Court of New Mexico discussed the "established

rule that an oil and gas lease is to be construed most strongly against the lessee," 1971-NMSC-

002, ¶19, 479 P.2d 294, 299. The Texas rule diminishes lessor protection. See Howell v.

Texaco, 112 P.3d at 1160 ("Whenever a producer is paying royalty based on one price but it is

selling the gas for a higher price, the royalty owners are entitled to have their payments

calculated based on the higher price.").

If any conflict exists between market-value leases and New Mexico's implied duty to

market, the conflict would relate to the marketable-condition rule, which involves deductions,

not the price the lessee must obtain in the downstream sale. The two main pricing clauses'

history demonstrates that the difference between market-value and proceeds clauses did not

originate to connote differences in the price that the lessee must obtain in downstream sales, but

to tell whether the lessee could take deductions. See Frank G. Harmon, Gas Royalty-Vela,

Middleton, and Weatherford, 33 Inst. on Oil & Gas L. & Tax'n 65, 69 (1982).[21] For proceeds

---

[21]Other scholars have similarly described the pricing clauses' history:

> It is suggested the purpose of the provision that the royalties in the latter case are
> based upon the "market value at the well" was not to establish a different standard
> for value, but rather to make it clear that the lessee's obligation to bear the entire
> cost and expense of producing the gas ends at the well.

Thomas Harrell, Recent Developments in the Nonregulatory Law of Oil and Gas, 33 Inst. on Oil
& Gas L. & Tax'n 17, 51 (1982). See John Lowe, Developments in Nonregulatory Oil and Gas
Law: Issues of the Eighties, 35 Inst. on Oil & Gas L. & Tax'n 1, 3 (1984)("Historically, royalty
clause formulations like [market value] were probably an attempt by draftsmen to ensure that the
lessee had the right to charge against the lessor the lessor's proportionate share of expenses such
as costs of transportation, processing and compression."); Louis Fischl, Ascertaining the Value
or Price of Gas for Purposes of the Royalty Clause, 21 Okla. L. Rev. 22, 24-25 (1968)(discussing
proceeds clauses as "ordinarily involv[ing] a determination of those costs of marketing in which
the lessor should participate"). An expert in a Louisiana oil-and-gas case called the market-value

leases, lessees were to pay royalty on sales at the wellhead, while on market value leases, lessees would owe the market value at the wellhead, even though they might not sell the products until farther downstream.  See Thomas Harrell, Recent Developments in the Nonregulatory Law of Oil and Gas, 33 Inst. on Oil & Gas L. & Tax'n 17, 51 (1982).  The market-value language, therefore, allowed the lessee to take deductions for transportation costs.  "The basic price each sought was, except for these cost differences, the same 'best-possible price.'"  McArthur, supra, at 300.

New Mexico would not likely vary the implied duty to market's applicability based on a lease's pricing clause, at least with respect to the limited implied duty to market, exclusive of the marketable-condition rule.[22]  Because New Mexico has stated that the implied duty to market is

---

clause a "lessee clause," developed to ensure that the lessee recouped the added expenses of marketing gas off the premises, and paid only a market value net-backed to the well.  Henry v. Ballard & Cordell Corp., 401 So. 2d 600, 607 (La. Ct. App. 1981), aff'd, 418 So. 2d 1334 (La. 1982).

[22]Again, the duty to market may be implied in all leases, but lease language can affect the determination whether the lessee breached the duty to market and how the lessor can recover.  The Court recognizes that, in ConocoPhillips Co. v. Lyons, 2013-NMSC-009, 299 P.3d 844, the Supreme Court of New Mexico stated that, for oil-and-gas leases with the State of New Mexico's Commissioner of Public Lands, the marketable-condition rule would not provide the lessor a means to recover damages where it would "alter the express terms of the lease" that the Legislature has enacted.  2013-NMSC-009, ¶¶ 57, 64, 299 P.3d at 859-60.  Immediately after this discussion, the Supreme Court of New Mexico stated: "This opinion should not be interpreted as affecting private oil and gas lease agreements."  2013-NMSC-009, ¶ 64, 299 P.3d at 860.  The Supreme Court of New Mexico repeatedly emphasized:

> When the legislature adopted the statutory oil and gas leases that we have referenced in this opinion, the Legislature expressed the policy decision that lessees under such leases are entitled to recover some post-production costs associated with making the gas marketable.  How much and what kinds of post-production costs remain at issue in this case.  However, because of this legislative policy decision we do not need to decide whether the marketable condition rule is inherent in the implied covenant to market.

2013-NMSC-009, ¶ 64, 299 P.3d at 860.  The Supreme Court of New Mexico's determination that an implied duty would not allow recovery in the face of a conflicting pricing clause,

implied in every oil and gas lease, regardless of the parties' intent, it would not likely create an exception to that rule and determine that lessees do not need the protection of an implied covenant for market value leases.  See ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 63, 299 P.3d 844, 860 ("[W]e held that the implied covenant to market is an implied covenant at law and does not require an analysis of the parties' agreement.").  As the Court has explained, lessors in market-value and proceeds leases alike aspire for the lessee to obtain the best possible price. Lessors in both kinds of leases also need the protection that the implied duty to market provides in self-dealing transactions.  Accordingly, the Court concludes that the leases' royalty language does not conflict with the implied duty to market's implication.  Moreover, because the Defendants paid all of the Plaintiffs the same way, regardless of royalty language, the Court will follow the Supreme Court of New Mexico's holding in Davis v. Devon Energy Corp. and allow the Plaintiffs to pursue their implied-duty-to-market claim.  As referenced above, however, it will limit the Plaintiffs' claim to those allegations that do not allege breach of the marketable-condition rule.

## IV.  THE PLAINTIFFS' FAILURE TO ALLEGE UNJUST ENRICHMENT DOES NOT MAKE THE IMPLIED-DUTY-TO-MARKET CLAIM FUTILE.

The Defendants contend that the "the Court cannot impose an implied-at-law duty on contracting parties in equity absent unjust enrichment."  Response at 2.  They cite no case law, however, that establishes that plaintiffs must allege an unjust enrichment claim.  Instead, their argument is based upon the notion that courts cannot imply legal duties on parties unless the defendant has retained something of value unjustly.  See Response at 15; Defendant's Notice of Supplemental Authority, filed February 24, 2016 (Doc. 174); Defendant's Third Notice of

---

therefore, was limited not only to public leases, but also to the marketable-condition rule. Additionally, the Supreme Court of New Mexico did not state that the marketable-condition rule could not be implied in these leases; it merely stated that, even if it were implied, it would not allow the lessor to recover.  See 2013-NMSC-009, ¶ 64, 299 P.3d at 860.

Supplemental Authority, filed February 28, 2016 (Doc. 176).   They contend that <u>Darr v.</u> <u>Eldridge</u>, 1959-NMSC-093, 346 P.2d 1041, and <u>Libby v. De Baca</u>, 1947-NMSC-007, 179 P.2d 263, "can be read as holding" that the lessee would be unjustly enriched.   Tr. at 46:22 (Sheridan). Because the Supreme Court of New Mexico implied the duty to market in these cases, the Defendants assert that they stand for the proposition that the Plaintiffs here must allege unjust enrichment to pursue their implied-duty-to-market claims.   <u>See</u> Response at 15-16.

Although the defendants in <u>Darr v. Eldridge</u> and <u>Libby v. De Baca</u> may have retained something of value unjustly, these cases do not mean that an unjust enrichment claim is a prerequisite to implied-duty-to-market claims.   The terms "unjust" and "enrichment" do not even appear in the cases.   For example, in <u>Darr v. Eldridge</u>, the lessee received something of value: the mineral well and the surface estate.   <u>See</u> 1959-NMSC-093, ¶ 16, 346 P.2d at 1044.   The Supreme Court of New Mexico determined that it would be unjust for the lessee to retain the mineral estate without marketing the minerals and sharing the profits with the lessor as payment for the mineral estate.   <u>See</u> 1959-NMSC-093, ¶ 16, 346 P.2d at 1044.   The Plaintiffs make a substantially similar allegation here.   <u>See</u> TAC ¶¶ 68-75, at 34-37.   They allege that the Defendants receive the mineral estate as value.   They further contend that the Defendants unjustly retain that value by not marketing the minerals for the lessors' and lessees' mutual benefit.   <u>See</u> TAC ¶¶ 68-75, at 34-37.

Moreover, the Supreme Court of New Mexico in <u>Davis v. Devon Energy Corp.</u> demonstrated that plaintiffs need not plead unjust enrichment to pursue implied-duty-to-market claims.   The plaintiffs there pursued breach-of-contract claims "for the alleged underpayment of royalty on natural gas production from oil and gas leases."   <u>Davis v. Devon Energy Corp.</u>, 2009-NMSC-048, 218 P.3d 75, Defendants/Appellees/Cross-Appellants' Answer Brief, filed

November 25, 2008 ("Davis Defendants' Brief").  Given their ongoing contractual relationship with the defendant oil companies, the plaintiffs also asserted claims for injunctive and declaratory relief to prevent future underpayments.  See Davis Defendants' Brief at 3.  Notably, they did not pursue an unjust enrichment claim.  Nevertheless, the Supreme Court of New Mexico allowed the plaintiffs to pursue their implied-duty-to-market claims without also pursuing unjust enrichment.  Again, the Defendants here could not persuasively distinguish how their case differed from Davis v. Devon Energy Corp.

**IT IS ORDERED** that the Plaintiffs' Motion for Leave to File Third Amended Complaint, filed December 10, 2015 (Doc. 165), is granted in part and denied in part.  The Plaintiffs may amend the Complaint to include all the new allegations, except for those that allege that the Defendants violate the implied duty to market through cost deductions.  Accordingly, the Plaintiffs cannot amend the Complaint to include the following allegations in their implied-duty-to-market claim, which all assert that the Defendants violate the implied duty to market through cost deductions:

    (a) Charging Plaintiffs a share of the New Mexico Natural Gas Processor's Tax.  See TAC ¶ 73(a), at 35;

    (b) Assessing "the expenses, including mainline transportation reservation fees, it incurs for its own purchased gas against the value it pays to Plaintiffs and Class Members."  TAC ¶ 73(b), at 35;

    (c) Improperly using and permitting third parties to use (i.e., deducting) "gas produced from Plaintiff's wells."  TAC ¶ 73(c), at 35-36;

    (d) "[F]ailing to credit revenues to Plaintiffs that represent the value of the produced drip condensate" from wells subject to their royalty interests.  TAC ¶ 73(d), at 36;

(e) "[P]aying Plaintiffs and the Class Members royalties based on a weighted average system in which ConocoPhillips averages sales of its own purchased gas with the gas produced from Plaintiffs' and the Class Members' well."  TAC ¶ 73(e);

(f) "[C]harging the Plaintiffs and Class Members interest on the cost of transporting ConocoPhillips' own purchased gas."  TAC ¶ 73(f), at 36.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Stan Koop
Stan Koop, PLLC
Norman, Oklahoma

--and--

Karen Aubrey
Law Office of Karen Aubrey
Santa Fe, New Mexico

--and--

Stephen R. McNamara
Brian Inbody
McNamara, Inbody & Parrish, PLLC
Tulsa, Oklahoma

--and--

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

--and--

Turner W. Branch
Cynthia Zedalis
Branch Law Firm
Albuquerque, New Mexico

--and--

Bradley D. Brickell
Brickell & Associates, P.C.
Norman, Oklahoma

     *Attorneys for the Plaintiffs*

Michael B. Campbell
Campbell Trial Law, LLC
Santa Fe, New Mexico

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
Holland & Hart LLP
Santa Fe, New Mexico

     *Attorneys for the Defendant*