## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a The
James H. Anderson Living Trust, THE
PRITCHETT LIVING TRUST; CYNTHIA W.
SADLER; SHIRLEY L. SCANLON LIVING
TRUST; ROBERT WESTFALL; LEE WILEY
MONCRIEF 1988 TRUST, and NEELY-
ROBERTSON REVOCABLE FAMILY
TRUST

    Plaintiffs,

vs.               No. CIV 12-0039 JB/SCY

CONOCOPHILLIPS COMPANY, LLC,

    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Partial Summary

Judgment, filed September 28, 2023 (Doc. 348)("Motion").  The Court held a hearing on January

5, 2024.  Clerk's Minutes, filed January 5, 2024 (Doc. 391); Transcript of Hearing at 1, taken

January 5, 2024, filed January 26, 2024 (Doc. 390).  The primary issue is whether the gas' price

before including transportation costs or after including transportation costs is the highest

reasonably obtainable price for the gas produced from the Plaintiffs' land in New Mexico's San

Juan Basin.  Because there is no genuine dispute of fact that only the gas' price before including

transportation costs determines the Plaintiffs' royalty payments, it is the only price that fulfills

ConocoPhillips' implied duty to market for the benefit of the Plaintiffs.  The Court therefore grants

in part and denies in part the Plaintiffs' motion for partial summary judgment.

## FACTUAL BACKGROUND

1.      **Undisputed Material Facts Not in the Record for the Motion.**

In the Motion briefings, the parties assume facts about the case and subject matter as undisputed without citations to the evidence in the record.  The Court concludes that these facts are undisputed based on the record, and then turns to the factual background for the Motion. Between January 1, 2005, and December 31, 2016, ConocoPhillips leased oil-and-gas wells from the Plaintiffs (hereinafter the "San Juan Wells") in the San Juan Basin, which is a significant natural-gas production area in northwest New Mexico and southwest Colorado.  See Order on ConocoPhillips' Motion for Partial Summary Judgment, filed March 3, 2023 (Doc. 332)("ConocoPhillips' MSJ Order"); Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *1 (D.N.M. March 3, 2023)(Browning, J.); Affidavit of Toni Frisina in Support of Motion for Partial Summary Judgment ¶ 1, at 1 (dated May 13, 2021), filed May 14, 2021 (Doc. 246-1)("Frisina  Aff.");  What  is  the  San  Juan  Basin?  Natural  Gas  Intelligence, https://www.naturalgasintel.com/glossary/what-is-the-san-juan-shale-basin/      (last      visited September 20, 2024).  ConocoPhillips gathered and processed gas from the San Juan Wells at the Ignacio and San Juan processing plants.  See Frisina Aff. ¶ 4, at 2.[1]

---

[1]The Ignacio and San Juan plants are located on the Ignacio Blanco gas field, which is at the northern end of the San Juan Basin, north of the Colorado-New Mexico State line.  The field is within the Southern Ute Indian Reservation.  See Clarence L. Harr, The Ignacio Blanco Gas Field      Northern      San      Juan      Basin,      Colorado, https://archives.datapages.com/data/rmag/cbm_1988/harr_op.htm (1988).

The Plaintiffs call the San Juan plant the "Blanco" plant.  See Motion at 2.  The Plaintiffs, however, do not cite to any evidence in the record showing that the San Juan plant is the "Blanco" plant.  The Frisina Aff. describes only a San Juan plant.  See Frisina Aff. ¶ 4, at 2.  The Court, therefore, concludes that the "Blanco" plant that the Plaintiffs reference is the San Juan plant.

2.      **Undisputed Material Facts for the Motion**.

The Court draws the factual background from the parties' assertions of undisputed material fact in their MSJ briefs. See Motion at 10-14; Defendant ConocoPhillips Company's Response to Plaintiffs' Statement of Facts at 4-10, filed November 20, 2023 (Doc. 373-1)(Response to SOF). Many of this case's facts are purportedly disputed. The Court states the undisputed material facts in the text. The Court specifically discusses facts that are purportedly disputed or actually disputed in the footnotes. CoconoPhillips's business unit, Lower 48,[2] produced the residue gas from the San Juan Wells. See Motion at 11; Frisina Aff. ¶ 6, at 2. ConocoPhillips other business unit, ConocoPhillips Commercial,[3] marketed and sold the residue gas from the San Juan Wells.[4] See

---

[2]The Plaintiffs refer to ConocoPhillips' production department as "Lower 48" or "L48." See Plaintiffs' MSJ at 11. While they do not cite to evidence in the record in support of "Lower 48," ConocoPhillips also uses the term "L48." See Response to SOF at 4. The Court also concludes that the evidence in the record supports the assertion. See Frisina Aff. ¶ 5, at 2. The Frisina Aff. states that "COP is a single corporation" and that Lower 48 is a business unit "within the single corporation." ¶ 6, at 2. The Frisina Aff. states that Lower 48 is "responsible for producing the residue gas subject to Anderson's and Westfall's royalty interests." ¶ 6, at 2. The Court therefore concludes that ConocoPhillips' business unit for gas production is "Lower 48."

[3]The Plaintiffs refer to ConocoPhillips' business and marketing department as "COP Commercial" and assert "COP Commercial" is the main actor for all gas marketing and transportation actions beyond the plant tailgates. See Plaintiffs' MSJ at 3. While they do not cite to evidence in the record in support of "COP Commercial," ConocoPhillips admits that its business unit is "COP Commercial." See Response to SOF at 4. The Court also concludes that the evidence in the record supports the assertion. See Frisina Aff. ¶ 5, at 2. The Frisina Aff. states that "COP is a single corporation" and that COP Commercial is a business unit "within the single corporation." ¶ 6, at 2. The Frisina Aff. states that "COP Commercial was responsible for marketing the gas." ¶ 6, at 2. The Court therefore concludes that ConocoPhillips' business unit is ConocoPhillips Commercial.

[4]ConocoPhillips purportedly disputes four of the Plaintiffs' assertions: that Lower 48 gathered and processed gas from Plaintiffs' wells, that the San Juan Wells are the Plaintiffs' wells, that ConocoPhillips transferred gas at the plant tailgates to ConocoPhillips Commercial, and that the gas is "Plaintiffs' gas." The Court addresses each assertion in turn.

First, ConocoPhillips purportedly disputes the Plaintiffs' assertion that "[Lower 48] gathered and processed gas from Plaintiffs' wells." Response to SOF at 4 (citing Motion at 11). The Plaintiffs support their assertion by citing to the Defendant ConocoPhillips's Partial Motion

for Summary Judgment, filed May 14, 2021 (Doc. 246)("ConocoPhillips' MSJ"), which in turn cites to the Frisina Aff, which in turn states that "[Lower 48] delivered the raw gas to production area services companies for gathering and processing.  Following gathering and processing -- of the raw gas, the residue gas was redelivered to Lower 48 at the tailgate of the processing plant -- either the San Juan plant or the Ignacio plant."  Frisina Aff. ¶ 4 at 2; ConocoPhillips' MSJ at 3-4.  The Court concludes that the evidence shows that Lower 48 delivered the gas to other companies for gathering and processing, but did not gather and process the gas itself.

Second, ConocoPhillips purportedly disputes the Plaintiffs' assertion that the San Juan Wells are the Plaintiffs' wells.  See Response to SOF at 4.  The Plaintiffs contend that Lower 48 gathered and processed gas from the Plaintiffs' wells at (a) the San Juan plant, which processed gas from Plaintiff The Anderson Living Trust's wells, and (b) the Ignacio plant, which processed gas from Plaintiff Robert Westfall's wells each month.  See Motion at 11.  In support of that contention, the Plaintiffs cite to Defendant ConocoPhillips' Motion for Partial Summary Judgment on Plaintiffs' Claim for Breach of the Implied Duty to Market Natural Gas at the Best Price at 3-4, filed March 30, 2022 (Doc. 246)(ConocoPhillips' MSJ), and ConocoPhillips' Response to Plaintiffs' Class Certification Motion at 16, filed May 15, 2021 (Doc. 248)(First Class Cert. Response).

The Plaintiffs' cite to the ConocoPhillips' MSJ fails to present competent evidence that the San Juan Wells are the "Plaintiffs' wells."  The paragraphs in the cited pages, and the underlying affidavit, assert only that the "natural gas subject to the [Plaintiffs'] interests was produced from wells on oil and gas leases in the San Juan Basin operated by . . . Lower 48."  ConocoPhillips' MSJ at 4; Frisina Aff. ¶ 4 at 2. Next, the Plaintiffs' cite to the First Class Cert. Response is insufficient for two reasons.  First, the citation does not even describe the San Juan Wells as the Plaintiffs' wells.  Second, and more importantly, the cite is to a motion briefing, as opposed to any evidence in the record.  The Plaintiffs thus do not present competent evidence that demonstrates the wells are the "Plaintiffs' wells."  This fact is not material to the motion, however, because it is undisputed that the Plaintiffs have royalty interests in the residue gas produced from San Juan Wells and that ConocoPhillips pays the Plaintiffs' royalties.  The Court therefore describes the wells as the "San Juan Wells" for factual background purposes.

Third, ConocoPhillips purportedly disputes the Plaintiffs' assertion that it "did not sell any of Plaintiffs' gas at the well, but transferred the residue gas at the plant tailgates" to ConocoPhillips Commercial.  Response to SOF at 4 (citing Motion at 11).  The Plaintiffs do not present evidence of ConocoPhillips' transferring the gas from the well to the tailgates.  To the contrary, the Frisina Aff. states that "Lower 48 did not sell or transfer residue gas after processing to it at the tailgate of each processing plant to COP Commercial in non-arm's length transactions."  Frisina Aff. ¶ 10(A), at 3.  Despite the confusing phrase "processing to it at," the evidence overall shows that ConocoPhillips did not transfer gas from one business unit to another.

Fourth, ConocoPhillips purportedly disputes the Plaintiffs' assertion that the gas is the "Plaintiffs' gas" based on insufficient evidence.  Response to SOF at 4.  Like with the San Juan Wells, the Plaintiffs do not present competent evidence that demonstrates the gas is the "Plaintiffs' gas."

Motion at 11 (setting forth this fact); Response SOF at 4 (admitting this fact); Frisina Aff. ¶ 8, at

3. ConocoPhillips Commercial commingled the residue natural gas from the San Juan Wells with

gas from two other sources: (i) gas from other wells in the San Juan Basin, and (ii) gas that

ConocoPhillips purchased from third parties at its El Paso Natural Gas interconnecting pipeline[5]

in the San Juan Basin. See Motion at 12 (setting forth this fact); ConocoPhillips' Demonstrative

No. 1 at 10 from the Class Certification Hearing, admitted into evidence January 27, 2022 (Doc.

299-1 at 2)("Class Cert. Demo. 1"); id. at 38; ConocoPhillips Total Gas Supply EPNG San Juan

Pool at 1-2, filed September 28, 2023 (Doc. 348-6)("Total Gas EPNG San Juan").[6] ConocoPhillips

---

[5]An interconnect is by definition a connection point between the transmission company and the receiving party, which may be another pipeline (interstate or intrastate), distribution company, or other customer. Each company typically owns and is responsible for operation of their assets at the interconnect location and publishes their own tariff for that interconnect. The Interstate Natural Gas Transmission System: Scale, Physical Complexity and Business Model at 7, Interstate Natural Gas Association of America, https://ingaa.org/wp-content/uploads/2010/08/10751.pdf (last visited September 11, 2024)("Interstate Transmission"). Today, there are no major interstate pipelines that operate in isolation, i.e., without interconnection with at least one or more other pipelines. Typically, there are interconnects (receipt and/or delivery) with many other pipelines and multiple customers on all interstate pipelines. See Interstate Transmission at 2.

An interconnecting pipeline or "interconnection" moves raw natural gas from the wellhead to a large mainline pipeline, or to a natural gas processing plant. Natural gas explained: Natural gas pipelines, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/natural-gas/natural-gas-pipelines.php (last updated March 19, 2024).

[6]ConocoPhillips contends that this fact is immaterial. See Response to SOF at 6. Arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion and is not effective to contest a fact. See Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. March 31, 2011)(Browning, J.)( "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."). If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed."). Accordingly, the Court construes this fact as undisputed.

The parties dispute whether ConocoPhillips produced the gas from other wells in the San Juan Basin. The Plaintiffs assert that ConocoPhillips' production unit, Lower 48, produced the gas from other wells. See Motion at 12. To support their assertion, the Plaintiffs cite to Total Gas

purchased and sold the following amounts of gas at its El Paso Natural Gas interconnecting pipeline.  In March, 2011, ConocoPhillips purchased 11,698,080 MMBtus.[7]  <u>See</u> Motion at 12 (setting forth this fact); Response to SOF at 6 (admitting this fact);  Total Gas EPNG San Juan at 1.  In February, 2012, ConocoPhillips purchased 7,437,042 MMBtus.  <u>See</u> Motion at 12 (setting forth this fact); Response to SOF at 6 (admitting this fact); Total Gas EPNG San Juan at 2.  In March, 2011, ConocoPhillips sold 16,213,232 MMBtus.  <u>See</u> Motion at 12 (setting forth this fact); Response to SOF at 6 (admitting this fact); ConocoPhillips Gas Sales in EPNG San Juan Pool at 1, filed September 28, 2023 (Doc. 348-7)("Gas Sales EPNJ San Juan").[8]  In February, 2012, ConocoPhillips sold 8,889,423 MMBtus.  <u>See</u> Motion at 12 (setting forth this fact); Response to SOF at 6 (admitting this fact); Gas Sales EPNJ San Juan at 2.

The tailgates of the Ignacio and San Juan processing plants run through ConocoPhillips' El Paso Natural Gas and Transwestern interconnecting pipelines.  <u>See</u> Motion at 13 (setting forth

---

Supply EPNG San Juan, but that exhibit only shows that ConocoPhillips combined gas from various plants, not that Lower 48 produced gas.  <u>See</u> Total Gas Supply EPNG San Juan at 1.  The Court therefore concludes that ConocoPhillips combined gas from other wells, but not that ConocoPhillips also produced the gas from those other wells.

[7] MMBtu stands for Million Metric British Thermal Units or "Btus."  <u>British thermal unit</u>, Wikipedia, https://en.wikipedia.org/wiki/British_thermal_unit (last visited September 11, 2024).  In the United States, Btu is the most common unit of measurement of heat energy for comparing energy sources or fuels.  <u>See</u> <u>Units and calculators explained</u>, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/units-and-calculators/ (last updated June 1, 2023)("<u>Units explained</u>").  For example, 1 barrel (42 gallons) of crude oil produced in the United States equals 5,684,000 Btu.  <u>See</u> <u>Units explained</u>.  An MMBTu is equal to 1,000,000 Btu.  <u>See</u> <u>Units explained.</u>

[8]The Plaintiffs also assert that ConocoPhillips sold gas at its Transwestern interconnecting pipeline.  <u>See</u> Motion at 12.  Although ConocoPhillips admits this assertion, no evidence in the record supports it.  The relevant evidence in the record, ConocoPhillips Gas Sales EPNG San Juan Pool at 1-2, filed September 28, 2023 (Doc. 348-7)("Gas Sales EPNG San Juan") only shows the El Paso Natural Gas interconnecting pipeline.

this fact); San Juan Basin Overview at 1, filed September 28, 2023 (Doc. 348-12).[9]  In the San

Juan Basin, the average sale price of gas from the El Paso Natural Gas and Transwestern

interconnecting pipelines were similar in March, 2011.  See Motion at 13 (setting forth this fact);

San Juan Basin Overview at 4.[10]

ConocoPhillips then transported the remainder of its gas to locations downstream of the

San Juan Basin, mostly in California, on the El Paso Natural Gas interconnecting pipeline.[11]  See

---

[9]ConocoPhillips disputes that the tailgates are the closest commercial market for gas
produced from the San Juan Wells.  See Motion at 13; Response to SOF at 10.  The Plaintiffs
present evidence of a map that depicts the tailgate of the Ignacio and San Juan plants, and shows
the El Paso Natural Gas and Transwestern interconnecting pipelines running through.  See San
Juan Basin Overview at 1, filed September 28, 2023 ((Doc. 348-12).  The map, however, does not
depict any facts about nearby commercial markets.  See San Juan Basin Overview at 1.
Accordingly, the Court concludes that the map shows only that the tailgate of the Ignacio and San
Juan plants run through the El Paso Natural Gas and Transwestern interconnecting pipelines, but
not that the tailgate is the closest commercial market for residue gas produced from the San Juan
Wells.
    ConocoPhillips also contends that this fact is immaterial.  See Response to SOF at 6.
Arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the
summary judgment motion and is not effective to contest a fact.  See Lowery v. City of
Albuquerque, 2011 WL 1336670, at *4 n.8 (D.N.M. March 31, 2011)(Browning, J.)  If necessary,
the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual
Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M.
2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact
effectively deems the fact undisputed.").  Accordingly, the Court deems this fact undisputed.

[10]ConocoPhillips purportedly disputes that the average sale price of gas from the El Paso
Natural Gas and Transwestern interconnecting pipelines were normally fairly close in value.  See
Response to SOF at 10.  The Plaintiffs' evidence shows that the average sale price was close in
value -- $3.71 from the El Paso Natural Gas pipeline, and $3.69 from the Transwestern pipeline -
- but only for the month of March 2011.  See San Juan Basin Overview at 4, filed September 28,
2023 (Doc. 348-12).  The Court concludes that, in March 2011, the average sale prices of gas from
the El Paso Natural Gas and Transwestern interconnecting pipelines were close in value.

[11]The Plaintiffs also assert that ConocoPhillips sold gas at its Transwestern interconnecting
pipeline.  See Motion at 12.  Although ConocoPhillips admits this assertion, no evidence in the
record indicates gas sales at the Transwestern interconnecting pipeline.  The relevant evidence in
the record, the Summary of Gas Transported and Sold from San Juan to SoCal at 1-4, filed
September 28, 2023 (Doc. 348-8)("Summary of Gas Transported and Sold"), shows only the El
Paso Natural Gas interconnecting pipeline.

Motion at 12 (setting forth this fact); Response to SOF at 7 (admitting this fact); Class Cert. Demo.
1 at 22, 28, 42, 46; Summary of Gas Transported and Sold from San Juan to SoCal at 1-4, filed
September 28, 2023 (Doc. 348-8)("Summary of Gas Transported and Sold").   ConocoPhillips
incurred fees, known as reservation or demand fees, to reserve pipeline capacity.  See Motion at
12 (setting forth this fact); Response to SOF at 6-7 (admitting this fact); Margin Analysis at 1-3,
filed September 28, 2023 (Doc. 348-9); Frisina Aff. ¶ 7, at 2-3.[12]  During the relevant time period
between 2005 and 2016, ConocoPhillips transported gas to sales locations out West, including in
California.  See Motion at 12 (setting forth this fact); see Response SOF at 6 (admitting this fact).[13]

Natural gas's market value varies based on where it is sold, and sales in the San Juan Basin
versus downstream sales, [14] including, for example, sales in California, have different average

---

[12]ConocoPhillips contends that this fact is immaterial.  See Response to SOF at 6.  Arguing
a proposed fact at summary judgment is immaterial to the Court's disposition of the summary
judgment motion and is not effective to contest a fact.  See Lowery v. City of Albuquerque, 2011
WL 1336670, at *4 n.8 (D.N.M. March 31, 2011)(Browning, J.).  If necessary, the Court will
address materiality in the Analysis, but will deem the fact undisputed for the Factual Background
section.   See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 at n.2 (D.N.M.
2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact
effectively deems the fact undisputed.").   Accordingly, the Court construes this fact as undisputed.

[13]Because neither party disputes this assertion, and it is indisputably correct, the Court will
deem it true.

[14]The oil and gas industry is usually divided into three major sectors: upstream, midstream,
and    downstream.    Downstream    (petroleum    industry),    Wikipedia,
https://en.wikipedia.org/wiki/Downstream_%28petroleum_industry%29 (last accessed September
11, 2024)("Downstream Wikipedia page").  The downstream sector is the refining of petroleum
crude oil and the processing and purifying of raw natural gas, as well as the marketing and
distribution of products derived from crude oil and natural gas.  See Downstream Wikipedia page
It is the business process associated with post-production activities.  See Downstream Wikipedia
page.

prices.  See Motion at 11 (setting forth this fact).[15]  For example, in March, 2011, the weighted

average sales price was $3.71 in the San Juan Basin and $3.94 in California.  See Class Cert. Demo.

1 at 27; Defendant's Class Certification Hearing Exhibit List at 8, filed January 28, 2022 (Doc.

296-1).  In February, 2012, the weighted average sales price was $2.56 in the San Juan Basin and

$2.90 in California.  See Class Cert Demo. 1 at 45.  The price of coal, another fuel, can vary based

on the location.  See Motion at 11; Coal Explained: Coal Prices and Outlook, U.S. Energy

Information    Administration    at    2,    https://www.eia.gov/energyexplained/coal/prices-and-

outlook.php (last accessed September 26, 2023), filed September 28, 2023 (Doc. 348-4)("Coal

Explained").[16]  The Plaintiffs have royalty interests for residue gas that ConocoPhillips produces

---

[15]ConocoPhillips purportedly disputes that market price varies by location.  See Response
SOF at 5.  ConocoPhillips argues that the Class Cert Demo. 1 shows only one month at a time, and
is limited to the San Juan Basin and its downstream sales.  ConocoPhillip's assertions on this point
conflict, however, with the evidence in the record at least for March, 2011 and February, 2012.
The unambiguous evidence in the record establishes that the price of gas at the San Juan Basin is
different than the price downstream in California.  See Class Cert Demo. at 27, 45.  The Court
concludes that the evidence shows the market value of gas varies depending on where the gas is
sold.

[16]ConocoPhillips objects on two grounds: insufficient evidence and immateriality.
Response SOF at 5.  The evidence describes how "[t]ransportation costs add to the delivered price
of coal" and "[i]n some cases, such as in long-distance shipments of Wyoming subbituminous coal
to power plants in the eastern United States, transportation costs are more than the price of coal at
the mine."  Coal Explained: Coal Prices and Outlook, U.S. Energy Information Administration at
2, https://www.eia.gov/energyexplained/coal/prices-and-outlook.php (last accessed September 26,
2023), filed September 28, 2023 (Doc. 348-4).  The evidence supports that the price can vary by
location because of transportation costs.  ConocoPhillips does not proffer any conflicting evidence.
    As to immateriality, if necessary, the Court will address materiality in the Analysis, but
will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land
Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("[O]bjecting to an asserted fact as
immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly,
the Court construes this fact as undisputed.

and sells from the San Juan Wells.  <u>See</u> Motion at 10 (setting forth this fact); Response to SOF at 4 (admitting this fact).[17]

ConocoPhillips made royalty payments to the Plaintiffs from January 2005 to December 2016.  Motion at 11 (setting forth this fact); Response to SOF at 4 (admitting this fact); Frisina Aff. ¶ 1, at 1.  Lower 48 calculated and distributed the royalty payments.  <u>See</u> Motion at 13; Response to SOF at 7 (not disputing this fact); Frisina Aff. ¶ 18, at 7.[18]  The Court concludes that the facts describing the royalty calculation analysis are based on the evidence in the record.  <u>See</u> Frisina Aff. ¶¶ 15-18, at 6-7.[19]  ConocoPhillips computed, for each delivery point, the gross

---

[17]ConocoPhillips purportedly disputes that the Plaintiffs' minerals were leased to ConocoPhillips or its predecessors.  <u>See</u> Response to SOF at 4.  Although ConocoPhillips argues that the Plaintiffs have insufficient evidence, it does not cite to any contravening evidence in the record.  <u>See</u> Response to SOF at 4.  The Plaintiffs' Motion does not cite to evidence in the record to support its assertion, and their Reply does not address this dispute.  <u>See</u> Reply at 4.  The Court concludes that because the Plaintiffs do not support their assertion with any evidence in the record, their assertion lacks merit. This assertion is also not material to the motion because regardless of whether Plaintiffs' minerals were leased, it is undisputed that Plaintiffs have royalty interests for gas produced from the San Juan Wells.

[18]ConocoPhillips disputes the Plaintiffs' description of how it calculates royalty payments, but does not dispute the overarching fact that Lower 48 calculated and distributed royalty payments to the Plaintiffs.  <u>See</u> Response to SOF at 8.  The Court, therefore, concludes that Lower 48 calculated and distributed royalty payments.

[19]The parties describe the royalty calculation analysis in disputing ways, but both cite to the same evidence in the record.  <u>See</u> Motion at 11-2; Response to SOF at 6; Frisina Aff. ¶¶ 15-18, at 6-7.
  The Plaintiffs assert that the royalty calculation analysis is a "complex accounting system" named the "hook" accounting system.  Motion at 12.  ConocoPhillips contends that there is no evidence in the record to support that it used a "hook" accounting system.  <u>See</u> Response to SOF at 7.  The Plaintiffs do not offer, however, any support for their contention. Their citations to evidence in the record describe the royalty calculation analysis neither as "complex," nor as a "hook" system.  Frisina Aff. ¶¶ 15-16, at 6-7.  While the Court did describe the royalty calculation analysis as a "complex calculation" in its ConocoPhillip's MSJ Order, it concludes that the evidence in the record supports using the term "royalty calculation analysis" instead of "complex hook accounting system" or a similar variation.  <u>See Anderson Living Trust v. ConocoPhillips Co., LLC,</u> 2023 WL 8544171 at *5 (D.N.M. March 3, 2023)(Browning, J.); ConocoPhillips' MSJ Order at 12.

proceeds of gas sales divided by the quantity of gas delivered to achieve the weighted average sales price.  See Response to SOF at 8 (setting forth the fact); Motion at 12-13 (also setting forth the fact); Frisina Aff. ¶ 15, at 6.  ConocoPhillips then applied the weighted average sales price to the pro rata quantity of gas delivered at each delivery point to achieve a sum of gross proceeds. See Frisina Aff. ¶ 15, at 6.  ConocoPhillips then divided the sum of gross proceeds, realized from the pro rata quantity of residue gas delivered at each delivery point, by the total quantity of residue gas from the plant tailgate[20] delivered to all delivery points.  See Frisina Aff. ¶ 15, at 6.  This resulting number is known as the Pool Price.  See Frisina Aff. ¶ 15, at 6.[21]  ConocoPhillips then generated a monthly Pool Price Report, known internally as the Hook Report, and sent it to Lower 48.  See Frisina Aff. ¶ 16, at 7.

_____

[20]A plant tailgate or "tailgate" is the outlet of a natural gas processing plant where dry residue gas is delivered or re-delivered for sale or transportation.  Glossary: T, U.S. Energy Information Administration, https://www.eia.gov/tools/glossary/index.php?id=t (last visited September 11, 2024).  A natural gas processing plant typically receives gas from a gathering system and sends out processed gas via an output, the tailgate, that is interconnected to one or more major pipeline networks.  See Natural Gas Processing: The Crucial Link Between NG Production & Its Transportation to Market at 3, U.S. Energy Information Administration (January 20, 2006), https://www.eia.gov/naturalgas/articles/ngprocessindex.php.

[21]In sum, a Pool Price is a weighted average sales price of gas that reflects both the sales prices and quantities of gas delivered to each delivery point.  This method is a more accurate way to calculate the sales price of gas than, for example, simply averaging sales prices without considering the quantities of gas delivered to each delivery point.

ConocoPhillips also computed the weighted average of mainline[22] pipeline transportation costs ("transportation costs").[23]  ConocoPhillips sent the weighted average of the transportation costs to Lower 48, and Lower 48 used both the Pool Price and weighted average of transportation costs to calculate the Plaintiffs' royalty payments.  See Motion at 13 (setting forth this fact); Response to SOF at 8 (admitting this fact); Frisina Aff. ¶ 7, at 2-3; id. ¶ 16-17, at 7.[24]

---

[22]Mainline pipelines, as well as other smaller pipelines, link natural gas production areas and storage facilities with consumers.  See Natural gas explained: Natural gas pipelines, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/natural-gas/natural-gas-pipelines.php (last updated March 19, 2024).  Natural gas produced at the wellhead, which in most cases contains contaminants and natural gas liquids, is processed, i.e., cleaned, before it is fed into the mainline gas transportation system.  See Natural Gas Processing: The Crucial Link Between NG Production & Its Transportation to Market, U.S. Energy Information Administration (January 20, 2006), https://www.eia.gov/naturalgas/articles/ngprocessindex.php.

[23]ConocoPhillips disputes the Plaintiffs' assertion that ConocoPhillips Commercial "allocated a percentage of its mainline interstate transportation cost it incurred with [El Paso Natural Gas] and [Transwestern]" to each plant tailgate.  Response to SOF at 8 (quoting Motion at 13).  The Plaintiffs do not offer any support for their contention.  The Plaintiffs cite to the ConocoPhillips' MSJ and the First Class Cert. Response, which both in turn cite to the Frisina Aff. ¶ 7, at 2-3.  The Frisina Aff. states only that ConocoPhillip's Commercial "computed the weighted average mainline pipeline transportation costs, including reservation fees . . . incurred in connection with sale of that gas."  ¶ 7, at 2-3.  The Court therefore concludes that the evidence in the record supports that ConocoPhillips Commercial computed the weighted average of mainline pipeline transportation costs ("transportation costs"), but not that it allocated a percentage of transportation costs to each plant tailgate.

[24]ConocoPhillips' disputes the Plaintiffs' assertion that, to calculate royalty payments, it "used the MMBtu values calculated by the 'hook' accounting system as a 'price,' then subtracted the cost of mainline transportation."  Response to SOF at 8 (quoting Motion at 13).  The Court concludes, for the reasons stated earlier, that the evidence in the record does not support the Plaintiffs' description of the 'hook' accounting system.  The evidence in the record also does not support the Plaintiffs' description of the royalty calculation analysis as resulting in a "price."  The Court concludes that ConocoPhillips used the Pool Price and the weighted average of mainline transportation costs to calculate the Plaintiffs' royalty payments.

The Parties initially disputed whether ConocoPhillips charged a portion of these transportation costs to Plaintiffs, but both parties ultimately admit not to describe the transportation costs as a "charge."  Response to SOF at 6; Plaintiffs' Reply to Defendant's Response In Opposition to Plaintiffs' Motion for Partial Summary Judgment at 5, filed December 22, 2023 (Doc. 382)("Reply").  The Court therefore concludes that the transportation costs were not a "charge" to Plaintiffs, but were used to calculate the Plaintiffs' royalties.

ConocoPhillips' Commercial then used a "netback" calculation method based on that data to calculate the Plaintiffs' royalty payments. Motion at 13 (setting forth this fact); Response SOF at 10 (admitting this fact). See Frisina Aff. ¶ 18, at 7.[25] A netback is a summary of all costs associated with bringing one unit of oil to the marketplace and the revenues from the sale of all the products generated from that same unit. See Netback: Definition, Calculation Formula, Analysis, Example, Investopedia,

https://www.investopedia.com/terms/n/netback.asp#:~:text=Netback%20is%20calculated%20by %20taking%20the%20revenues%20from,-%20Royalties%20-%20Production%20- %20Transportation%20%3D%20Netback (last updated August 15, 2024).[26] Specifically in this case, one way to calculate the netback is to deduct mainline transportation costs from the sale price

---

[25]While parties agree on the use of the term "netback" calculation, the evidence in the record describes only the calculation itself.

[26]Generally, to calculate a netback is to deduct all costs associated with getting the oil to a market, including transportation, royalties, and production costs, from revenues from the oil. See Netback: Definition, Calculation Formula, Analysis, Example, Investopedia, https://www.investopedia.com/terms/n/netback.asp#:~:text=Netback%20is%20calculated%20by %20taking%20the%20revenues%20from,-%20Royalties%20-%20Production%20- %20Transportation%20%3D%20Netback (last updated August 15, 2024).

of gas downstream, e.g., the sales price in California.  See Motion at 13 (setting forth this fact).[27]

This results in the price of gas at the wellhead.[28]  See Motion at 13.[29]

## PROCEDURAL BACKGROUND

The Plaintiffs filed their Complaint in New Mexico State Court.  See Notice of Removal,

filed on December 5, 2011 (Doc. 1).  ConocoPhillips removed the case to federal court on January

12, 2012.  See Notice of Removal.  The Plaintiffs filed the Plaintiffs' Motion for Leave to File

Third Amended Complaint, on December 10, 2015 (Doc. 165).  The Court allowed the Plaintiffs

to amend the Complaint to include a claim that ConocoPhillips breached the implied duty to

market.  See Memorandum Opinion and Order granting in part and denying in part Plaintiffs'

---

[27]See Response SOF at 9 (purportedly disputing this fact).  The Plaintiffs also assert that mainline transportation is "always" deducted from a downstream sale to arrive at the price at the well.  See Motion at 13.  To support their assertion, they cite to Weighted Average Pricing at 1, filed September 28, 2023 (Doc. 348-11), which explains that "another" way to calculate the netback "is to determine a rate deduction for each transportation component."  See Weighted Average Pricing at 2.  The evidence also provides an example of one way that a netback price could be calculated, which includes subtracting transportation and fuel tariffs from the sales price. See Weighted Average Pricing at 2.  The Plaintiffs do not offer any competent evidence, however, in support of their assertion.  The Court therefore concludes that to calculate the netback, mainline transportation can be deducted from a downstream sales price to arrive at the wellhead price

[28]The wellhead is where natural gas processing begins.  Raw natural gas is extracted from the producing wells.  See Natural Gas Processing: The Crucial Link Between NG Production & Its Transportation to Market at 2, U.S. Energy Information Administration (January 20, 2006), https://www.eia.gov/naturalgas/articles/ngprocessindex.php.

[29]ConocoPhillips purportedly disputes whether the netback calculation results in wellhead price.  It argues that the Plaintiffs' stated resulting "price" does not conform to the Court's prior ruling that the "sales price" is subject to the implied duty to market.  See Response to SOF at 9. The evidence in the record shows that the netback calculation results in the wellhead price.  See ConocoPhillips' Class Cert. Exhibit No. F-2; Weighted Average Pricing at 2.  ConocoPhillips does not present any competent evidence that disputes the evidence in the record, and their mere argument that the wellhead price does not conform with the implied duty to market's "sales price" is insufficient to create a genuine dispute.  The Court, therefore, concludes that the netback calculation results in the wellhead price.

Motion for Leave to File Third Amended Complaint at 35, filed March 1, 2016 (Doc. 177)("TAC

Order"); Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 (D.N.M. March

1, 2016)(Browning, J.).  The Court also defines the implied duty to market:

> The implied duty to market . . . requires lessees to secure the best reasonable sales price for gas being marketed.  See Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d 280, 284 (Tex. App. 1979)(concluding that the lessee breached the implied duty to market, even though it paid royalties based on the amount received pursuant to the lessor's lease agreements, because it did not obtain the best possible price): Bruce M. Kramer & Christ Pearson, The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's, 46 La. L. Rev. 787, 812 n.151 (1986).
>
> The duty to obtain the best reasonable sales price is distinct from any duty to physically develop and market the product, but both are a part of every state's duty to market, even though New Mexico has not expressly stated so.  See Cabot Corp. v. Brown, 754 S.W.2d 104 (Tex. 1987)(stating that the implied duty to market is "two-pronged: the lessee must); Smith v. Amoco Prod. Co., 31 P.3d 255, 272 (Kan. 2001)(explaining that the "implied covenant to market pricing obligation . . . is contained within its duty to act at all times as a reasonably prudent operator"); El Paso Nat. Gas Co. v. Am. Petrofina Co., 733 S.W.2d 541, 550 (Tex. App. 1986); 6 Eugene Kuntz, A Treatise on the Law of Oil and Gas §60.3, at 138 (1991 & Cum. Supp. 2002)(dividing the marketing duty into "situations where product is not marketed and those where it is marketed"); Byron C. Keeling & Karolyn King Gillespie, The First Marketable Product Doctrine: Just What is the "Product"? 37 St. Mary's L.J. 1, 11 (2005)(observing that the implied duty to market "embrace[s] two distinct elements – a 'timing' element and a 'pricing' element," and that, under the "pricing" element, the lessee owes a duty to market its production at the best reasonable price).  Along the same lines, the duty to obtain the best reasonable price is separate from the duty not to deduct post-production costs.  See Scott Lansdown, The Implied Covenant to Market: A Few Years Later, 4 Tex. J. Oil Gas & Energy L. 299, 334 (2008-09)("The Implied Covenant to Market").
>
> The duty to market's obligation to obtain the best price serves to ensure that lessees do not unfairly enter into contract terms that would reduce the lessor's royalty payments in situations where "the amount of the royalty depends upon the price at which the product is marketed."  El Paso Nat. Gas Co. v. Petrofina Co., 733 S.W.2d 541, 550 (Tex. App. 1986).  See Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d at 284.

<u>Anderson Living Trust v. ConocoPhillips Co., LLC</u>, 2016 WL 1158341 at *12-13; TAC Order at

27-28.  The Court also holds that determining the best reasonable price requires a reasonableness

component:

> Determining the highest or best obtainable price[. . .] requires ascertaining
> what a reasonably prudent operator would do in the same situation in marketing its
> oil.  See <u>Watts v. Atl. Richfield Co.</u>, 115 F.3d 785, 794 (10th Cir. 1997)(stating
> that, although a producer has a duty "to obtain the best price and terms available"
> under Oklahoma's implied duty to market, the producer need only exercise "that
> degree of diligence exercised by a prudent operator having regard for the interests
> of both the lessor and lessee"); <u>Cabot Corp. v. Brown</u>, 754 S.W.2d 104, 106 (Tex.
> 1987)(requiring the lessee to "market the production with due diligence and obtain
> the best price reasonably possible"); <u>Duhe v. Texaco</u>, 779 So. 2d at 1982
> (describing Louisiana's implied duty to market as requiring the lessee to obtain "the
> best price reasonably possible").  In other words, the best price, or the highest
> obtainable price, is the price that the lessee could reasonably attain under existing
> market conditions.  It does not impose upon lessees a duty to get the highest price
> in a vacuum.  See <u>Smith v. Amoco Prod. Co.</u>, 31 P.3d at 271-72 (explaining that,
> courts should determine whether a lessee complies with the duty to market with
> reference to the facts and circumstances surrounding the sale under the reasonably
> prudent operator standard); Judith M. Matlock, <u>Payment of Gas Royalties in
> Affiliate Transactions</u>, 48 Inst. on Oil & Gas L. & Tax'n § 9.06[3], at 9-48 (1997).
> The above cited authority demonstrates, however, that in marketing the product, a
> reasonably prudent operator will get the best price possible under the circumstances
> so that operators cannot pay royalties at below market prices.[. . .]  See 5 Howard
> Williams & Charles Meyers, <u>Oil & Gas Law</u> §§ 806-08 (2001).

<u>Anderson Living Trust v. ConocoPhillips Co., LLC</u>, 2016 WL 1158341 at *15; TAC Order at 34-

35 (footnotes omitted).  The Court also explains in a footnote the distinction between the highest

price and the highest obtainable price:

> The "highest price" is different from the "highest <u>obtainable</u> price" or the
> "best price <u>available</u>."  Courts have recognized that the best obtainable or available
> price differs, because it encompasses an understanding that highest absolute price
> may not be available or obtainable in all factual circumstances in which the lessee
> must market the product.  See <u>Smith v. Amoco Prod. Co.</u>, 31 P.3d 255, 271
> (describing the difference between the "<u>best</u>" price and the "best price <u>possible</u>, or
> stated another way, the best available price").

<u>Anderson Living Trust v. ConocoPhillips Co., LLC</u>, 2016 WL 1158341 at *15 n. 13; TAC

Order at 34 n. 13 (emphasis in original).

The Plaintiffs filed the operative complaint, the Third Amended Complaint for Underpayment of Oil and Gas Royalties, on April 6, 2016 (Doc. 178)("TAC").  They added a Seventh Cause of Action: ([sic]Breach of the Implied Covenant to Market - Duty to Market with Reasonable Diligence as a Reasonably Prudent Operator.  TAC ¶¶ 68-75 at 23.  They allege that ConocoPhillips' implied duty to market requires that ConocoPhillips "seek[s] the best prices and values obtainable" for the gas produced by the Plaintiffs' wells.  TAC ¶¶ 69-70, at 23.  They also allege that ConocoPhillips must "remit this 'highest obtainable value'" to the Plaintiffs, TAC ¶ 71, at 23, and that ConocoPhillips breached its duty by not achieving the highest obtainable value.  See TAC ¶ 73, at 24.  In summary, the Seventh Cause of Action asserts that ConocoPhillips breached its implied duty to market for the benefit of royalty owners by failing to obtain the highest reasonable price of gas, which serves as the basis for calculating royalty payments.

The Court also denied Defendant ConocoPhillips's Partial Motion for Summary Judgment, filed May 14, 2021 (Doc. 246)("ConocoPhillips' MSJ").  See Order on ConocoPhillips' Partial Motion for Summary Judgment, filed March 3, 2023 (Doc. 332)("ConocoPhillips' MSJ Order"); Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *1 (D.N.M. March 3, 2023)(Browning, J.).  In denying ConocoPhillips' MSJ, the Court concludes that ConocoPhillips fails to meet its burden to demonstrate that its method of calculating the highest reasonably obtainable price for the Plaintiffs' royalty payments complies with its duty to market under New Mexico law.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *1; ConocoPhillips' MSJ Order at 12.  While there is sufficient evidence that ConocoPhillips based its royalty payments off of its pool price calculation, the Court cannot conclude that the pool price is the "best possible price."  Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL

8544171 at *1; ConocoPhillips' MSJ Order at 12.  The Court also holds, as is relevant to this Motion, that the duty to obtain the best reasonable price is separate from the duty not to deduct post-production costs.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *5; ConocoPhillips' MSJ Order at 10 (citing Scott Lansdown, The Implied Covenant to Market: A Few Years Later, 4 Tex. J. Oil Gas & Energy L. 299, 334 (2008-09)).  The Court concludes that the Plaintiffs' Seventh Cause of Action in the TAC, that ConocoPhillips breached the implied duty to market by failing to pay royalties based on the highest reasonably obtainable price, is not a cost-deductions claim.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *6; ConocoPhillips' MSJ Order at 13.  The Court explains:

> Contrary to ConocoPhillips' suggestion, however, the Third Amended Complaint's seventh claim is not a cost-deductions claim, because ConocoPhillips' method of calculating the pool price involves more than simple deductions for transportation costs and related processing expenses.  ConocoPhillips calculates royalties based on a complex system that involves pooling gas, averaging prices, and applying those prices to upstream wells.  It follows that claim seven -- which implicates that calculation -- involves more than simply cost deductions.  Instead, claim seven contemplates whether ConocoPhillips' entire process of pooling gas, averaging prices, and applying those averages upstream delivers the "best possible price."  Amoco Prod. Co. v. First Baptist Church of Pyote, 579 S.W.2d at 284.  Accordingly, claim seven is not a cost-deductions claim and, therefore, it is cognizable under New Mexico's duty to market.

Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *6; ConocoPhillips' MSJ Order at 13.

The Plaintiffs also moved for class certification.  See Motion for Class Certification, filed April 16, 2021 (Doc. 238)("First Class Cert. Motion").  The Court denied the First Class Cert. Motion because the Plaintiffs have not demonstrated that the common questions predominate the individual issues, as rule 23(b)(3) of the Federal Rules of Civil Procedure requires.  See Order denying First Class Cert. Motion at 1-2, filed March 31, 2023 (Doc. 334)("First Class Cert.

Order"); Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 6554427 at *1 (N.M.D. March 31, 2023)(Browning, J.).

Now before the Court is the Plaintiffs' Motion. The Plaintiffs make the following arguments in furtherance of the TAC's Seventh Cause of Action. First, the Plaintiffs argue that, under the implied duty to market, the duty to obtain the highest reasonably obtainable price exists as a matter of law. See Motion at 15-16; Anderson Living Trust v. Energen Res. Corp., 886 F.3d 826, 833-34 (10th Cir. 2018)("[O]il and gas well operators have a duty to market the gas for the benefit of the royalty owners and that duty is one implied as a matter of law (irrespective of the parties' agreement)(citing Davis v. Devon Energy Corp., 2009-NMSC-048, 147 N.M. 157, 218 P.3d 75, 86 (N.M. 2009)). Second, the Plaintiffs argue that the meaning of "highest" reasonably obtainable price refers to the best reasonable commercial sale market value that a prudent operator can obtain. See Motion at 16. Third, the Plaintiffs argue that ConocoPhillips's method of calculating the highest reasonably obtainable price, which uses gross sale price without subtracting transportation or other costs, is wrong. See Motion at 19. Fourth, the Plaintiffs argue that ConocoPhillips's royalty payments were based on gross sale price minus transportation fees. See Motion at 20. Fifth, the Plaintiffs argue that because Lower 48 listed the gross sales value as the price of gas on Plaintiffs' checks for royalty payments, ConocoPhillips's calculation of royalty payments failed to use the true netback value of the downstream sales of gas. See Motion at 21-22. Sixth, the Plaintiffs attest that, contrary to ConocoPhillips' argument that its gas is sold mainly outside of New Mexico, there is a significant market for the Plaintiffs' gas in San Juan Basin at ConocoPhillips's El Paso Natural Gas and Transwestern interconnecting pipelines. See Motion at 22. Seventh, the Plaintiffs contend that ConocoPhillips fails to calculate the highest reasonably obtainable price at the correct location, because an operator could have obtained a higher amount

at a local market such as in the San Juan Basin at ConocoPhillips's El Paso Natural Gas and Transwestern interconnecting pipelines.  See Motion at 22-23.  The Plaintiffs analogize that ConocoPhillips' use of a gross sales price in California is not reflective of the market value in San Juan Basin, just as a home value in Beverly Hills, California is not reflective of the market value of a home in Albuquerque, New Mexico.  See Motion at 23.  Eighth, the Plaintiffs contend that the correct location to calculate the highest reasonably obtainable price should be at the plant tailgate.  See Motion at 25.

ConocoPhillips filed its Response In Opposition to Plaintiffs' Motion for Partial Summary Judgment, on November 20, 2023 (Doc. 373)("Response").  ConocoPhillips first contends that the Court's prior rulings establish that the implied duty to market "requires lessees to secure the best reasonable sales price for gas being marketed," Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC Order at 27, "at the market outlet where the gas is sold," Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 6554427 at *30; First Class Cert. Order at 72.  See Response at 4.  Second, ConocoPhillips asserts that the Plaintiffs have the burden to prove that it breached the implied duty to secure the best reasonable sales price for gas it sells. See Response at 5.  Third, ConocoPhillips asserts that the highest reasonably obtainable price means "the best price possible on the sales on which they pay the lessors' royalties."  Response at 6-7 (citing Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *13; TAC Order at 30).  To that point, ConocoPhillips argues that the Court previously dismissed the Plaintiffs' claim that ConocoPhillips violated the implied duty to market through cost deductions. See Response at 7 (citing Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *11; TAC Order at 24-27).  Also to that point, ConocoPhillips argues that the Plaintiffs' reliance on In re Lease Oil Antitrust Litigation, 186 F.R.D. 403 (S.D. Tex. 1995)(Jack, J.), is irrelevant

here, because that case involves allegations of price fixing between large national oil companies.
See Response at 9 (citing In re Lease Oil Antitrust Litigation, 186 F.R.D. at 411-413).  Finally to
that point, ConocoPhillips cites Flanagan v. Chesapeake Exploration, 2015 WL 6736648 (N.D.
Tex., Nov. 4, 2015)(Boyle, J.), which holds that gas is sold at the point of sale and the "[l]essees
must obtain the best price reasonably possible at that point."  2015 WL 6736648 at *3.  Fourth,
ConocoPhillips argues that the vast majority of New Mexico's natural gas production is sold and
used outside of the state.  See Response at 13.  The Court found in its findings of fact in the First
Class Cert. Order that "less than one-tenth of New Mexico's natural gas is used in the state."
Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 6554427 at *3; First Class Cert.
Order ¶ 27 at 5.  Fifth, ConocoPhillips contends that, under the New Mexico Oil and Gas Severance
Tax Act, N.M.S.A. § 7-29-4.2, and the Oil and Gas Ad Valorem Production Tax Act,
N.M.S.A. § 7-32-6, when natural gas is sold at an area outside of the wellhead, its value can be
commensurate with the actual price of similar products in that area.  See Response at 16;
N.M.S.A. §§ 7-29-4.2, 7-32-6.  Further, according to ConocoPhillips, the regulations provide an
example that, when gas is delivered and sold to an area outside of the wellhead, the gas' value is
not established at the wellhead.  See Response at 16; N.M.S.A. § 3.18.6.8(A)(1).  Sixth,
ConocoPhillips argues that the Plaintiffs cannot challenge the price of residue gas without also
challenging the price of natural gas liquids and, thus, their claim is improper.  See Response at 19
(citing Abraham v. BP Am. Prod. Co., 685 F.3d 1196, 1199 (10th Cir. 2012); and Abraham v.
WPX Prod. Prods., LLC, 317 F.R.D. 169, 265, ¶¶ 78-79 (D.N.M. 2016)(Browning J.)).

The Plaintiffs filed the Plaintiffs' Reply to Defendant's Response in Opposition to
Plaintiffs' Motion for Partial Summary Judgment, on December 22, 2023 (Doc. 382)("Reply").
The Plaintiffs first argue that, by citing to Anderson Living Trust v. Energen Res. Corp., 886 F.3d

826, in the Response, ConocoPhillips admits that (i) a netback calculation deducts transportation costs and other post-production costs from a downstream sales price, and (ii) this results in the gas's wellhead price. See Reply at 1. Second, the Plaintiffs reiterate that ConocoPhillips has an implied duty to market to obtain the highest reasonably obtainable price, and ConocoPhillips has not challenged this duty. See Reply at 4. Third, the Plaintiffs reiterate their argument that the highest reasonably obtainable price must be the highest price at the wellhead, citing Anderson Living Trust v. Energen Resources Corp., 886 F.3d at 847, and Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1167 (10th Cir. 2000). See Reply at 10-11. To that point, they argue that ConocoPhillips' cite to Flanagan v. Chesapeake Exploration, 2015 WL 6736648, is improper because there, the parties' lease agreement requires that the royalty payments are computed at "the point of sale." 2015 WL 6736648 at *3. Fourth, the Plaintiffs assert that a majority of ConocoPhillips's gas from the San Juan Wells was sold in the San Juan Basin. See Reply at 9; Gas Production and Sale in the San Juan Basin at 7, filed December 22, 2023 (Doc. 382-1)("Gas Production and Sale San Juan"). Fifth, the Plaintiffs reiterate that the gas' taxable wellhead price equals the "actual price received" at the downstream market, less all costs of mainline transportation. See Reply at 15. See NMAC §§ 3.18.6.8(A)-(B); Feerer v. Amoco Prod. Co., 242 F.3d 1259, 1262-63 (10th Cir. 2001). Sixth, the Plaintiffs assert that, contrary to ConocoPhillips' argument that they must simultaneously challenge the price of residue gas and natural gas liquids, the Plaintiffs can challenge only the price of residue gas because they only seek revenue from residue gas sales. See Reply at 15-16.

The Court held a hearing on January 5, 2024. See Clerk's Minutes at 1, filed January 5, 2024 (Doc. 391); Transcript of Hearing at 1, taken January 26, 2024 (Doc. 390)("Tr."). At the hearing, the Plaintiffs emphasized that the highest reasonably obtainable price should be the price

at the tailgate of the Ignacio and San Juan plants in the San Juan Basin.  See Tr. at 10:7-13 (Brickell); id. at 47:25 (Brickell); id. at 48:1-4 (Brickell).  The Plaintiffs provided an example to illustrate that the gas at the San Juan Wells, i.e., the wellhead, becomes marketable at the tailgate.  See Tr. at 10:7-16 (Brickell).  The Plaintiffs note that, while there are marketing costs between the well and the tailgate, those are not at issue in this case.  See Tr. at 10:24-25 (Brickell).[30]  According to the Plaintiffs, even though the gross price of gas in California is higher, that price is not a benefit to the royalty owners.  See Tr. at 46:24-25 (Brickell); id. at 47:1-3 (Brickell).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

---

[30]Because the marketing costs are not at issue, the price of gas at the tailgate is synonymous with the gas' wellhead price for the purposes of this case.

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'")(quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

### LAW REGARDING THE IMPLIED DUTY TO MARKET IN OIL AND GAS LEASES

New Mexico has an implied duty to market.  It has long recognized:

> [A]n implied covenant on the part of the lessee (in the absence of any expressed on the subject as in [the] lease) that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development for production of oil and gas with reasonable diligence as to the undeveloped portion of the leased land.

Libby v. DeBaca, 1947-NMSC-4976 ¶ 17, 51 N.M. 95, 99, 179 P.2d 263, 265.  In addition, the lessee "must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product." Libby v. DeBaca, 1947-NMSC-4976 ¶ 17, 51 N.M. at 99, 179 P.2d at 265.[31]  See Elliot Industries Ltd. Partnership v. BP America Production Co., 407 F.3d 1091, 1113 (10th Cir. 2005). The Supreme Court of New Mexico later characterized the implied duty to market as an "implied covenant 'to make diligent efforts to market the production in order that the lessor may realize on this royalty interest.'" Darr v. Eldridge, 1959-NMSC-6523, 66 N.M. 260, 263, 346 P.2d 1041, 1044 (citing Wolfe v. Texas Co., 83 F.2d 425, 432 (10th Cir. 1936)).[32]

The Court previously has explained that oil-and-gas leases are construed "like any other contracts." Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d 979, 988 (D.N.M. 2013)(Browning, J.)(citing Elliott Indus Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1108). Additionally, New Mexico implies in law a duty -- "'to make diligent efforts to market the production in order that the lessor may realize on his royalty interest'" -- on oil-and-gas producers, "in equity, without looking to the language of the agreements or other evidence of the parties'

---

[31]In Libby v. DeBaca, the Supreme Court of New Mexico said that this duty to market includes building a plant to convert the gas into dry ice because that plant was the only way the gas could be sold.  See Elliot Industries Ltd. Partnership v. BP America Production Co., 407 F.3d at 1113.

[32]In Darr v. Eldridge, the court was faced with a situation where the lessee was holding onto the property without selling the minerals.  See Darr v. Eldridge, 1959-NMSC-6523, 6 N.M. at 263, 346 P.2d at 1044.

intentions." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218 P.3d 75

(quoting Darr v. Eldridge, 1959-NMSC-6523, 6 N.M. at 263, 346 P.2d at 1044).  This obligation

is called the "duty to market." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M.

157, 218 P.3d 75.  See Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d at 1022.

Under the implied duty to market, the lessee must obtain the best reasonable sales price for gas

being marketed.  See Anderson Living Trust v. ConocoPhillips Co., 2016 WL 1158341 at *12

(citing Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d 280, 284 (Tex. App. -- El Paso

1979)(concluding that the lessee breaches the implied duty to market, even though it pays royalties

based on the amount received pursuant to the lessors' lease agreements, because it does not obtain

the best possible price); Bruce M. Kramer & Chris Pearson, The Implied Marketing Covenant in

Oil and Gas Leases: Some Needed Changes for the 80's, 46 La. L. Rev. 787, 812 n.151 (1986)).

The Court previously has explained how to determine the best reasonable sales price:

> Determining the highest or best obtainable price requires ascertaining what
> a reasonably prudent operator would do in the same situation in marketing its oil.
> See Watts v. Atl. Richfield Co., 115 F.3d 785, 794 (10th Cir. 1997)(stating that,
> although a producer has a duty "to obtain the best price and terms available" under
> Oklahoma's implied duty to market, the producer need only exercise "that degree
> of diligence exercised by a prudent operator having regard for the interests of both
> the lessor and lessee"); Cabot Corp. v. Brown, 754 S.W.2d 104, 106 (Tex.
> 1987)(requiring the lessee to "market the production with due diligence and obtain
> the best price reasonably possible"); Duhe v. Texaco, 779 So. 2d at 1982
> (describing Louisiana's implied duty to market as requiring the lessee to obtain "the
> best price reasonably possible").  In other words, the best price, or the highest
> obtainable price, is the price that the lessee could reasonably attain under existing
> market conditions. It does not impose upon lessees a duty to get the highest price
> in a vacuum. See Smith v. Amoco Prod. Co., 31 P.3d at 271-72 (explaining that,
> courts should determine whether a lessee complies with the duty to market with
> reference to the facts and circumstances surrounding the sale under the reasonably
> prudent operator standard); Judith M. Matlock, Payment of Gas Royalties in
> Affiliate Transactions, 48 Inst. on Oil & Gas L. & Tax'n § 9.06[3], at 9-48 (1997).
> The above cited authority demonstrates, however, that in marketing the product, a
> reasonably prudent operator will get the best price possible under the circumstances
> so that operators cannot pay royalties at below market prices.  See 5 Howard
> Williams & Charles Meyers, Oil & Gas Law §§ 806-08 (2001).

Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *15.  Notably, the Court makes a distinction between the "highest price" and the "highest obtainable price" or "best price available," explaining:

> Courts have recognized that the best obtainable or available price differs, because it encompasses an understanding that highest absolute price may not be available or obtainable in all factual circumstances in which the lessee must market the product.  See Smith v. Amoco Prod. Co., 31 P.3d 255, 271 (describing the difference between the "best price" and the "best price possible, or stated another way, the best available price").

Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *15 n. 13.

## ANALYSIS

Simply put, the duty to obtain the highest reasonable price of gas requires: (i) obtaining the highest price of gas (ii) under existing market conditions.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *15; TAC Order at 34-35 (footnotes omitted).  The Plaintiffs seek partial summary judgment that under (i), the highest price of gas is based on the gas' wellhead price, as opposed to a final market price that includes post-production and transportation costs which often vary by market location.  See Motion at 10.  They do not seek, however, summary judgment that under (ii), gas' wellhead price at the tailgate is the highest price under existing market conditions.  The Court nevertheless addresses both steps of the duty to obtain the highest reasonable price of gas in this Memorandum Opinion and Order.

The Court first concludes that the Plaintiffs have met their burden to show that the highest reasonably obtainable price must be based off of the gas' wellhead price, because this price determines the Plaintiffs' royalty payments.  In contrast, the gas' price at a downstream market location includes the cost of transporting the gas, but ConocoPhillips subtracts such costs before calculating the Plaintiffs' royalty payments and thus the gas' price at a downstream market location is not realized to the royalty owners.  Only the gas' wellhead price benefits the

Plaintiffs under the implied duty to market.  The Court, therefore, grants the Plaintiffs' Partial

Motion for Summary Judgment.

Second, the Court also concludes that it cannot hold as a matter of law that the highest

reasonably obtainable price is the price at the tailgate of the Ignacio and San Juan plants, because

there is a genuine dispute of fact about the size of the existing market for ConocoPhillips' gas at

the tailgate.  There is thus a genuine dispute of material fact as to whether the tailgate price, or a

distant market price less transportation costs, is the highest reasonably obtainable price under

existing market conditions; this determination must go to a jury.

I.     **CONOCOPHILLIPS HAS A DUTY TO OBTAIN THE HIGHEST REASONABLE
       PRICE UNDER THE IMPLIED DUTY TO MARKET.**

Under a lessee's implied duty to market, ConocoPhillips has a duty to obtain the highest

reasonable price of gas which then forms the basis to calculate the Plaintiffs' royalty payments.

The Court of Appeals for the Tenth Circuit holds that a lessee "must proceed with reasonable

diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own

interest as well as that of the lessor, to market the product."  Elliot Industries Ltd. Partnership v.

BP America Production Co., 407 F.3d 1091, 1113 (10th Cir. 2005) (citing Libby v. DeBaca, 1947-

NMSC-4976 ¶ 17, 51 N.M. 95, 99, 179 P.2d 263, 265).  See also Watts v. Atlantic Richfield Co.,

115 F.3d 785, 794 (10th Cir. 1997)(concluding that the duty to market under Oklahoma law meant

that the defendant ARCO must exercise "that degree of diligence exercised by a prudent operator

having regard for the interests of both the lessor and lessee").  The Court previously defined the

implied duty to market: "At its core, the duty requires lessees to secure the best reasonable sales

price for gas being marketed."  Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL

8544171 at *4; ConocoPhillips' MSJ Order at 10 (citing Amoco Prod. Co. v. First Baptist Church

of Pyote, 579 S.W.2d at 284 (concluding that the lessee breached the implied duty to market, even

though it paid royalties based on the amount received pursuant to the lessors' lease agreements, because it did not obtain the best possible price); Bruce M. Kramer & Chris Pearson, The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's, 46 La. L. Rev. 787, 812 n.151 (1986)).

## II.     THE HIGHEST REASONABLY OBTAINABLE PRICE IS BASED ON THE GAS' WELLHEAD PRICE.

The Plaintiffs argue that ConocoPhillips' duty to obtain the highest reasonable price requires that it use the highest "upstream" or wellhead price as the basis to calculate royalty payments.  See Motion at 21.  ConocoPhillips contends that the duty to obtain the highest reasonable price requires that it use the highest "sales price" for gas being marketed.  Response at 6; Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC Order at 27.  ConocoPhillips essentially argues that the highest reasonable price is the gross sales value of downstream or "arm's length" sales.  See Response at 6.  ConocoPhillips also notes that the Court has not described the "sales price" as the wellhead price.  Response at 6; Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC Order at 27.

To meet its implied duty to market, ConocoPhillips must calculate the Plaintiffs' royalty payments based on the price of gas at the market location that has the highest price -- the highest reasonably obtainable price of gas.  The highest reasonably obtainable price must be based on the price of gas "upstream" of the market location, i.e., at the wellhead.  The gas' wellhead price is the price before transportation and other post-processing costs.  ConocoPhillips uses the gas' wellhead price as the basis for the Plaintiffs' royalty payments, because it concedes that it uses the netback method to calculate the Plaintiffs' royalty payments.  See Frisina Aff. ¶ 7, at 2-3; id. ¶ 16-17, at 7; id. ¶ 18, at 7.  ConocoPhillips, therefore, must first use the netback method to obtain the highest reasonable price based on the gas' wellhead price so it can make an apples-to-apples

comparison of gas prices less transportation costs.  This is consistent with ConocoPhillips'
obligation under the implied duty to market for the benefit of the Plaintiffs as royalty owners.

ConocoPhillips contends that its use of the gas' downstream price to obtain the highest
reasonable price is correct.  Response at 4, 12.  ConocoPhillips' use of the gas' downstream price,
however, as opposed to the correct "upstream" wellhead price, provides ultimately no benefit to
the royalty owners.  By first selecting the highest price of gas based on the downstream price and
then subtracting transportation costs under the netback method to calculate the Plaintiffs' royalty
payments, the Plaintiffs are not receiving the benefit of the highest downstream gas sales.  The
highest downstream gas sales are only the highest because of those transportation costs that
ConocoPhillips subtracts when calculating royalty payments.  The Court concludes, therefore, that
the gas' wellhead price must be determinative of the highest reasonable price that ConocoPhillips
must obtain under its implied duty to market.

The Tenth Circuit cases that the Plaintiffs cite to are not authoritative, because they involve
express contractual provisions that require the lessee calculate the royalty payments based on the
gas' value at the wellhead, i.e., the wellhead price.  In Anderson Living Trust v. Energen Resources
Corp., 886 F.3d at 833, the Tenth Circuit concludes that, when the plaintiffs' leases explicitly set
the basis for their royalty payments as the "market value at the well" or the "prevailing field market
price," the defendant Energen Resources must calculate the market value at the well even where
no such market exists.  886 F.3d 826 at 822.  The Tenth Circuit explains, "[t]he point is to calculate
the royalty payments based on the market value at the wellhead -- the price that would have been
paid at the wellhead if there were a market there."  886 F.3d at 822 n.10.  Similarly, Abraham v.
BP American Production Co., 685 F.3d 1196 (10th Cir. 2012), involves a contract where "the
express terms of the royalty obligations direct the royalty to be paid on the value of the gas 'at the

well.'"  685 F.3d at 1199.  In contrast, here, the evidence in the record for this motion does not show any express contractual provision that requires ConocoPhillips to calculate the royalty payments based on the gas' wellhead price.  Nor is that relevant here where the Plaintiffs move for partial summary judgment on their claim that ConocoPhillips breached the implied duty to market. The Tenth Circuit and the New Mexico Supreme Court, nevertheless, establish that "oil and gas well operators have a duty to market the gas for the benefit of the royalty owners and that duty is one implied as a matter of law (irrespective of the parties' agreement)."  Anderson Living Trust v. Energen Resources Corp., 886 F.3d at 833-34 (citing Davis v. Devon Energy Corp., 2009-NMSC-048, 147 N.M. 157, 218 P.3d 75, 86 (N.M. 2009)).  Here, ConocoPhillips has an implied duty to market the gas for the benefit of the Plaintiffs.  As part of this duty, it must obtain the highest reasonable price of gas based on the gas' wellhead price, because it is from this price that Plaintiffs receive the benefit of the sale of gas from the San Juan Wells.

The Court addresses ConocoPhillips' contention that the Court holds that the implied duty to market "requires lessees to secure the best reasonable sales price for gas being marketed." Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC Order at 18. The "sales price" means the gas' wellhead price.  Similarly, the Court concludes that the "point of sale" at which lessees must "obtain the best price reasonably possible," Flanagan v. Chesapeake Exploration, LLC, 2015 WL 13814515, here means the wellhead.  Using the gas' wellhead price as the highest reasonably obtainable price is consistent with the implied duty to market's requirement that the lessee market the gas for the benefit of the Plaintiffs.  In contrast, using the gas' higher price downstream may not comply with that duty if the transportation costs are the reason the price is higher; such transportation costs are of no benefit to the Plaintiffs.

ConocoPhillips subtracts transportation costs as a step in its "netback" calculation of the Plaintiffs' royalty payments.  See Frisina Aff. ¶ 18, at 7.

Additionally, New Mexico State tax law supports the proposition that the gas' wellhead value is the highest reasonably obtainable price under the implied duty to market.  The "value" of natural gas for state tax purposes is the "actual price received for products at the production unit." N.M.S.A. §§ 7-29-2(D), 7-32-2(D).  The "production unit" is the wellhead.  NMAC § 3.18.1.7(E). ConocoPhillips expressly concedes that "the taxable value of natural gas is determined at the wellhead."  See Response at 16 (citing N.M.A.C. § 3.18.1.7(E)).  Even when the natural gas is sold at a point other than the production unit, e.g., downstream, the regulations conclude that the gas' taxable value is the actual price received less transportation costs.  See N.M.A.C. § 3.18.6.8(B). The regulations therefore require using the netback method to calculate the gas' taxable value for gas sold downstream, which is the gas' wellhead value.  For ConocoPhillips to obtain the highest reasonable price of gas under its implied duty to market for the benefit of the Plaintiffs, it must look at the gas' wellhead value.

### A.   UNDER THE NETBACK METHOD, TO CALCULATE THE PLAINTIFFS' ROYALTY PAYMENTS, THE GAS' WELLHEAD VALUE MUST SUBTRACT TRANSPORTATION COSTS.

The Plaintiffs argue that ConocoPhillips must use the "netback" method, i.e., subtract transportation costs from the downstream gross sales value, to determine the gas' wellhead value. Motion at 21.  The Plaintiffs are correct that ConocoPhillips' use of the netback method to calculate the Plaintiffs' royalty payments requires subtracting transportation costs from the downstream gross sales value.  See Motion at 21.  The Tenth Circuit, the Court, and other courts, all consistently hold that the netback method is appropriate to calculate the gas' wellhead value.  In Anderson Living Trust v. Energen Resources Corp., the Tenth Circuit holds that the netback method should

be used to determine the value of any gas at the wellhead at issue, unless the lease provides otherwise.   See 886 F.3d at 847.   The Tenth Circuit explains that the "post-production expenses[. . .] are subtracted from the sales amount as an accounting mechanism to determine the market value at the wellhead. . . it is an accounting adjustment designed to effectuate the intention of the parties as it is expressed in the parties' agreement -- the lease."  Anderson Living Trust v. Energen Res. Corp. 886 F.3d at 832-33.   Earlier in this case, the Court concludes that the netback method could determine the gas' wellhead value by subtracting reasonable, post-production marketing costs from the market value at the downstream sales point.  Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *9 n.6; TAC Order at 31.   Thus, the Court concludes as a matter of law that (i) the highest reasonably obtainable price shall be determined using the gas' wellhead value; and (ii) the gas' wellhead value shall be calculated by the netback method, which subtracts transportation costs from the gross sales value at the downstream sales point.

**1.      Using the Gas' Wellhead Value to Find the Highest Reasonably Obtainable Price is Different From Making a Cost Deduction in the Royalty Payments.**

ConocoPhillips argues that the Court's prior rulings contradict the Plaintiffs' arguments. It points to the Court's TAC Order, which concludes that deductions in royalty payments do not violate New Mexico's implied duty to market.  See Response at 8; Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *10; TAC Order at 27 (holding that "any argument that the Defendants violate the implied duty to market through deductions is untenable.").  In the TAC Order, the Court also holds that the Plaintiffs' proposed claim that ConocoPhillips reduced its royalty revenues by charging mainline transportation costs and pipeline reservation fees is a "straightforward deductions claim" that is not actionable under New Mexico's implied duty to

market.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC

Order at 26.

ConocoPhillips argues incorrectly that its use of the netback method to calculate royalties

is an unactionable deductions claim.  The Court's prior ruling explains clearly that the issue here

is distinguishable from the issue of deductions in royalty payments.  The issue, here, is about the

highest reasonably obtainable price based on the price of gas, which is premised on the gas'

wellhead value.[33]   In contrast, the Court's prior determination was on the issue of whether

deductions in royalty payments breached the implied duty of marketability.  See Anderson Living

Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *11; TAC Order at 26-27.  The duty to

obtain the highest reasonably obtainable price "is distinct from any duty to physically develop and

market the product, but both are a part of every state's duty to market."  See Anderson Living

Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12; TAC Order at 27 (ellipses added).

ConocoPhillips mistakenly believes that the Plaintiffs want the Court to reconsider its findings in

the ConocoPhillips' MSJ Order, to find that ConocoPhillips' use of the netback method to calculate

royalty payments breaches its implied duty to market.  The Plaintiffs, rather, want the Court to find

that ConocoPhillips's failure to use the netback method to obtain the highest reasonable price of

gas at the wellhead, breached its implied duty to market.  See Motion at 23.

ConocoPhillips concedes that its deductions argument was not relevant to this current

Motion.  In the hearing, its counsel states:

---

[33]The duty to obtain the highest reasonable price is a component within the implied duty to
market.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *12
(D.N.M. March 1, 2016)(Browning, J.); TAC Order at 27 ("The implied duty to market has another
component, however.  The duty requires lessees to secure the best reasonable sales price for gas
being marketed.").  Nevertheless, the Court's prior ruling is not determinative here, because,
within the implied duty to market, ConocoPhillips' duty to obtain the highest reasonable price for
the Plaintiffs remains a separate and distinct issue.

> We believe that the amendment order holds that to the extent the implied duty to market is applicable, it requires the lessee to secure the best reasonable sales price of the gas.  And that that is distinct, separate and distinct of any effect of the deductions in the computation of royalty value.  The Court held that deductions are not part of the implied duty to market.  Therefore, what we need to look at is not the effect of deductions in terms of its effect on the royalty claim.  What needs to be looked at is the price at which the gas is sold.
>
> And if [the Plaintiffs] want to make a case that ConocoPhillips did not sell the gas at the best reasonable sales price, they've got to compare sales prices, not the effect of deductions on sales.  I think that is the effect of the Court's amendment order.

January 5 Tr. at 42:21- 43:15 (Sheridan).  The Court, therefore, rejects ConocoPhillips' argument that the Plaintiffs' Motion conflicts with the Court's prior ruling.  See Response at 6-8.  The Court's prior ruling barring the Plaintiffs from claiming that ConocoPhillips' deductions in its royalty payments breached its implied duty to market, is irrelevant here.  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2016 WL 1158341 at *11; TAC Order at 26-27.

### B.  THERE IS A GENUINE FACTUAL DISPUTE WHICH MARKET LOCATION HAS THE HIGHEST REASONABLY OBTAINABLE PRICE.

The Plaintiffs also request the Court conclude that the market location with the highest reasonably obtainable price is at the tailgate, because an available market exists at the tailgate.  See Motion at 23.  To support their claim that an available market exists at the tailgate, the Plaintiffs point to the evidence in the record showing how much gas ConocoPhillips purchased and sold in the San Juan Basin.  See Total Gas EPNG San Juan; Gas Sales EPNG San Juan.  As noted in the factual background section, ConocoPhillips purchased 11,698,080 MMBtus in March, 2011 and 7,437,042 MMBtus in February, 2012, and sold 16,213,232 MMBtus in March, 2011 and

8,889,423 MMBtus in February, 2012.  See Motion at 12; Response to SOF at 6, Total Gas EPNG

San Juan at 1-2, Gas Sales EPNG San Juan at 1-2.[34]

ConocoPhillips contests that not enough of a market exists at the tailgate, and thus the

highest reasonably obtainable price is at downstream market locations.  See Response at 14.

ConocoPhillips essentially argues that the market location with the highest reasonably obtainable

price is where ConocoPhillips sells most of its gas -- downstream, in places outside of New

Mexico, like California.  See Response at 15 ("Plaintiffs thus intend to subject every lessee in New

Mexico, where 90% of the gas produced is consumed somewhere else . . . .")(ellipses added).

ConocoPhillips cites to the fact that 2.237 trillion cubic feet -- six percent of the nation's supply -

- was marketed in New Mexico in 2021, but only 276 billion cubic feet of gas was consumed in

New Mexico.  See Response at 14; New Mexico State Energy Profile, U.S. Energy Information

Administration, https://www.eia.gov/state/print.php?sid=NM#NaturalGas (last updated June 20,

2024).

"The best price, or the highest obtainable price, is the price that the lessee could reasonably

attain under existing market conditions."  Anderson Living Trust v. ConocoPhillips Co., LLC,

2016 WL 1158341 at *15; TAC Order at 34.  Here, there is a genuine factual dispute about the

existing market conditions for ConocoPhillips' gas from the San Juan Wells at the tailgate and at

---

[34]The Plaintiffs assert that ConocoPhillips bought and sold the following amounts of gas in 2013, but there is no evidence in the record: specifically, in March, 2013, ConocoPhillips bought and sold over 28 million MMBtu's of gas in New Mexico.  See Motion at 22.  New Mexico used 246 million MCF (thousand cubic feet) of gas.  See Motion at 22.  ConocoPhillips' transaction volumes exceeded the volume the entire State of New Mexico used by over 90 million MMBtu's. See Motion at 22.  The Plaintiffs, however, only cite to "Fact No. 7" to support these assertions. See Motion at 22.  In support of Fact No. 7, the Plaintiffs cite to Gas Sales EPNG San Juan at 1-2. Gas Sales EPNG San Juan does not support any of the Plaintiffs' assertions because it only shows gas sales for March, 2011 and February, 2012.  See Gas Sales EPNG San Juan at 1-2.  The Court, therefore, concludes only that ConocoPhillips purchased and sold specific quantities of gas for March, 2011 and February, 2012.

downstream locations like California.  An absolute highest price at the tailgate is not necessarily the highest reasonably obtainable price, and the Court notes that the "highest absolute price may not be available or obtainable in all factual circumstances in which the lessee must market the product."  See Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *15 n. 13 (citing Smith v. Amoco Prod. Co., 31 P.3d 255, 271 (describing the difference between the "best price" and the "best price possible, or stated another way, the best available price")).  The Court cannot conclude that ConocoPhillips must sell all of the gas from the San Juan Wells at the tailgate as opposed to downstream in California.  The jury must determine whether the highest reasonably obtainable price under existing market conditions is indeed at that tailgate -- or downstream in distant markets such as in California -- such that ConocoPhillips has a duty to mainly market there.

## **CONCLUSION**

**IT IS ORDERED** that the Plaintiffs' Motion for Partial Summary Judgment, filed September 28, 2023 (Doc. 348), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Stan A. Koop
Goolsby | Proctor

Oklahoma City, Oklahoma

-- and --

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

-- and --

Bradley D. Brickell
Brickell & Associates, PC
Norman, Oklahoma

*Attorneys for the Plaintiffs*

Adam G. Rankin
Mark F. Sheridan
Robert J. Sutphin
John C. Anderson
Holland & Hart LLP
Santa Fe, New Mexico

*Attorneys for the Defendants*