# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a The
James H. Anderson Living Trust, THE
PRITCHETT LIVING TRUST; CYNTHIA W.
SADLER; SHIRLEY L. SCANLON LIVING
TRUST; ROBERT WESTFALL; LEE WILEY
MONCRIEF 1988 TRUST, AND NEELY-
ROBERTSON REVOCABLE FAMILY
TRUST,

        Plaintiffs,

vs.                                                                No. CIV 12-0039 JB/SCY

CONOCOPHILLIPS COMPANY, LLC,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Opposed Renewed Motion to
Certify This Matter as a Class Action and to Narrow the Class Definition and Reconsider Certain
Issues in the Denial of Plaintiffs' Original Certification Motion Under Fed. R. Civ. P. 59(E) and
Brief in Support, filed March 19, 2024 (Doc. 402)("Motion"). The Court held two days of
hearings, over a month apart. The first hearing day was July 1, 2024. <u>See</u> Clerk's Minutes, filed
July 1, 2024 (Doc. 435)("July 2024 Clerk's Minutes"); July 1, 2024, Hearing Transcript at 1 (taken
July 1, 2024), filed July 15, 2024 (Doc. 434)("July 2024 Hearing Tr."). The second hearing day
was August 12, 2024. <u>See</u> Clerk's Minutes, filed August 12, 2024 (Doc. 438)("August 2024
Clerk's Minutes"); August 12, 2024, Hearing Transcript at 1 (taken August 12, 2024), filed
October 3, 2024 (Doc. 442)("August 12 Hearing Tr."). The Motion has two parts: reconsideration,
and a New Class definition. On reconsideration, the primary issues are: (i) whether, in New
Mexico, the implied duty to market exists in all oil-and-gas leases so as to establish a common
question which predominates over individualized issues under rule 23(a)'s commonality

requirement and rule 23(b)(3)'s predominance requirement; and (ii) whether the question does ConocoPhillips owe interest on late gas royalty payments pursuant to New Mexico State law is a common question which predominates over individualized issues under rule 23(a)'s commonality requirement and rule 23(b)(3)'s predominance requirement.   The Court concludes that: (i) individualized lease language can negate the implied duty to market; (ii) a subclass excluding those whose leases negate the implied duty to market -- leaving only those for whom ConocoPhillips must obtain the highest reasonable price for gas from the Plaintiffs' wells -- eliminates individualized issues based in the implied duty to market; and (iii) individualized issues whether ConocoPhillips owe interest on late gas royalty payments pursuant to New Mexico State law defeat rule 23(a)'s commonality requirement and rule 23(b)(3)'s predominance requirement.

For the New Class definition, the primary issues are: (i) whether the Court should certify the New Class, which narrows the Original Class to those whose wells produce gas that is commingled with other Class wells in the San Juan Basin before processing and sale; and (ii) whether the Court should accept the San Juan Basin sale price as the highest reasonably obtainable price for gas from the Plaintiffs' wells.   The Court concludes that: (i) the New Class' limitation to only those whose gas is commingled before sale eliminates individualized issues in the Original Class; (ii) the common question -- whether ConocoPhillips breached its implied duty to market by not selling the gas from the Plaintiffs' wells at the highest reasonably obtainable price -- predominates over individualized issues; (iii) individualized issues with damages awards do not predominate because a common methodology applies to the entire New Class to calculate royalty damages and damages calculations can occur post-class certification; (iv) the Court certifies a subclass within the New Class of those whose leases uphold the implied duty to market and whose wells produce gas that is commingled at a plant before processing and sale; and (v) the Court

accepts the San Juan Basin price as the highest reasonably obtainable price because it simplifies damages calculations, benefits both parties, and promotes judicial efficiency.

## FACTUAL AND PROCEDURAL BACKGROUND

If this case were a child, it would now be in middle school. The Court first introduces the Plaintiffs, and then delves into the case's thirteen-year history. This includes the original 2011 lawsuit, the motions to dismiss, the resulting operative complaint, and the denial of class certification in a similar oil-and-gas royalties case that the Plaintiffs' brought simultaneously to this one. Then, the Court summarizes its Order denying class certification, which is the order most directly relevant to the Motion. See Anderson Living Tr. v. ConocoPhillips Co., LLC, 2023 U.S. Dist. LEXIS 174812, at *1 (D.N.M. March 31, 2023)(Browning, J.)("Anderson v. ConocoPhillips"), Order, filed March 31, 2023 (Doc. 334)("Class Cert. Denial Order"). The Court ends this section by summarizing the Motion briefing and hearings: (i) the Plaintiffs' Motion; (ii) the Defendant's Response in Opposition to Plaintiffs' Renewed Motion to Certify This Matter as a Class Action and to Narrow the Class Definition and Reconsider Certain Issues in the Denial of Plaintiffs' Original Certification Motion Under Fed. R. Civ. P. 59(e) and Brief in Support, filed May 24, 2024 (Doc. 419)("Response"); (iii) the Plaintiffs' Reply to ConocoPhillips Company's Response in Opposition to Plaintiffs' Renewed Motion to Certify, filed June 20, 2024 (Doc. 427)("Reply"); and (iv) the Motion Hearing, see July 2024 Clerk's Minutes at 1; July 2024 Hearing Tr. at 1; August 2024 Clerk's Minutes at 1; August 2024 Hearing Tr. at 1.

### 1.     **The Plaintiffs.**

The named Plaintiffs are: (i) Plaintiff Anderson Living Trust, formerly known as the Jams H. Anderson Living Trust; (ii) Plaintiff Prichett Living Trust; (iii) Plaintiff Cynthia W. Sadler; and (iv) Plaintiff Robert Westfall. See Third Amended Complaint for Underpayment of Oil and Gas

Royalties ¶¶ 1-5, at 2, filed April 6, 2016 (Doc. 178)("TAC"). The named Plaintiffs are individuals and trusts, who have no in-depth knowledge of the oil-and-gas industry. See Anderson Living Tr. v. ConocoPhillips Company, LLC, No. CIV12-0036 JB/KM, 2016 WL 1158341, at *2 (D.N.M. 2016)(Browning, J.)("TAC Order"). Often, including in this case, the lessor of an oil-and-gas lease is not someone within -- or someone familiar with the trade usage of -- the oil-and-gas industry. See Owen L. Anderson, Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?, 37 Nat. Resources J. 611, 611-12 (1997)("[S]eldom [could a] lessor engaged in the oil and gas business . . . be regarded as a 'merchant' knowledgeable about oil and gas production and marketing practices. Typically, the lessor is a farmer or a laborer, someone engaged in an unrelated business or profession, or a retired person."). The Plaintiffs own royalty interests in "the revenues derived from the production and sale of hydrocarbons[1] pursuant to the terms of oil and gas leases owned" by ConocoPhillips. TAC ¶ 9, at 3. The Court hereinafter describes the Plaintiffs' royalty interests in the sale of gas from the Plaintiffs' wells as "gas royalties."

## 2. **The 2011 Lawsuits Against ConocoPhillips and Williams Production Company.**

On October 20, 2011, a group of attorneys representing two similar groups of plaintiffs[2] filed two similar lawsuits in State court against two gas and oil companies. The first lawsuit is

---

[1]A hydrocarbon is an organic chemical compound that is composed exclusively of hydrogen and carbon atoms. They are naturally-occurring and form the basis of crude oil, natural gas, coal, and other energy sources. Jason Fernando, Hydrocarbons: Definition, Companies, Types, and Uses, Investopedia, https://www.investopedia.com/terms/h/hydrocarbon.asp#:~:text=The%20term%20hydrocarbon %20refers%20to%20an%20organic%20chemical,natural%20gas%2C%20coal%2C%20and%20 other%20important%20energy%20sources (July 15, 2023).

[2]Five parties are Plaintiffs in both cases, two Plaintiffs are unique to ConocoPhillips, and three Plaintiffs are unique to Anderson v. WPX. Compare ConocoPhillips Complaint ¶¶ 1-5(c),

against Defendant ConocoPhillips Co., LLC.  See Anderson v. ConocoPhillips, D-117-CV-2011-00510 (Cnty. of Rio Arriba, 1st Jud. Dist. Ct., State of N.M.)(Raphaelson, J.).  The second is against WPX Energy Production, LLC, Williams Production Company, LLC, and WPX Energy Rocky Mountain, LLC ("collectively WPX").  See Anderson Living Tr. v. Williams Prod. Co., D-117-CV-2011-00511 (Cnty. of Rio Arriba, 1st Jud. Dist. Ct., State of N.M.)(Raphaelson, J.).  Both cases were later removed to federal court.  See Anderson Living Tr. v. ConocoPhillips Co., No. CIV 12-0039 JB-SCY (D.N.M.)("Anderson v. ConocoPhillips"); Anderson Living Tr. v. WPX Energy Production, LLC, No. CIV 12-0040 JB-LFG (D.N.M.)("Anderson v. WPX").

In both suits, the Plaintiffs propose a class action on behalf of landowners who executed long-term leases with ConocoPhillips and WPX.  See Anderson v. WPX Fourth Amended Complaint for Underpayment of Oil and Gas Royalties ¶ 26, at 10-12, filed September 27, 2013 (Doc. 129, No. CIV 12-0040 JB-LFG)("Anderson v. WPX Complaint"); TAC ¶ 8, at 3.  The leases, which were largely executed in the 1940s, allow the Defendants to drill for natural gas[3] on the Plaintiffs' land in exchange for a royalty payment.  See Anderson v. WPX Complaint ¶ 26, at 10-12; TAC ¶ 11, at 4.  As the Court previously explained about the Plaintiffs in the TAC Order:

---

at 1-2, with Anderson v. WPX Fourth Amended Complaint for Underpayment of Oil and Gas Royalties ¶¶ 1-4(d), at 2, filed September 27, 2013 (Doc. 129)("Anderson v. WPX Complaint").

[3]The United States Energy Information Administration defines natural gas as:

> Natural gas is a fossil fuel energy source.  Natural gas contains many different compounds.  The largest component of natural gas is methane, a compound with one carbon atom and four hydrogen atoms ($CH_4$).  Natural gas also contains smaller amounts of natural gas liquids (NGLs, which are also hydrocarbon gas liquids), and nonhydrocarbon gases, such as carbon dioxide and water vapor.  We use natural gas as a fuel and to make materials and chemicals.

Natural gas explained, U.S. Energy Information Administration (last updated October 10, 2024) https://www.eia.gov/energyexplained/natural-gas/.

> The only information that all of the Plaintiffs receive regarding their
> gas royalties is their monthly check stubs, which contain figures -- broken
> down by well, for those Plaintiffs who own royalty interests in more than
> one well -- for the total "price," "quantity," "value," "deductions," and "net
> [proceeds]" of all gas recovered from the Plaintiff's well over that payment
> period, and the "interest," "paid int[erest]," "value," "deductions," and "net
> share" of the Plaintiff's royalty. E.g., Check Stubs of James H. Anderson
> Living Trust (dated over numerous years), filed with the Court during the
> class-certification hearing in WPX as Plaintiffs' Ex. 1. See WPX
> Complaint ¶¶ 86-87, at 26-27; id. ¶ 95, at 28-29. The Plaintiffs also receive
> the checks, which contain only the final dollar figure of the royalty payout
> for that payment period. See, e.g., Check Stubs of James H. Anderson
> Living Trust at 1-2.

See TAC Order, 2016 WL 1158341, at *2. At first, the Plaintiffs assert identical causes of action

in both suits: (i) failure to pay royalty on hydrocarbons; (ii) breach of the duty of good faith and

fair dealing; (iii) violation of the New Mexico Oil and Gas Proceeds Payment Act, NMSA 1978

§§ 70-10-1 to 70-10-6 ("NMPPA"), and interest due under Colorado law; (iv) bad faith breach of

contract; (v) declaratory relief; (vi) breach of the duty to market hydrocarbons under Colorado law.

See TAC at 11-21; Anderson v. WPX, 306 F.R.D. 312, 353 (D.N.M. March 19, 2015)(Browning,

J.)("Anderson v. WPX Class Cert. Denial Order").

### 3. The Motions to Dismiss in ConocoPhillips and WPX.

The Defendants in both cases removed their cases to federal court on January 12, 2012,

asserting federal diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)

("CAFA"). Anderson v. WPX Notice of Removal, filed January 12, 2012 (Doc. 1, No. CIV 12-

0040 JB-LFG); Anderson v. ConocoPhillips Notice of Removal, filed January 12, 2012 (Doc. 1).

In 2013, the Court dismisses the Plaintiffs' marketable-condition rule claim against

ConocoPhillips. See Anderson v. ConocoPhillips, 952 F. Supp. 2d 979 (D.N.M. 2013)(Browning,

J.)("FAC Order"). In the FAC, the Plaintiffs assert that ConocoPhillips violates the implied duty

to market and the marketable-condition rule by deducting production costs from the Plaintiffs'

royalty payments and using non-arm's length transactions to calculate the Plaintiffs' royalty payments. See FAC Order, 952 F. Supp. 2d at 1046-47. In the FAC Order, the Court dismisses the Plaintiffs' implied-duty-to-market claim insofar as it alleges that ConocoPhillips violates the marketable-condition rule, because New Mexico "does not recognize the marketable condition rule as part of the implied duty to market." FAC Order, 952 F. Supp. 2d at 1035. The Court explains:

> [T]he Tenth Circuit's decision in Elliot Indus. precludes the Plaintiffs' allegation that the Defendants have breached the marketable condition rule. In Elliot Indus., the Tenth Circuit expressly stated that a "conception of the implied duty to market" as requiring oil and gas lessees to "bear the burden of all costs incurred to put the gas in a marketable condition including the cost of removing the [natural gas liquids] from the gas . . . finds no support within New Mexico law." 407 F.3d at 1113-14.

FAC Order, 952 F. Supp. 2d at 1048 (quoting Elliot Indus. v. BP Am. Prod. Co., 407 F.3d 1091, 1113-14 (10th Cir. 2005)("Elliot")(Court adds brackets).[4]

### 4.    The Court Denies Class Certification in WPX and Denies Reconsideration.

On March 19, 2015, the Court denied class certification in Anderson v. WPX primarily because the royalty-payment methodology that WPX owes the Plaintiffs varies lease-to-lease, creating individualized issues which predominate. See Anderson v. WPX Class Cert. Denial Order, 306 F.R.D. at 319-320. The Plaintiffs in Anderson v. WPX then filed a motion asking the Court to reconsider its denial of class certification based on an alleged breach of the implied duty to market. See Anderson v. WPX, 312 F.R.D. 620, 623 (D.N.M. December 31, 2015)(Browning,

---

[4]The Court again dismisses the implied-duty to market claim in Anderson Living Tr. v. ConocoPhillips Co., LLC, 2015 WL 3543011 (D.N.M. May 26, 2015)(Browning, J.)("SAC Order"). In the SAC Order, the Court notes that it has already dismissed the claim previously, because Elliot, "which holds that New Mexico does not recognize the marketable-condition rule, binds the Court." SAC Order, 2015 WL 3543011 at *42-43.

J.)("Anderson v. WPX Class Cert. Reconsideration Order").  The Court concludes that the implied duty to market imposes requirements on the price that lessees must obtain when selling hydrocarbons, but ultimately denies the Motion to Reconsider on the grounds that it had already dismissed the implied-duty-to-market claim.  See Anderson v. WPX Class Cert. Reconsideration Order, 312 F.R.D. at 623.

### 5.        The Complaint in Anderson v. ConocoPhillips.

After the Court dismisses the implied duty to market's marketable-condition-rule claim in Anderson v. ConocoPhillips and denies class certification in Anderson v. WPX, the Plaintiffs in this case file the TAC.  The first six causes of action remain the same: (i) failure to pay royalty on hydrocarbons; (ii) breach of the duty of good faith and fair dealing; (iii) violation of the New Mexico Oil and Gas Proceeds Payment Act, NMSA 1978 §§ 70-10-1 to 70-10-6 ("NMPPA"), and interest due under Colorado law; (iv) bad faith breach of contract; (v) declaratory relief; (vi) breach of the duty to market hydrocarbons under Colorado law.  See TAC at 11-21.  The Plaintiffs allege an additional seventh cause of action for breach of the implied duty to market, which specifically includes the "duty to market with reasonable diligence as a reasonably prudent operator."  TAC at 23.  The Plaintiffs allege that ConocoPhillips breached its implied duty to market by not obtaining the highest reasonable price for the gas from the Plaintiffs' wells ("the Plaintiff's gas").[5]  See TAC ¶ 35, at 14.  The Plaintiffs allege that instead of conducting arms-length sales on the open market, ConocoPhillips sold gas to its own affiliates in non-arms-length transactions based on lower "index or other published rates."  TAC ¶ 76, at 24.  The Plaintiffs allege that ConocoPhillips' affiliates

---

[5]The Court describes the gas from the Plaintiffs' wells more simply as "the Plaintiff's gas" only for descriptive purposes, but does not conclude that the Plaintiffs own the gas that ConocoPhillips extracts from the wells.

then sell the gas in an arms-length resale downstream at even higher prices.  See TAC ¶¶ 36-37, at 14.  The Plaintiffs allege that ConocoPhillips improperly paid royalties based on the non-arms-length affiliate sales, which do not reflect the higher values from the arms-length resales downstream.  See TAC ¶ 76, at 24.  The Plaintiffs allege that this shortchanging violates the implied duty to market and its duty to obtain the highest reasonably obtainable price of the Plaintiffs' gas.  TAC ¶ 35, at 14.

> **6.      The Class Certification Hearing and the Order Denying Class Certification.**

In January 2022, the Court held four days of evidentiary hearings on the Plaintiffs' Motion for Class Certification.  See Motion for Class Certification, filed March 10, 2022 (Doc. 306)("Motion for Class Cert."); Amended Clerk's Minutes for January 2022 Class Certification Hearing at 1 (taken January 24, 2022), filed January 24, 2022 (Doc. 300)("Class Cert. Hearing"); Transcript of Class Certification Hearing Volume 1, filed March 22, 2022 (Doc. 309); Transcript of Class Certification Hearing Volume 2, filed March 22, 2022 (Doc. 310); Transcript of Class Certification Hearing Volume 3, filed March 22, 2022 (Doc. 311); Transcript of Class Certification Hearing Volume 4, filed March 22, 2022 (Doc. 312)(Volumes 1 through 4 collectively "Class Cert. Hearing Tr.").  The Court denies the Plaintiffs' Motion for Class Certification.  See Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *1-2.  In the Class Cert. Denial Order, the Court first makes forty-three findings of fact, and then after evaluating all the rule 23 class certification requirements, concludes that the Plaintiffs' proposed Class definition does not meet the rule 23(b)(3) predominance requirement.

> **a.      Findings of Fact.**

The Court makes findings of fact in its Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *3-9.  The Court basis the findings of fact on the following filings: (i) Plaintiffs'

Proposed Findings of Fact and Conclusions of Law, filed April 29, 2022 (Doc. 319)(Plaintiffs' PF"); (ii) Defendant ConocoPhillips Company's Proposed Findings of Fact and Conclusions of Law, filed Aril 29, 2022 (Doc. 322)("ConocoPhillips' PF"); (iii) Second Stipulation Regarding Refund in Federal Energy Regulatory Commission Proceeding, filed March 7, 2022 (Doc. 301)("Second Stipulation"); and (iv) Third Stipulation Regarding Class Certification Hearing and Putative Class Wells and Members, filed April 5, 2022 (Doc. 315)("Third Stipulation").  The Court does not repeat the findings of fact here as it incorporates many of them into the findings of fact for this Motion.

        **b.**     <u>**The Merits**</u>.

After establishing findings of fact, the Court turns to the merits of class certification.  The Court explains that the case "boils down to three essential questions: (i) how should ConocoPhillips have calculated the proposed Class members' royalties; (ii) how did ConocoPhillips calculate the proposed Class members' royalties; and (iii) what is the difference, if any, between the two figures?" <u>Anderson v. ConocoPhillips</u>, 2023 U.S. Dist. LEXIS 174812, at *86-87.  In denying class certification, the Court first concludes that rule 23(a) prerequisites are satisfied with respect to numerosity, commonality, typicality, and adequacy.  <u>Anderson v. ConocoPhillips</u>, 2023 U.S. Dist. LEXIS 174812, at *84.  In the Court's analysis of the commonality requirement, however, the Court emphasizes the two common two questions that all proposed Class members share: (i) how ConocoPhillips calculated the proposed Class members' royalties; and (ii) how ConocoPhillips paid the proposed Class members' royalties.  <u>See Anderson v. ConocoPhillips</u>, 2023 U.S. Dist. LEXIS 174812, at *86-89.  The Court also looks for commonality in one of the Plaintiffs' proposed questions: "Does the law of the State of New

Mexico require COP[6] to pay the putative Class Members' interest, if they are not paid within a certain time period following COP's receipt of money for the sale of natural gas production from the Class Members' wells?"  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *90 (quoting Brief and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 7, filed April 16, 2022 (Doc. 239)).   The Court concludes that the question does not meet rule 23(a)(2)'s commonality requirement, because its incidental nature makes it not "apt to drive the resolution of the litigation."  Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *89 (quoting Walmart, 564 U.S. 338, 350 (2011)).  Despite noting that this late-payment-interest question may be important to many Class members and is "one piece of the issue," the Court ultimately concludes that the question is incidental to the main thrust of the case, which is whether ConocoPhillips' method of calculating the highest reasonably obtainable price of gas from the Plaintiffs' wells results in underpaying royalties.  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *91.

Next, the Court turns to the additional requirements for class certification under rule 23(b): predominance and superiority.  It concludes that rule 23(b)(3)'s predominance requirement is not satisfied, "because individual questions concerning lease language, gas quality, and damages will overwhelm the common questions" that the Court identifies in its 23(a) analysis.  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *97-98.  The Court concludes that rule 23(b)(3)'s predominance requirement is not satisfied after analyzing the Tenth Circuit's three factors that trial courts specifically in oil-and-gas royalty cases should consider to determine whether individual issues predominate.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS

---

[6]Both parties use "COP" as an abbreviation for ConocoPhillips.

174812, at *98-99 (citing Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x 938, 943 (10th Cir. 2013))("Chieftan").[7]  Those factors are: (i) variations in lease language; (ii) variations in marketability; and (iii) the individuality of damage calculations.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *98 (citing Chieftan, 528 F. App'x at 943).  First, the Court concludes that the first factor cuts against predominance, because some leases modify or negate ConocoPhillips' implied duty to market, and thus the Plaintiffs' principal claim that ConocoPhillips breached its implied duty to market cannot apply to all Class members.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *97-98.  Second, the Court concludes that the second factor cuts against predominance, because "the quality of gas as it comes out of the ground -- coupled with other market factors -- impacts the highest obtainable price." Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *103.  The Court, therefore, "cannot escape proceeding well-by-well, month-by-month to determine what the highest reasonably obtainable price was for gas obtained from a particular well for a particular month-long royalty payment period."  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *107.

---

[7]Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x 938, 943 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Chieftain Royalty Co. v. XTO Energy, Inc. has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

In other words, gas from different proposed Class members' wells sells at different prices and thus has different highest reasonably obtainable prices.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *107.  Third, the Court concludes that individualized damages awards weigh "slightly against" predominance, because the fact that gas from each different proposed Class members' well has different highest reasonably obtainable prices at different points in time, means that proposed Class members will have different damages awards.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *107-108.  Furthermore, the Court concludes that proposed Class members are entitled to different royalty amounts depending on the unique terms of their individual leases: for example, some receive "1/8 of net proceeds," while others receive "3/16 of value produced and saved."  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *108 (citing Lease Summary Chart at 1, filed April 16, 2021 (Doc. 239-9)).  Damage awards for allegedly underpaid royalties, therefore, will differ because ConocoPhillips owes differing amounts to each proposed Class member.  Accordingly, the Court denies the Plaintiffs' Motion for Class Cert in an order, and states that it intends to issue a Memorandum Opinion later further detailing the decision.  See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *1; id., 2023 U.S. Dist. LEXIS 174812, at *1 n.1.

c.    **After the Order**.

The Plaintiffs informed the Court that they do not request a Memorandum Opinion on the Class Cert. Denial Order, because they intend to file a motion to reconsider.  See Motion for Summary Judgment Hearing Tr. at 56:3-18 (Brickell), taken January 5, 2024, filed January 26, 2024 (Doc. 390)("MSJ Hearing Tr.").  ConocoPhillips agreed that it also does not need a Memorandum Opinion on the Class Cert. Denial Order.  See MSJ Hearing Tr. at 57:5-10 (Sutphin).

The Court then stated that it would not write a Memorandum Opinion on the Class Cert. Denial Order. See MSJ Hearing Tr. at 57:20-22 (Court).

       **7.**     **The Motion for Summary Judgment**.

      On September 30, 2024, the Court granted in part and denied in part the Plaintiffs' Motion for Summary Judgment. See Anderson v. ConocoPhillips, No. CV 12-0039 JB/SCY, 2024 U.S. Dist. LEXIS 177835, at *1-2, _ F. Supp. 3d _ (D.N.M. September 30, 2024)(Browning, J.)("MSJ MOO"). There, the primary issue is whether gas' price before including transportation costs or after including transportation costs is the highest reasonably obtainable price for the gas produced from the Plaintiffs' land in New Mexico's San Juan Basin. Anderson v. ConocoPhillips, 2024 U.S. Dist. LEXIS 177835, at *1. The Court concludes that "[b]ecause there is no genuine dispute of fact that only the gas' price before including transportation costs determines the Plaintiffs' royalty payments, it is the only price that fulfills ConocoPhillips' implied duty to market for the benefit of the Plaintiffs." Anderson v. ConocoPhillips, 2024 U.S. Dist. LEXIS 177835, at *1-2. On March 25, 2025, ConocoPhillips filed a motion to reconsider the MSJ MOO. See ConocoPhillips Company's Motion to Reconsider a Fact Determined in the Memorandum Opinion and Order on Plaintiffs' Motion for Partial Summary Judgment (Doc. 441), filed March 25, 2025 (Doc. 454)("MSJ Motion to Reconsider"). At the time of filing this Memorandum Opinion and Order, the briefing on the MSJ Motion to Reconsider is not complete.

       **8.**     **The Motion**.

      The Plaintiffs' Motion restructures their central claim. See Motion at 6. The Plaintiffs no longer contend that ConocoPhillips failed to obtain the highest reasonably obtainable price for the gas from the Plaintiffs' well. See Motion at 6. Instead, they argue that ConocoPhillips did, in fact, execute an arms-length resale of gas from the Plaintiffs' wells and obtained the highest reasonable

price at one market location: the San Juan Basin.  See Motion at 6.  The Plaintiffs argue, however, that ConocoPhillips did not use that highest reasonable price to calculate royalties, and instead used the non-arms-length affiliate sale value.  See Motion at 6.

### a.       A Narrower New Class Definition.

The Plaintiffs seek to narrow the Original Class definition, which encapsulates individuals whose wells in the San Juan Basin of New Mexico and Colorado produced gas which ConocoPhillips ultimately sold.  See Motion at 7-8.  The New Class now contains two subclasses, Sub-class No. 1 and Sub-class No. 2.  See Motion at 7-8.  Sub-class No. 1 reads: "All owners of non-cost bearing interest which are part of Sub-class No. 2 below, limited to those owners whose interest is in wells located in the State of New Mexico, only."  Motion at 7.  Sub-class No. 2, which reads:

> All persons owning a non-cost bearing interest (royalty interest and/or overriding royalty interest)("putative class members") which interest is subject to oil and gas leases ("Class leases") which are owned or have previously been owned by the Defendant COP and its corporate predecessors in interest, in and under wells productive of natural gas in the San Juan Basin of New Mexico and Colorado.  The proposed Class period includes the time period from January 2005 to the present, and because COP conveyed its interest in these wells effective July 31, 2017 to Hilcorp, the class period ends on that date.  This class includes the owners of non-cost bearing interest in gas produced from wells whose gas was processed at either the Blanco/San Juan, Chaco, Ignacio, Kutz, Milagro, or Val Verde plants and commingled with gas from other wells processed at the same plant, and whose gas and gas products was [sic] sold by COP at or after the plant tailgate(s).

Motion at 8 (brackets added).  Sub-class No. 2 also includes a section excluding "entities and claims" b through h, with h being the most notable:

> b.      The proposed Class excludes claims of governmental entities and those of Indian tribes held in trust by the United States.

> c.      The proposed Class excludes interests held by sovereign Indian tribes and their successors.

      d.      The proposed Class excludes all wells productive of gas from the Fruitland Coal Formation, i.e. coal seam gas, in the State of New Mexico.

      e.      The proposed Class excludes interests under oil and gas leases that were owned by Burlington Resources Oil and Gas Co. which company was acquired by COP.

      f.      The proposed Class excludes owners under oil and gas leases who were paid on a basis other than the COP weighted average pricing system.

      g.      The proposed Class excludes claims previously adjudicated through prior actions.

      h.      Also excluded are those wells which are otherwise in the class definition as described above, but produced residue gas that was not commingled with the residue gas produced from any other putative class wells, and was sold by COP to a third party prior to reaching either a plant tailgate or an interconnect with El Paso Natural Gas pipeline or Transwestern pipeline in the San Juan Basin. The "plant" refers to any of the following six processing plants in the San Juan Basin: Blanco/San Juan, Chaco, Ignacio, Kutz, Milagro, and Val Verde.

Motion at 8. In summary, the new Class definition adds significant constraints which limit the Class only to those plaintiffs: (i) whose wells in the San Juan Basin of New Mexico produced raw gas; (ii) which ConocoPhillips sent to one of six processing plants (Blanco/San Juan, Chaco, Ignacio, Kutz, Milagro, and Val Verde) in the San Juan Basin for processing; (iii) where the processed gas combines or "commingles" with the processed gas from other wells; and (iv) then ConocoPhillips sells the processed gas at the processing plant's "tailgate."[8] Motion at 8. To help

--------

[8]A plant tailgate or "tailgate" is the outlet of a natural gas processing plant where dry residue gas (i.e., processed gas) is delivered or re-delivered for sale or transportation. Glossary: T, U.S. Energy Information Administration, https://www.eia.gov/tools/glossary/index.php?id=t (last visited September 11, 2024). A natural gas processing plant typically receives gas from a gathering system and sends out processed gas via an output, the tailgate, that is interconnected to one or more major pipeline networks. See Natural Gas Processing: The Crucial Link Between NG Production & Its Transportation to Market at 3, U.S. Energy Information Administration (January 20, 2006), https://www.eia.gov/naturalgas/articles/ngprocessindex.php.

clarify the distinction between the Original Class definition and the narrower new Class definition, in some instances at processing plants, ConocoPhillips extracted, processed (or third-party processed), and sold gas from a Class member's well without first combining it with other processed gas from other wells. Sub-Class No. 2 explicitly excludes those plaintiffs whose gas is uncombined. The key, therefore, is that the new Class members are only those whose wells produced gas that was combined or "commingled" with other wells' gas before sale. Motion at 8. Under the Original Class definition, the highest reasonably obtainable price for each Class members' gas can vary greatly, because various market factors -- such as "the date, the type of well, the well's location, the quality and marketability of the gas obtained from the well, the quantity of the gas extracted, the market demand for gas at the time, and other external market forces" -- cause the gas' value to fluctuate. Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *106. Ascertaining the highest reasonably obtainable price for the gas produced by Class members' wells, therefore, would have been, as the Court notes in its Class Cert. Denial Order, a "significant undertaking that will involve numerous individualized questions which overwhelm the common questions." Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *105. The Plaintiffs seek to eliminate these numerous individualized issues by adopting this new Class definition. See Motion at 6.

   **b.**  **The Implied Duty to Market.**

    Furthermore, the Plaintiffs argue that ConocoPhillips' implied duty to market supersedes any express language in Class members' leases that may negate that implied duty. See Motion at 9. According to the Plaintiffs, the Tenth Circuit in Anderson Living Tr. v. Energen Resources Corp., 886 F.3d 826 (10th Cir. 2018)("Energen"), holds that the implied duty to market exists in New Mexico oil-and-gas leases, and does not require analysis of the parties' agreement and applies

notwithstanding the agreement.  See Motion at 21.  They argue that, even though different Class members' leases may treat the implied duty to market differently, such variations in lease language do not establish individualized issues because ConocoPhillips' implied duty to market unequivocally applies to all Class members.  See Motion at 9.  The Plaintiffs also "personally conducted an exhaustive survey and review of all (over 3,000)" leases or overriding royalty interests, and found exactly 206 leases belonging to 105 individual owners that contain a close variation of the following language: "the owner of the override has no decision making in regard to development, operations, drilling production, or marketing or whether to continue production."  See Motion at 9.  The Court in its Class Cert Denial Order cites this language to conclude that lease language may "modify or negate the implied duty to market."  Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *99-102.  The Plaintiffs argue that this language does not alter the implied duty to market; the "decision making" clause indicates merely that ConocoPhillips markets the gas when only it determines it is appropriate to do so, but does not disclaim ConocoPhillips' implied duty to market.  Response at 10.  The Plaintiffs propose as an alternative that if the Court concludes that lease language has the power to override the implied duty to market, the Court should (i) form a separate subclass for those 105 Class members whose 206 leases modify or negate ConocoPhillips' implied duty to market; or (ii) exclude them from the Class.  See Motion at 10.

### c.    New Sub-Class for Late Royalty Payment Interest.

The Plaintiffs claim that ConocoPhillips owes interest on late royalty payments under THE NMPPA, NMSA § 70-10-4; the Court hereinafter refers to this as the late-payment-interest claim.  See Third Amended Complaint at 17-18, filed April 6, 206 (Doc. 178).  The Plaintiffs challenge the Court's conclusion in its Class Cert. Denial Order that the late-payment-interest claim is not a

common question under rule 23(a)(2) because it is not "central" to the litigation.  Motion at 10 (citing Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *91 (quoting <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011)("<u>Wal-Mart</u>")).  They also seek to certify a sub-class of New-Mexico lease holders on the late royalty payment interest claim.  <u>See</u> Motion at 1.  The Plaintiffs proffer evidence of royalty checks showing that ConocoPhillips paid royalties many years after production, which the Plaintiffs argue violates New Mexico's required window of paying royalties within forty-five days after production, pursuant to N.M. Stat. § 370-10-3.  <u>See</u> Motion at 11.  At the Class Cert. Hearing, the Plaintiff's expert Ley Kaplin testified that a royalty payment in April, 2011, for the production month of October, 2007, may indicate that ConocoPhillips could owe interest on that payment.  <u>See</u> Class Cert. Hearing Tr. at 444:16-445:13 (Ley).  The Plaintiffs also argue that the late royalty payment interest claim is independent from the core claim that ConocoPhillips did not obtain the highest reasonable price for the gas from the Plaintiffs' wells.  <u>See</u> Motion at 11.

> ### d.  <u>Proposed Fact That the San Juan Basin Price Is The Highest Reasonably Obtainable Price</u>.

The Plaintiffs request that the Court accept the following: "their proposed method to determine the HROP[9] for <u>all class wells</u> is at the point of sale of <u>the volume of the majority of all gas issue here</u>, the SJB."[10]  Motion at 24 (emphasis in Motion).  In sum, the Plaintiffs seek to use the sales price for the Plaintiffs' gas in the San Juan Basin, as opposed to elsewhere such as in California, as the highest reasonably obtainable price.  The Plaintiffs cite to a Class Cert. Hearing

---

[9]Both parties use "HROP" as an abbreviation for "highest reasonably obtainable price."

[10]Both parties use "SJB" as an abbreviation for the San Juan Basin.

exhibit showing that, in March, 2011, ConocoPhillips sold ninety percent of the gas from the Class members' wells in the San Juan Basin.  See March 2011 ConocoPhillips Gas Supply in the El Paso Natural Gas San Juan Pool at 2-3, admitted on January 25, 2022 as Plaintiff's Class Cert. Hearing Exhibit Demonstrative 1 at 9, 12, filed March 19, 2024 (Doc. 402-9)("March 2011 San Juan Gas Supply").[11]

        **e.**      **New Evidence.**

Finally, the Plaintiffs bring new evidence post-Class Cert. Hearing showing that ConocoPhillips underpaid royalties specifically related to money that the El Paso Natural Gas Pipeline, a buyer of ConocoPhillips' gas, refunded to ConocoPhillips.  See Motion at 33.  The Plaintiffs contend that over the course of several months, the El Paso Natural Gas Pipeline overcharged ConocoPhillips transportation costs to transport the Plaintiffs' gas.  See Motion at 31.  When the El Paso Natural Gas Pipeline refunded the overcharged transportation costs to ConocoPhillips, ConocoPhillips was to in turn refund Class members.  See Motion at 31.  El Paso Natural Gas Pipeline agreed to pay ConocoPhillips two rounds of refunds: a first round of $2.9 million, and a second round of $25 million.  See Letter from Thomas J. Mathialmeier and Chris M. Meyer to Clint Stockman at 3, dated February 25, 2015, filed March 19, 2024 (Doc. 402-16).  At the Class Cert. Hearing, ConocoPhillips confirmed that both refunds were reimbursed to the Class members.  See Motion at 32; Class Cert. Hearing Tr. at 685:6-686:10 (Saltsman, Sutphin).  ConocoPhillips' attorney stated that "ConocoPhillips has indicated that it

---

[11]The Court cites to admitted exhibits using the following convention: Title (date if applicable), admitted on date as Plaintiff/Defendant's Class Cert. Hearing Exhibit at page number, filed date if applicable (docket number if applicable)(abbreviation).  See Exhibit and Witness List at 1-4, filed January 24, 2022 (Doc. 300-1), for the complete list of all Class Cert. Hearing Exhibits and their date of admission.

would stipulate that the El Paso mainline adjustment was placed into March [2011]."  Class Cert. Hearing Tr. at 685:6-686:10 (Sutphin).  The Plaintiffs contend, however, that there is evidence only that ConocoPhillips executed the first refund of $2.9 million.  See Motion at 33; Second Stipulation Regarding Refund in Federal Energy Regulatory Commission Proceeding, filed March 7, 2022 (Doc. 301).

        **9.**     **The Response.**

ConocoPhillips responds to the Plaintiffs' Motion and addresses additional issues with the Plaintiffs' new Class definition.  First, ConocoPhillips states that the Plaintiffs improperly raise a new claim at the reconsideration stage, and second, the Plaintiffs' new Class definition does not meet rule 23's threshold requirement of ascertainability.  Then, ConocoPhillips explains how the new Class definition, under the Plaintiffs' proposed stipulation that the highest reasonably obtainable price for gas from the Plaintiffs' wells is in the San Juan Basin, also does not meet the rule 23(a) and rule 23(b)(3) requirements.  ConocoPhillips additionally asserts that the Motion does not meet the necessary standard of review for motions for reconsideration, that the Plaintiffs' do not provide a required damages model, and do not establish a class-wide injury.  ConocoPhillips then separately addresses the NMPPA claim, and finally ends by asserting that the Plaintiffs' new evidence claim will be waived by joint stipulation.

        **a.**     **Standard of Review and Procedural Matters.**

First, ConocoPhillips argues that the Plaintiffs have not established the required "clear showing" of error, which is "one that manifests itself without the need for in-depth analysis or review of the facts."  Response at 30 (quoting Anderson v. WPX Class Cert. Reconsideration Order, 312 F.R.D. at 660).  Second, ConocoPhillips argues that the Plaintiffs cannot pursue their new claim in the Motion -- that ConocoPhillips failed to pay royalties based on the price of the gas

from the Plaintiffs' wells that is processed, commingled, and sold in the San Juan Basin -- because the Plaintiffs never pled it in the TAC.  See Response at 32.  ConocoPhillips contends that it is not the proper subject of a class certification motion, see Response at 30, and cites to a United States District Court for the District of Nebraska case which holds that the "Plaintiff cannot use a motion for class certification or a redefined class to introduce an unpled claim and corresponding theories of liability."  Johansson v. Nelnet, Inc., 2022 U.S. Dist. LEXIS 184614, at *13 (D. Neb. July 21, 2022)(Zwart, M.J.).

**b.**     **Ascertainability.**

ConocoPhillips argues that the Plaintiffs' proposed new Class is no longer ascertainable, which is an implied threshold requirement for rule 23 class certification.  See Response at 5.  Specifically, ConocoPhillips argues that, with the new Class definition, there is no way to determine who the Class members are and who they are not.  See Response at 7.  ConocoPhillips argues that, noting that the leases at issue were executed in the early 1950s, seventy years ago, "[t]he interests have splintered into hundreds if not thousands of owners over the course of several generations."  Response at 8 (brackets added).  According to ConocoPhillips, the Plaintiffs' evidence only shows a list of overriding royalty instruments[12] and the number of original owners,

---

[12]An "overriding royalty instrument" is an interest in a mineral lease, like an oil-and-gas lease, that gives the holder the right to a proportional share of the sale of oil and gas produced.  It is carved out of the lease, but is not part of the oil-and-gas lease itself.  See Ryan C. Moore, What is Overriding Royalty Interest and How to Value it? (last updated October 17, 2024) https://www.pheasantenergy.com/overriding-royalty-interest/assignment of a royalty interest.  An example:

Richard is a Texas resident who owns a tract of land with an associated mineral estate.  He also owns 30 percent of the royalty interests attached to that mineral estate.  (To be clear, Richard does not own a [non-participating royalty interest] or an [overriding royalty interest].)

but does not identify the individuals who owned those overriding royalty instruments. <u>See</u> Response at 8; Terry Expert Report at 44-46. ConocoPhillips explains:

> As is typical in the industry, when COP acquires existing wells, it accepts the accuracy of the prior operator's pay deck, remits royalties to owners listed in the division order[13], and does not link owners on the pay deck with the underlying leases and title assignments (which COP's predecessor might or might not have provided). [Terry Expert Report] at 45. Consequently, the revenue pay history for operated wells does not always reflect the leases and assignments that are associated with particular owners. [Terry Expert Report at 45].

Response at 8. ConocoPhillips asserts that tracing a Class member who receives royalty payments to a specific lease or overriding royalty instrument requires "conducting a full-blown chain of title." <u>See</u> Response at 8. As a result, the Class is not ascertainable. <u>See</u> Response at 8.

### c.    The Stipulated Method for Calculating the Highest Reasonably Obtainable Price.

ConocoPhillips asserts several challenges to the Plaintiffs' proposed fact that the highest reasonably obtainable price is the San Juan Basin price. <u>See</u> Response at 10-11. First,

---

> When a new tech advancement considerably increases production, Richard decides he'd like to include his two brothers so that they benefit, as well. He decides to bequeath his royalty interests to his only son, as might be expected. However, he also elects to carve out a couple of overriding royalty interests for his two brothers, amounting to 7 percent each.

> In Richard's family, his son will retain all the benefits of the executorship of royalty rights. However, Richard's two brothers will also reap the benefits of the lucrative mineral estate via production-related revenues.

<u>See</u> What Is an Overriding Royalty Interest: Definition and Examples, The Impact Investor, https://theimpactinvestor.com/overriding-royalty-interest/ (last visited January 11, 2025).
[13]A division order is an instrument that sets forth the proportional ownership in produced hydrocarbons, including crude oil, natural gas, and natural gas liquids. <u>See</u> <u>Division Order – Understanding Oil and Gas Division Orders</u>, MineralWise https://www.mineralwise.com/owners-guide/leased-but-not-producing/division-order (last visited February 25, 2025).

ConocoPhillips asserts that "a plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified." Response at 10 (quoting Standard Fire Insurance Co. v. Knowles, 568 U.S. at 59). ConocoPhillips thus contends that the Plaintiffs inappropriately attempt to bind legally the proposed Class to the price of gas from the Plaintiffs' wells in the San Juan Basin as the highest reasonably obtainable price. See Response at 14.

Second, ConocoPhillips explains that under the proposed fact, the new Class definition does not meet rule 23(a)'s requirements of commonality, typicality, and adequacy. For commonality, ConocoPhillips argues that the required common injury is not cognizable. See Response at 11. Class members must "have suffered the same injury," and "a claim of injury is not cognizable unless it results from the breach of a recognized legal duty owed to the plaintiff." Response at 11 (quoting Soseeah v. Sentry Ins., 808 F.3d 800, 808-810)(10th Cir. 2015)). ConocoPhillips argues that the only recognized legal duty here is the duty to obtain the highest reasonable price, not a duty to obtain the price in the San Juan Basin. See Response at 12. ConocoPhillips' adequacy and typicality arguments focus on how binding Class members to a highest reasonably obtainable price in the San Juan Basin deprives and forecloses Class members from making arguments that ConocoPhillips obtained even higher prices elsewhere. See Response at 14-15.

### d.    Predominance and the Implied Duty to Market.

ConocoPhillips contends that the individual issues concerning Class members' royalty interests overwhelm common questions, so as to fail the rule 23(b)(3)'s predominance requirement. See Response at 16. First, ConocoPhillips disagrees with the Plaintiffs' conclusion that the implied duty to market underlies all Class members' leases such that ConocoPhillips has a duty to obtain the highest reasonable price of gas from the Plaintiffs' wells. See Response at 14.

ConocoPhillips asserts that individual Class members' lease language "can and does negate or modify" the implied duty to market, and therefore, also negates or modifies the duty to obtain the highest reasonably obtainable price of gas from the Plaintiffs' wells.  See Response at 14. ConocoPhillips argues that lease language, other than the language the Plaintiffs identify, expressly disclaims ConocoPhillips' implied duty to market.  See Response at 17 (citing Terry Expert Report at 18, ¶ 54).  The Terry Expert Report identifies an example: Lease No. 188485 provides the lessor with the 3/16th market value at the mouth of the well, allows deductions for post-production costs, and includes the following sentence:

> Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the covered minerals capable of being produced from said wells, but in the exercise of such diligence, Lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities, flowlines, separator, and lease tank, and shall not be required to market such covered minerals upon terms unacceptable to Lessee.

Terry Expert Report at 18, ¶ 54.  ConocoPhillips also cites to Devon Energy, 2009-NMSC-048, ¶ 35, 147 N.M. at 168, 218 P.3d at 86, and ConocoPhillips Co. v. Lyons, 2013-NMSC-009 ¶¶ 61-62, 299 P.3d 844, 859-60, which both conclude that the implied duty to market is a covenant implied in law within oil-and-gas leases, but argues that lease language is still relevant to whether a lessee breached the duty.  See Response at 14.  ConocoPhillips maintains that the Court even concluded so when it stated in its TAC Order that "[t]he duty to market may be implied in all leases, but lease language can affect the determination whether the lessee breached the duty to market and how the lessor can recover."  See TAC Order, 2016 WL 1158341, at *21 n.22. ConocoPhillips also challenges the Plaintiffs' claim that Energen supersedes lease language.  See Response at 15.  In Energen, the Tenth Circuit drops a footnote explaining that it declines to resolve the issue whether the implied duty to market overcomes express contractual terms, and also notes

that the Supreme Court of New Mexico in <u>Devon Energy</u> states that the implied duty to market "is one implied by law and therefore applies regardless of what the parties' contract says on the issue." <u>Energen</u>, 886 F.3d at 836 n. 12 (citing <u>Devon Energy</u>, 2009-NMSC-048, ¶ 35, 147 N.M. at 168, 218 P.3d at 86).  ConocoPhillips, therefore, argues that the Tenth Circuit's statements on the issue are "plainly dicta, not a holding."  Response at 15.  ConocoPhillips also points to the Tenth Circuit case <u>Kerr-McGee Corp. v. Bokum Corp.</u>, 453 F.2d 1067, 1073 (10th Cir. 1972), which acknowledges that, in mineral leases, an implied duty to market minerals at the highest reasonably obtainable price exists, but "cannot be written into a lease in which the parties have contracted otherwise."  <u>See</u> Response at 15 (citing <u>Kerr-McGee Corp. v. Bokum Corp.</u>, 453 F.2d at 1073).

ConocoPhillips then explains that determining whether it breached its implied duty to market requires a lease-by-lease analysis, because Class members' leases "call for payment of royalty on different products and/or at different points in the production line."  Response at 16. ConocoPhillips also argues that the Plaintiffs cannot demonstrate a clear, class-wide violation of the implied duty to market, because different leases entitle different Class members to royalties on different products -- unprocessed versus processed -- at different points in the production line -- at the well versus at a market location.  <u>See</u> Response at 18.  ConocoPhillips argues that the Plaintiffs inaptly "presuppose" that every Class member's lease entitles the lessor to a royalty interest in gas from the Plaintiffs' wells that is processed, commingled, and then sold at the processing plant's tailgate, according to the new Class definition.  Response at 18.  ConocoPhillips contends that some leases entitle some Class members to royalties based on the price of unprocessed gas at the well.  <u>See</u> Response at 22.  For example, Anderson Living Trust's "Community Oil and Gas Lease" states that its royalty interest is the "market value at the well of 3/16 of gas sold or used."  Plaintiffs' Interests in Leases Attachment C to the Terry Expert Report at 1-2, admitted on January 27, 2022,

as Defendant's Class Cert. Hearing Exhibit F-6, filed May 24, 2024 (Doc. 419-2)("Plaintiff's Interests in Leases"). Westfall inherited his royalty interest from his father, whose royalty interest was for "the price at the wellhead." Pacific Northwest Pipeline Corporation Division Order to Archie Westfall at 2-3 (dated August 6, 1957), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F, filed May 24, 2024 (Doc. 419-3). Other leases, however, entitle other Class members to royalties based on the price of processed gas at the tailgate. For example, one lease states that the assignors' royalty interest applies "to all minerals produced from an oil well and to all minerals produced from a gas well." See Lease Number and Language Chart at 2, Row 14 Column I, admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8, filed May 24, 2024 (Doc. 419-5). Another lease states that the assignor's overriding royalty interest "shall only apply to, and is hereby strictly limited to, gas as hereinafter defined produced from that certain interval between the surface of the earth and the base of the Pictured Cliffs formation." See Lease Number and Language Chart at 10, Row 73 Column I, admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8, filed May 24, 2024 (Doc. 419-5). According to ConocoPhillips, to determine whether ConocoPhillips paid royalties based on the highest reasonably obtainable price of gas from the Plaintiffs' wells, "the Court must therefore determine where in the production line the royalty interest was payable." Response at 24. This individualized issue, ConocoPhillips argues, requires a lease-by-lease analysis. See Response at 24.

ConocoPhillips also argues that the variations in gas quality still defeat predominance. See Response at 22. ConocoPhillips explains that gas is valuable "for its energetic potential." Response at 22 (citing Abraham v. WPX, 317 F.R.D. 169, 180, ¶ 74 (D.N.M. 2016)(Browning, J)). According to ConocoPhillips, that potential is measured by each well's Btu factor, which is a measurement for the energy per volume of gas. See Response at 23. According to ConocoPhillips,

Btu factors vary significantly in the San Juan Basin. See Response at 24. According to ConocoPhillips, if a Class members' royalty interest is in unprocessed gas at the well, then the highest reasonably obtainable price for that gas "depends on the volume produced, multiplied by its Btu factor, and valued in dollars and cents per MMBtu as if sold at the well based on its energetic potential." Response at 24.

Next, ConocoPhillips argues that the Plaintiffs' proposed fact that the highest reasonably obtainable price of gas is in the San Juan Basin still fails the rule 23(b)(3) predominance requirement. See Response at 24. ConocoPhillips argues that, because some Class members' royalties are based on the price of unprocessed gas, while other are based on processed gas, a significant number of individualized questions remain under the Plaintiffs' proposed fact:

> Before making any comparison to their Stipulated HROP, Plaintiffs would need to (a) prove the total sales revenues COP realized from all of its sales of all production from each well; (b) calculate the effective sales price per MMBtu applicable to the unprocessed gas at the well based on COP's total sales revenue; and (c) determine (under Plaintiffs' theory) the "net sales price" by subtracting the mainline transportation cost per MMBtu that COP incurred to market the production and the "net-net sales price" realized by COP after deducting all other post-production costs. This evidence is not common.

Response at 29.

Finally, ConocoPhillips provides an example of how it calculated royalty payments to a Class member, Sadler, to show that individualized issues regarding how it calculates royalty payments for each Class member predominate. See Response at 27-30. Accordingly, ConocoPhillips asserts that the Plaintiffs do not produce a viable damages model that accounts for ConocoPhillips' individualized royalty-payment calculations. See Response at 30-31.

e.  **Injury**.

ConocoPhillips argues that the Plaintiffs have no reliable means of establishing class-wide injury, because the Plaintiffs cannot prove that ConocoPhillips sold all of the gas from the Plaintiffs' wells in the San Juan Basin and then did not pay royalties based on that price.  See Response at 31.  According to ConocoPhillips, in contrast, the Plaintiffs sought to have the Court make a finding of fact that half of the gas from the Plaintiffs' wells is sold in the San Juan Basin, while the other half is sold at other distant market locations.  See Response at 34 (citing Plaintiffs' Proposed Findings of Fact ¶ 52, at 18, filed April 29, 2022 (Doc. 319)).  Furthermore, according to ConocoPhillips, in the Plaintiffs' appeal to the Tenth Circuit, the Plaintiffs previously explained that ConocoPhillips "sold approximately half of its total commingled gas locally in the SJB, and transported the rest via interstate pipeline transmission (and expense) to distant markets, mostly in California."  Petition for Permission to Appeal Order Denying Class Certification at 15-16, filed April 26, 2023 (Doc. 335-1)("Petition to Appeal Class Cert. Denial Order").  The Plaintiffs presented evidence showing that, in March, 2011, ConocoPhillips sold forty-five percent of the gas in the El Paso San Juan pipeline and fifty-four percent of the gas from the Transwestern pipeline to other distant market locations.  See Petition to Appeal Class Cert. Denial Order at 17.  According to ConocoPhillips, the Tenth Circuit oral argument described the fact that ConocoPhillips sold gas from the San Juan Basin outside of the San Juan Basin, in locations such as Arizona and California.  See Petition to Appeal Class Cert. Denial Order at 28.  According to ConocoPhillips, the Plaintiffs now "inexplicably" attempt to argue that ConocoPhillips sold ninety percent of the gas from the Plaintiffs' wells in the San Juan Basin.  Response at 33.

f.    **The NMPPA Claim.**

ConocoPhillips next argues that the Plaintiffs' inappropriately challenge the Court's conclusion that the late royalty payment interest claim is "relatively incidental," see Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *91, because the Plaintiffs did not seek a Memorandum Opinion fully detailing the Court's rationale when given the opportunity,  see Response at 36.  In other words, the Plaintiffs waived their right to a full analysis of the Court's holding on late royalty payment interest, so they should not be allowed to make the Court reconsider its holding now.  See Response at 36.

As to the merits, ConocoPhillips states that the Plaintiffs' damages model inappropriately assumes that ConocoPhillips owes interest on late royalty payments, but "[l]iability cannot be assumed; it must be proven, on a payment-by-payment basis."  See Response at 37 (emphasis in original)(brackets added).  ConocoPhillips asserts that there are many instances where it may not owe interest on late payments, though it only cites to its own proposed findings of fact from the Original Class Cert. Motion.  See ConocoPhillips Proposed Findings of Fact at 53, ¶ 195, filed April 29, 2022 (Doc. 322)("ConocoPhillips' Proposed Findings of Fact").  It also asserts that its initial royalty payments were timely under the NMPPA.  See Response at 38 (citing ConocoPhillips' Proposed Findings of Fact at 56, ¶ 208-10).  It challenges the Plaintiffs' characterization of subsequent payments as "late" under the NMPPA, and instead calls them "prior period adjustments," which are accounting adjustments "relating to a production period that has been accounted for."  See Response at 38-39.  Furthermore, the Court must assess the "reasons and circumstances" behind a prior period adjustment to determine whether ConocoPhillips violated the NMPPA.  See Response at 39.  ConocoPhillips then lists numerous reasons why it paid Class members prior period adjustments, such as because of plant adjustments to allocations

of gas from specific producers or properties, because of the Bureau of Land Management's ("BLM's") approval to add more wells to a "unit" such that ConocoPhillips must reallocate unit production, or when Class members lose their royalty checks.  See Response at 39-40.  These prior period adjustments, ConocoPhillips asserts, affect different Class members differently so as to defeat rule 23(a)'s commonality requirement, as well as rule 23(b)(3)'s predominance requirement. See Response at 41-42.

ConocoPhillips also responds to various aspects of the Plaintiffs' NMPPA claim as follows: (i) the testimony of Dr. Becker explains that a highly individualized inquiry is necessary to determine late payments, see ConocoPhillips' Proposed Findings of Fact at 55, ¶ 204; (ii) pages 52-67 of ConocoPhillips' Proposed Findings of Fact demonstrate the individualized nature of late payments; (iii) significant title issues that led to prior period adjustments do not violate the NMPPA; (iv) the Plaintiffs do not establish evidence that ConocoPhillips is holding any interest payments in suspense as the NMPPA requires; (v) ConocoPhillips determines interest on a case-by-case basis, see ConocoPhillips' Proposed Findings of Fact at 55-56, ¶¶ 205-06; (vi) some lease terms validly include payment timelines different from what the NMPPA requires; (vii) and Oklahoma State law and the Oklahoma Production Revenue Standards Act differs from the NMPPA such that several class certifications on similar issues in Oklahoma are not analogous here,  see Response at 45.

Lastly as to the Plaintiffs' NMPPA claim, ConocoPhillips argues that the Plaintiffs have not established that they have royalty interests upon which any late royalty payment interest is based.  See Response at 45.  Therefore, in ConocoPhillips' view, the NMPPA claim is not valid. See Response at 45.

g.    **New Evidence.**

ConocoPhillips asserts that the Plaintiffs "have now agreed that COP paid class members their proportionate share of the $25 million in [El Paso Natural Gas] settlement funds."  Response at 4 (Court adds brackets).  Then, in a footnote attached to this sentence, ConocoPhillips further states that the Plaintiffs are no longer pursuing this argument "[b]ased on information provided by COP and several meets among the parties' counsel and COP accounting personnel."  Response at 4, fn. 1 (brackets added).  The footnote lastly states that the parties are working on a stipulation regarding this argument and that, "[a]ccordingly, COP does not respond to it here."  Response at 4, fn. 1 (brackets added).

10.    **The Reply.**

In the Reply, the Plaintiffs address their NMPPA claim, the holding of <u>Energen</u> that discusses the implied duty to market's application in oil-and-gas leases, and that the New Class definition eliminates individualized issues so as to overcome rule 23(b)(3)'s predominance requirement.  The Plaintiffs then dispute several specific arguments in the Response regarding royalty calculations, whether the New Class is ascertainable, and the proposed fact that the highest reasonably obtainable price is the San Juan Basin price.

a.    **Ascertainability.**

If the Court concludes that individual lease language can negate or modify the implied duty to market, the Plaintiffs propose an even narrower sub-class only for those individuals whose leases require ConocoPhillips to execute its implied duty to market.  <u>See</u> Reply at 11.  The Plaintiffs contend that this narrower sub-class is ascertainable, because ConocoPhillips must have the required evidence, such as land titles, royalty interests, and transfers, and must have evidence that can match sub-class members with the corresponding royalty interests in any given property.

See Reply at 19 ("COP, in order to make accurate payments, has the records of all transfers of these [royalty] interests."). The Plaintiffs argue that "[i]n order to properly pay overriding royalty interests on those wells, COP necessarily had to keep up with the title issues and the (current owners') names and addresses." Reply at 20 (brackets added). The Plaintiffs assert, therefore, that these records will reveal the individuals in the Class and will reveal the individuals' names that are excluded. See Reply at 20.

###### b.    **Predominance.**

The Plaintiffs assert that three aspects of the case present common questions which defeat individual issues: an underlying implied duty to market in all Class members' leases, a uniform damages calculation method for underpaid royalties, and a universal highest reasonably obtainable price of gas from the Plaintiffs' wells.

First, the Plaintiffs reemphasize their argument from their Motion that the implied duty to market underlies and applies to all oil-and-gas leases, based on Energen. See Reply at 5, 15. There, the Tenth Circuit paraphrases a Supreme Court of New Mexico case which holds that "the implied duty to market is one implied by law, which does not require analysis of the parties' agreement and applies notwithstanding that agreement." Energen, 886 F.3d at 836 (citing Devon Energy, 2009-NMSC-048, ¶ 35, 147 N.M. at 168, 218 P.3d at 86). The Plaintiffs further argue that this case is distinguishable from Abraham v. WPX, which holds that "lease language is not irrelevant," 317 F.R.D. at 264, because that case concerned "refined NGLs"[14] and predates

---

[14]"Natural gas liquids (NGLs) are hydrocarbons -- in the same family of molecules as natural gas and crude oil, composed exclusively of carbon and hydrogen. Ethane, propane, butane, isobutane, and pentane are all NGLs. There are many uses for NGLs, spanning nearly all sectors of the economy. NGLs are used as inputs for petrochemical plants, burned for space heat and cooking, and blended into vehicle fuel." What are natural gas liquids and how are they used?, U.S.

Energen's determination that the netback method must calculate the price of gas at the well, see Reply at 24.

Second, the Plaintiffs argue that calculating Class members' damages meets rule 23(b)(3)'s predominance requirement, because the damage calculation is the same for all Class members under the new Class definition and under the stipulated fact that the highest reasonably obtainable price for the gas from the Plaintiffs' wells is in the San Juan Basin. See Reply at 6. Thus, according to the Plaintiffs, "all wells behind each SJB plant received the same price and Plaintiffs' damage model attributes the same HROP to all Class members each month (COP's own SJB monthly average)." See Reply at 6. The damages calculation is as follows:

> the HROP amount in the San Juan Basin ("SJB") less the price paid by COP to all owners behind each plant for residue gas in the SJB (multiplied by) the residue gas volume for the well (multiplied by) the percent (in decimal) of the total class member interest in each well (examples: one eighth, three sixteenths, twenty percent).

Reply at 6.

Third, the Plaintiffs assert that, under the new Class definition, differences in wellhead quality, pressure, or location will not impact the highest reasonably obtainable price for gas from the Plaintiffs' wells, nor the actual price that ConocoPhillips obtained, because ConocoPhillips combined all of the gas from the Plaintiffs' wells, and "achieved the same quality, pressure, and location prior to any sale." See Reply at 6. According to the Plaintiffs, all Class members receive the same sales price for gas from their wells. See Reply at 7. Additionally, the Plaintiffs argue

---

Energy Information Administration (April 20, 2012) https://www.eia.gov/todayinenergy/detail.php?id=5930 ("EIA NGLs").

The Plaintiffs do not define, and the Court is not able to define, what "refined NGLs" are. The Court understands that NGLs are inherently refined by being "extracted from the natural gas production stream in natural gas processing plants." EIA NGLs.

that ConocoPhillips calculates royalties for all Class members using the same netback method to calculate the value of unprocessed gas, further eliminating any individualized issues.  See Reply at 10.  The Plaintiffs assert, therefore, that the netback method also eliminates individualized issues concerning whether Class members have royalty interests in the price of processed gas or unprocessed gas, since ConocoPhillips' method to calculate royalties is the same regardless.  See Reply at 10.

### c.    Highest Reasonably Obtainable Price Stipulation.

The Plaintiffs respond to several of ConocoPhillips' contentions regarding the Plaintiffs' proposed stipulation.  First, the Plaintiffs dispute ConocoPhillips' characterization of the proposed fact that San Juan Basin price is the highest reasonably obtainable price.  See Reply at 9.  The Plaintiffs clarify that they do not argue that ConocoPhillips sold all of the gas from the Plaintiffs' wells in the San Juan Basin, but rather, that the "volume" of gas that ConocoPhillips sold in the San Juan Basin is "roughly equivalent to the volume of gas produced from the wells."  See Reply at 9.  Second, the Plaintiffs assert that, contrary to ConocoPhillips' argument, the proposed fact would not result in some Class members getting smaller damages than if they had litigated their claims separately.  See Reply at 22.  The Plaintiffs point to admitted exhibits showing that in April 2011, the wellhead value -- which subtracts transportation costs from the sales price via the netback method -- for the Plaintiffs' gas was $3.71.00 per MMBtu in the San Juan Basin and $3.51.00 per MMBtu in California.  See Reply at 23; April 30, 2011 Gas Price Analysis California, admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit B3 at 10, filed June 20, 2024 (Doc. 427-5); April 30, 2011 Gas Price Analysis San Juan Basin, admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit B3 at 10, filed June 20, 2024 (Doc. 427-6).  The Plaintiffs, therefore, argue that the San Juan Basin price is the highest reasonably obtainable price after

subtracting transportation and post-production costs, and no Class members would receive smaller damages under the stipulation by binding themselves to that determination. See Reply at 23.

        **a.**    <u>**Other Issues.**</u>

     The Plaintiffs address several other issues without making clear the relationship between those issues and rule 23's requirements. For example, the Plaintiffs dispute ConocoPhillips' illustration of how it calculates Class member Sadler's royalties in a way that results in overpaying royalties. See Reply at 26. Unlike the calculation method ConocoPhillips illustrates in the Response, the Plaintiffs assert that ConocoPhillips used the netback method to calculate Sadler's royalties, as <u>Energen</u> requires. See Reply at 26. The Plaintiffs also assert that their main claim -- that ConocoPhillips violated its implied duty to market by not paying the Class members' royalties based on the highest reasonably obtainable price for the gas from their wells -- is in the TAC. See Reply at 28 (citing TAC ¶ 71, at 23).

        **b.**    <u>**The NMPPA Claim.**</u>

     The Plaintiffs contend that ConocoPhillips' policy of paying late royalty payment interest on a case-by-case basis violates the NMPPA, NMSA § 70-10-4, which requires interest on all late payments. See Reply at 3, 11. They further cite to the Supreme Court of New Mexico case <u>First Baptist Church of Roswell v. Yates Petroleum Corp.</u>, 2015-NMSC-004, 345 P.3d 310 ("<u>Baptist Church</u>"), which explains that "the express language" of § 70-10-4 "requires in no uncertain terms that interest on suspended funds <u>shall</u> be paid." 2015-NMSC-004 ¶ 24, 345 P.3d at 317 (emphasis in <u>Baptist Church</u>). The Tenth Circuit in <u>Energen</u> cites to the Supreme Court of New Mexico's holding in <u>Baptist Church</u> to conclude that one of the plaintiffs, the Neely-Robertson Revocable Family Trust, is entitled to interest on suspended funds under NMSA § 70-10-4. The Tenth Circuit

points out that the New Mexico Supreme Court "first interpreted" NMSA § 70-10-4 in <u>Baptist</u>

<u>Church</u>, and quotes from <u>Baptist Church:</u>

> Subsection A requires that when proceeds cannot be paid on time, the funds shall be held in a suspense account or interpleaded into court.  Subsection B provides that interest owners shall be entitled to receive interest on suspended funds that they are legally entitled to receive.  The language in the statute clearly reflects the Legislature's intent to mandate that interest owners who are legally entitled to proceeds, but who are not paid on time, shall receive interest on funds that are rightfully owed to them.

[<u>Baptist Church</u>] at 317 (citations omitted).

<u>Energen</u>, 886 F.3d at 851.  Applying this reading of NMSA § 70-10-4 to the plaintiffs in <u>Energen</u>,

the Tenth Circuit concludes that the N-R Trust was entitled to interest on the suspended funds.

The Tenth Circuit holds that the district court errs in granting Energen Resources Corp. summary

judgment on the plaintiffs' NMPPA claim, and remands to the district court to determine whether

Energen Resources Corp. paid "statutory interest" or late payment interest pursuant to NMSA §

70-10-4.  <u>Energen</u>, 886 F.3d at 851.  The Plaintiffs assert that NMSA § 70-10-4 imposes strict

liability to pay interest on late royalty payments.  <u>See</u> Reply at 14.  The Plaintiffs, therefore, contest

the notion that each late royalty payment requires an individualized inquiry into why the payment

was late and whether late payment interest is due under NMSA § 70-10-4.  <u>See</u> Reply at 14.  As

long as the payment is late, the Plaintiffs argue, ConocoPhillips owes interest on it.  <u>See</u> Reply at

14.

### 11.    <u>The Hearing</u>.

The Court held two days of hearings in July and August 2024.  <u>See</u> July 2024 Hearing Tr.

at 1; August 2024 Hearing Tr. at 1.  On the first day, the parties argue the NMPPA claim and the

HROP claim.  <u>See</u> July 2024 Clerk's Minutes at 1.  On the second day, the parties argue the HROP

claim.  See August 2024 Clerk's Minutes at 1.  The parties summarize and elaborate on the arguments in their briefing.  See July 2024 Hearing Tr.; August 2024 Hearing Tr.

## FINDINGS OF FACT

The Court builds upon its original findings of fact in the Class Cert. Denial Order.[15]  See 2023 U.S. Dist. LEXIS 174812, at *3-9.  The Court also notes, as it does in the Class Cert. Denial Order, that these findings are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).

### 1.    The Parties.

1.    The Anderson Living Trust ("Anderson") owns oil-and-gas wells in the San Juan Basin, which is located in northwest New Mexico and southwest Colorado.  See ConocoPhillips' PF ¶ 19, at 7; Plaintiffs' PF at 1.

---

[15]The Court adopts numerous Findings of Fact from the Class Cert. Denial Order's Findings of Fact.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 2023 U.S. Dist. LEXIS 174812 at *3 ("Class Cert. Denial Order").  The parties do not contest the Court's Class Cert. Denial Order's Findings of Fact after the Class Cert. Hearing, which determined what exhibits were admitted, or after the Court's Class Cert. Denial Order.  The Court, therefore, concludes that it can repeat those Findings of Fact, as well as their relied-upon citations, but only to the extent the citation supports the original Findings of Fact.  The relied-upon citations include: (i) the Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed April 29, 2022 (Doc. 319)("Plaintiffs' PF"); (ii) ConocoPhillips' Proposed Findings of Fact, filed April 29, 2022 (Doc. 322)("ConocoPhillips' PF"); and (iii) the  Lease Summary Chart, filed April 16, 2021 (Doc. 239-9).  The Court notes that the Lease Summary Chart is attached to the Plaintiffs' Motion for Class Certification, filed April 19, 2021 (Doc. 239), but was not admitted as a Class Cert. Hearing Exhibit.  See Exhibit and Witness List at 1-4, filed January 24, 2022 (Doc. 300-1).  The Plaintiffs do not contest, however, the Court's reliance on the Lease Summary Chart to make several Findings of Fact in the Class Cert. Denial Order.  The Court, therefore, includes the Lease Summary Chart in its Findings of Fact.

2.      Westfall owns an oil-and-gas well in the San Juan Basin.  See ConocoPhillips' PF ¶ 1, at 1.

3.      The Plaintiffs and others leased their wells in the San Juan Basin ("the San Juan Wells") to ConocoPhillips.  See ConocoPhillips' PF ¶¶ 1, 2 at 1; Expert Witness Report at 2 (dated January 25, 2021), filed April 16, 2021 (Doc. 239-8)("Kaplin Report").

4.      ConocoPhillips produces natural gas at the San Juan Wells.  See Plaintiffs' PF at 1.

5.      The Plaintiffs' leases with ConocoPhillips provided them with royalty interests in the natural gas produced at the San Juan Wells.  See ConocoPhillips' PF ¶¶ 8, 28 at 2, 6.

**2.      The Plaintiff's Leases and Overriding Royalty Interests.**

6.      Westfall's lease provides:

> The lessee shall pay lessor, as royalty, one-eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found, and where not sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well . . . . The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other product, as royalty, one-eighth of the market value of such gas at the mouth of the well.  If said gas is sold by lessee, then as royalty one-eighth of the proceeds of the sale contract.

ConocoPhillips' PF ¶ 8, at 2.

7.      Similarly, the 1962 Anderson Trust lease provides:

> On gas, including casinghead gas or other gaseous substances, produced from the above described land, and sold or used off the premises for the extraction of gasoline or other products available, the market value at the well of 3/16 of gas sold or used, provided that any gas sold at the wells the royalty shall be 3/16 of the amount realized from such sale.

ConocoPhillips' PF ¶ 28, at 7.

8.      The Class members comprise of 6,857 individuals and entities who, along with the Plaintiffs, possess royalty interests in gas produced at the San Juan Wells that ConocoPhillips leases.  See Third Stipulation at 1.

9.      The Class members' leases cover over 16,000 wells in the San Juan Basin.  See Plaintiffs' PF ¶ 3, at 6.

**3.      Variations in Lease Language Regarding Royalty Amount.**

10.      There are variations among the royalty clauses in the various leases.  See Lease Summary Chart at 1, filed April 16, 2021 (Doc. 239-9)(chart summarizing leases between ConocoPhillips and various San Juan Well owners).

11.      Leases vary with respect to what value forms the basis of the royalty amount. Various leases state that well owners are entitled to royalties based on "gross proceeds," "value produced and saved," "gas sold or used," "gross production," "net proceeds from sale," "market value at the mouth of well," and "sales price," among other variations.  Lease Summary Chart at 1-2.

12.      Leases vary with respect to royalty amount.  See Lease Summary Chart at 1.

13.      Various leases state that well owners are entitled to a fraction of a specific value, such as: "3/16 of value produced and saved," "3/16 of gas sold or used," "1/8 of proceeds," "1/8 of gross production," "1/8 of net proceeds from sale," "1/4 produced and saved" of "1/4 of proceeds," among others.  Lease Summary Chart at 1.

14.      Some leases state that well owners are entitled to a percentage of value with restrictions on deductions, such as: "20% Market value at mouth of well, allow deducts," "20% market value at mouth of well, no deducts alllowed [sic], Deduc clause stricken from lease," and "20% of sales price no post production costs."  Lease Summary Chart at 2.

**4.      Variations in Lease Language Regarding the Implied Duty to Market.**

15.      There are 206 leases, belonging to 105 Class members, that have the exact language or a minor variation of the following which grants ConocoPhillips the exclusive right to market:

> Notwithstanding the grant to Royalty Owner of the above-described overriding royalty, [ConocoPhillips] shall have the exclusive right, as between the parties hereto, to develop and operate all of the above-described land and every part thereof to such extent and in such manner as [ConocoPhillips] shall determine to be proper, without incurring any liability whatever to [royalty owner], and nothing herein shall be deemed, as between the parties hereto, to obligate [ConocoPhillips] or [ConocoPhillips'] successors in interest in said lease to drill for, produce or market oil, gas, casinghead gas or other gaseous substances from the above-described land, or to continue the production therefrom for the benefit of [royalty owner].

Lease Language Chart at 1, filed March 19, 2024 (Doc. 402-3). See also Lease SF 078740 (dated March 11, 1952), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 30, filed May 24, 2024 (Doc. 419-5); Lease SF 078739 (dated March 11, 1953), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 31, filed May 24, 2024 (Doc. 419-5); Lease SF 078995 (dated March 11, 1953), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 35, filed May 24, 2024 (Doc. 419-5). The Court refers collectively to these as the "Exclusive Right Leases."

16.     There are at least three other leases whose language grants ConocoPhillips the exclusive right to market, but differently: Lease No. 74604, Lease No. 188485, and a 1948 Anderson Trust lease. See Overriding Royalty Agreement L-74604 (dated March 11, 1953), filed May 15, 2021 (Doc. 248-12); Expert Report of Kris L. Terry ¶ 54, at 18 (dated April 1, 2021), admitted on January 24, 2022, as Defendant's Class Cert. Hearing Exhibit D-16, filed May 24, 2024 (Doc. 419-1)("Terry Expert Report"); Plaintiff's Interests in Leases at 4.

17.     Lease No. 74604 states that "nothing herein contained shall be deemed . . . to obligate Phillips or Phillips' successors in interest in said lease to drill for, produce, or market oil [or gas] . . . from the above-described land . . . ." Class Cert. Denial Order, 2023 U.S. Dist. LEXIS

174812, at *100-101 (quoting Overriding Royalty Agreement L-74604).[16]  Lease No. 188485

states:

> Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the covered minerals capable of being produced from said wells, but in the exercise of such diligence, Lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities, flowlines, separator, and lease tank, and shall not be required to market such covered minerals upon terms unacceptable to Lessee.

Terry Expert Report ¶ 54, at 18.  The 1948 Anderson Trust lease states:

> Assignee shall be entitled to the free use (without any obligation to Assignor) of any oil and gas in any operations under said lease including without limitation gas actually consumed or lost in the operation of an extraction plant . . . In no event shall Assignee be responsible on account of Assignee's failure or inability to save or utilize any oil or gas or for shrinkage or loss thereof.

Plaintiff's Interests in Leases at 4 (Court adds ellipses).

**5.**    **Royalty Payment Calculation.**

18.    ConocoPhillips calculates the Plaintiffs' royalty payments using a weighted

average system.  See Plaintiff's PF ¶¶ 5-21, at 5-8 (summarizing calculation); ConocoPhillips' PF

¶¶ 50-61, at 12-15.

19.    A ConocoPhillips business unit called "Lower 48" operates the San Juan Wells.

See ConocoPhillips' PF ¶ 46, at 11.

---

[16]The Court notes that the Overriding Royalty Agreement L-74604 (dated March 11, 1953), filed May 15, 2021 (Doc. 248-12), is attached to Defendant ConocoPhillips' Response Memorandum In Opposition to Plaintiffs' Motion for Class Certification, filed May 15, 2021 (Doc. 248), but was not admitted as a Class Cert. Hearing Exhibit.  See Exhibit and Witness List at 1-4, filed January 24, 2022 (Doc. 300-1).  Nevertheless, the Plaintiffs do not contest the Court's reliance on the Overriding Royalty Agreement after the Class Cert. Hearing, which determined what exhibits were admitted, or after the Court's Class Cert. Denial Order.  The Court, therefore, includes the Overriding Royalty Agreement L-74604 in its findings of fact.

20.    Lower 48 processes the gas produced at the San Juan Wells at six plants.  <u>See</u> Plaintiffs' PF ¶ 6, at 6.

21.    A separate ConocoPhillips business unit, COP Commercial, then aggregates or "commingles" the gas from the six plants into two pools in the San Juan Basin: the El Paso Pipeline Pool, also known as Hook No. 99368, and the Transwestern Pipeline Pool, known as Hook No. 99291.  <u>See</u> Plaintiffs' PF ¶ 7, at 6.

22.    COP Commercial markets and sells the commingled gas from the El Paso Pipeline Pool and the Transwestern Pipeline Pool.  <u>See</u> ConocoPhillips' PF ¶ 47, at 12.

23.    As an example, in March, 2011, ConocoPhillips sold 16,213,232 MMbtus of gas in the El Paso Pipeline Pool to the following companies: Southern California Gas Company, 4,990,187 MMbtus; Pacific Gas & Electric Company, 1,316,611 MMbtus; Citigroup Energy Inc., 1,947,204 MMbtus; Total Gas & Power, 2,112,456 MMbtus; BP Energy Company, 1,052,859 MMbtus; Others, 4,793,915 MMbtus.  <u>See</u> March 2011 San Juan Gas Supply at 1.

24.    A third ConocoPhillips business unit, Financial Services, performs the accounting and royalty calculations for the gas that COP Commercial sells from the San Juan Wells.  <u>See</u> ConocoPhillips' PF ¶ 51, at 12.

25.    In March, 2011, ConocoPhillips produced over 18,000,000 MMBtu's[17] of gas from the Plaintiffs' wells in the San Juan Basin.  <u>See</u> El Paso Natural Gas San Juan Pool March 2011 at 2 (dated March, 2011), filed March 19, 2024 (Doc. 402-9).

---

[17]MMBtu stands for Million Metric British Thermal Units or "Btus."  <u>British thermal unit</u>, Wikipedia, https://en.wikipedia.org/wiki/British_thermal_unit (last visited September 11, 2024). In the United States, Btu is the most common unit of measurement of heat energy for comparing energy sources or fuels.  <u>See</u> <u>Units and calculators explained</u>, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/units-and-calculators/ (last updated June 1, 2023)("<u>Units explained</u>").  For example, 1 barrel (42 gallons) of crude oil produced in the United

26.     Also in March, 2011, ConocoPhillips sold over 16,000,000 MMBtu's of gas from the Plaintiff's wells in the San Juan Basin.  See El Paso Natural Gas San Juan Pool March 2011 at 3.

**6.     Late Payments Because of Federal Unit Expansion, Plant Reallocation, and Reissued Checks.**

27.     Some Class members received royalty payments after the due date that NMSA § 70-10-3 describes, which is "not later than six months after the first day of the month following the date of first sale and thereafter not later than forty-five days after the end of the calendar month within which payment is received by payor for production."  NMSA § 70-10-3.  These are "late royalty payments."

28.     Some Class members received late royalty payments because of a federal unit expansion, which occurs when the BLM approves the expansion of a federal "unit" of land that contains hundreds of wells.  43 C.F.R. 3180.1.  See Unit Expansion Example at 1-5, admitted on January 26, 2022, as Defendant's Class Cert. Hearing Exhibit Demonstrative 9, filed January 28, 2022 (Doc. 296-1 at 8); Class Cert. Hearing Tr. at 579:18-580:5 (Sutphin, Saltsman).

29.     When new land is proven to contain commercially viable gas, the BLM allows the federal unit to include the new land, thereby expanding the federal unit.  See 43 C.F.R. 3180.1.

---

States equals 5,684,000 Btu.  See Units explained.  An MMBTu is equal to 1,000,000 Btu.  See Units explained.  The industry standard for 1 barrel is 42 gallons, as opposed to the average industrial-sized barrel's 55-gallon capacity, because in 1872, the Petroleum Producers Association, the US Geological Survey, and the US Bureau of Mines all adopted the 42-gallon drum as their standard.  See The History of Why Oil Comes in a "Barrel," Petroleum Service Company,  https://petroleumservicecompany.com/blog/the-history-of-why-oil-comes-in-a-barrel/ (August 19, 2015).

30.    The BLM requires that the federal unit's production is allocated as if the new land was always part of the federal unit.  <u>See</u> 43 CFR § 3137.80.

31.    This requirement results in reallocating the production of gas from the new land to all of the landowners in the federal unit.  <u>See</u> 43 CFR § 3137.80.

32.    For example, the BLM approved a unit expansion of the 29-6 Unit Dakota Participating Area in 2015.  <u>See</u> Unit Expansion Example at 5.  The unit expansion, which includes one well on 160 acres of land, applied retroactively to 2005.  <u>See</u> Unit Expansion at 5.

33.    Thus, 207 owners in the unit received 119 months of payment adjustments because of reallocated gas production in that unit.  <u>See</u> Unit Expansion at 5.

34.    Some Class members received late royalty payments due to a plant reallocation, which occurs when a plant revises its allocations of gas production among ConocoPhillips and other similar companies.  <u>See</u> Class Cert. Hearing Tr. at 549:19-552:23 (Sutphin, Saltsman).

35.    Because ConocoPhillips produced more gas than the plant originally thought, ConocoPhillips also receives greater profits from its produced gas' sales, and, in turn, pays a portion of these profits as a royalty to Class members.  <u>See</u> Class Cert. Hearing Tr. at 569:1-10 (Sutphin, Saltsman).

36.    Plant reallocations are routine in the oil-and-gas industry.  <u>See</u> Terry Expert Report at 4.

37.    Some Class members received late royalty payments because of a reissued check. <u>See</u> Milnes Reissued Check 2144629 at 8 (dated April 25, 2014), admitted on January 26, 2022, as Defendant's Class Cert. Hearing Exhibit G-5, filed January 28, 2022 (Doc. 296-1).

38.    When a royalty owner loses their check and requests a new one, ConocoPhillips reissues the check.  <u>See</u> Class Cert. Hearing Tr. at 568:16-22 (Sutphin/Saltsman).

## LAW REGARDING CLASS CERTIFICATION UNDER RULE 23

Rule 23 sets forth the requirements for certifying a class action under the federal rules.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all rule 23(a)'s requirements; and (ii) one of rule 23(b)'s three requirements, where the three requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b).  The plaintiff[18] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action.").  In ruling on a class certification motion, the Court need not accept the representations of either party, but must independently find the relevant facts to a preponderance of the evidence.[19]  See Castano v.

---

[18]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.).  As a practical matter, however, plaintiffs almost exclusively make motions for class certification.

[14]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true, but it 'need not blindly rely on conclusory allegations which parrot Rule 23,' and 'may consider the legal and factual issues presented by plaintiff's complaints.'"  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1220 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); and Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued a case stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re

American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [General Telephone Co. of the Southwest v.] Falcon[, 457 U.S. 147 (1982)("Falcon")] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

---

Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

Wal-Mart, 564 U.S. at 349-50.   In a subsequent admonition, however, the Supreme Court

cautioned district courts not to decide the merits of the case at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be
> "rigorous" and may "entail some overlap with the merits of the plaintiff's
> underlying claim," Rule 23 grants courts no license to engage in free-ranging merits
> inquiries at the certification stage.  Merits questions may be considered to the extent
> -- but only to the extent -- that they are relevant to determining whether the Rule 23
> prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 465-66 (2013)(Ginsburg, J.).  To

comply faithfully with these two directives, the Court will find facts for the purposes of class

certification by the preponderance of the evidence but will allow the parties to challenge these

findings during this case's subsequent merits stage.  This approach is analogous to preliminary

injunction practice, and, although the Tenth Circuit has not endorsed it, other Courts of Appeals

have adopted the practice.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir.

2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant

Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class

judgment has on absent parties, a court may not simply accept the named parties' stipulation that

class certification is appropriate, but must conduct its own independent rule 23 analysis.  See

Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.  In taking evidence on the question of class

certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.[20]

---

[20]Rule 1101 of the Federal Rules of Evidence provides:

    **(a)**    **To Courts and Judges.**  These rules apply to proceedings before:

•    United States district courts;

    •    United States bankruptcy and magistrate judges;

    •    United States courts of appeals;

- the United States Court of Federal Claims; and

- the district courts of Guam, the Virgin Islands, and the Northern Mariana        Islands.

**(b)    To Cases and Proceedings.**  These rules apply in:

-  civil cases and proceedings, including bankruptcy, admiralty, and maritime cases;

- criminal cases and proceedings; and

- contempt proceedings, except those in which the court may act summarily.

**(c)    Rules on Privilege.**  The rules on privilege apply to all stages of a case or proceeding.

**(d)    Exceptions.**  These rules--except for those on privilege--do not apply to the following:

**(1)**    the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility;

**(2)**    grand-jury proceedings; and

**(3)**    miscellaneous proceedings such as:

- extradition or rendition;

- issuing an arrest warrant, criminal summons, or search warrant;

- a preliminary examination in a criminal case;

- sentencing;

- granting or revoking probation or supervised release; and

- considering whether to release on bail or otherwise.

---

(e) **Other Statutes and Rules.**  A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules.

Fed. R. Evid. 1101.  It is not immediately obvious whether a class certification hearing is a "civil case[ or] proceeding" under rule 1101(b) -- in which case the Federal Rules of Evidence apply -- or a "miscellaneous proceeding" under rule 1101(d)(3) -- in which case the Rules do not apply.  The Tenth Circuit has not addressed this question, but most courts have concluded that the Federal Rules of Evidence do not apply to class certification hearings.  See Paxton v. Union Nat'l Bank, 688 F.2d 552, 562 n.14 (8th Cir. 1982)(Heaney, J.)("Hearsay testimony may be admitted to demonstrate typicality."  (citing Donaldson v. Pillsbury Co., 554 F.2d 825, 830 n.3 (8th Cir. 1977)(Webster, J.)));  Bell v. Addus Healthcare, Inc., No. C06-5188, 2007 WL 3012507, at *3 (W.D. Wash. October 12, 2007)(Bryan, J.)("[T]he Court is still not persuaded that it must apply the traditional rules . . . [to] evidence in support of class certification.");  Fisher v. Ciba Specialty Chems. Corp., 238 F.R.D. 273, 279 (S.D. Ala. 2006)(Steele, J.)("[T]he Federal Rules of Evidence are not stringently applied at the class certification stage because of the preliminary nature of such proceedings.  Courts confronted with Rule 23 issues may consider evidence that may not ultimately be admissible at trial.");  id. at 279 n.7 ("[D]efendants proffered . . . that the Federal Rules of Evidence should be rigorously applied . . . .  [D]efendants came forward with not a single case supporting their position that those Rules should be stringently enforced.");  Rockey v. Courtesy Motors, Inc., 199 F.R.D. 578, 582 (W.D. Mich. 2001);  In re Hartford Sales Practices Litig., 192 F.R.D. 592, 597 (D. Minn. 1999);  Thompson v. Bd. of Educ. of Romeo Cmty. Sch., 71 F.R.D. 398, 402 n.2 (W.D. Mich. 1976), rev'd on other grounds, 709 F.2d 1200 (6th Cir. 1983).  See also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)("[W]e might note that a preliminary determination of the merits [at the class certification stage] may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials.").  But see Mars Steel Corp. v. Cont'l Bank N.A., 880 F.2d 928, 937-38 (7th Cir. 1989)(Easterbrook, J.)(holding that the Federal Rules of Evidence apply to class settlement fairness hearings);  In re Fine Paper Antitrust Litig., 751 F.2d 562, 584 (3d Cir. 1984)(Gibbons, J.)("[P]lainly, the requirement of an evidentiary hearing [to resolve attorneys' claims for fees from an equitable fund] demands the application in that hearing, of the Federal Rules of Evidence."  (citing no cases));  Soutter v. Equifax Info. Servs. LLC, 299 F.R.D. 126, 129 (E.D. Va. 2014)(Payne, J.)("The Federal Rules of Evidence . . . 'apply to proceedings in United States courts,' subject to certain exceptions not applicable here.  A motion for class certification is, without doubt, such a proceeding.");  Pecover v. Elec. Arts Inc., No. C08-2820 VRW, 2010 WL 8742757, at *2 (N.D. Cal. Dec. 21, 2010)(Walker, J.)("There seems to be nothing in the Federal Rules of Evidence or in the Federal Rules of Civil Procedure to suggest that class action certification proceedings present an exception to FRE 1101 or that the Federal Rules of Evidence carry different meaning in the class action certification context than elsewhere.");  Lewis v. First Am. Title Ins. Co., 265 F.R.D. 536, 544 (D. Idaho 2010)(Lodge, J.)("[T]he FRE and the minimal case law available support First American's position that the FRE apply generally at the class certification stage."  (citing no cases));  McLaughlin on Class Actions § 3:14 ("When conducting its rigorous analysis of whether a class should be certified, the Court should apply the Rules of Evidence.").

The Supreme Court, however, dropped an important clue in <u>Wal-Mart</u> indicating that the Federal Rules of Evidence apply in class certification hearings: "The District Court concluded that <u>Daubert</u> did not apply to testimony at the certification stage of class-action proceedings. We doubt that is so . . . ." 564 U.S. at 354 (citation to the district court omitted). The Court is reticent to read too much into this passing reference, but, considering the issue on its own, concludes that the Federal Rules of Evidence apply to class certification hearings. First of all, under rule 1101(b), the Federal Rules of Evidence apply to "civil cases and proceedings"; a class action is a civil case, and the class certification hearing is a civil proceeding. If there were no exceptions, the Federal Rules of Evidence would apply. Hence, if the Federal Rules of Evidence do not apply, class certification hearings must fit within one of the exceptions. All of the exceptions specifically listed in rule 1101(d)(2) and (d)(3) are criminal; only rule 1101(d)(1) clearly covers civil cases. Rule 1101(d)(1) encompasses the common-sense rule that the court can consider inadmissible hearsay for the limited purpose of determining, under rule 104(a), "any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Fed. R. Evid. 104(a). A class certification hearing is not a hearing to decide the admissibility of evidence, but whether the case should proceed as a class under rule 23; in that sense, it is more like a hearing under rule 12(b)(6) or rule 56 than one to determine admissibility under the rules of evidence. Similarly, a class certification hearing is not similar to the miscellaneous criminal proceedings that rule 1101(d)(3) lists. There may be a public policy need to dispense with the formalities of the rules of evidence when making the potentially life-and-death decisions concerning: (i) whether to release a criminal defendant on bail when he or she may present a danger to the public; (ii) whether to revoke probation or grant a defendant release after he or she has allegedly violated the terms of his or her release; (iii) how long to sentence a defendant who may be a danger to the public; (iv) whether to extradite a defendant out of the court's jurisdiction, where the court may never see the defendant again, and where the defendant may not be treated fairly; and (v) whether to grant an arrest warrant, criminal summons, or search warrant -- decisions that are made ex parte and often under time constraints. The similarity of a class certification hearing to a trial suggests that a class certification hearing is not a "miscellaneous proceeding such as" a hearing on sentencing, extradition, preliminary examination, probation violation, or setting bail.

Class certification is an important stage of a case: a certified class action often settles, often for a large amount of money; a rejected or precertification class action is difficult to settle -- except for the often miniscule value of the claims of the individual class representatives -- because res judicata does not attach to the absent class members unless and until the class is certified. The importance of the class-certification determination led Congress, the Supreme Court, and the drafters of the Rules to avail litigants to an interlocutory appeal of the district court's determination -- a rare exception to the final-judgment rule. <u>See</u> Fed. R. Civ. P. 23(f) ("A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule. A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered . . . ."). Thus, given the importance of the class certification determination and the evidentiary nature of the hearing, the Court concludes that the Federal Rules of Evidence apply. On the other hand, the sole decider in class certification hearings is a judge, and not a jury. Judges may be better equipped to weigh properly the value of hearsay and irrelevant evidence than juries. Moreover, there is no practical way to screen a presiding judge entirely from hearing inadmissible evidence, as it is the judge who must decide the threshold question of admissibility. It is, thus,

1.     **<u>Requirements Applicable to All Classes: Rule 23(a).</u>**

All classes must satisfy the prerequisites of rule 23(a):

(a)     **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    (1)     the class is so numerous that joinder of all members is impracticable;

    (2)     there are questions of law or fact common to the class;

    (3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  <u>Reed v. Bowen</u>, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  <u>Shook v. El Paso Cnty.</u>, 386 F.3d 963, 968 (10th Cir. 2004)(quoting <u>Gen. Tel. Co. of the S.W. v. Falcon</u>, 457 U.S. 147, 161 (1982))(citing <u>Reed v. Bowen</u>, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.

---

perhaps more realistic and more honest for the judge to consider all but the most egregiously inadmissible pieces of evidence as they are presented and factor any evidentiary infirmity into the weight he or she gives to them.

    The parties have to decide how to put on their cases; if they want to object to each others' evidence, it may make their presentations difficult.  On the other hand, if the parties decide to make objections, the Court will do its job and decide the objections under the Federal Rules of Evidence, not some other standard.

a.    **Numerosity.**

Rule 23(a)(1) requires that the proposed class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable.  Some courts hold that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption."  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)).   In determining whether a proposed Class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable."  Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002).  A leading treatise on class actions, however, suggests that "a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder," whereas "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone."  William B. Rubenstein, 1 Newberg and Rubenstein on Class Actions § 3:12 at 335-36 (6th ed. 2022).  See also Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible."[21]).  The Court finds that joinder of "several hundred tenants and homeowners" is impracticable, and thus the proposed class meets rule

---

[21]The Court notes that impracticable, in fact, means impossible.  See The American Heritage Dictionary of the English Language 661 (William Morris ed., New College ed. 1976)(defining "impracticable" as "[n]ot capable of being done or carried out").  The consensus in the case law, however, is that the drafters of the rule meant to say "impractical," and reached for a longer, and wronger, word.

23(a)(1)'s numerosity requirement.  Lowery v. City of Albuquerque, 273 F.R.D. 668, 682-3 (D.N.M. 2011)(Browning, J.).  At the other end of the spectrum, the Court finds that a class of 6,100 members, in a securities action, is so numerous that joinder is impracticable.  See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.).  See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constitutes "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

### b.    **Commonality.**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist."  In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (quoting Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir.1988)).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart, 564 U.S. at 350.

"The commonality requirement has been applied permissively in securities fraud litigation."  In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004)(Scheindlin,

J.).  "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement."  5 Jerold S. Solovy, Ronald L. Marmer, Timothy J. Chorvat & David M. Feinberg, Moore's Federal Practice § 23.23[4][b], at 23-77 (3d ed. 2004).  "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."  In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.).  Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

The commonality requirement was perceived widely to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 564 U.S. at 349-51. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 564 U.S. at 343.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 564 U.S. at 344-45.  The plaintiffs argued that, although no discriminatory formal policy applies to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  564 U.S. at 345 (no citation given for internal quotation).  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-51 (emphasis in original)(quoting Nagareda, supra, at 132).

### c.     **Typicality**.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994). The Supreme Court notes that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157

n.13.  "Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality."  DG v. Devaughn, 594 F.3d 1188, 1198-99 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d at 676).  "[L]ike commonality, typicality exists where . . . all [potential] class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  DG v. Devaughn, 594 F.3d at 1199.  Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and [proposed] class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d at 676.  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of [P]laintiffs and the other putative class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  See also Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982))("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory").

The Court engaged in a commonality analysis in the similar oil-and-gas royalty case Anderson v. WPX, 306 F.R.D. 312.  In Anderson v. WPX, the Court explained on commonality:

> Incidental common questions of law and fact exist in this case, but none satisfy Wal-Mart.  For better or for worse, the commonality inquiry now focuses on quality rather than quantity. While, in the old days, a single common question

might have cleared the rule 23(a)(2) bar, and in the right case might still do so, Wal-Mart has beefed up the requirements to be considered a common question in the first place. Post-Wal-Mart, a common question must be "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," or, to use the more popular phraseology, it must be prone "to generate [a] common answer[] apt to drive the resolution of the litigation." 131 S. Ct. at 2551 (emphasis in original). In this case, common questions do not abound . . . .

Regarding the underpayment claims, the Defendants paid all class royalties and overriding royalties under a uniform policy, with the exception of two of the wells committed to the 372K gathering contract, which the Court excludes from the class. See Stipulation ¶¶ 9, at 2 ("There are no differences in WPX's royalty accounting methodology based on the royalty provisions contained in the [class] leases and the [class] assignments."); id. at 4 n.6. This policy valued production from all wells committed to Williams Four Corners under a keep-whole method and production from all wells committed to independent gatherers under the sale price that the Defendants received from the independent gatherer. In terms of deducting postproduction expenses from the royalty, the Defendants (i) do not deduct them at all for Colorado wells; (ii) deduct them at a proportionate rate to what the gatherer charges the Defendants for New Mexico wells committed to independent gatherers; and (iii) deduct them using a COS charge identical to the one that the federal government demands for non-arm's length transactions for New Mexico wells committed to the Williams Four Corners gathering systems. This uniform policy, which calculates and pays the class' royalties without regard to variations in lease language, is a common issue of fact, and it forms one half of the Plaintiffs' underpayment claims. The underpayment claims, at base, consist of two input inquiries and one output result: (i) "how were the class members entitled to be paid by the Defendants," which is a mixed legal and factual question that requires looking to the language in the leases and any implied-in-law terms; (ii) "how did the Defendants actually pay the class members," which is a factual question that requires looking to the evidence; and (iii) "what is the numerical difference, if any, between (ii) and (i)," which determines damages. Issue (ii) is common, but it is undisputed, and, thus, incidental. It is not merely "capable of" a producing a common answer, Wal-Mart, 131 S. Ct. at 2545, it has already been given one. The Court thus does not believe, after Wal-Mart, that the Defendants' uniform payment policy is the common question that satisfies rule 23(a)(2). See EQT Prod. Co. v. Adair, 764 F.3d at 366 ("That the defendants engaged in numerous common practices may be sufficient for commonality purposes." (emphasis added)). Issue (i) -- how were the class members entitled to be paid by the Defendants -- is the important one in this case, and it is an individualized inquiry.

. . . .

The primary question in this case is not sufficiently similar to the common questions in those cases to give the Court comfort that the primary question in the case is a common question.  In those cases, the common questions answered the main issues in the case. Here, the primary issue is how much the Plaintiffs should have been paid, and the Defendants' practices do not answer that question in a common way. Moreover, most of these common questions, in the pre-Wal-Mart era, could theoretically be broken down into more specific questions that no longer encompassed the entire class. None of them, on its own, definitively establishes a claim, even if answered in the affirmative. It is questions like these that Justice Scalia had in his crosshairs when he wrote Wal-Mart.

Anderson v. WPX, 306 F.R.D. at 437-39.

### d.    **Adequacy.**

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement protects the due process interests of unnamed proposed class members -- who are bound by any judgment in the action.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").  "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ."  Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their

counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court errs in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(holding that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining

the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, <u>Federal Practice & Procedure</u> § 1768, at 389-93 (3d ed. 2005). "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit. 1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed. 2002)." <u>Lowery v. City of Albuquerque</u>, 273 F.R.D. at 680.

### 2.    <u>Different Categories of Classes: Rule 23(b).</u>

Once the court concludes that the threshold requirements are met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." <u>Adamson v. Bowen</u>, 855 F.2d at 675. <u>See</u> <u>DG v. Devaughn</u>, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)    Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> **(1)**    prosecuting separate actions by or against individual class members would create a risk of:
>
> **(A)**    inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> **(B)**    adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests;

    **(2)**    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    **(3)**    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

        **(A)**    the class members' interests in individually controlling the prosecution or defense of separate actions;

        **(B)**    the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

        **(C)**    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        **(D)**    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions.")).

      The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class

actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments").

> **a.    (b)(1)(A) and (b)(1)(B) Class Actions -- Class Actions to Avoid Inconsistent Judgments.**

Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions;[22] a class need satisfy the requirements of only one to be certified. See Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a

---

[22]The Court notes that (b)(3) -- the standard damages class action -- also has subparts marked (A), (B), (C), and (D), but that those subparts represent the four requirements, which must all be met, to certify a (b)(3) class action. The difference lies in the disjunctive language joining (b)(1)(A) and (b)(1)(B), versus the conjunctive language connecting the subparts of (b)(3).

result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, e.g., a defendant was ordered to pay $10,000.00 to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication that the judiciary used to apply a uniform set of laws onto varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule (b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors -- most likely by paying each investor sixty percent of his or her lost investment.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a sixty-percent value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. Accordingly, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A).

### b.    (b)(2) Class Actions -- Class Actions for Injunctive and Declaratory Relief.

Class actions under (b)(2) provide for injunctive or declaratory relief[23] when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

---

[23]The Supreme Court has left open a small space for "incidental" money damages in (b)(2) class actions. See Wal-Mart, 564 U.S. at 367. The Supreme Court has not held that incidental damages permissibly can be sought under (b)(2), but it declined to hold the opposite, as well, by explicitly exempting incidental damages from its otherwise blanket prohibition against (b)(2) suits for damages -- provided that the damage calculation is not individualized and flows directly from the injunctive relief. See Wal-Mart, 564 U.S. at 367. The Supreme Court states that individualized damage calculations, or damages that do not flow directly from the injunctive relief requested, would never be permissible in a (b)(2) class action. See Wal-Mart, 564 U.S. at 367.

In a class action for damages, however, each proposed class member has a constitutional right to opt out of the class. See Phillips Petrol. Co. v. Shutts, 472 U.S. at 811-12. Notice to opt out is not normally a component of (b)(2) class actions, as they, like (b)(1) class actions, are

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, supra, at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original).  The (b)(2) class action was invented for the

purpose of facilitating civil rights suits, and much of its use is in that field today.  See William B.

Rubenstein, Newberg on Class Actions § 4:26 (5th ed.)("Newberg").  The (b)(2) class action

allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a

disenfranchised black voter representing a class of all black voters within an unconstitutionally

drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar

with the nation's seminal civil rights cases, however, knows that many of them are not brought as

class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .  Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain

---

mandatory.  See Fed. R. Civ. P. 23(c)(2)(A).  Thus, it remains unclear to what extent, if any, incidental damages can be sought in a (b)(2) action.

circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  See Fed. R. Civ. P. 23(c)(2)(A).

**c.**        **(b)(3) Class Actions -- Class Actions for Damages.**

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).  These four factors are not generally considered separately, but rather are analyzed at the level of two requirements -- both of which must be satisfied -- listed in the opening paragraph of rule 23(b)(3):

predominance and superiority.  The four factors in (b)(3)(A) through (b)(3)(D) are all probative of both requirements.

### i.    The Superiority Requirement.

The first requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation,[24] see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases. The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.  First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them

---

[24]Multidistrict litigation presents different challenges, and is perhaps subject to an entirely different mode of analysis vis-à-vis superiority, because the decision whether to initiate a new multidistrict litigation or to transfer a case to an existing multidistrict litigation belongs entirely to the Judicial Panel on Multidistrict Litigation; there is no provision even permitting district courts to formally petition the Panel for a transfer.  See 28 U.S.C. § 1407(c) ("Proceedings for the transfer of an action under this section may be initiated by -- (i) the judicial panel on multidistrict litigation upon its own initiative, or (ii) motion filed with the panel by a party in any action in which transfer for coordinated or consolidated pretrial proceedings under this section may be appropriate."); David F. Herr, Multidistrict Litigation Manual § 4:3 ("Proceedings before the Panel may be commenced by a party or by the Panel.").  The Court informally can advise the Panel of its opinion that the multidistrict litigation might be appropriate for one or more of its cases, and the Panel may then choose to take up the matter "upon its own initiative." 28 U.S.C. § 1407(c)(i).  If, however, the Panel considers the issue -- either on the court's advice or upon motion of one of the parties -- and elects not to transfer the case into multidistrict litigation, the court should respect that decision and exclude the possibility of multidistrict litigation from its superiority analysis.  In other words, if the Panel declines to transfer a case into multidistrict litigation, the court should not then decide that the proposed class lacks superiority because the multidistrict litigation device would be an equal or superior means for adjudicating the case.

economically non-viable without aggregation. These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting, in full, Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)). The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorney, devote time and energy to their own discovery, and testify on their own behalf. The second way in which superiority can be achieved by rendering the usual procedural forms impractical is when there is such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately. While this consideration militates against individual treatment and counsels towards aggregation, the court carefully must consider whether another mass aggregation form, such as multidistrict litigation, might be better suited to the task.

In addressing whether a proposed class action superior, courts must start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive. See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria."). The first factor, "the class members' interests in individually controlling the prosecution . . . of separate actions," closely tracks the money value of the individual cases. Fed. R. Civ. P. 23(b)(3)(A). When individual actions are practical, they are preferred; the United States has a "deep-rooted historic tradition that everyone should have his own day in court," and

adjudicating individual disputes is the core activity of our judicial scheme.  Martin v. Wilks, 490

U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper,

Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine T. Struve,

Federal Practice  Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).  The proposed

class members' emotional connection to the case also may be relevant: the stronger the attachment,

the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC,

708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich.

2003).  Another recurring issue that arises in relation to this factor is when the statute upon which

the suit is based provides greater remedies for individual suits than for class suits, either by

imposing a damage cap for class actions which does not apply to individual actions, or by granting

statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages.

See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual

damages at $1,000 and class action damages at $500,000); Truth in Lending Act, 15 U.S.C.

§ 1640(a) (capping individual damages at $5,000 and class action damages at $500,000).  Although

claims under these statutes may be more lucratively brought as individual actions, courts should

assess the real-world likelihood that class members would bring their own actions, which

implicates another factor the court should consider: the likelihood that proposed class members

know they have a claim, and whether they are savvy enough to pursue it.[25]  See Hicks v. Client

---

[25]It is often the case that a plaintiff would receive greater remuneration -- damages or
settlement less attorney's fees and other expenses of litigation -- from an individual action than he
would from his proportional share of the class recovery.  If the number of proposed class members
likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from
an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$),
then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally
certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those
individuals who: (i) would, in the event of certification, become class members, i.e., they would

Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters"). As the Honorable Loretta A. Preska, then-Chief United States District Judge for the United States District Court for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case. Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior . . . .

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007)(Preska, J.). See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," is linked closely to the first factor. Fed. R. Civ. P. 23(b)(3)(B). The advisory notes to the rules state that "[t]he court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. In this connection the court should inform itself of any litigation actually pending by or against the individuals." Fed. R. Civ. P. 23 advisory committee's notes (citations omitted). This passage suggests that the extent to which proposed class members -- or individuals who otherwise would be proposed class members but for being specifically excluded from the definition by virtue

---

not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action. Thus, $n$ is likely to be a small number in most cases.

of their individual claims -- already have filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial, and indicates a higher "interest[] in individually controlling the prosecution." Fed. R. Civ. P. 23(b)(3)(A). It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel merely is representing that they are of negative value to enhance his argument for certification.

In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class. See Fed. R. Civ. P. 23(c)(2)(B). The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so. The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members. As a practical matter, in most instances, this group contains few people, if any. Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action. For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance. The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun." Fed. R. Civ. P. 23(b)(3)(B). The Court interprets this language to mean that it must look at what procedural forms the proposed class members' cases have taken. For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania. See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Penn.)(Robreno, J.). Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.[26] See

---

[26]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court always should strive to avoid having multiple overlapping or competing class actions certified in the federal court system. It is less clear how to handle a proposed class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members. Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis. The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action. See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."). There are possible exceptions, however, including that, pursuant to the All Writs Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement. See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002)(Scirica, J.). In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the

_____

equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem. As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control." In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 337 (2d Cir. 1985). See also Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered."). The in rem analogy may help to bring into focus what makes these cases stand apart. In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached." Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922). Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction. See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have conflicting orders from different courts"). What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case." Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12. See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the propriety of the federal class action"). Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- which also were defendants in a federal multidistrict suit -- from entering any settlement that contained any release of claims under South Carolina law, thereby "clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it"). But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 134 F.3d 133 passim (3d Cir. 1998)(Becker, J.)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had

- 74 -

Newberg § 4:70 ("[I]f a class action case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)). Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[27]

The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to

---

already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments"). In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

As a practical matter, CAFA has obviated many of the questions relating to competing state and federal class actions. CAFA has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008). Although CAFA's primary effect has been to make superiority determinations easier by placing limitations on state court class actions that could overlap with federal class actions, it also raises novel questions, such as whether and when the court -- in light of CAFA's explicit purpose to push more multistate class actions into federal court -- should conclude that the availability of a state court aggregation device destroys superiority of a proposed federal class action.

[27]If a class already has been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses. The claims contained in the already-certified class action could be asserted in the proposed class action only by individuals excluded from the already-certified class' definition. Claims not included in the already-certified class action could be asserted by the entirety of the proposed class, including those individuals who are also members of the already-certified class.

adjudicate the aggregated dispute.  Fed. R. Civ. P. 23(b)(3)(C).  The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.  See Newberg § 4:71.  The second prong is whether the particular court at issue is a desirable forum for the litigation.  Some issues that reliably influence the determination of this prong include: (i)  the parties', witnesses', or class counsel's geographic convenience, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the locus of the harm, as well as any other events forming the action's basis, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001)(Bolton, J.); (iii) the bulk of the proposed class' location, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000)(Arterton, J.); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).  "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of Albuquerque, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge already has made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004); if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

The fourth, final, and most important[28] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  Courts should not judge manageability in a vacuum, but rather -- as a part of the superiority analysis -- they should assess how the difficulties the class action device present stack up against the difficulties that other available procedural mechanisms present.  See Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1358 (11th Cir. 2009)("[W]e are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives." ).  The principal concern in a manageability inquiry is individualization.  The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).  Accordingly, several courts hold that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> The predominance analysis has a tremendous impact on the superiority analysis for
> the simple reason that, the more common issues predominate over individual issues,
> the more desirable a class action lawsuit will be as a vehicle for adjudicating the

---

[28]Newberg writes that the "manageability factor . . . is, by far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing Hamlet without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010).  See Klay v. Humana, Inc., 382 F.3d 1241, 1272 (11th Cir. 2004)("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

### ii.     The Predominance Requirement.

Rule 23(b)(3)'s second requirement is predominance of common questions over individual ones.  See Fed. R. Civ. P. 23(b)(3).  While the question of superiority evaluates the desirability of the class action device relative to other procedural forms, the predominance inquiry is absolute. Predominance means that the questions common to the class predominate over those that are individualized.  A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member." Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The

predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

Monread v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

The predominance inquiry is a qualitative, not quantitative, one; a single common issue may predominate over numerous individual ones.  See Butler v. Sears, Roebuck & Co., 727 F.3d 796, 801 (7th Cir. 2013); Chavez v. Don Stoltzner Mason Contractor, Inc., 272 F.R.D. 450, 455 (N.D. Ill. 2011)(Kennelly, J.); Olson v. Tesoro Refining & Mktg. Co., No. C06-1311 RSL, 2007 WL 2703053, at *6 (W.D. Wash. 2007)(Lasnik, J.).  Likewise, rule 23(b)(3) "does not require that common questions be dispositive or significant," but merely that they predominate over the individual inquiries.  In re Potash Antitrust Litig., 159 F.R.D. 682, 699 (D. Minn. 1995)(Kyle, J.). Examining the case law, the Court notes several recurring individual issues that often exist in the class action context, but which rarely defeat a predominance finding, such as: (i) a defendant's desire to assert individual counterclaims -- generally speaking, counterclaims, even common ones, are not permitted against absent class members at all, see Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003); (ii) a defendant's desire to assert individual affirmative defenses, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action

status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."); or (iii) a defendant raising individual statute-of-limitations defenses.[29]   Other recurring individual issues present more serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[30] (ii) differences

_____

[29]Limitations defenses generally present a common question and not an individual one. Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims or if the discovery rule might delay the accrual of the statute -- then it typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[30]The advisory committee notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes.

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in

in the applicable law in a multi-state, state law-based class actions, see Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.  The Court

---

which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some Courts of Appeal hold that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

concludes that the best approach -- one that is rooted in rule 23's text, gives the otherwise vague terms' content, and advances the purposes of the class certification inquiry -- is to assess predominance through the lens of rule 23(b)(3)(D), the manageability inquiry.  See Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184; Klay v. Humana, Inc., 382 F.3d at 1272.  A proposed class action satisfies predominance if common issues exist in the "right" places in the case that allow the court to adjudicate the dispute fairly and efficiently -- to accurately resolve all the claims for which the court certifies the class.

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class.  Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense.  If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

> > The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.  When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

See McLaughlin on Class Actions § 5:23 (19th ed. 2022)(footnotes omitted)(quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.12 (11th Cir. 1997)).

Some courts consider manageability -- or administrative feasibility -- as a prerequisite to rule 23(a)'s requirements, while others consider it under rule 23(b)(3)'s predominance requirement.  But in In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., No. MD 16-2695 JB/LF, 2023 US. Dist. LEXIS 166820 (D.N.M. 2023)(Browning,

J.)("Santa Fe Tobacco"), the Court predicts that the Tenth Circuit will analyze administrative feasibility under rule 23(b)(3) requirements. See 2023 US. Dist. LEXIS 166820, at *350-351. There, the Court examines the Courts of Appeals' split on whether to apply an administrative feasibility requirement for a proposed class; the United States Courts of Appeals for the First, Third, and Fourth Circuits apply administrative feasibility as an ascertainability issue, whereas the United States Courts of Appeals for the Second, Sixth, Seventh, Eighth, and Ninth Circuits do not. See In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015); Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012); Byrd v. Aaron's Inc., 784 F.3d 154, 177 (3d Cir. 2015)(Rendell, J., concurring)(suggesting that the Third Circuit eliminate the administrative feasibility prong)); EQT Prod. Co. v. Adair, 764 F.3d 347, 358-60 (4th Cir. 2014); In re Petrobras Secs., 862 F.3d at 265, 268 (2d Cir. 2017); Rikos v. Procter & Gamble Co., 799 F.3d at 525 (6th Cir. 2015); Mullins v. Direct Digital, LLC, 795 F.3d 654, 662 (7th Cir. 2015), cert. denied 136 S. Ct. 1161); Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d at 995-96 (8th Cir. 2016). The Fifth Circuit applies the administrative feasibility standard in some cases, but not in others. See Seeligson v. Devon Energy Production Co., 761 F. App'x 329, 344 (5th Cir. 2019)(concluding that the class was ascertainable based on objective criteria and noting that it has not adopted the Third Circuit's heightened standard of administrative feasibility); A.A. by and through P.A. v. Phillips, No. 21-30580, 2013 WL 334010, at *2 (5th Cir. January 20, 2023)(explaining that the "touchstone of ascertainabilty" inquires into administrative feasibility).[31] In Santa Fe Tobacco, the Court notes that, while an administrative feasibility requirement is not

---

[31]The Second Circuit issued its opinion in Brecher v. Republic of Argentina, 802 F.3d 303 (2d Cir. 2015) in 2015, two years before its opinion in In re Petrobras Secs., where it explicitly declines to apply the administrative feasibility requirement. See In re Petrobras Secs., 862 F.3d at 265.

an express requirement in rule 23's language, it is built into 23(b)(3)(D). <u>See</u> 2023 US. Dist. LEXIS 166820, at *348. Rule 23(b)(3) states:

> The matters pertinent to [the predominance and superiority] findings include
>
> (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Determining whether a proposed class will be feasible administratively is a question inherent to the Court's consideration of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).

Although the Tenth Circuit has not adopted the administrative feasibility requirement like the First, Third, and Fourth Circuits, it holds in <u>Davoll v. Webb</u>, 194 F.3d 1116 (10th Cir. 1999) -- the only case where the Tenth Circuit references the requirement -- that district courts do not err when they determine that individualized inquiries render class certification administratively infeasible. 194 F.3d at 1146. In <u>Davoll v. Webb</u>, the district court determines that "the individualized consideration required to determine whether each class member was disabled under the ADA rendered the proposed definition 'untenable.'" 194 F.3d at 1146 (quoting <u>Davoll v. Webb</u>, 160 F.R.D. 142, 144 (D.Colo. 1995)). The Tenth Circuit notes that "'[t]he district court has broad discretion to determine whether the class description is sufficiently definite,'" <u>Davoll v. Webb</u>, 194 F.3d at 1146 (quoting <u>Moore's Federal Practice</u> § 23.21[5] at 23-61), and, accordingly,

"it was within the district court's discretion to decide that determining class membership under the proposed definition would be administratively infeasible," 194 F.3d at 1146.

Given the extensive debate in the Court of Appeals and the Tenth Circuit's discussion in Davoll v. Webb, the Court predicts the Tenth Circuit likely would conclude that administrative feasibility is a part of the rule 23(b)(3)(A)-(D) considerations, and, accordingly, weigh administrative feasibility in its analysis of rule 23(b)(3)'s predominance analysis, but not view administrative feasibility as a prerequisite the failure of which dooms a proposed class.[32] See

---

[32]In this regard, the Court predicts that the Tenth Circuit will align with the Eleventh Circuit's formulation of this rule, and determine that ascertainability requires a class definition that relies on objective criteria, but that the 23(b)(3) predominance and superiority analyses encompass the administrative feasibility determinations. See Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir. 2004)(listing "identifiability" as one of rule 23(b)(3)'s elements); Cherry v. Dometic Corp., 986 F.2d 12996, 1301-05 (11th Cir. 2021). In Cherry v. Dometic Corp., the Eleventh Circuit concludes that ascertainability is a rule 23(a) prerequisite and that administrative feasibility is not relevant to ascertainability, but rather is a part of a court's consideration under rule 23(b)(3)(D)'s manageability criteria. See 986 F.3d at 1303-05. The Eleventh Circuit notes that it applies an administrative feasibility requirement in Karhu v. Vital Pharms., Inc., 621 F. App'x 945, 946 (11th Cir. 2015)(citing Bussey v. Macon Cnty. Greyhound Park, Inc., 562 F. App'x 782, 787 (11th Cir. 2014)), but that this line of cases is unpublished and therefore not binding precedent. See Cherry v. Dometic Corp., 986 F.3d at 1302. In walking back from its previous analysis, the Eleventh Circuit states:

> Our ascertainability precedents though do not mandate proof of administrative feasibility. A class is "clearly ascertainable" if we are certain that its membership is "capable of being" determined. Ascertain, Webster's New International Dictionary (3d ed. 1993); Ascertainable, Webster's New International Dictionary (3d ed. 1993). But membership can be capable of determination without being capable of convenient determination. Administrative feasibility is not an inherent aspect of ascertainability.

> . . . .

> Administrative feasibility does not follow from the text of Rule 23(a). Unlike traditional ascertainability, administrative feasibility does not bear on the ability of a district court to consider the enumerated elements of that subsection. A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class after certification. See, e.g., In re Cmty. Bank of

N. Va. Mortg. Lending Pracs. Litig., 795 F.3d 380, 396-97 (3d Cir. 2015).  The plaintiff satisfies this requirement if the district court concludes that the proposed process will be manageable and successful.  Byrd, 784 F.3d at 163-64.  But neither foreknowledge of a method of identification nor confirmation of its manageability says anything about the qualifications of the putative class representatives, the practicability of joinder of all members, or the existence of common questions of law or fact.  Fed. R. Civ. P. 23(a).  Because administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry.

Nor does a requirement of administrative feasibility follow from Rule 23(b).  To be sure, administrative feasibility has relevance for Rule 23(b)(3) classes, in the light of the manageability criterion of Rule 23(b)(3)(D).  See Rubenstein, 2 Newberg on Class Actions § 4:76, at 301 (5th ed. 2012).  Rule 23(b)(3)(D) instructs the district court, in deciding whether "a class action [would be] superior to other available methods for fairly and efficiently adjudicating the controversy," to consider "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3). A difficulty in identifying class members is a difficulty in managing a class action.  See Briseno, 844 F.3d at 1126.  But because Rule 23(b)(3) requires a balancing test, it does not permit district courts to make administrative feasibility a requirement.  The manageability inquiry focuses on whether a class action "will create relatively more management problems than any of the alternatives," not whether it will create manageability problems in an absolute sense.  Klay v. Humana, Inc., 382 F.3d 1241, 1273 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 . . . (2008).  And the district court must balance its manageability finding against other considerations.  Fed. R. Civ. P. 23(b)(3).  So administrative difficulties -- whether in class-member identification or otherwise -- do not alone doom a motion for certification.  Indeed, we have made clear that manageability problems will "rarely, if ever, be in [themselves] sufficient to prevent certification."  Klay, 382 F.3d at 1272.

Cherry v. Dometic Corp., 986 F.3d at 1303-04 (emphasis and alterations in original).

While the Court still thinks that the Third Circuit's rule is the best, the Court believes the Tenth Circuit will not adopt that rule, so the Court clarifies here the basic analysis for a proposed rule 23(b)(3) class that it believes the Tenth Circuit will use.  Rule 23(c) requires the Court to "define the class" in its class certification order.  Fed. R. Civ. P. 23(c)(1)(B).  When identifying definiteness, "Courts generally treat the requirement as a precursor to Rule 23 and therefore examine the implicit requirements before proceeding to the Rule's explicit requirements." Newberg on Class Actions § 3:3.  Additionally, "[a]ll courts essentially focus on the question of whether the class can be ascertained by objective criteria.  A class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness." Newberg on Class Actions § 3:3.  After determining the proposed class' definiteness -- because the class is or is not ascertainable on the basis of objective criteria -- the Court examines the

Santa Fe Tobacco, 2023 US. Dist. LEXIS 166820, at *351.  In the earlier class action case

Abraham v. WPX, in which the Court cites the Third Circuit's administrative-feasibility

requirement.[33]  There, the Court concludes that the class is not ascertainable, because "no existing

---

explicit rule 23(a) requirements: numerosity, commonality, typicality, and adequacy.  See Fed. R. Civ. P. 23(a).  Once the Court has determined that the proposed class satisfies the rule 23(a) criteria, the Court turns to the rule 23(b)(3) predominance and superiority requirements, which direct the Court to consider, among other factors, "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  In analyzing the likely difficulties in managing the class action, the Court considers whether it will be feasible administratively for each proposed class member to prove that they are a class member.  Even where a proposed class relies on objective criteria for its definition -- in Abraham v. WPX, whether gas was processed at a particular plant -- determining whether an individual proposed class member satisfies those objective criteria may be burdensome or requires significant individualized inquiry such that the individualized inquiries predominate over common questions or the class action is not superior to other adjudication methods.  In Abraham v. WPX, the Court determines that identifying where each wells' gas was processed would have been "an individual and time-consuming inquiry.  Abraham v. WPX, 317 F.R.D. at 258.

[33]In Abraham v. WPX, 317 F.R.D. at 254-58, the Court references rule 23(c)'s requirement that the Court "'define the class and the class claims, issues, or defenses.'"  Abraham v. WPX, 317 F.R.D. at 254 (quoting Fed. R. Civ. P. 23(c)).  The Court next asserts that "[a]nother 'essential' prerequisite to a rule 12(b)(3) class action is that the 'class must be currently and readily ascertainable based on objective criteria.'"  Abraham v. WPX, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93).  The objective criteria which the Court references stand in opposition to subjective criteria, such as a class composed of individuals "'who 'believe' they were discriminated against."  Abraham v. WPX, 317 F.R.D. at 254 (quoting Chiang v. Veneman, 385 F.3d 256, 271 (3d Cir. 2004)).  The Court finally states that, "'[i]f class members are impossible to identify without extensive and individualized factfinding or 'mini-trials,' then a class action is inappropriate.'"  Abraham v. WPX, 317 F.R.D. at 254 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d at 593).  The Court's subsequent analysis includes a reference to Carrera v. Bayer Corp.'s administrative-feasibility language alongside a consideration of the administrative difficulties in identifying which gas flowed to which wells, at the conclusion of which the Court states that "identify[ing] which wells' gas was processed in each year . . . is an individual and time-consuming inquiry."  Abraham v. WPX, 317 F.R.D. at 258.  Although the Court frames its analysis in Abraham v. WPX as an ascertainability question, given the Court's extensive review of the caselaw above, the Court concludes that the Tenth Circuit would find that administrative feasibility is more appropriately a predominance and superiority analysis, investigating whether identifying which wells' gas was processed where would be an individualized and time-consuming inquiry, such that the individualized questions predominate over any common questions, and whether the class action is the superior vehicle for the plaintiffs to bring their claims.  Although the Court now believes the Tenth Circuit would consider the

---

database can identify the proposed class.  Moreover, it is not feasible for the Court to identify which wells' gas was processed in each year.  Doing so is an individual and time-consuming inquiry."[34]  317 F.R.D. at 258.

An administrative-feasibility requirement does not endanger all low-value consumer classes -- just some.  The choice is really between considering the difficulties in managing and identifying a class action now, or kicking the issue down the road to the claim administration stage after the class certification.  This delay gives plaintiffs the advantage of trying to secure a settlement without the district court ever deciding the difficulties in managing a class action.  While plaintiffs prefer not to bother about the difficulties of managing a class action, the rule requires the

---

Court's analysis in Abraham v. WPX Production Productions, LLC, to be an analysis under rule 23(b)(3) -- predominance and superiority -- rather than 23(c) -- ascertainability -- the Court would have reached the same conclusion in that case, given the overwhelming administrative difficulties in identifying the processed gas's source wells.

The Court would adopt the Third Circuit's rule for similar reasons that the Third Circuit identified in announcing the rule.  See Marcus v. BMW of N. Am., LLC, 687 F.3d at 593.  First, an administrative-feasibility requirement ensures that the Court and the parties easily can identify class members.  Engaging in prolonged class certification litigation only to end up with a claims administration process that struggles to identify class members without engaging in individualized inquiries is not an efficient use of time and resources.  Second, an administrative feasibility requirement protects class members' rights, because such a requirement limits fraudulent claims and ensures that only valid class members obtain relief, which is important particularly where defendants are ordered to pay a lump-sum judgment of which each class member takes a share.  Third, an administrative feasibility requirement protects defendants' rights, because requiring clear records and documentation avoids "mask[ing] individual issues" and enables defendants to exercise their rights under the Seventh Amendment to challenge individual claimants.  Carrera v. Bayer Corp., 727 F.3d at 307.

[34]On reconsideration, the plaintiffs submitted a new proposed class definition, which the Court determined was ascertainable, because "the Defendants appear to have records showing who they pay on the keep-whole methodology, [and so] there is 'a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified.'"  Abraham v. WPX Energy Prod., LLC, 322 F.R.D. 592, 642 (D.N.M.2017)(Browning, J.)(quoting Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006)).

district court to consider difficulties at class certification, and not just postpone them. In many low-value consumer cases, the consumer is readily ascertainable and feasible administratively to identify. The administrative feasibility requirement, rather, endangers classes only where the consumers are not ascertainable. Many times, the defendant knows its customers, and the information can be ascertained from the defendant's documents. It is only cases where the consumer cannot be ascertained that this requirement creates problems. When ascertainability creates problems, the question is why the class action -- which attorneys largely manufacture -- should go forward when the victims cannot be determined.

District courts have myriad tools for managing a class and can design new tools to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism." Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010). Most techniques that truly are "procedural" are fair game: cases can be bifurcated, trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question how to distribute damages among the class can be addressed with less formality.[35] Techniques that merely presume away substantive elements that normally must be

---

[35]Defendants have a Due Process right to have any damages against them proven in court. The question of how to distribute those damages among the class, however, does not implicate the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme. The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial. The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages. The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially

_____

when the alternative is denying certification. One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class." Black's Law Dictionary 444 (9th ed. 2009). It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts.

> "Cy pres" is an equitable doctrine, designed to save testamentary charitable trusts that would otherwise fail because their beneficiaries are no longer capable of receiving the funds the trust held for them. The Cy pres doctrine allows trust funds to be applied to the next best use that would most closely satisfy the testator's intent.

5 James Wm. Moore, Jerold S. Solovy, Ronald M. Marmer, Timothy J. Chorvat & David M. Feinberg, Moore's Federal Practice § 23.171, at 23-599 (3d ed. 2011). "The doctrine, or rather something parading under its name, has been applied in class action cases . . . , but for a reason unrelated to the reason for the trust doctrine." Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 784 (7th Cir. 2004)(Posner, J.). "Use of the cy pres doctrine in the class action context can be traced largely to a pioneering student Comment, published in the University of Chicago Law Review in 1972." Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 631 (2010)(citing Stewart R. Shepard, Comment, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U. Chi. L. Rev. 448 (1972)). That student argued that "[w]hen distribution problems arise in large class actions, courts may seek to apply their own version of cy pres by effectuating as closely as possible the intent of the legislature in providing the legal remedies on which the main cause of action was based." Shepard, supra, at 452. Courts resort to cy pres where funds remain after distributing a class award and the court wishes to avoid: (i) returning the funds to a defendant who has been found liable, or agreed it was liable, in that amount; and (ii) increasing the pro-rata share of the class members who file claims, potentially giving those class members a windfall. In the context of a class action, a court may employ the cy pres doctrine to "put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007).

. . . .

The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money

damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

With respect to the Court's first criticism, several Circuit Court Judges have discussed a similar view. The Honorable Richard A. Posner, United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, has commented on the unsoundness of the rationale underlying the application of the cy pres doctrine. . . . [H]e noted that "[t]here is no indirect benefit to the class from the defendant's giving the money to someone else" and noted that the badly named "'cy pres' remedy" is "purely punitive." Mirfasihi v. Fleet Mortg. Corp., 356 F.3d at 784. The Honorable Joseph F. Weis, Senior United States Circuit Judge for . . . the Third Circuit, . . . also stated that he was "not persuaded that application of the cy pres doctrine is appropriate in the class action setting," and that "any funds remaining at the conclusion of the claims process should be distributed to class members where possible or escheated to the government." In re Pet Food Prods. Liability Litig., 629 F.3d 333, 359 (3d Cir. 2010)(Weis, J., concurring and dissenting). Discussing the fundamental differences between a testator's wishes -- at which the cy pres doctrine was originally aimed -- and class actions, Judge Weis noted that, "[t]his lawsuit is not charitable," and that "[t]here are no individuals whose wishes need to be considered and there is no intent to benefit charitable purposes that can be attributed to the class members or the lawyers who established the fund." In re Pet Food Prods. Liability Litig., 629 F.3d at 363. He commented that "[w]e deal here with charitable contributions to which members of the class never voiced any interest or approval and a procedure subject to criticism as an inappropriate judicial function." 629 F.3d at 363 (footnote omitted). The Court agrees with the position that Judge Weis advances. Parties do not initiate class actions so that class action damages can be distributed to third parties not involved in the litigation and without standing to sue for the damages they receive through court intervention. Traditionally, the argument in favor of cy pres awards has been that it prevents both plaintiffs and defendants from receiving a windfall. This rationale, however, does not justify an award to parties outside the litigation. In the Court's experience, there is unlikely to be a large windfall to the class members, because, even if not all class members file claims, the class is usually sufficiently numerous that distributing the remaining class funds to those class members does not substantially increase their individual awards. Also, rarely do plaintiffs get one-hundred percent of the damages or losses in a settlement; often they are dealing with financially strapped defendants, who force the plaintiffs to take a serious haircut in settlement. On the other side of the equation, the defendant's arguably have a strong equitable claim to the funds, as it provided the funds in the expectation

that compensating the class would exhaust the funds and, if that purpose is not fulfilled, the defendant does not experience a windfall when the money is returned -- it simply demonstrates that the parties misjudged the class size or interest in recovery.  The Honorable Edith H. Jones, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, has expressed similar sentiments.  In a concurring opinion, she stated: "It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation."  Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 480 (5th Cir. 2011)(Jones, J., concurring).  The defendant usually just wants to the case to go away, and does not care where the money goes if the case will disappear.  With cy pres, the plaintiff's lawyers get fees and costs, and if there are remaining funds, a sizable contribution to his or her favorite charity.

        The Court also believes that distributions to third parties presents issues regarding the appearance of impropriety, because judges are engaging in the selective distribution of funds to parties not before it.  There are no principled rationales for how a court goes about choosing from among charitable organizations when there is no indication that the parties contemplated that these funds might be distributed to a third-party entity.  There is no mechanism for how charitable organizations come before the court to be considered for such an award.  Three national newspapers have all indicated the suspect nature of judges engaging in such awards.  In an article for the *New York Times*, Adam Liptak quoted Samuel Issacharoff, a law professor at New York University, as stating that the practice of awarding cy pres awards is "getting out of hand" and former federal judge David F. Levi, now dean of the Duke University School of Law, as stating that "allowing judges to choose how to spend other people's money 'is not a true judicial function.'"  Adam Liptak, Doling Out Other People's Money, N.Y. Times, Nov. 26, 2007, at A14.  Liptak noted that "[j]udges are turning into grant administrators, and some of them are starting to enjoy it.  Who wouldn't?"  Liptak, supra, at A14.  In an editorial, the Washington Post expressed the opinion that, "[i]n all but the rarest of circumstances, [cy pres] funds should be made available to individual plaintiffs and not to outside organizations -- no matter how worthy," because "giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and borders on distasteful."  Editorial, When Judges Get Generous: A Better Way to Donate Surpluses from Class-Action Awards, Wash. Post, Dec. 17, 2007, at A20.  The Wall Street Journal describes cy pres awards as distributing "the money, in an ad hoc manner, to people who are not even in the class, who would not have had standing to sue, and who were never even alleged to have been wronged."  George Krueger & Judd Serotta, Op-Ed., Our Class–Action System is Unconstitutional, Wall St. J., Aug. 6, 2008, at A13.  It noted that "[j]udges, in their unlimited discretion, have occasionally been known to order a distribution to some place like their own alma mater or a public interest organization that they happen to favor."  Krueger & Serotta, supra.  One

commentator notes that "[j]udges often do not explain or justify their cy pres decision and there are very few instances in which cy pres distributions have been overturned on appeal," and that the "broad range of discretionary decisions" involved "gives trial judges enormous power." Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014, 1037 (2009). The broad range of discretion that trial judges have to distribute funds and the possibility that such distributions will be viewed as selfish decisions made to charitable organizations with which a judge is involved tarnishes the judiciary's image and creates the appearance of impropriety. The class members or public might see that the court may become more interested in being a bigshot in his or her community than really making certain that the class members get every penny to which they are entitled. As these articles indicate, to have judges making these kinds of decisions is inappropriate, and the Court does not want to engage in such unlimited, unprincipled decision-making.

Furthermore, courts are often not in the best position to make these decisions and any efforts to become better informed about the range of charitable organizations available is likely to result in lobbying for distributions from the Court. Courts should not be placed in the tenuous position of making a false choice about which organizations will convey the greatest "indirect" benefit to class members who are not present and have no real voice in determining who should receive the funds. Judges "often use their discretion to approve charities proposed by class counsel" and "many cy pres distributions are channeled to organizations that support the work done by plaintiffs' attorneys." Yospe, supra, at 1028. It thus appears that courts do not, in any meaningful way, search for the organization that is the "next-best" recipient of the funds, and are not in the best position to further the unpaid class member's interests, but approve a distribution to the organization whose name is put before it. Courts are likely in the habit of approving distributions to organizations that the class counsel proffer, because courts have limited time and resources to search for alternative options. Also, it is unclear how a court, with its limited resources, would solicit charitable organizations which might be the "next-best" recipient without engaging in ex parte shopping. An additional bias that some commentators have noted, with respect to cy pres awards, is a geographic bias. Even where a class is national in scope, cy pres awards tend to be distributed to charities within the district in which the case was brought. See Yospe, supra, at 1030-31. To put themselves in a better position to receive awards, groups have now started lobbying for cy pres distributions where it appears there might be funds remaining. For example, "the New York Bar Association recently published a manual promoting the use of cy pres and appointed a working group 'to develop an effective educational and marketing strategy' with the goal of steering money awards towards the bar association's legal services departments." Yospe, supra, at 1035. In his article, Liptak also noted that "[t]he process is starting to become institutionalized, and legal services organizations that represent poor people have begun relying on class-action settlements to finance their work." Liptak, supra, at

A14.  This seems far afield from the purposes of the class action litigation, from the cy pres doctrine, and from the traditional functions of the courts. Courts address cases and controversies; they are not fora in which to reorder society or push social agendas.

. . . .

The Court believes . . . th[at] cy pres awards are inappropriate, because they inject a third party into the litigation, do not adequately reflect the best interests of absent class members, create an appearance of impropriety, and are not the best use of the Court's time and resources.  The class action device in twenty-first century American society pushes due process and the conventional civil litigation model to the limits of how to compensate for mass harm.  See Philip Morris USA Inc. v. Scott, 131 S. Ct. 1, 4 (2010)("The extent to which class treatment may constitutionally reduce the normal requirements of due process is an important question.  National concern over abuse of the class-action device induced Congress to permit removal of most major class actions to federal court.").  While often an unwieldy and rough mode of delivering justice, there are at present no other acceptable substitutes short of special legislation and regulation, which creates other problems and issues.  On the other hand, it should not be expanded to include charitable gifts to non-parties at the expense of the parties and especially the class members.  While the practice of law might at times be more enjoyable for attorneys if they did not have clients, in the end, litigation is not about the bar, but about the client.  Cy pres moves the focus too much away from the class members' welfare, which the Court must jealously protect if the class action device is to remain a legitimate means of advancing justice.  The Court can be cautious and prudent in using the class action device without touching the extreme limits of what the judiciary can do.

Lane v. Page, 862 F. Supp. 2d 1182, 1230-35 (D.N.M. 2012)(Browning, J.)(citations omitted). See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012)(Browning, J.)(denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values).  The Tenth Circuit has never discussed cy pres relief -- it has only once even uttered the term, see United States v. State of New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), the Wall Street Journal, see Krueger & Serotta, supra, and the Washington Post, see Editorial, supra, at A20, have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C.

proven by the plaintiff, or that would impair a defendant's Due Process rights, however, are not permissible.   In particular, the Supreme Court has expressly disavowed or trials "by formula," either as to liability or damages.   Wal-Mart, 564 U.S. at 367.  This formerly popular tool involved a small but representative sample of class members presenting evidence on individual questions in their own cases and inviting the jury to extrapolate its conclusions from the sample to the entire class.   See, e.g., Wal-Mart, 564 U.S. at 367.  For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.  Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[36]   The defendants might put on their own sample, attack the

_____

§ 2072, or both.  See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.).

Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100 in damage receives the same distribution as another class member who sustained $800 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[36]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.   See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm;  Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval;  Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of +/- 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample. The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[37]

The Supreme Court bars this method of trying cases, because it violates a defendant's right to have (i) each element of (ii) each claim asserted against it by (iii) each class member specifically proven. See Wal-Mart, 564 U.S. at 367.[38] When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this

_____

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa. See CI/CL Websites. For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a +/- 8% margin of error and a 99% confidence level, or a +/- 1% margin of error and a 90% confidence level. The use of a 95% confidence level, however, is a scientific and industry standard.

[37]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00. The math works out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.
        The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class. That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately. See supra note 35, at 123.

[38]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the Constitution of the United States. See Wal-Mart, 564 U.S. at 367 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

common determination can be done forms the basis of the class action.  Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.

Although courts cannot sacrifice the defendant's rights for the economic convenience of the plaintiffs, neither should they forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members does not weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parol evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses -- such as that certain class members waived performance of the disputed term.  The defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  Just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result. Although this burden may seem unfair to the defendant, bear in mind that it would have to expend the same energy and resources in the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- does not excuse the defendant of its ordinary litigation

burdens.  In short, the issues that most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts.

3.    **Oil-and-Gas Class Actions.**

Oil-and-gas wells are often drilled on land owned by entities or individuals other than the oil company that performs the drilling.  The landowners execute mineral leases or deeds with the oil companies, dividing the estate up into a royalty interest, which the landowner-lessor owns, and a working interest, which the oil company-lessee owns.  The lessee builds wells on the leased land and connects them to a gathering system -- a system of small pipelines that collect oil and gas from a large number of wells in a region -- which then carries it to a plant for treatment or processing. When the lessee sells the oil or gas, it then pays the lessors a fraction of the proceeds, known as a royalty, which effectively serves as "rent" for the use of the leased land.  Royalty owners often contend that their lessees are underpaying their royalty, either by deducting impermissible costs from the proceeds -- a lessee typically can deduct post-production costs, but not production costs, from the sale proceeds before dividing off royalties -- or by paying on an amount that does not reflect the true sale proceeds.  Courts will generally refer to this claim as a "royalty underpayment" claim.  The relationship between lessors and lessee is fundamentally a contractual one, but there is also positive law -- case law and statutes -- supplying default terms and contractual gap-fillers. Each lessor's monthly royalty is typically small, and, thus, lessors have little practical recourse for royalty underpayment in individual litigation.  They instead will band together with other landowner-lessors with whom a given oil company-lessor contracts -- often other lessors on a

single gathering system or within a region -- and sue the oil company via class action. These royalty underpayment class actions have a prodigious history in the State courts, where they were brought traditionally -- because oil-and-gas royalty law is principally State law -- before CAFA's passage. See, e.g., Phillips Petrol. Co. v. Shutts, 472 U.S. at 799. These actions present recurring issues, and, as certification reversals are both more common[39] and more instructive than affirmances, the Court focuses mostly on cases where appellate courts conclude that a proposed class fails to satisfy rule 23's requirements.

---

[39]Before rule 23(f)'s interlocutory-appeal provision was added, the Courts of Appeals could rule on class certification only (i) after a final judgment issued in the case, which, given the class actions' high settlement rate, was rare; or (ii) by way of a writ of mandamus, in which case the Courts of Appeals would not generally issue an opinion unless they granted the writ and ordered decertification. See, e.g., In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995). Even now, most Courts of Appeals interpret rule 23(f) in such a way that they will hear an interlocutory appeal only if it appears the certification decision was erroneous:

> We apply a five-factor test to assess the appropriateness of granting a Rule 23(f) petition. The relevant factors are:
>
> > (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance; (4) the nature and status of the litigation before the district court (such as the presence of outstanding dispositive motions and the status of discovery); and (5) the likelihood that future events will make appellate review more or less appropriate.
>
> We consider these factors on a holistic basis, but the court should grant the petition, notwithstanding the other factors, "[w]here a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal."

EQT Prod. Co. v. Adair, 764 F.3d 347, 356-57 (4th Cir. 2014)(citations omitted). These standards -- rule 23(f) and, formerly, the mandamus standard -- result in the Courts of Appeals appearing to reverse a higher proportion of class certifications that they actually do. A district court's decision to certify a class or deny certification is reviewed for abuse of discretion. See Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009).

The Tenth Circuit has three cases on rule 23(a) and (b)(3)'s application to oil-and-gas royalty underpayment cases.[40]  The first two are two companion cases issued on July 9, 2013, Wallace v. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213 ("Roderick"), and Chieftan, 528 F. App'x 938.[41]  The key issue in both cases is that the putative class members have

---

[40]Unsurprisingly, given that the Tenth Circuit's geographic footprint encompasses such oil-rich states as Oklahoma, New Mexico, Wyoming, Kansas, and Colorado, the Tenth Circuit has dealt with a number of other oil-and-gas royalty class actions, but those cases mostly address questions other than the front-end certification inquiry.  See, e.g., Abraham v. BP Am. Prod. Co., 685 F.3d at 1196 (Kelly, J., joined by Murphy & Hartz, JJ.)(reversing, after a class-action trial, the district court's decisions to admit evidence of the defendant's transition to a uniform same-as-federal payment methodology and to grant judgment as a matter of law on two lease forms); Eatinger v. BP Am. Prod. Co., 528 F. App'x 859 (10th Cir. 2013)(unpublished)(McKay, J., joined by Kelly & Matheson, JJ.)(holding that a class-action settlement mooted the appeal of royalty owners who had been excluded from the class definition); Pelt v. Utah, 539 F.3d 1271 (10th Cir. 2008)(Robinson, J., joined by Murphy & Lucero, JJ.)(holding that the conclusions in a prior class action, where the plaintiffs are not parties, does not bind the plaintiffs); Elliott, 407 F.3d at 1091 (Murphy, J., joined by Seymour & McKay, JJ.)(making a number of substantive holdings, and ruling that an intervention was timely and proper); S. Ute Indian Tribe v. Amoco Prod. Co., 151 F.3d 1251 (10th Cir. 1998)(en banc)(Seymour, C.J.)(holding that Indian Tribes which own mineral rights in coal also own the rights to the accompanying coalbed methane), rev'd by 526 U.S. 865 (1999); Craig v. Champlin Petrol. Co., 435 F.2d 933, 939 (10th Cir. 1971)(overturning the district court's clearly erroneous factual finding that "a market exists for . . . gas in 1965 at the contract price established in 1960").

[41]Chieftain Royalty Co. v. XTO Energy, Inc. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Chieftain Royalty Co. v. XTO Energy, Inc., Skinner v. Uphoff, 175 F. App'x 255 (10th Cir. 2006), Baldauf v. Garoutte, 137 F. App'x 137 (10th Cir. 2005), Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 410 F. App'x 151 (10th Cir. 2011), and In re Kahn, 133 F.3d 932

leases -- ranging in the hundreds to ten thousands -- with differences in language, potentially creating individualized issues that predominate over common questions. The Honorable Paul J. Kelly, Jr.,[42] United States Circuit Judge for the Tenth Circuit, writes the opinion in both cases; the Honorable Scott M. Matheson, Jr.,[43] United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit, join Judge Kelly's opinion. In Roderick, a class of individuals owning interests in roughly 650 leases and over 300 wells across ten well fields in Kansas brought a class action against XTO Energy for breach of contract, unjust enrichment, and an accounting. See 725 F.3d at 1215. The district court certified the class on the basis of a single common issue -- "whether XTO's uniform payment methodology breached the implied duty of marketability under Kansas law" -- which the district court deemed to predominate over individual issues. Roderick, 725 F.3d at 1217. On appeal, the Tenth Circuit reversed the district court's certification of the class on two grounds.

---

(10th Cir. 1998), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[42]Judge Kelly is a subject-matter expert in oil-and-gas law, having practiced for many years with one of New Mexico's oldest firms, the well-respected firm now known as Hinkle Shanor LLP, with offices in Roswell and Santa Fe, New Mexico. The Hinkle firm is known for its representation of oil companies.

[43]Westlaw lists one member of the panel as being the Honorable Charles E. Matheson, then-Chief United States Bankruptcy Judge for the District of Colorado. The Court thinks it more likely that the Judge Matheson on the panel was the Tenth Circuit judge, because: (i) the official published opinion states that the case is "[b]efore Kelly, McKay, and Matheson, Circuit Judges"; and (ii) Article I judges can not and do not sit on federal appellate panels. 28 U.S.C. § 46(b)(stating that Courts of Appeals "shall consist of the circuit judges of the circuit in regular active service"); 28 U.S.C. § 44(a) (requiring that circuit judges be appointed by the President with Senate confirmation under Article III of the United States Constitution).

First, the Tenth Circuit stated that the district court fails to consider variations in lease language, relying instead on the implied duty of marketability.  See Roderick, 725 F.3d at 1216. This failure constitutes an abuse of discretion, because the duty of marketability obtains only "[a]bsent a contract providing to the contrary," and, thus, express lease language can negate the duty of marketability.  725 F.3d at 1216 (brackets in original)(quoting Sternberger v. Marathon Oil Co., 257 Kan. 315, 894 P.2d 788, 800 (Kan. 1995)).  The plaintiffs had not reviewed any of the class leases, and XTO Energy reviewed only one-fifth of them, categorizing them by royalty type, "several of which negate the IDM completely or in part (i.e., by providing for certain express deductions)."  Roderick, 725 F.3d at 1216.  Second, the Tenth Circuit holds that applying Kansas' implied duty to market requires determining the point at which gas from each well becomes marketable, declaring that "[o]nce gas is in marketable condition, the IDM is satisfied -- regardless of whether a market exists at that location . . . [and] gas may be marketable at the well."  Roderick, 725 F.3d at 1219 (emphasis in original).  Importantly, the Tenth Circuit does not hold that the class cannot be certified, and, to the extent that the Court reads such things into judicial opinions, Roderick implies the opposite: class certification based on leases upholding the implied duty to market is theoretically possible.  Roderick holds that the district court's inquiry is inadequate: "from what we are told, there are roughly 430 leases which have yet to be examined by the Trust or the district court."  Roderick, 725 F.3d at 1219.  The Tenth Circuit then gives the district court multiple leads for conducting a new rule 23 analysis on remand.  See 725 F.3d at 1219 ("On remand, the [plaintiffs] could, for example, create a chart classifying lease types, and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM."  (citing Foster v. Merit Energy Co., 282 F.R.D. 541, 551 n.12 (W.D. Okla. 2012)));

Roderick, 725 F.3d at 1219 ("On remand, the district court should consider whether and to what extent marketability affects commonality." (footnote omitted)).

In the unpublished companion case, Chieftain, the Tenth Circuit applies Roderick's holding to a much larger class action composed of lessors for 14,300 leases and 2,300 wells in Oklahoma. See 528 F. App'x at 940. Echoing the language in Roderick, Judge Kelly notes that "approximately 13,568 leases have yet to be examined by XTO Energy -- let alone by Chieftain or the district court." Judge Kelly states even further that this omission is "particularly significant because unlike the plaintiff in Roderick, Chieftain admits that some leases expressly abrogate -- and one even negates -- the IDM." 528 F. App'x at 942-43. Judge Kelly then elaborates on the Roderick holding:

> Indeed, the district court acknowledged the significance of lease language variations when it stated that "the express terms of the various leases will necessarily have to be evaluated . . . to determine whether the [IDM] has been abrogated." Chieftan, 2021 U.S. Dist. LEXIS 51593, 2012 WL 1231837, at *5. However, the district court decided the issue was "capable of resolution at the summary judgment stage of this litigation." Id.
>
> To be sure, the legal effect of lease language is a merits question that is likely "capable of resolution at the summary judgment stage." However, it is also an issue that bears directly on Rule 23's criteria. As the Supreme Court has emphasized, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n. 12, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (quotation omitted). Therefore, the district court must address the lease language issue as it relates to Rule 23 before certifying the class.

528 F. App'x at 942 (brackets, ellipses, emphasis, and omitted quotation in original).

Judge Kelly's two companion cases tee up the Tenth Circuit's requirement that district courts evaluate lease language variations when conducting the rule 23(a) commonality and rule 23(b)(3) predominance analysis for discussion in the most recent oil-and-gas royalty underpayment class action case: Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779 (10th

Cir. 2019)("Chaparral").   In Chaparral, the Tenth Circuit affirms the district court's grant of class

certification and, in particular, agrees with the district court's conclusion that the class meets rule

23(a)'s commonality requirement and rule 23(b)(3)'s predominance requirement.  See 923 F.3d at

784.  There, the district court narrows the class to include only those royalty owners whose leases

contain a certain royalty clause, known as a Mittelstaedt clause,[44] that does not negate the implied

duty to market under Oklahoma State law.  The Tenth Circuit concludes that the district court

properly identifies the narrowed class by using plaintiff Naylor Farms' chart, which categorizes

the leases at issue by royalty clause language.  See Chaparral, 923 F.3d at 795.  The Tenth Circuit

"previously indicated" that a chart classifying lease language "is precisely what a plaintiff should

do to establish commonality under these circumstances."   Chaparral, 923 F.3d at 795 (citing

Roderick, 725 F.3d at 1219).  The district court also independently confirms that Naylor Farms'

chart is "generally accurate," and defendant Chaparral Energy Corporation does not provide

anything that "might call into question" the district court's assessment.  Chaparral, 923 F.3d at

796.

    Chaparral also addresses two other challenges to the district court's conclusions that the

class meets rule 23(a)'s commonality requirement and rule 23(b)(3)'s predominance requirement

which, unlike the lease language issue, are new to Tenth Circuit discourse.  First, the question

whether Chaparral Energy Corporation breaches the implied duty to market "is subject to common,

---

    [44]The Oklahoma Supreme Court considers royalty clauses in three cases: (i) Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, 954 P.2d 1203, 1206 (Okla. 1998); (ii) TXO Production Corp. v. State ex rel. Commissioners of Land Office, 1994 OK 131, 903. P.2d (Okla. 1995); and (iii) Wood v. TXO Production Corp., 1992 OK 100, 854 P.2d 880 (Okla. 1993).  The Oklahoma Supreme Court concludes that these clauses collectively are the Mittelstaedt clauses, and the Mittelstaedt clauses' language does not negate the implied duty to market and is consistent with the marketable product rule.  See Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 790 (10th Cir. 2019).

classwide proof" that satisfies commonality and predominance. 923 F.3d at 795. Chaparral

Energy Corporation performs "gathering, compressing, dehydrating, transporting, and producing"

("GCDTP") services on the gas at issue to make the gas marketable. Chaparral, 923 F.3d at 783-

84. The plaintiffs allege that Chaparral Energy Corporation deducts GCDTP costs from royalty

payments in violation of Oklahoma law. See Chaparral, 923 F.3d at 783. Under Oklahoma's

implied duty to market, the lessee must bear the costs of making gas marketable. See Chaparral,

923 F.3d at 783. The Tenth Circuit describes the requirement, in some States, that the operator

make gas marketable at his or her own expense as the "marketable condition rule." See Energen,

886 F.3d at 830. The Tenth Circuit holds that, while individualized issues stem from variations in

gas quality from well to well, which impact gas' marketability as well as the different GCDTP

services and amounts of GCDTP services required to make the gas at issue marketable, these

individualized issues do not overwhelm the common fact that Chaparral Energy Corporation

performed at least one GCDTP service on all the gas at issue. See 923 F.3d at 791-95.

Accordingly, whether Chaparral Energy Corporation breached the implied duty to market by

deducting GCDTP costs from royalty payments is a common question that predominates over

individual ones. See 923 F.3d at 795.[45] Second, although Naylor Farms does not show that

---

[45]The district court also "appeared to recognize" that "differences in the precise number
and nature of GCDTP services required to make the gas from each well marketable are relevant
only to the post-breach question of damages." 923 F.3d at 790. The Tenth Circuit does not discuss
the district court's conclusion on this issue, but the Court thinks the district court's conclusion is
useful to show that, in some instances, individualized issues are a matter of individualized damages
issues. "[T]he fact that damages may have to be ascertained on an individual basis is not, standing
alone, sufficient to defeat class certification." Wallace B. Roderick Revocable Living Tr. v. XTO
Energy, Inc., 725 F.3d 1213, 1220 (10th Cir. 2013) (quoting McLaughlin v. Am. Tobacco Co.,
522 F.3d 215, 231 (2d Cir. 2008)). See Newberg § 4:54 & n.2 (stating that "courts in every circuit
have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to
make individualized  damage determinations" and listing cases).

Chaparral Energy Corporation uses a uniform payment methodology to calculate royalty payments, "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."  923 F.3d at 798 (quoting Menocal v. GEO Grp., Inc., 882 F.3d 905, 922 (10th Cir. 2018)).  The Tenth Circuit notes that a uniform payment methodology is not necessary to establish predominance, though it also notes that "standing alone, [a uniform payment methodology] isn't sufficient to establish predominance."  923 F.3d at 798 (emphasis in original)(brackets added).

Other Courts of Appeals also have analyzed oil-and-gas royalty underpayment class actions, although the Tenth Circuit does not cite any of them in the cases discussed above.  The Court suspects that the Tenth Circuit does not want to rely too heavily on cases issued before Wal-Mart.  One influential case that discusses rule 23's application to oil-and-gas royalty cases in the post-Wal-Mart era is EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2014).  The Honorable Albert Diaz, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, joined by the Honorable J. Harvie Wilkinson III and the Honorable Barbara M. Keenan, United States Circuit Judges for the Fourth Circuit, vacates a district court's certification of five closely related oil-and-gas royalty class actions and remands them for further analysis.  See 764 F.3d at 352.  That case is primarily about mineral-rights ownership -- namely, whether certain coal-rights owners also hold title to the coalbed methane under the leased premises -- but it also addresses royalty underpayments.  See 764 F.3d at 347-365 (addressing the coalbed methane ownership issue).  Judge Diaz notes three individual issues that the district court failed to consider and that weigh against predominance.  First, the case addresses the issue of intra-class variations in lease language; the Fourth Circuit's rationale parallels the Tenth Circuit's, going into more detail in some areas:

[T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation. Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties. Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability. Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology." But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate. For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

764 F.3d at 366-67 (citations omitted). These statements support the Court's conclusion that the predominance inquiry is neither a quantitative inquiry comparing the number of common questions to the number of individual questions, nor a cursory inquiry asking whether the defendants generally subjected the class members to the same factual treatment or whether their claims are subject to the same legal standard. Rather, it is a manageability inquiry that requires the Court to determine whether common legal issues, susceptible to common evidence, exist in the right places to try the case in a way that is fair to all parties. Second, the Fourth Circuit points out that the

district court would "likely need to consider" course-of-performance evidence.  764 F.3d at 370-71.  Third, it states that "the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement."  764 F.3d at 371.  The plaintiffs' claims were time-barred facially, but they pled fraudulent concealment to toll the statute, and the Fourth Circuit holds that, "[a]lthough a defendant's conduct is not irrelevant, attention must also be paid to the plaintiff's knowledge and actions," and, "[i]n this context, a plaintiff's knowledge typically requires individual evidence."  764 F.3d at 370.

After determining that the facts that oil-and-gas companies engaged in numerous common practices may be sufficient for commonality purposes, the Fourth Circuit in EQT Production Co. v. Adair makes it clear that such common practices are not enough to satisfy the predominance requirement:

> But the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement.  The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.  See Amchem Prods., 521 U.S. at 623 (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy").  Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

> We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.  Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

> The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology."  But the district court's analysis fell short because it

never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate. For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

. . . .

Although the district court recognized the problem of lease language variation, it did not see it as a barrier to class certification in any of these cases. In our view, however, these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.

. . . .

Yet, as the defendants note, the district court failed to discuss course of performance evidence entirely.

Second, the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement.

764 F.3d at 366-68, 70 (footnote omitted)(citation omitted).

The Fourth Circuit, like the Tenth Circuit, never holds that the five putative classes were intractably or irredeemably uncertifiable -- just that the district court did not ask all the necessary questions.[46]

---

[46]Unlike the Tenth Circuit, however, the Fourth Circuit implies that the case might be doomed: "In our view, however, these variable [royalty] terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." EQT Prod. Co. v. Adair, 764 F.3d at 367-68. The Fourth Circuit left open the possibility, however, that the classes might be certifiable: "On remand, after reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis." 764 F.3d at 369.

> We do not decide today whether the disparate practices identified by the
> defendants are sufficient to defeat the predominance requirement.  On remand, the
> district court may well conclude that the defendants' common conduct is sufficient
> to ensure the predominance of common issues over individual ones.  But it was an
> abuse of discretion for the district court to focus only on the number of common
> practices without considering the significance of the defendants' disparate conduct
> in the broader litigation.

EQT Prod. Co. v. Adair, 764 F.3d at 367.  The case is littered with instructions to the district court

for improving its rule 23 analysis on remand.  See, e.g., 764 F.3d at 367 ("We also remand for the

district court to . . . consider how variations in the defendants' royalty obligations to the class

members implicate the commonality and predominance inquiries in [certain of the five classes].");

id. at 371 ("Where the proper balance lies in the superiority analysis we leave to the district court

on remand as part of its broader consideration of the other Rule 23(b)(3) factors.").   In its

conclusion, the Fourth Circuit sums up its holding:

> We ultimately hold that the district court's analysis lacked the requisite rigor
> to ensure the requirements of Rule 23 were satisfied by any of the certified classes.
> On remand, the district court may conclude that one or more subclasses should be
> certified. It may also find that class certification should be denied entirely.  At this
> point, we only conclude that certification was premature.
>
> We recognize that there are numerous CBM owners in Virginia who haven't
> received a penny of CBM royalties and others who may have gotten less than their
> due.  We are not unsympathetic to their plight.
>
> But sympathy alone cannot justify certification under Rule 23.   We
> therefore vacate the district court's grant of the plaintiffs' motions for class
> certification, and remand the case for further proceedings consistent with this
> opinion.

764 F.3d at 371.

Finally, there is one application of rule 23(a) and rule 23(b)(3) in a Tenth Circuit oil-and-

gas royalty class action case which concerns antitrust claims rather than contract-based royalty

underpayment claims.  See Black v. Occidental Petro. Corp., 69 F.4th 1161, 1168-69 (10th Cir.

- 110 -

2023).  Cf. Roderick, 725 F.3d at 1215 (discussing contract-based royalty underpayment claims),

Chieftan, 453 F.2d at 1073 (same), and Chaparral, 923 F.3d at 783-84 (same).  In Black v.

Occidental Petro. Corp., a class of private landowners allege that an oil-and-gas operator

Anadarko Petroleum, engaged in an intracompany practice of leasing its mineral interests to its

affiliated operating company at a relatively high -- for the industry -- thirty-percent royalty rate,

which allegedly reduced the landowners' mineral interests' value.  See 69 F.4th at 1168-69.  The

landowner plaintiffs allege that Anadarko Petroleum's intracompany leasing at a 30% royalty

rate "maintained and furthered its dominant position" in the oil-and-gas mineral interest leasing

market in violation of the Sherman Act § 2 and Wyoming antitrust laws.  See 69 F.4th at 1168-

69.  The Tenth Circuit affirms the district court's certification of the class.  Black v. Occidental

Petro. Corp., 69 F.4th at 1189.  The Tenth Circuit quotes the district court's conclusion that

"[t]here are two common questions that could yield common answers at trial: the existence of an

antitrust violation and the existence of impact. These questions will drive the litigation and

generate common answers that will determine liability in a single stroke."  Black v. Occidental

Petro. Corp., 69 F.4th at 1189.  Anadarko Petroleum argues that proving market power and

antitrust impact requires individualized proof for each mineral owner, but the Tenth Circuit

rejects this argument, and concludes that the plaintiffs prove that "market definition and market

power would 'in fact' present common questions capable of class-wide resolution."  69 F.4th at

1189 (quoting Wal-Mart, 564 U.S. at 350)(emphasis added in Black v. Occidental Petro. Corp.).

Anadarko Petroleum also argues that variable factors affect the outcomes of each class members'

lease with Anadarko Petroleum, but the Tenth Circuit concludes that the variable factors do not

defeat predominance.  See Black v. Occidental Petro. Corp., 69 F.4th at 1184.  The Tenth Circuit

explains:

The district court correctly reasoned that such matters are properly left for summary judgment or trial, not for resolution at class certification. [Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 470 (2013)](holding failure of plaintiffs' proof of an essential element is properly addressed at summary judgment or trial, not at class certification); Tyson Foods, Inc., 577 U.S. at 459, 136 S.Ct. 1036 (holding "persuasiveness is, in general, a matter for the jury" and not grounds for denying class certification unless "no reasonable juror could have believed" plaintiffs' evidence of an essential element of their claim).

Black v. Occidental Petro. Corp., 69 F.4th at 1185.

After over two decades on the bench, the Court has denied class certification of three oil-and-gas royalty payment class actions involving both royalty underpayment claims and NMPPA claims: Anderson v. WPX, Abraham v. WPX, and Anderson v. ConocoPhillips. In Anderson v. WPX, the Court denies class certification, specifically addressing rule 23(b)(3)'s predominance requirement:

While there are several common issues in this case, they will not predominate over the individualized ones. The majority of the trial, and the Court's time preparing for trial and managing this case, will be spent on the individual issues.

. . .

The main fight in this case is what payment methodology the Defendants should have used. This issue is resolved by examining the language of the individual leases. Every lease does not, however, contain identical language; the Court must, therefore, apply a different legal standard to each lease variety. Variation in lease language was the main problem that the Fourth Circuit identified in EQT Production Co. v. Adair. See 764 F.3d at 367. There, the Fourth Circuit instructed the district court to "consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries," and even noted that these lease variations would "make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." 764 F.3d at 367-68. These same concerns are prevalent in this case because of the leases' varying language and the different industry-custom-and-usage evidence that will be needed to interpret the different lease variations.

Anderson v. WPX, 306 F.R.D. at 443-45.  The Court also denies reconsideration.  See Anderson v. WPX Class Cert. Reconsideration Order, 312 F.R.D. at 623.  In Abraham v. WPX, the Court denies class certification because the proposed class fails rule 23(a)(3)'s commonality requirement and rule 23(b)(3)'s predominance requirement.  See 317 F.R.D. at 175.  The Court summarizes:

> First, because the Plaintiffs' class definition includes only those wells whose gas is or has been processed at three specific processing plants, and the Court cannot determine whether some of the wells' gas was processed at those plants, the Court cannot adequately ascertain the class.  Second, because the Plaintiffs' class definition includes only that gas that was processed for natural gas liquid extraction and marketing, the Court must determine which gas was processed.  This inquiry weighs against finding predominance.  Third, the central issue in this case -- how the Defendants should have paid the Plaintiffs -- varies between leases. Accordingly, when considered alongside the other individual issues, textual variations among the leases destroy commonality and predominance.

Abraham v. WPX, 317 F.R.D. at 175.  The Court also denies reconsideration and a second motion for class certification.   See Abraham v. WPX, 322 F.R.D. 592, 595 (D.N.M. September 30, 2017)(Browning, J.).  In Anderson v. ConocoPhillips, the Court issues an Order, but not a full Memorandum Opinion, concluding that "individualized questions concerning lease language, gas quality, and damages will overwhelm the common questions."   See 2023 U.S. Dist. LEXIS 174812, at *97-98.  Specifically, the Court explains that variations in lease language "materially impact the implied duty to market, and by extension, the viability of the Plaintiffs' implied duty to market claim."   Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *101. Additionally, ascertaining the highest reasonably obtainable price for gas involves "numerous individualized questions" regarding the quality of gas produced from the Plaintiffs' wells. Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *106.  The Court, therefore, denies class certification.  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *1-2.

#### d.     <u>Special rule 23(b)(3) Class Actions</u>.

Court will briefly address two frequently occurring yet atypical rule 23(b)(3) class actions: the settlement class action and the securities class action.  These two types of class actions serve distinct purposes within the class action framework. Settlement class actions arise when parties reach an agreement before class certification and seek certification solely to facilitate settlement, and securities class actions involve shareholders asserting claims related to alleged securities violations.

#### i.     **Settlement Class Actions**.

Classes seeking to be certified when there is no settlement agreement in sight are referred to as litigation class actions.  If, however, the named plaintiffs and the defendants come to an agreement before the class is certified, and seek certification for the sole purpose of achieving global settlement, then the action is called a settlement class action.  <u>See generally</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. at 601, 618-19.  The court must still conduct a full class certification analysis: the parties may not stipulate to class certification, and rule 23(e) -- requiring the district court to scrutinize substantively all class settlement agreements to ensure fairness to the absent plaintiffs -- is a supplement to, not a substitute for, the requirements of rules 23(a) and (b).  <u>See</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. at 620-22.  Settlement class actions are held to all the same standards as litigation class actions, with the sole exception that, when certifying a class for settlement purposes only, the court need not consider the difficulties that will be encountered in managing the class at trial, as the class action will not go to trial if the court approves the

settlement.[47]  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620 (explaining that a district court need not weigh rule 23(b)(3)(D)'s criteria when determining whether to certify a class action for settlement only, as the class action will not go to trial if the settlement is approved).  As the Honorable Ruth J.B. Ginsburg, Associate Justice of the Supreme Court, wrote in her majority opinion:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.  But other specifications of the Rule -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context.  Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.  See Rule 23(c), (d).
>
> . . . .
>
> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments -- checks shorn of utility -- in the settlement-class context.  First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind -- class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.
>
> Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed.  Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, see John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1379-1380 (1995), and the court would face a bargain proffered for its approval without benefit of adversarial investigation, see, e.g., Kamilewicz v. Bank of Boston Corp., 100 F.3d 1348, 1352 (7th Cir. 1996)(Easterbrook, J., dissenting from denial of rehearing en banc)(stating that parties "may even put one over on the court, in a staged performance").

---

[47]Although the Court has couched the predominance finding in terms of manageability, Justice Ginsburg never suggests -- and the Court does not conclude -- that the predominance inquiry is watered down in any way when analyzing settlement class actions.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 621 (footnote omitted).

The court must still provide notice and an opportunity to opt out to all class members, and it must still independently scrutinize the settlement agreement substantively for fairness, and provide notice and opportunity to object to the settlement.[48]  See Fed. R. Civ. P. 23(e).  If anything, a certifying court's rule 23(e) obligations are heightened in the context of settlement class actions, because the lack of post-certification litigation raises the potential that settlement might be premature, that additional or stronger claims might have been more fully developed, or that class counsel might be sacrificing a better settlement for the guarantee of recovery and the limiting of its own expenses.

### ii.     Securities Class Actions.

Because of the uniform position a corporation's shareholders have with regard to alleged securities violations by corporate management, "the United States Court of Appeals for the Tenth Circuit has endorsed [(b)(3)] class actions as an appropriate means to resolve claims under the federal securities laws." Lerner v. Haimsohn, 126 F.R.D. 64, 65 (D. Colo. 1989)(citing T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330 (10th Cir. 1983)).  See In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. 572, 577 (D. Colo. 2001)("In general, class actions are the favored method of litigating securities fraud actions in which numerous plaintiffs are involved."); City P'ship Co. v. Jones Intercable, Inc., 213 F.R.D. 576, 581 (D. Colo. 2002); Schwartz v. Celestial Seasonings, 178 F.R.D. 545, 550 (D. Colo. 1998); Newberg § 22:1 ("Actions under the federal securities laws are particularly well suited for representative litigation under Rule

---

[48]Class inclusion notice under rule 23(c)(2)(B) may be merged into the same mailing or notice device as settlement notice under rule 23(e)(1), for convenience and cost-reduction.

23 . . . .").  "Where plaintiffs allege that defendants violated federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the shareholders, the action is appropriate for class treatment."  Lane v. Page, 272 F.R.D. at 573 (citing Pellman v. Cinerama, Inc., 89 F.R.D. 386, 390 (S.D.N.Y. 1981)).

### 3.    The Class Order: Rule 23(c).

Rule 23(c) provides the requirements for a court order certifying a class:

(c)    **Certification Order; Notice to class members; Judgment; Issues Classes; Subclasses.**

    (1)    **Certification Order.**

        **(A)**    Time to Issue.  At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

        **(B)**    Defining the Class; Appointing Class Counsel.  An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

        **(C)**    Altering or Amending the Order.  An order that grants or denies class certification may be altered or amended before final judgment.

Fed. R. Civ. P. 23(c).  The United States Court of Appeals for the Third Circuit addresses rule 23(c)(1)(B)'s requirements after the 2003 amendments to the Federal Rules of Civil Procedure, holding that "Rule 23(c)(1)(B) requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment."  Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 184 (3d Cir. 2006).  The Third Circuit "noted that

most district court opinions fell short of this standard." Nafar v. Hollywood Tanning Sys., Inc.,

339 F. App'x 216, 219 (3d Cir. 2009).

> [T]he proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion.

Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d at 185.

## LAW REGARDING MOTIONS TO RECONSIDER

Motions to reconsider in civil cases fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight][49] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See

Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

---

[49]Former rule 59 used to provide for a ten-day period after entry of judgment to file motions to reconsider. In 2009, the rule was amended, extending the filing period to twenty-eight days:

> Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

While the civil rules are not applicable expressly to criminal cases, the courts have used the principles somewhat interchangeably. See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015). The case law for the civil side can inform when a motion to consider is appropriate in a criminal case. See United States v. Christy, 739 F.3d at 534, 539-40 (10th Cir. 2014); United States v. DeLeon, No. CR 15-4268 JB, 2016 WL 7242579, at *29 (D.N.M. October 28, 2016)(Browning, J.).

      1.    **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment. See Price v. Philpot, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b). See Price v. Philpot, 420 F.3d at 1167 n.9. "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished). The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751, 753 (10th Cir. 1989)). In other words, if the reconsideration motion seeks to alter the district

- 119 -

court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's

constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)     mistake, inadvertence, surprise, or excusable neglect;
>
> (2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4)     the judgment is void;
>
> (5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

> Neither a rule 59 nor a rule 60 motion for reconsideration are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion . . . .  Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.  "[A] motion for reconsideration is appropriate

where the court has misapprehended the facts, a party's position, or the controlling law."  Servants

of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling

on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief." Fed. R. Civ. P. 60(b). A court cannot enlarge the time for filing a rule 59(e) motion. See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment." 12 James Wm. Moore, Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012). Nevertheless, a court generally will not treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority. See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . ."). Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines. See Yapp v. Excel Corp., 186 F.3d at 1231. If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault. See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under

Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists, because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962)).  The Tenth Circuit holds that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and notes that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore, supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have

previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 (quoting Ackermann v. United States, 340 U.S. 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discusses in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2.   <u>Motions to Reconsider Interlocutory Orders</u>.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone

set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation

in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions in civil

cases -- motions to alter or amend a judgment -- as "motions to reconsider,"[50] compounded that

baseline confusion.  204 F.3d at 1005.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a)

("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.").

In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall

have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final

judgment narrows the district court's formerly plenary jurisdiction over the case in three

ways.  First, for the first twenty-eight days after the entry of a civil judgment, when the court can

entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that

---

[50]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  204 F.3d at 1005.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.[51]  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.  See Fed. R. App. P. 4(a)(4)(A)(vi).

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need

---

[51]Rule 60(a), which allows the district court to correct clerical errors, provides that, "after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave."  Fed. R. Civ. P. 60(a).  Rule 60(b), which provides for the correction of substantive legal errors, has an interestingly one-sided application when the case is up on appeal: "[A] notice of appeal does not divest a district court of jurisdiction to consider a Rule 60(b) motion, although it prevents a district court from granting such a motion unless it notifies this court of its intention to grant the motion upon proper remand."  West v. Ortiz, No. CIV 06-1192, 2007 U.S. App. LEXIS 5700, 2007 WL 706924, at *5 n.5 (10th Cir. Mar. 9, 2007)(unpublished)(Broby, J.)(citing Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002); Aldrich Enters., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991)).  In other words, "a district court does have the authority 'to consider on the merits and deny a 60(b) motion after a notice of appeal, because the district court's action is in furtherance of the appeal,'" but the district court does not have the authority to grant a rule 60(b) motion without first asking the Court of Appeals to remand the case. United States v. Edmonson, 928 F. Supp. 1052, 1053 (D. Kan. 1996)(Crow, J.)(emphasis in original)(quoting Winchester v. U.S. Att'y for the S. Dist. of Tex., 68 F.3d 947, 949 (5th Cir. 1995)).

for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment, Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void."); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit incorporates traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice"); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not mention specifically motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that

> <u>adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all
> the parties does not end the action as to any of the claims or parties and <u>may be
> revised at any time before the entry of a judgment</u> adjudicating all the claims and
> all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added). Rule 54(b) thus (i) provides that a district court freely can reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability reconsider, other than that it must do so "before the entry of judgment." Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d 1217, 1225 (10th Cir. 2007). In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. <u>See</u> <u>Austin v. Kroger Tex., L.P.</u>, 864 F.3d 326, 336 (5th Cir. 2017)("The trial court is free to consider and reverse its decision for any reason it deems sufficient."). It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. <u>Cf.</u> <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"). First, the Court

should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addresses the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point is addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling is on a criminal suppression motion, class certification motion, or preliminary injunction,[52] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addresses the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that

---

[52]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b)(bold in original). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to 28 days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4478.1 at 664-65 (3d ed. 2024 Update)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the Motion for Protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred. These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court always should apply a deferential standard of

review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling is harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court is wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by restricting its review is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling and should try to prevent that party from having to bear the same impositions again.  Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion which produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the Court denies the injunction and the party moves for reconsideration, the party should not be entitled to

the presumption of an evidentiary hearing merely because he or she received that presumption the first time that the Court considered the motion.

In light of these statements, it is best to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling and not by starting anew. Parties opposing reconsideration can also start where the Court finished, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they convincingly must refute both the counterarguments and evidence that the opposing party used to win the prior ruling, and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and, if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to lead single-handedly the Court to his or her way of thinking.

## LAW REGARDING WAIVER OF CLAIMS

The Tenth Circuit has noted, in the context of waiver on appeal, that, "if the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it." Richision v. Ernest Group, Inc., 634 F.3d 1123, 1127 (10th Cir. 2011)(Gorsuch, J.). "Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it." United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183 (10th Cir. 2009). "We

typically find waiver in cases where a party has invited the error that it now seeks to challenge, or where a party attempts to reassert an argument that it previously raised and abandoned below."

United States v. Zubia-Torres, 550 F.3d 1202, 1205 (10th Cir. 2008).

> In United States v. Zubia-Torres, the Tenth Circuit illustrates the waiver doctrine:
>
> Similarly, in United States v. Gambino-Zavala, 539 F.3d 1221, 1227 (10th Cir. 2008), the court found waiver, not forfeiture, when defense counsel first raised an issue and then affirmatively abandoned it. The defendant moved to suppress certain evidence, which the government claimed had been found in plain view. In a written pleading, the defendant argued that no facts were in dispute, but during the suppression hearing challenged the evidentiary basis for the government's plain view argument. The prosecutor responded that he thought the facts were undisputed but that the government could prove its position by testimony. Defense counsel neither contested the prosecutor's argument nor insisted that the testimony be heard. Accordingly, this Court found waived, the argument that the government had not proved that the contraband was in plain view. Defense counsel obviously knew of the issue. By his action, the defendant "affirmatively abandoned his challenge to the officers' testimony about the contraband and waived any claim on appeal.

United States v. Zubia-Torres, 550 F.3d at 1207. Although the Tenth Circuit defines and applies the invited error doctrine, the Court and other district courts in the Tenth Circuit apply it to motions for reconsideration. See, e.g., Abraham v. WPX, LLC, 322 F.R.D. at 641 (describing and applying the invited error doctrine as a form of waiver); United States v. Yazzie, 2012 U.S. Dist. LEXIS 4784, at *9-10 (D.N.M. January 9, 2012)(Browning, J.)(concluding that the defendant waived his right to challenge the a no-contact condition of supervised release, because he "invited any error" by requesting the modification condition himself and agreeing to it at sentencing.); Zia Agric. Consulting, LLC v. Tyson Fresh Meats, Inc., 2022 U.S. Dist. LEXIS 202790, at *20-21 (D.N.M. November 7, 2022)(Strickland, J.), Sher v. Amica Mut. Ins. Co., 2024 U.S. Dist. LEXIS 188454, at *13 (D. Colo. October 16, 2024)(Wang, J.). The Court is not able to find any Tenth Circuit case

that holds that a district court improperly applies the invited error doctrine for the reason that it is exclusively an appellate court doctrine.

## LAW REGARDING A CLASS DEFINITION NOT IN THE OPERATIVE COMPLAINT

As an initial matter,

[d]istrict courts are split over whether to hold a plaintiff to the definition of a class as set forth in the complaint. Compare Costelo v. Chertoff, 258 F.R.D. 600, 604 (C.D. Cal. 2009)("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond."); Berlowitz v. Nob Hill Masonic Mgmt., No. C-96-01241 MHP, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996)("The court is bound by the class definition provided in the complaint."), with Savanna Group, Inc. v. Trynex, Inc., No. 10 C 7995, 2013 WL 66181, at *2-3 (N.D. Ill. Jan. 4, 2013)(allowing amendment during certification proceedings and noting "[t]hat this approach is also consistent with Rule 23, which contemplated the amendment of a class certification order prior to judgment"); Bridgeview Health Care Ctr. Ltd. v. Clark, 09 C 5601, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011)(allowing amendment during certification proceedings).

Grodzitsky v. Am. Honda Motor Co. Inc., No. 2:12-CV-01142-SVW, 2014 WL 718431, at *4 (C.D. Cal. Feb. 19, 2014)(Wilson, J.). The Tenth Circuit does not have a controlling opinion on this point, although Tenth Circuit language exists that suggests that a court need not hold a plaintiff to the class definition in the operative complaint. See Carpenter v. Boeing Co., 456 F.3d 1183, 1187 (10th Cir. 2006)("The district court can modify or amend its class-certification determination at any time before final judgment in response to changing circumstances in the case.")(citing Fed. R. Civ. P. 23(c)(1)(C)); In re Integra Realty Res., Inc., 354 F.3d 1246, 1261 (10th Cir. 2004)("Moreover, a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment.")(citing Fed. R. Civ. P. 23(c)(1)).

In litigation related to this case, the Court notes:

Moreover, rule 23(c)(1)(C) authorizes courts to alter or amend orders granting or denying class certification before final judgment.  See Fed. R. Civ. P. 23(c)(1)(C).  The Court has "ample discretion to consider (or decline to consider) a revised class certification motion after initial denial."  In re Initial Public Offering Sec. Litig., 483 F.3d 70, 73 (2d Cir. 2007).  Even after courts have denied a plaintiff's first attempt at class certification, courts allow plaintiffs to propose a refined class definition or different claims in an attempt to certify a different class than the one originally proposed.  See Pettco Enterprises, Inc. v. White, 162 F.R.D. 151, 156 (M.D. Ala. 1995)(Albritton, J.)(allowing the plaintiffs to attempt to certify a class, even after the court had already denied certification once, and noting that the plaintiffs' new class definition changed the class and the claims).  Courts of Appeals have made clear that nothing "precludes the [plaintiffs] from returning to the District Court to seek certification of a more modest class, as one to which the Rule 23 criteria might be met."  In re Initial Public Offering Sec. Litig., 483 F.3d 70, 73 (2d Cir. 2006).  The United States Court of Appeals for the Fifth Circuit has "specifically invited" a district court to reconsider a denial of class certification.  Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d 384, 389 (5th Cir. 1989).  The United States Court of Appeals for the Second Circuit has similarly noted that a plaintiff could seek to certify a narrower class after the Second Circuit upheld the district court's denial of class certification.  See In re Initial Public Offering Sec. Litig., 483 F.3d at 73.  The Second Circuit stated that the district court "can be expected to give such a request full and fair consideration."  In re Initial Public Offering Sec. Litig., 483 F.3d at 73.  On remand, the Honorable Shira A. Scheindlin, United States District Judge for the Southern District of New York, "held that the revised class definition satisfied the Rule 23 certification requirements" for purposes of a class settlement.  In re Initial Public Offering Sec. Litig., 2011 WL 2732563, at *3 (S.D.N.Y. July 8, 2011)(Scheindlin, J.).  On the other hand, the plaintiffs need to be careful not to turn a new class certification motion into a motion to reconsider, thereby asking the Court to apply the standards applicable to motions to reconsider.

Anderson v. WPX, 2016 WL 5376325, at *9.  There, however, the Plaintiffs do not attempt to certify a new class definition.  The Court decided one case in 2017 that concerns whether the Plaintiffs may raise a new class definition not in the operative complaint: Abraham v. WPX, 322 F.R.D. 592 (D.N.M. 2017).  In Abraham v. WPX, the Court holds that the Plaintiffs may raise a new class definition based on its reasoning in Anderson v. WPX, 2016 WL 5376325, at *9.  See Abraham v. WPX, 322 F.R.D. 592 at 639.  The Tenth Circuit has not ruled explicitly on this issue, but other Courts of Appeals have implied that a court need not hold a plaintiff to the class definition

in the operative complaint.  The Court also thinks that a plaintiff should not be bound rigidly to

the class definition in the operative complaint for purposes of a second motion to certify a class.

Class actions are hard work for the Court and the parties; the Court and the parties need to conform

the pleadings to the reality of discovery, a lengthy class certification hearing, and the judicial

resources expended in analyzing all of the extensive evidence on record.  Class actions are often

evolving with discovery, expert reports, depositions, cross-examinations of experts, and

arguments.  The complaint is often in the rear-view mirror where the plaintiffs file the motion for

certification.  The motion for class certification -- not the complaint -- more often states and reflects

the plaintiffs' current thoughts.  Also ,the Court needs the flexibility to confine and shape and train

a class to conform to its rules.  Some flexibility -- not more formality -- is needed in crafting a

class action where one is warranted.

## LAW REGARDING THE NMPPA

The NMPPA provides a specific time frame in which lessees on oil-and-gas lessees must

pay royalty interest owners for proceeds they receive:

> The oil and gas proceeds derived from the sale of production from any well
> producing oil, gas or related hydrocarbons in New Mexico shall be paid to all
> persons legally entitled to such payments, commencing not later than six months
> after the first day of the month following the date of first sale and thereafter not
> later than forty-five days after the end of the calendar month within which payment
> is received by payor for production unless other periods or arrangements are
> provided for in a valid contract with the person entitled to such proceeds.

NMSA  § 70-10-3.   See Abraham v. WPX, 317 F.R.D. 169, 280 (D.N.M. August 16,

2016)(Browning, J.)(concluding that if WPX did not pay royalty on "related hydrocarbons" as the

plaintiffs allege, WPX would violate the NMPPA).  A plaintiff who seeks to assert an NMPPA

claim has the initial burden to show that a payment was made outside the forty-five day window.

See Anderson v. WPX, 306 F.R.D. at 460.  Working interest owners who fail to make payments

- 136 -

within § 70-10-3's timeframe incur eighteen-percent interest on the "unpaid balance due," unless

one of the four exceptions in § 70-10-5 applies:

> A.   the payor fails to make payment in good-faith reliance upon a title opinion by a licensed New Mexico attorney making objection to the lack of good and marketable title of record in the party claiming entitlement to payment and furnishes a copy thereof to such party for curative action required thereby;
>
> B.   the payor receives information that in his good-faith judgment brings into question the entitlement of the person claiming the right to the payment to receive the payment or that has rendered the marketable title of record unmarketable or that may expose the payor to the risk of multiple liability or liability to third parties if the payment is made;
>
> C.   the total amount of oil and gas proceeds in the possession of the payor owed to the owner of the oil and gas proceeds making claim to payment is less than one hundred dollars ($100) at the end of any month; or
>
> D.   the party entitled to payment has failed or refused to execute a reasonable division or transfer order acknowledging the proper interest to which he claims to be entitled and setting forth a mailing address to which payment may be directed.

NMSA § 70-10-5.  Additionally, the lessee need not pay interest on unpaid balances if the lessee

has not received from the operator or lessee arranging for the sale of oil and gas "the name, the

address, and the percentage of interest of each person to whom payment is to be made, as well as

proof of marketable title" to the oil and gas to be sold.  NMSA §§ 70-10-3.1 and 70-10-5 (providing

that a lessor does not incur the eighteen-percent penalty on unpaid balances if payments are made

in accordance with § 70-10-3's time period and the lessor "has been furnished with the information

required by Section 70-10-3.1").

The New Mexico Legislature enacted the NMPPA as a derivative remedy for oil-and-gas

royalty owners.  See NMSA §§ 70-10-3.1 to 70-10-6.  The plaintiff must first demonstrate a

lessee's breach of an underlying agreement with, or duty to, an interest owner.  See Elliott, 407

F.3d at 1120 ("[I]n order to maintain a Payment Act claim, Elliott must allege a potentially successful claim for underpayment of royalties or theory of liability showing that it is 'legally entitled to such payments.'" (quoting NMSA § 70-10-3)).  See Anderson v. WPX, 306 F.R.D. at 460 (denying class certification based on the NMPPA claim because the plaintiffs do not have a viable underpayment claim, and "no NMPPA claim may lie absent some underlying claim -- typically an underpayment claim").

## ANALYSIS

The Court separates its analysis into two sections: (i) reconsideration of its denial of class certification, which includes denial of the underpayment claim and denial of the NMPPA claim; and (ii) analysis of the New Class under rule 23's class certification requirements.  First, the Court reconsiders carefully and fully the underpayment claim.  The Court concludes that individualized issues with lease language which can negate the implied duty to market do not defeat rule 23(b)(3)'s predominance requirement.  Further, individualized damages calculations do not defeat predominance.  The Court, however, maintains that the Original Class shall not be certified, because rule 23's requirements are not met.  The Court also reconsiders carefully and fully the NMPPA claim, but also does not come to a different conclusion.  There is no common question that meets rule 23(a)'s commonality requirement.  Even if the Plaintiffs proceed on a subclass of those whose leases adhere to the NMPPA, individualized issues whether a specific late payment violates the NMPPA predominate common questions so as to not meet rule 23(b)(3)'s predominance requirement.  Finally, the Court grants class certification of a subclass within the New Class whose leases uphold the implied duty to market, because the subclass meets all of rule 23's class certification requirements.  Namely, the common question whether ConocoPhillips

breached its implied duty to market and its sub-duty to obtain the highest reasonable price predominates over individualized issues with lease language that relate to damages calculations.

## I.    <u>THE COURT RECONSIDERS THE UNDERPAYMENT CLAIMS.</u>

The Plaintiffs first challenge the Court's prior conclusion that the individual leases can negate or modify the implied duty to market, <u>i.e.</u>, ConocoPhillips' obligation to pay Plaintiffs the highest reasonably obtainable price. <u>See</u> Motion at 3. Second, the Plaintiffs challenge the Court's prior conclusion that the underpayment claim does not meet rule 23(b)(3)'s predominance requirement. <u>See</u> Motion at 3. The Court explains in the Class Cert. Denial Order that. because explicit language in royalty agreements can negate the implied duty to market, individualized issues with each class members' lease language overwhelm common issues to defeat predominance. <u>See</u> 2023 U.S. Dist. LEXIS 174812, at *99-103. First, the Court explains why it reconsiders this issue under rule 54(b) instead of under the Plaintiffs' requested rule 59(e). Then, because rule 54(b) permits the Court to use a standard of review at its own discretion, the Court explains why it fully and thoroughly looks at issues again. The Court then affirms its prior conclusion that lease language can negate the implied duty to market. The Court, however, upon reconsideration, concludes that while there are individualized issues with whether a lease upholds or negates the implied duty to market, those issues do not predominate to defeat class certification. Specifically, Tenth Circuit precedent that shows that Plaintiffs can sort leases into those which uphold the implied duty to market to form a subclass, and exclude those class members' leases which negate the implied duty to market.

### A.   THE PLAINTIFFS CAN SEEK RECONSIDERATION OF THE UNDERPAYMENT CLAIM ONLY UNDER RULE 54(B).

Rule 54(b) is the sole basis upon which the Court can reconsider the Plaintiffs' underpayment claim.  See Fed. R. Civ. Pro. 54(b).  The Plaintiffs incorrectly raise their Motion under rule 59(e), which governs the timing of motions to alter or amend a final judgment.  See Motion at 1.  The Motion similarly does not fall under rule 60, which also governs reconsideration of a "final judgment, order, or proceeding."  Fed. R. Civ. Pro. 54(b).  The Class Cert. Denial Order is not a final judgment; it is an interlocutory order.  See 2023 U.S. Dist. LEXIS 174812, at *1.  Final judgments "must be set out in a separate document" under rule 58, and the Court has not entered a final judgment in this case.  See Fed. R. Civ. Pro. 58.  The only proper mechanism for reconsideration here is the rule governing interlocutory orders: rule 54(b).  See Fed. R. Civ. P. 54(b).  Rule 54(b) provides that a district court freely can reconsider its prior rulings "before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).

### B.   THE COURT RECONSIDERS FULLY ITS PRIOR CLASS CERT. DENIAL ORDER'S ANALYSIS OF THE UNDERPAYMENT CLAIM.

Under rule 54(b), a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  See Fed. R. Civ. P. 54(b); Austin v. Kroger Tex., L.P., 864 F.3d 326, 336 (5th Cir. 2017)("The trial court is free to consider and reverse its decision for any reason it deems sufficient.").  The Court thoroughly analyzed the issue whether lease language negates the implied duty to market in over four pages in its Class Cert. Denial Order.  The Court looks at a specific class member's royalty agreement that explicitly negates the implied duty to market by saying "nothing herein contained shall be deemed . . . to obligate Phillips or Phillips' successors in interest in said lease to drill for, produce, or market oil [or gas] . . . from the above-described

land . . . ."  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *100-101 (quoting Overriding Royalty Agreement L-74604 at 2-3).  The Court therefore correctly concludes that "the language's existence demonstrates that there are variations in lease language that materially impact the implied duty to market, and, by extension, the viability of the Plaintiffs' implied duty to market claim."  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *101.  The Court also correctly concludes that it will "have to take the leases on a lease-by-lease basis and determine whether each lease implicates, modifies, or negates the implied duty to market.  That is a significant undertaking that will require the Court to interpret thousands of leases."  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *101-102.

The Plaintiffs do not present new authority or new evidence to support their underpayment claim, but they argue that the Court makes a legal error.  See Motion at 3.  In the Motion, the Plaintiffs argue that the Court's conclusion "is in direct conflict with binding Tenth Circuit authority," specifically citing Energen, 886 F.3d at 836.  Motion at 3.  They argue that the Tenth Circuit holds in Energen that the implied duty to market is "implied in all New Mexico oil-and-gas leases without regard to any language contained in the instrument(s)."  Motion at 3 (emphasis in original).  The Plaintiffs' cite is not sound; in selectively paraphrasing Energen, they strip it of important context.  Energen quotes the Supreme Court of New Mexico's conclusion in Devon Energy that "the implied duty to market is one implied by law, which does not require analysis of the parties' agreement and applies notwithstanding that agreement."  Energen, 886 F.3d at 836 (citing Devon Energy, 2009-NMSC-048, ¶ 35, 147 N.M. at 168, 218 P.3d at 86).  But when the defendant argues that express contract terms overrule "[e]ven duties implied by law in New Mexico," Energen, 886 F.3d at 836 fn. 12 (brackets added)(emphasis in original), the Tenth Circuit states that it declines to resolve "this issue based on the language of the parties' royalty

agreements." Energen, 886 F.3d at 836 fn. 12. Energen steers clear of the conclusion that the Plaintiffs think it makes. The Plaintiffs, therefore, do not establish legal error. The Court, next, addresses the Plaintiffs' implied-duty-to-market arguments and relevant Tenth Circuit and New Mexico caselaw to substantiate that it makes no legal error.

1.     **The Implied Duty to Market is an Implied Covenant At Law in All Oil-and-Gas Leases, But Express Lease Terms Can Modify or Even Negate Such Duty.**

In the Class Cert. Denial Order, the Court concludes that explicit language in royalty agreements can negate the implied duty to market. See 2023 U.S. Dist. LEXIS 174812, at *99-103. The Plaintiffs now contend that the explicit language cannot negate the implied duty to market, because the implied duty to market applies to all class members' royalty agreements irrespective of explicit lease language. See Motion at 3.

While the implied duty to market is a legal principle that underlies all class members' leases, ConocoPhillips has no obligation to fulfill that duty in leases that expressly disclaim it. In New Mexico, it is well established that the implied duty to market in oil-and-gas leases exists "without looking to the language of the agreements or other evidence of the parties' intentions," and therefore, is an implied covenant in law. Devon Energy, 2009-NMSC-048, ¶ 35, 147 N.M. at 168, 218 P.3d at 86. The Supreme Court of New Mexico explains in Devon Energy that by implying a covenant at law, a court is "stating that a duty imposed by law creates an obligation on one or more of the parties to the agreement." Devon Energy, 2009-NMSC-048, ¶ 32, 147 N.M. at 167, 218 P.3d at 85. The Supreme Court of New Mexico later affirms Devon Energy's holding in ConocoPhillips Co. v. Lyons, 2013-NMSC-009 ¶¶ 62-63, 299 P.3d at 859-60, and notes that it also is consistent with the previous Supreme Court of New Mexico cases of Darr v. Eldridge, 1959-NMSC-093, 66 N.M. 260, 346 P.2d 1041, and of Libby v. De Baca, 1947-

NMSC-007, 51 N.M. 95, 179 P.2d 263. The implied duty to market is, thus, an implied covenant in law that applies to all oil-and-gas leases. In ConocoPhillips Co. v. Lyons, the Supreme Court of New Mexico makes an important distinction between an implied covenant in law and an implied covenant in fact, which is when a court "effectuat[es] the parties' intentions by interpreting the written terms of an agreement and analyzing the parties' conduct." 2013-NMSC-009 ¶ 62, 299 P.3d at 859 (quoting Devon Energy, 2009-NMSC-048, ¶ 32, 147 N.M. at 167, 218 P.3d at 85). The implied duty to market is an implied covenant in law -- which does not depend on lease language -- as opposed to an implied covenant in fact -- which depends on lease language. But the Court's analysis does not end there because lease language remains integral. The Court correctly states in its earlier TAC Order that "the duty to market may be implied in all leases, but lease language can affect the determination whether the lessee breached the duty to market and how the lessor can recover." Anderson v. ConocoPhillips, 2016 U.S. Dist. LEXIS 38288, at *73 n. 22. The Court, thus, is also correct that "there are variations in lease language that materially impact the implied duty to market, and, by extension, the viability of the Plaintiffs' implied duty to market claim." Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *101.

The Court's conclusions are consistent with the Tenth Circuit's holding in Chieftan. In Chieftan, the Tenth Circuit notes that under Oklahoma law, lessees have an implied duty of marketability. See 528 F. App'x. at 940 (citing Wood v. TXO Prod. Corp., 1992 OK 100, 854 P.2d 880, 882-83 (Okla. 1992). The Tenth Circuit then goes on to say, however, that "absent lease language negating the IDM," the lessee is obligated to bear the costs of making the gas marketable as the implied duty to market requires. Chieftan, 528 F. App'x. at 940 (citing Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, 954 P.2d 1203, 1208 (Okla. 1998)). Chieftan thus states that, in Oklahoma, lease language can negate the implied duty to market. Similarly, in Kerr-McGee Corp.

v. Bokum Corp., 453 F.2d 1067 (10th Cir. 1972), in a case involving New Mexico leases, the Tenth

Circuit concludes that mineral leases can have lease language that disclaims an implied duty to

market.  See 453 F.2d at 1073 ("Kerr-McGee Corp.").  In Kerr-McGee Corp., the parties entered

a uranium mining lease for land near Grants, New Mexico.  See 453 F.2d at 1069.  The plaintiff

contends that there is an implied covenant to market ore at the highest price obtainable.  See 453

F.2d at 1073.  The Court explains:

> Although such a covenant may be implied in particular mineral
> leases, it cannot be written into a lease in which the parties have contracted
> otherwise.  The granting clause of the 1962 lease clearly gives Kerr-McGee
> the exclusive right to "own and dispose of all uranium-bearing ores or
> uranium-bearing materials and by-products."

Kerr-McGee Corp. v. Bokum Corp., 453 F.2d at 1073 (internal quote has no citation).  The Tenth

Circuit's conclusion as to the implied duty to market ore in mineral leases offers instruction for

the implied duty to market hydrocarbons in oil-and-gas leases.

New Mexico has not ruled whether oil-and-gas leases can negate the implied duty to

market, but the Court predicts that the New Mexico Supreme Court would find that lease language

can disclaim the implied duty to market.  The Court looks to State courts that have examined lease

language regarding the implied duty to market.   The Kansas Supreme Court states that "where the

lease itself does not contain express provisions creating duties in the lessee . . . to operate with

diligence and market the product . . . the law imposes such duties upon the lessee under the

doctrine of implied covenants."  Vonfeld v. Hanes, 414 P.2d 7, 10 (Kan. 1966).  The Oklahoma

Supreme Court considers lease clauses involving the implied duty to market in three cases:

Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, ¶ 8, 954 P.2d 1203, 1206 (Okla. 1998); (ii)

TXO Production Corp. v. State ex rel. Commissioners of Land Office, 1994 OK 131, ¶ 11, 903

P.2d 259, 261 (Okla. 1995); and (iii) Wood v. TXO Production Corp., 1992 OK 100, ¶ 9, 854 P.2d

880, 882 (Okla. 1993). In <u>Chaparral</u>, the Tenth Circuit concludes that the district court correctly finds these three collective "<u>Mittelstaedt</u> clauses" do not negate the implied duty to market. <u>Chaparral</u>, 923 F.3d at 789-791. One Colorado district court references "the Colorado rule that leases which do not expressly negate the implied duty to market require the producer to calculate royalties based upon commercial market prices," but provides no citation. <u>Colton v. Antero Res. Corp.</u>, 2018 Colo. Dist. LEXIS 2678, at *10 (Colo. January 1, 2018)(Boyd, J.)(no reporter citation). Outside of the Tenth Circuit, the Ohio Supreme Court "has not directly addressed whether an implied covenant to market applies to oil and gas leases," <u>Lutz v. Chesapeak Appalachia, L.L.C.</u>, 148 Ohio St. 3d 524, 529, 2016-Ohio-7549 ¶ 20, 71 N.E.3d 1010, 1014, but has concluded that "an implied covenant of reasonable development arises only when the lease is silent on the subject." 148 Ohio St. 3d at 529, 2016-Ohio-7549 ¶ 20, 71 N.E.3d at 1014 (citing <u>State ex rel. Claugus Family Farm, L.P. v. Seventh Dist. Court of Appeals</u>, 145 Ohio St. 3d 180, 2016-Ohio-178, 47 N.E.3d 836, ¶ 31-33. In other words, no State court holds that the implied duty to market applies even when lease language expressly disclaims the implied duty to market. The Court thinks that New Mexico Supreme Court would conclude that lease language can either negate or uphold the implied duty to market, and that this conclusion is consistent with the courts in Kansas, Oklahoma, Colorado, and Ohio.

Here, class members' lease language negates the implied duty to market as <u>Chieftan</u> and <u>Kerr-McGee Corp. v. Bokum Corp.</u> permit, and as the Court predicts the New Mexico Supreme Court would permit. <u>See</u> <u>Chieftan</u>, 528 F. App'x. at 940. Like the mineral lease that gives exclusive rights to own and operate minerals in <u>Kerr-McGee Corp. v. Bokum Corp.</u>, 453 F.2d at 1073, the 206 class members' Exclusive Right Leases in FOF 14 contain the following provision

which gives ConocoPhillips the "exclusive right" to operate the class members' land in whatever way it wants:

> Phillips shall have the exclusive right, as between the parties hereto, to develop and operate all of the above-described land and every part thereof to such extent and manner as Phillips shall determine to be proper, without incurring any liability whatever to Royalty Owner, and nothing herein shall be deemed, as between the parties hereto, to obligate Phillips or Phillips' successors in interest in said lease to drill for, produce or market oil, gas, casinghead gas or other gaseous substances from the above-described land, or to continue the production therefrom for the benefit of Royalty Owner.

Lease Language Chart at 1; Lease SF 078740 (dated March 11, 1952), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 30, filed May 24, 2024 (Doc. 419-5); Lease SF 078739 (dated March 11, 1953), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 31, filed May 24, 2024 (Doc. 419-5); Lease SF 078995 (dated March 11, 1953), admitted on January 27, 2022, as Defendant's Class Cert. Hearing Exhibit F-8 at 35, filed May 24, 2024 (Doc. 419-5). Even more so than the lease in Kerr-McGee Corp. v. Bokum Corp., here, the class members' Exclusive Right Leases even explicitly disclaims ConocoPhillips' obligation to "market" gas "for the benefit of the Royalty Owner." Lease Language Chart at 1; Lease SF 078740, Lease SF 078739, Lease SF 078995. The Court, therefore, concludes that lease language can negate the implied duty to market.

The Plaintiffs repeat the argument which they made at Class Certification: the quoted language in the Exclusive Right Leases "does not negate the implied duty to market, and instead merely establishes that 'the owner of the override has no decision making in regard to development, operations, drilling production, or marketing or whether to continue production." Plaintiffs' Reply to Defendant's Response to Motion for Class Certification at 10, filed June 1, 2021 (Doc. 252). See also Motion at 9-10 (making the same argument). The Court still disagrees

with the Plaintiffs' argument and concludes that the class members' Exclusive Right Leases negate the implied duty to market. The Exclusive Right Leases establish that ConocoPhillips has sole discretion over marketing the gas, thereby negating any implied duty to market for the benefit of the overriding royalty owner. There are individualized issues, therefore, whether each member's lease language negates the implied duty to market.

**2.    Because a Subclass of Those Whose Leases Uphold the Implied Duty to Market Can Proceed, Individualized Issues Do Not Predominate.**

Next, the Court explains in its Class Cert. Denial Order that the individualized issues regarding each member's lease language negates the implied duty to market predominate, defeating rule 23(b)(3):

> The Court will have to take the leases on a lease-by-lease basis and determine whether each lease implicates, modifies, or negates the implied duty to market. That is a significant undertaking that will require the Court to interpret thousands of leases. That interpretation will involve parol evidence, trade-usage evidence, and other extrinsic evidence that will bog the Court down, and overwhelm the evidence concerning the common issues presented.

Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *101-102. That the court must take the leases on a lease-by-lease basis does not alone defeat predominance; the party seeking to certify the class can present a manageable system to assist the Court in this task. For instance, in Chaparral, the plaintiffs prepare a chart that categorizes the leases by "royalty[-]clause language" to show which class members' leases actually contain a clause, known as a Mittelstaedt clause, that does not negate the implied duty to market under Oklahoma law. Chaparral, 923 F.3d at 796 (brackets in original). Then, the district court independently confirms that the chart is accurate. See 923 F.3d at 796. The Tenth Circuit upholds the district court's reliance on the plaintiffs' chart, noting that a chart "is precisely what a plaintiff should do to establish commonality under these circumstances." 923 F.3d at 796. In Chaparral, the Tenth Circuit upholds the district court's

- 147 -

finding of rule 23(a)'s commonality and rule 23(b)(3)'s predominance in a combined analysis.  See

923 F.3d at 796-798.  Here, the Plaintiffs provide the inverse of the chart in Chaparral.  They

identify leases that negate the implied duty to market, and seek to have the Court either separate

them out into a subclass or exclude them from the class.  See Motion at 9.  The Plaintiffs attach to

their Motion a list of leases that contain the following clause:

> Notwithstanding the grant to Royalty Owner of the above-described overriding
> royalty, [ConocoPhillips] shall have the exclusive right, as between the parties
> hereto, to develop and operate all of the above-described land and every part thereof
> to such extent and in such manner as [ConocoPhillips] shall determine to be proper,
> without incurring any liability whatever to [royalty owner], and nothing herein shall
> be deemed, as between the parties hereto, to obligate [ConocoPhillips] or
> [ConocoPhillips'] successors in interest in said lease to drill for, produce or market
> oil, gas, casinghead gas or other gaseous substances from the above-described land,
> or to continue the production therefrom for the benefit of [royalty owner].

Lease Language Chart at 1, filed March 19, 2024 (Doc. 402-3).  The Plaintiffs note that there are

206 leases, belonging to 105 class members, with this exact language or a minor variation in the

lessee/lessor/assignee/assignor names.  See Motion at 9.  Similar to the plaintiffs in Chaparral who

identified all leases with the Mittelstaedt clauses, here, the Plaintiffs identify some -- but not all --

leases that negate the implied duty to market.  The Court, therefore, consistent with Chaparral,

concludes that an exhaustive subclass of class members whose leases uphold the implied duty to

market meets rule 23(a)'s commonality and rule 23(b)(3)'s predominance requirement.

The Court notes, however, that the Plaintiffs' chart is inexhaustive, because other lease

language different than that in the Lease Language Chart negates the implied duty to market.  For

example, Lease No. 188485 states:

> Lessee covenants and agrees to use reasonable diligence to produce, utilize, or
> market the covered minerals capable of being produced from said wells, but in the
> exercise of such diligence, Lessee shall not be obligated to install or furnish
> facilities other than well facilities and ordinary lease facilities, flowlines, separator,

and lease tank, and shall not be required to market such covered minerals upon terms unacceptable to Lessee.

Expert Report of Kris L. Terry ¶ 54, at 18 (dated April 1, 2021)(admitted on January 24, 2022, as Defendant's Class Cert. Exhibit D-16).   Looking at the last sentence specifically, the lease explicitly negates the implied duty to market, because ConocoPhillips is not required to market "upon terms unacceptable" to ConocoPhillips.   Expert Report of Kris L. Terry ¶ 54, at 18.   As another example, Lease No. 74604 states that "nothing herein contained shall be deemed . . . to obligate Phillips or Phillips' successors in interest in said lease to drill for, produce, or market oil [or gas] . . . from the above-described land . . . ."  Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *100-101 (quoting Overriding Royalty Agreement L-74604).  Lease No. 74604 disclaims any implied duty to drill for, produce, or market the royalty owner's gas.  As a third example, the 1948 Anderson Trust lease states:

> 1.    Assignee shall be entitled to the free use (without any obligation to Assignor) of any oil and gas in any operations under said lease including without limitation gas actually consumed or lost in the operation of an extraction plant . . . In no event shall Assignee be responsible on account of Assignee's failure or inability to save or utilize any oil or gas or for shrinkage or loss thereof.

Plaintiff's Interests in Leases at 4.  The 1948 Anderson Trust lease gives the assignee full control over oil and gas operations, and disclaims obligations, including implied duties.  All of these leases disclaim unstated obligations and thus negate the implied duty to market in different language. The Plaintiffs do not acknowledge these lease language variations, even though they state that "counsel has personally conducted an exhaustive survey and review of all (over 3,000) overriding royalty interest and lease conveyances."  Motion at 9.  Just because the Plaintiffs are missing some leases, however, they still meet their burden to show rule 23(a) commonality and rule 23(b)(3) predominance; pursuant to Chaparral, their Lease Language Chart shows that it is possible to

exclude those whose lease language negates the implied duty to market, thereby establishing a subclass of at least 105 Class members whose leases uphold the implied duty to market.  <u>See Roderick</u>, 725 F.3d at 1218 ("[I]t is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but [rather] the plaintiff who bears the burden of showing that the class does comply with Rule 23")(quoting <u>Thorn v. Jefferson-Pilot Life Ins. Co.</u>, 445 F.3d 311, 321 (4th Cir. 2006)(first bracket added by the Court, second bracket added in <u>Roderick</u>).  In the Court's assessment of numerous leases, the Court identifies additional lease language variations that negate the duty to market and thus thinks that the Plaintiffs can create an exhaustive lease list like in <u>Chaparral</u> -- classifying leases based on whether lease language retains, negates, or modifies the implied duty to market -- to establish the viable subclass.  The Plaintiffs should use their Lease Language Chart as a starting point and take the remaining leases of all 6,857 class members on a lease-by-lease basis to determine whether their language negates the implied duty to market, incorporating the Court's identification of other lease language variations.  The Court can then review the list independently, just like the district court properly did in <u>Chaparral</u>. The Plaintiffs' proposed subclass for all members whose leases uphold the implied duty to market, therefore, meets rule 23(a)'s commonality and rule 23(b)(3)'s predominance requirement.  At this point, the subclass is identifiable, but the subsequent stages of this case require that the subclass is identified.

> ### 3.     <u>Individualized Damages Calculations Do Not Defeat Predominance</u>.

The Court previously concludes that individual questions concerning damages "slightly" weigh against predominance.  <u>See</u> Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *107-108.  Class members are entitled to different royalty amounts depending on the unique terms of their individual leases: for example, among class members whose royalty is based off of the

wellhead value, some members may receive "seven and one-half percent," Lease SF 078386 (dated March 17, 1952), Lease Number and Language Chart at 14, Row 97 Column I, to "20%," Lease Summary Chart at 2.  The Tenth Circuit holds in <u>Chaparral</u>, however,  that "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."  923 F.3d at 798 (quoting <u>Menocal v. GEO Grp.</u>, Inc., 882 F.3d 905, 922 (10th Cir. 2018)).  The Tenth Circuit also explains that "there are ways to preserve the class action model in the face of individualized damages." <u>Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.</u>, 725 F.3d 1213, 1220 (10th Cir. 2013)(citing <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1437 n* (2013)(Ginsburg, J. and Breyer, J., dissenting, Sotomayor, J. and Kagan, J., joining Ginsburg and Breyer's dissent)("A class may be divided into subclasses for adjudication of damages.  Fed. R. Civ. Pro. 23(c)(4)-(5). Or, at the outset, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings.").  Although damage amounts will vary among class members, this fact alone does not alone weigh against predominance and thus does not defeat class certification.

### 4.    The Court Still Denies Class Certification of the Original Class Definition.

Although the Court concludes that the Plaintiffs can form a subclass of those whose leases uphold the implied duty to market, and that individualized damages calculations do not defeat predominance, the Original Class still does not meet rule 23(b)(3)'s predominance requirement. "[T]he quality of gas as it comes out of the ground -- coupled with other market factors -- impacts the highest obtainable price" for each Plaintiff's gas.  <u>Anderson v. ConocoPhillips</u>, 2023 U.S. Dist. LEXIS 174812, at *103.   The Court, therefore, correctly concludes that it "cannot escape proceeding well-by-well, month-by-month to determine what the highest reasonably obtainable

price was for gas obtained from a particular well for a particular month-long royalty payment period." Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *107. Gas from different proposed Class members' wells sell at different prices and thus have different highest reasonably obtainable prices. See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *107. The Court correctly denies class certification of the original class definition, because individualized issues predominate under rule 23(b)(3).

## II.    THE COURT RECONSIDERS THE NMPPA CLAIM BUT CONCLUDES THAT INDIVIDUALIZED ISSUES WHETHER THE NMPPA APPLIES PREDOMINATE.

The Plaintiffs challenge the Court's previous statement that the Plaintiffs' NMPPA claim is "tethered" to their underpayment claim. Motion at 2 (quoting Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *86). The Court thus analyzes the NMPPA claim separate from the underpayment claim as it did in Anderson v. WPX, 306 F.R.D. at 497-98, and Abraham v. WPX, 317 F.R.D. at 279 (analyzing NMPPA claims separate from underpayment claims).

First, the Court concludes that the Plaintiffs do not waive reconsideration of their NMPPA claim when they state that they do not need the Court to issue the promised Memorandum Opinion following the Class Cert. Denial Order. Second, in choosing whatever standard of review of an interlocutory order the Court wants under Been v. O.K. Indus., 495 F.3d at 1225, the Court concludes that reconsideration of the NMPPA claim is warranted; the Court did not have the opportunity to consider thoroughly the NMPPA claim because the parties did not want the provided Memorandum Opinion and Order. Third, after fully undertaking the rule 23(a) commonality analysis, the Court concludes again that the NMPPA claim still does not satisfy rule 23(a)'s commonality requirement and still does not satisfy rule 23(b)(3)'s predominance requirement. The following individual questions concerning the class members' leases and royalty

payments predominate: (i) whether the NMPPA governs each class member's lease given that some class member leases have overriding royalty payment due dates; and (ii) even if the NMPPA governs all class members, whether the NMPPA's definition of late royalty payments applies to each class member's late royalty payments, whose reasons for their lateness vary. The Court first must resolve the significant individual issues before it can reach and answer, the common question whether ConocoPhillips must pay interest on the class members' late royalty payments. The Court, therefore, upholds its prior decision denying class certification to proceed on the NMPPA claim.

**A.   THE PLAINTIFFS HAVE NOT WAIVED THEIR RIGHT TO CHALLENGE THE COURT'S PRIOR HOLDING ON THE NMPPA CLAIM.**

As an initial matter, ConocoPhillips argues that the Plaintiffs effectively relinquished their right to challenge the NMPPA claim, because they told the Court they did not need a Memorandum Opinion fully outlining the Court's reasoning. See Response at 38. A party waives an argument when it has "intentionally relinquished or abandoned" such argument either in the district court or on appeal. Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127 (10th Cir. 2011). ConocoPhillips raises a specific species of waiver known as "invited error": a party may not "invite[]" an error "by suggesting that the court take particular action" and then later seek reversal on the same ground. United States v. Teague, 443 F.3d 1310, 1317 (10th Cir. 2006).[53] If the party invites error, "we can presume that the party has acted voluntarily and with full knowledge of the material

---

[53]As the Court notes in the above Section titled Law Regarding Waiver, although the Tenth Circuit defines and applies the invited error doctrine, the Court and other district courts in the Tenth Circuit consistently apply it to motions for reconsideration. See e.g., Abraham v. WPX, LLC, 322 F.R.D. at 641; United States v. Yazzie, 2012 U.S. Dist. LEXIS 4784 at *15 (D.N.M. January 8, 2012)(Browning, J.); Zia Agric. Consulting, LLC v. Tyson Fresh Meats, Inc., 2022 U.S. Dist. LEXIS 202790 at *20-21 (D.N.M. November 7, 2022)(Strickland, J.), Sher v. Amica Mut. Ins. Co., 2024 U.S. Dist. LEXIS 188454 at *13 (D. Colo. October 16, 2024). The Court was not able to find any Tenth Circuit case that holds that a district court improperly applies the invited error doctrine for the reason that it is exclusively an appellate court doctrine.

consequences" and that party is "not entitled to appellate relief" on that argument. United States v. Teague, 443 F.3d at 1317 (10th Cir. 2006). ConocoPhillips cites to Preventive Energy Solutions., L.L.C. v. NCAP Ventures L.L.C., 2023 U.S. App. LEXIS 28806 (10th Cir. 2023), where the Tenth Circuit holds that the plaintiff waives any argument on appeal that the relevant contract is unenforceable, because the plaintiff stipulated in district court that the contract is enforceable and also did not object to a jury instruction containing that stipulation. 2023 U.S. App. LEXIS 28806, at *18. Unlike Preventive Energy Solutions, L.L.C. v. NCAP Ventures L.L.C., here, the Plaintiffs do not assert that the Court's holding on the NMPPA claim is correct and then challenge the same holding in their Motion. Rather, the Plaintiffs' advocacy of their NMPPA claim remains steadfast and resolute throughout the thirteen years that this case has been going. See TAC ¶ 49, at 178 (claiming, as the third cause of action, "A Violation of the New Mexico Oil and Gas Proceeds Payment Act"); Motion for Class Certification at 3, filed April 16, 2021 (Doc. 238). They only state that they do not need a Memorandum Opinion on the NMPPA claim. The invited error doctrine, therefore, does not apply, because the Plaintiffs do not urge the Court to reverse an action that the Plaintiffs previously urged the Court to take. See United States v. Teague, 443 F.3d 1310, 1317 (10th Cir. 2006). The Court, therefore, concludes that the Plaintiffs do not waive their right to challenge the Court's prior ruling on the NMPPA claim.

**B.    THE COURT RECONSIDERS ITS RULING ON THE NMPPA CLAIM.**

The Plaintiffs improperly raise their Motion under rule 59(e), which governs the timing of motions to alter or amend a final judgment. See Motion at 1. Nor can the Motion fall under rule 60, which also governs reconsideration of a "final judgment, order, or proceeding." Fed. R. Civ. Pro. 54(b). The Class Cert. Denial Order is not a final judgment; it is an interlocutory order. See Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *1. Final judgments "must be set out

in a separate document" under rule 58, and the Court has not entered a final judgment in this case. See Fed. R. Civ. Pro. 58. The only proper mechanism for reconsideration here is the rule governing interlocutory orders: rule 54(b). See Fed. R. Civ. P. 54(b). Rule 54(b) provides that a district court freely can reconsider its prior rulings "before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007). A district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. See Austin v. Kroger Tex., L.P., 864 F.3d 326, 336 (5th Cir. 2017)("The trial court is free to consider and reverse its decision for any reason it deems sufficient."). As stated in the Law Regarding Motions for Reconsideration, the Court assesses three factors to determine its standard of review: (i) the thoroughness with which the Court addressed the exact points that the motion to reconsider challenges; (ii) the degree of reasonable reliance the opposing party has placed in the Court's prior ruling; and (iii) the grounds under Servants of the Paraclete v. Does --new authority, new evidence, or clear indication that the Cour erred. Here, the Court concludes that the three factors warrant reconsideration under rule 54(b). As an initial matter, the second factor weighs in favor of reconsideration as ConocoPhillips has not reasonably relied on the Class Cert. Denial Order to its detriment. Turning to the first and third factors, the Court only assesses the NMPPA claim over the course of two pages, and never issued a full-length opinion before the Plaintiffs filed their Motion. See Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *89. In those two pages, the Court ultimately concludes that the common question driving the NMPPA claim "is not an adequate question" under rule 23(a)(2)'s commonality requirement, because it is not "central"

to the litigation, is "hardly at this case's forefront." Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *89. The Court also concludes that the common question driving the NMPPA claim is not "apt to drive the resolution of the litigation." Anderson v. ConocoPhillips, 2023 U.S. Dist. LEXIS 174812, at *89 (quoting Wal-Mart, 564 U.S. at 350). The rule 23(a)(2)'s commonality requirement, however, does not demand that the common question be the central focus of the case. Instead, the full test in Wal-Mart requires that answering the common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. The rule 23(a)(2) commonality requirement also includes other considerations that the Court did not address previously. Because the Court only briefly addresses rule 23(a)(2) in its Class Cert. Denial Order and has not fully analyzed it, the Court will reconsider the NMPPA claim.

### C.   THE NMPPA CLAIMS DO NOT MEET RULE 23(A)(2)'S COMMONALITY REQUIREMENT AND RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT.

Here, the NMPPA claim does not meet either the rule 23(a)(2) commonality requirement and the rule 23(b)(3) predominance requirement. An answer to the common question driving the NMPPA claim does not resolve all class members' NMPPA claims, because whether the NMPPA applies first to each class members' leases, and then to the late royalty payments themselves, requires resolution of predominating individualized issues. The Court first analyzes rule 23(a)(2)'s commonality requirement and then turns to rule 23(b)(3)'s predominance requirement.

### 1.   The NMPPA Claims Do Not Meet Rule 23(a)(2)'s Commonality Requirement.

The Plaintiffs argue that the question whether the NMPPA requires ConocoPhillips to pay class members interest on late royalty payments is a common question that meets rule 23(a)(2)'s

commonality requirement. See Motion at 20. Rule 23(a)(2) establishes the class certification

prerequisite that there must be "questions of law or fact common to the class." See Fed. R. Civ.

Pro. Rule 23. Commonality requires the class proponent to demonstrate that the claims of all the

class members can be litigated productively at once. See Wal-Mart, 564 U.S. at 350. In Wal-

Mart, the Supreme Court explains that the plaintiffs' mere claim that they have suffered a Title VII

injury, or a disparate-impact Title VII injury

> gives no cause to believe that all their claims can productively be litigated at once.
> Their claims must depend upon a common contention -- for example, the assertion
> of discriminatory basis on the part of the same supervisor. That common
> contention, moreover, must be of such a nature that it is capable of classwide
> resolution -- which means that determination of its truth or falsity will resolve an
> issue that is central to the validity of each one of the claims in one stroke.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. at 350. To share a common question of law or fact

within the commonality requirement's meaning, the class members' claims must depend on a

"common contention of such a nature that is capable of classwide resolution." The contention

must be such that the resolution of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims asserted by the class members. Wal-Mart Stores, Inc. v. Dukes,

564 U.S. at 350; Stockwell v. City & Cnty. of San Francisco, 749 F.3d 1107, 1112 (9th Cir.

2014)(stating that a common contention need not be one that will be answered, on the merits, in

favor of class; it only must be of such a nature that it is capable of classwide resolution, so that

determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke).

The common question is whether the NMPPA requires ConocoPhillips to pay interest to

class members for late royalty payments. See Motion at 20. The NMPPA has six subsections: the

Short title, § 70-10-1; Definitions, § 70-10-2; Payment of oil and gas proceeds; time for payment,

§ 70-10-3 ("Payment Timing Section"); Duty to locate, § 70-10-3.1 ("Duty to Locate Section");

Interest on late payments, § 70-10-4 ("Interest Section"); Application; penalty, § 70-10-5 ("Penalty

Section"), and Attorneys' fees; § 70-10-6. The parties quibble over the relevance of most of these

sections; the Plaintiffs argue that their claim is under the entire NMPPA, while ConocoPhillips

argues that only the Interest Section § 70-10-4 applies. See Hearing Tr. at 44:8 (Sutphin); id. at

61:6-10 (Brickell). Most importantly, the Payment Timing Section sets forth deadlines for the

lessee to send the first royalty payment and all subsequent royalty payments:

> The oil and gas proceeds derived from the sale of production from any well
> producing oil, gas or related hydrocarbons in New Mexico shall be paid to all
> persons legally entitled to such payments, commencing not later than six months
> after the first day of the month following the date of first sale and thereafter not
> later than forty-five days after the end of the calendar month within which payment
> is received by payor for production unless other periods or arrangements are
> provided for in a valid contract with the person entitled to such proceeds.

NMSA § 70-10-3. In sum, the initial royalty payment must begin no later than six months after

the first day of the month following the first sale, and subsequent payments must be made within

forty-five days after the end of each month in which the payor receives payment for the

production.[54] Next, the Duty to Locate Section requires that the payor has a duty to identify and

pay the payee:

> A.    The operator or lessee arranging for the sale of oil and gas shall furnish the
> payor with the name, the address and the percentage of interest of each
> person to whom payment is to be made, as well as proof of marketable title
> to all of the oil and gas to be sold.
>
> B.    The payor shall make a diligent effort to furnish each interest owner with a
> reasonable division or transfer order that will set forth the proper interest to

---

[54]For example, if ConocoPhillips sells the gas from the class member's wells to a purchaser in October, 2007, it must make its initial royalty payment in April, 2007. If the purchaser pays ConocoPhillips for the first part of the sale in January, 2008, then ConocoPhillips must pay a royalty to the class member mid-March, 2008, forty-five days after the end of January, and so on, depending on when the purchaser's next payments occur.

which the interest owner is entitled, as well as the mailing address to which payment may be directed.

C.      If the purchaser or payor is unable to locate any person listed by the operator or lessee then the purchaser or payor shall notify the operator or lessee that he has been unable to locate or obtain the address of the person entitled to payment.

NMSA § 70-10-3.1.  If the payor cannot determine the payee as the Duty to Locate Section requires, then the Suspended Funds Section requires that the payor first create a suspense account for the payee's funds and second pay interest on those suspended funds:

A.      Any delay in determining any person legally entitled to an interest in the proceeds from production shall not affect payments to all other persons entitled to payments.  In instances where payments cannot be made within the time period provided in Section 70-10-3 NMSA 1978, the payor shall create a suspense account on his books for such interest or may interplead the suspended funds into court.

B.      The person entitled to payment from the suspended funds shall be entitled to interest on the suspended funds from the date payment is due under Section 70-10-3 NMSA 1978.  The interest awarded shall be the discount rate charged by the federal reserve bank of Dallas to member banks plus one and one-half percent on the date payment is due.  Payment of principal and interest on the suspended funds shall be made to all persons legally entitled to funds within thirty days from the date that the persons are determined to be entitled to the suspended funds by a legal determination.

NMSA § 70-10-4 ("Suspended Funds Section").  Finally, under the Penalty Section, if the payor fails to make payment within the period provided in the Payment Timing Section, see NMSA § 70-10-3, then the payor "shall pay the person the unpaid amount of the payment" and "shall pay interest at the rate of eighteen-percent per year on the unpaid balance due," NMSA § 70-10-5.

The Court first must determine which provisions are at issue, because the Plaintiffs argue that the entire NMPPA statute is relevant, see July 1 Hearing Tr. 61:7-8 (Brickell), while ConocoPhillips contends that the Plaintiffs assert a claim only under the Suspended Funds Section, NMSA § 70-10-4, see July 1 Hearing Tr. 44:6-8 (Sutphin).  The Plaintiffs do not allege that they

are entitled to suspended funds; rather, they allege only that they are entitled to interest on late royalty payments that ConocoPhillips already has paid them. See Reply at 2. The Suspended Funds Section, therefore, does not apply. See NMSA § 70-10-4. By that same logic, the Duty to Locate Section also does not apply, because ConocoPhillips already located the Plaintiffs when it paid them late royalty payments. See NMSA § 70-10-3.1. The Court determines that the only relevant provisions for the Plaintiffs' NMPPA claim is the Payment Timing Section, NMSA § 70-10-3, which establishes a due date for royalty payments, and the Penalty Section, NMSA § 70-10-5, which requires interest on any royalty payments made past those due dates.

For the rule 23(a)(2)'s commonality requirement, the foremost hurdle that the Plaintiffs cannot overcome is that the Payment Timing Section negates the NMPPA's required royalty payment due date if "other periods or arrangements are provided for in a valid contract with the person entitled to such proceeds." NMSA § 70-10-3. The Court has examined every class members' royalty agreement that is admitted into evidence and finds at least one which has a different payment timing clause. For example, the royalty agreement between George Bowra and James B. Bowra, and the Southwest Production Company, states:

> The royalties provided for herein shall be ascertained and computed annually with respect to each taxable year, and shall be paid within ninety days following the end of such calendar year. However, if royalty has been withheld by the purchaser of production or otherwise suspended or if a question exists as to the person or persons to whom royalty is payable, it shall be paid within ninety days after release thereof or resolution of such question.

Community Oil and Gas Mining Lease from George Bowra and James B. Bowra to the Southwest Production Company (dated January 5, 1962), admitted on January 24, 2022, as Defendant's Class Cert. Hearing Exhibit V, filed January 28, 2022 (Doc. 296-1 at 1)("Bowra Lease"). In the Bowra lease, because the payment timing clause sets forth its own due date that is different from the

NMPPA's due date, the NMPPA's Payment Timing Section does not apply.  See NMSA § 70-10-3.  Neither party sufficiently addresses the fact that other payment arrangements can negate the NMPPA's required royalty payment due date.  See NMSA § 70-10-3.  ConocoPhillips spends three sentences on the issue, arguing that "Plaintiffs do not address the affect [sic] of such express contract terms."  Response at 44.  The Plaintiffs do not address it in their Motion, nor in their Reply.  The Court thinks that this fact is significant, because the Penalty Section, NMSA § 70-10-5, requires that the payor pay interest only if the payor "fails to make payment . . . within the period provided in Section 70-10-3 NMSA 1978." NMSA § 70-10-5.  So, if a royalty agreement has its own payment arrangement, then the NMPPA's Penalty Section also does not apply.  In the end, all of the NMPPA's sections are inapplicable to this class member's lease.  The Plaintiffs' NMPPA claim, therefore, does not depend upon a "common contention" that "is capable of classwide resolution," because ConocoPhillips has no NMPPA obligations in at least one of its royalty agreements with class members.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. at 350.  Because any answer to the question of whether ConocoPhillips owes late royalty payment interest under the NMPPA cannot possibly resolve all the class members' claims, the Court concludes that the NMPPA claim does not generate a common question that meets rule 23(a)(2)'s commonality requirement.

## 2.    The NMPPA Claims Do Not Meet Rule 23(b)(3)'s Predominance Requirement.

Although the Plaintiffs do not propose a subclass of class members excluding those whose royalty agreements disclaim the NMPPA, the Court entertains the idea.  Even still, the sub-class does not meet rule 23(b)(3)'s predominance requirement.  Because each late royalty payment has a distinct reason for delay -- some of which may not make ConocoPhillips liable under the NMPPA

-- the individual issues associated with each late royalty payment predominate any common questions, making class wide resolution of the NMPPA claims unmanageable. ConocoPhillips describes three examples of late payments that do not violate the NMPPA. ConocoPhillips calls the first two forms of payment adjustments: plant reallocation and unit expansion. The third example is reissued checks. The Court assesses each example and concludes that they support the conclusion that whether ConocoPhillips violated the NMPPA involves predominating individualized issues concerning each late royalty payment that fail rule 23(b)(3)'s predominance requirement.

> a.    **Late Royalty Payments Resulting From Plant Reallocation Do Not Violate the NMPPA.**

The first payment adjustment is plant reallocation, which occurs when a plant revises its allocations of gas production among ConocoPhillips and other similar companies, and in this case specifically reallocates more production to ConocoPhillips. See Response at 41. Because ConocoPhillips produced more gas than the plant originally thought, ConocoPhillips also receives greater profits from its produced gas' sales, and in turn pays a portion of these profits as a royalty to class members. See Hearing Tr. at 569:1-10 (Sutphin, Saltsman). Expert Kris L. Terry describes plant reallocations as routine in the oil and gas industry. See Terry Expert Report at 4. The date that ConocoPhillips receives payment for production is what triggers the Payment Timing Section's payment due date. See NMSA § 70-10-3. Individualized issues, therefore, exist whether a plant reallocation or some other reason causes a delay. Furthermore, if a plant reallocation causes a delay, additional individualized issues exist regarding when ConocoPhillips received payment for the reallocated production -- and whether ConocoPhillips made the corresponding royalty payment to class members after the NMPPA's due date.

### b.     Late Payments Resulting From Federal Unit Expansions May Not Violate the NMPPA.

The second payment adjustment is federal unit expansions in the San Juan Basin, in which the BLM approves the expansion of a federal "unit" of land that contains hundreds of wells. Response at 41; 43 C.F.R. § 3180.1.  When a new piece of land is proven to contain commercially viable gas, the BLM allows the federal unit to include the new piece of land, thereby expanding the federal unit.  See Response at 41; 43 C.F.R. § 3180.1.  BLM federal regulations require that the federal unit's production is allocated as if the new piece of land was always part of the federal unit.  See 43 CFR § 3137.80.  This results in reallocating the production of gas from the new piece of land to all of the landowners in the federal unit.  See 43 CFR § 3137.80.  By way of example, the BLM approved the expansion of a unit in 2015.  See Unit Expansion at 5, admitted on January 26, 2022 as Defendant's Class Cert. Hearing Exhibit Demonstrative 9, filed January 28, 2022 (Doc. 296-1 at 8).  The expansion, which included one well on 160 acres of land, applied retroactively to 2005.  Unit Expansion at 5.  Thus, 207 owners in the unit received payment adjustments due to reallocated gas production in that unit.  Unit Expansion at 5.  Because federal unit expansions retroactively change how ConocoPhillips allocates gas production, they are not late payments that violate the NMPPA.  Some landowners get payment adjustments -- not because the original payments were late, but because of federal regulations that require changing underlying production shares when a new piece of land is added.  Like plant reallocation, individualized issues abound regarding a late royalty payment is because of a federal unit expansion, which does not violate the NMPPA.

### c.    <u>Reissued Royalty Checks Do Not Violate the NMPPA.</u>

The third scenario is not a payment adjustment, but rather occurs when ConocoPhillips reissues a royalty check when the first one gets lost.  <u>See</u> Response at 40; Hearing Tr. at 568:16-22 (Sutphin, Saltsman).  ConocoPhillips reissues checks upon request.  <u>See</u> Milnes Reissued Check 2144629 at 8.  In this instance, the timestamps on the reissued check, which show payments for as early as August, 2008, suggests liability for a late royalty payment under the NMPPA.  <u>See</u> Milnes Reissued Check 2144629 at 8.  Late royalty payments resulting from reissued checks do not violate the NMPPA necessarily, because the Payment Timing Section states that "payment shall be deemed to have been made upon deposit in the United States mail" and not when the class member receives the payment.  NMSA § 70-10-3.  The Court, therefore, as part of its individualized inquiry into each late royalty payment, must determine whether the reason for a late royalty payment is a reissued check and, if so, whether ConocoPhillips' original deposit date complies with the NMPPA.

The Court concludes that the individualized issues that stem from the reason for the late royalty payment -- whether a payment adjustment, a reissued check, another justification, or a plainly unlawful delay -- predominate over the common question whether ConocoPhillips must pay interest on late royalty payments under the NMPPA.  ConocoPhillips explains that its standard procedure to determine whether it owes interest on late royalty payments is to look at each late royalty payment on a case-by-case basis, because each late royalty payment has a unique reason for being late.  <u>See</u> Hearing Tr. at 544-45:2-4 (Sutphin/Saltsman).  The Court concludes that this process is sound and aligns with the Court's conclusion that each late royalty payment presents its own individual issues that impede the Court's ability to resolve the NMPPA claims on a class-wide basis.  The Plaintiffs' NMPPA claims, therefore, do not meet rule 23(b)(3)'s predominance

requirement.  The Court denies class certification based on the NMPPA claims, because the Class does not meet rule 23(a)(2)'s commonality requirement nor 23(b)(3)'s predominance requirement.

### D.    THE NMPPA CLAIMS SATISFY SUPERIORITY.

Lastly, the NMPPA claims satisfy rule 23(b)(3)'s superiority requirement, but that alone is insufficient to grant class certification.  Rule 23(b)(3)'s superiority requirement is met, because it is even less likely that the NMPPA claims could be pursued as individual actions than the underpayment claims could be pursued on an individual basis, because they are not valuable enough to render individual litigation financially worthwhile.  Trying the Plaintiffs' NMPPA claims as a class action is superior to other alternatives and is likely the only way those claims will be heard.  Because the Plaintiffs' NMPPA claim does not meet all of rule 23's requirements, however, the Court denies class certification on the NMPPA claim.  See Anderson v. WPX, 306 F.R.D. at 460-461 (concluding that the NMPPA claims satisfy the superiority requirement, but denying certification, because the NMPPA claims do not satisfy the commonality and predominance requirements).

### III.    THE COURT GRANTS CERTIFICATION OF A SUBCLASS WITHIN THE NEW CLASS DEFINITION OF THOSE WHOSE LEASES UPHOLD THE IMPLIED DUTY TO MARKET.

First, the Court determines that the Plaintiffs improperly bring their motion for class certification of the New Class under rule 59(e) and concludes that it will consider the New Class' definition under rule 23.  Then, the Court assesses rule 23's class certification requirements.  The Court concludes that the New Class: (i) meets the adequacy prerequisite; (ii) meets the commonality requirement; (iii) meets the predominance requirement; and (iv) meets the superiority requirement.  The Court, therefore, grants class certification of the New Class which

only contains those whose leases uphold the implied duty to market and whose gas is commingled before sale.

## A. THE COURT CONSIDERS THE NEW CLASS DEFINITION UNDER RULE 23 RATHER THAN UNDER RULE 59(E).

The Plaintiffs seek to certify a new Class definition.  See Motion at 1.  While the Tenth Circuit does not have a controlling opinion on whether a plaintiff can seek to certify a class definition not in the operative complaint, Tenth Circuit language exists that suggests that a plaintiff can modify the definition as the case proceeds.  See Carpenter v. Boeing Co., 456 F.3d 1183, 1187 (10th Cir. 2006)("The district court can modify or amend its class-certification determination at any time before final judgment in response to changing circumstances in the case.")(citing Fed. R. Civ. P. 23(c)(1)(C)); In re Integra Realty Res., Inc., 354 F.3d 1246, 1261 (10th Cir. 2004)("Moreover, a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment.")(citing Fed. R. Civ. P. 23(c)(1)).  The Court concludes that Plaintiffs may make a new attempt at class certification with a new Class definition after the Court denies their first attempt at class certification.  See Abraham v. WPX, 322 F.R.D. at 639 (concluding that the Court need not hold the plaintiffs to the class definition in their operative complaint).

The Court has warned, however, that "the plaintiffs need to be careful not to turn a new class certification motion into a motion to reconsider, thereby asking the Court to apply the standards applicable to motions to reconsider."  Anderson v. WPX, 2016 WL 5376325, at *9.  Here, the Plaintiffs do what the Court warns against: they propose a new Class definition, but do so by moving for reconsideration under rule 59(e).  See Fed. R. Civ. Pro. 59(e).  Rule 59(e) governs

motions to alter or to amend a final judgment.  See Fed. R. Civ. Pro. 59(e).  It gives the district court "the chance to rectify its own mistakes."  Banister v. Davis, 590 U.S. 504, 508 (2020).  In Anderson v. WPX, the Court has good reason to forewarn about the standard of review for motions for reconsideration, because it is stringent.  See Moore's Federal Practice -- Civil, § 59.30.  See also Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997)(explaining that a rule 59(e) motion should be granted only to correct manifest errors of law or to present newly discovered evidence); Webber v. Mefford, 43 F.3d 1340, 1345 (10th Cir. 1994)(holding that the moving party must show that evidence is newly discovered or, if evidence available before judgment, that counsel made diligent attempts to discover evidence); Hayes Family Tr. v. State Farm Fire & Cas. Co., 845 F.3d 997, 1005 (10th Cir. 2017)("Certainly a motion under Rule 59(e) allows a party to reargue previously articulated positions to correct clear legal error.").

The Plaintiffs improperly move for class certification of a new Class definition under rule 59(e).  First, the Court's task to consider a new Class definition -- that is brought up for the first time in this Motion -- is incongruous with its authority under rule 59(e), which permits the Court to "only reconsider matters properly encompassed in a decision on the merits."  Banister v. Davis, 590 U.S. at 508.  Second, a rule 59(e) motion cannot assert new arguments or claims, whereas here, the Plaintiffs raise a new Class definition.  See Moore's Federal Rules Pamphlet § 59.7 (citing Woo v. Spackman, 988 F.3d 47, 52-53 (1st Cir. 2021); JTH Tax, Inc. v. Aime, 984 F.3d 284, 290 (4th Cir. 2021); Barrington Music Prods. v. Music & Arts Ctr., 924 F.3d 966, 969 (7th Cir. 2019); Fletcher v. Tomlinson, 895 F.3d 1010, 1025 (8th Cir. 2018); and Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52-53 (2d Cir. 2012)).  The Plaintiffs' Motion, therefore, is not a proper rule 59(e) motion.  Instead, it falls under rule 54(b) for motions to reconsider an interlocutory

order, and rule 23 for motions for class certification.  See Fed. R. Civ. Pro. 23.  The Court analyzes

the new Class definition pursuant to rule 23's class certification requirements.

> **B.   THE NEW CLASS MEETS RULE 23(A)'S REQUIREMENTS.**

The Plaintiffs' proposed new Class definition limits the Class to those: (i) whose wells in

the San Juan Basin of New Mexico produced raw gas; (ii) which ConocoPhillips sent to one of six

processing plants (Blanco/San Juan, Chaco, Ignacio, Kutz, Milagro, and Val Verde) in the San

Juan Basin for processing; (iii) where the processed gas combines with the processed gas from

other wells; and (iv) then ConocoPhillips sells the processed gas at the processing plant's

"tailgate."  Motion at 8.  Furthermore, the Court narrows its analysis of this new Class definition

further to exclude those whose lease language negates the implied duty to market.  The Court

analyzes this narrowed class as the "New Class," under rule 23(a).  The Court concludes that the

New Class meets commonality, because the New Class shares the common question whether

ConocoPhillips breached its implied duty to market to obtain the highest reasonable price of gas.

The Court also concludes that the New Class meets the typicality and adequacy requirements for

the same reasons set forth in the Class Cert. Denial Order.

> **1.   The New Class Definition Meets Rule 23(a)(2)'s Commonality Requirement.**

Because the Court concludes above that the Plaintiffs can create a subclass only of those

whose leases uphold the implied duty to market, see supra at 147,   ConocoPhillips has a duty to

all subclass members, under the implied duty to market, to obtain the highest reasonable price for

gas.  The common question whether ConocoPhillips breached the implied duty to market, is now

common to all class members.  The Court's conclusion is identical to Chaparral, where the district

court "correctly concluded that whether Chaparral breached the IDM is a common question."  923

F.3d 779, 789 n. 10 (citing Wal-Mart, 564 U.S. at 350 (explaining that question is common for purposes of Rule 23(a)(2) if its answer "will resolve an issue that is central to the validity of each one of the claims in one stroke")). In contrast, in Abraham v. WPX, the Court concludes that the plaintiffs do not establish commonality. 317 F.R.D. at 261. There, the plaintiffs allege that the defendant, WPX, failed to pay royalties on all hydrocarbons. Abraham v. WPX, 317 F.R.D. at 207. The Court concludes that "[t]o determine whether the royalty agreements require payment on all production in the method that the Plaintiffs seek, the Court must ask the question as to each of the different lease forms. The question, therefore, is not common to all proposed class members." Abraham v. WPX, 317 F.R.D. at 261. The Court's holding in Abraham v. WPX is analogous to its conclusion in the Class Cert. Denial Order. Where each Class members' lease language enforces different obligations on the defending oil production company, the question whether the oil production company breached one specific obligation is not common among the Class. After reconsideration, however, the subclass of those whose leases preserve the implied duty to market, can proceed on the common question whether ConocoPhillips breached the implied duty to market, i.e., to obtain the highest reasonable price for the gas from the subclass' wells. The New Class meets rule 23(a)'s commonality requirement.

### 2. The New Class Definition Meets Rule 23(a)(3)'s Typicality Requirement.

Rule 23(a)(3) requires that the named representatives' claims be typical of the class' claims. See Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiffs' interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994). "In determining whether the typicality and commonality requirements have

been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient." Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982). See Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."). "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010). "Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality." DG v. Devaughn, 594 F.3d at 1198 (citing Adamson v. Bowen, 855 F.2d at 676). In other words, factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

Even under the New Class definition, which limits the Class to only those whose gas is commingled before sale and excludes those whose leases negate the implied duty to market, the Court's typicality analysis is the same as in the Class Cert. Order. See Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *91. Here, the Anderson Living Trust and Westfall's claims are typical of the New Class as a whole, because they bring the same causes of action, and present comparable factual circumstances, as the New Class members would bring and present.

Like the New Class members, Anderson Living Trust and Westfall have royalty interests in oil-and-gas leases with ConocoPhillips for oil-and-gas wells in the San Juan Basin.  See Findings of Fact ¶¶ 38-41, at 38.  All New Class members' gas, including gas from Anderson Living Trust and Westfall's wells, is commingled before sale.  See Findings of Fact ¶ 22, at 43. Like the New Class members, Anderson Living Trust and Westfall allege that ConocoPhillips underpaid their royalties.  See Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *94. Accordingly, Anderson Living Trust and Westfall's claims necessarily will involve similar questions of law and fact as the proposed class members' claims, sufficient to demonstrate typicality for rule 23(a)(3)'s purposes.  See Milonas v. Williams, 691 F.2d at 938; Fed. R. Civ. P. 23(a)(3).  The Court, therefore, concludes that the New Class meets rule 23(a)'s typicality requirement.

### 3.    The New Class Definition Meets Rule 23(a)(4)'s Adequacy Requirement.

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement protects the due process interests of unnamed proposed class members -- whom any judgment in the action binds.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement).    "The requirement of fair-and-adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).  See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of

representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel vigorously will prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis.  See Lopez v. City of Santa Fe, 206 F.R.D. 285, 289-90 (D.N.M. 2002)(Vazquez, J.).

In WPX, the Court determined that Anderson Living Trust and Westfall -- and their attorneys -- were adequate representatives in a substantially similar proposed class action suit against different defendants.  See WPX, 306 F.R.D. at 441-42.  In WPX, the Court explains:

> The class representatives will vigorously prosecute this action on behalf of the absent class members.  The representatives' claims are not only typical but essentially identical to those of the absent class, and the representatives appear competent, informed, and savvy regarding the law and the facts of this case.  The Patton Trust has Bank of America as its trustee, represented by Munoz, who has over fifteen years of experience in the oil-and-gas industry. Anderson received royalties from seven different oil-and-gas companies, and has served as a class representative in other oil-and-gas class actions -- meaning that at least one other judge has already deemed him an adequate representative in a case very similar to this one. This part of the commonality analysis overlaps heavily with the typicality analysis.  To the extent that there is any noticeable difference in factual circumstances between the representatives and the bulk of the class, it is that the representatives appear to own unusually large or valuable interests relative to the rest of the class.  This difference however, increases the representatives' adequacy rather than decreasing it.  Last, the Defendants also contend that the representatives are inadequate, because they do not possess leases and assignments that contain every category of textual royalty/overriding royalty provision.  The Defendants, however, offer no reason for why that level of detailed representativeness is necessary, and the Court cannot conceive of any strong ones.

WPX, 306 F.R.D. at 441-42.

The Court stands by its analysis in WPX and concludes that Anderson Living Trust, Westfall, and their counsel will adequately represent the New Class.  See WPX, 306 F.R.D. at 441-

42.  Counsel will adequately represent the New Class for all of the same reasons that the Court determines in the Class Cert. Denial Order, which also cites to WPX.  Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *94-97.  First, Anderson Living Trust, Westfall, and their attorneys do not have any conflicts with the proposed class members.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  Second, they will "vigorously prosecute the action on the class' behalf."  Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  "The representatives' claims are not only typical but essentially identical to those of the absent class, and the representatives appear competent, informed, and savvy regarding the law and the facts of this case." WPX, 306 F.R.D. at 441-42.  For these reasons, the Court concludes that rule 23(a)(4)'s adequacy requirement is met.

### C.    THE NEW CLASS MEETS RULE 23(B)(3)'S PREDOMINANCE AND SUPERIORITY REQUIREMENTS.

The Court now turns to rule 23(b)(3)'s class certification requirements, which provide for two additional requirements when a class action seeks damages awards: predominance and superiority.  The Court concludes that under the New Class, the common question whether ConocoPhillips breached its implied duty to market and its sub-duty to obtain the highest reasonable price predominates over individual issues to meet rule 23(b)(3)'s predominance requirement.  Although damages awards present individualized issues, the Plaintiffs show that a common methodology applies to all New Class members' for calculating damages, and the Court can sort out damages awards after class certification.  As to superiority, the Court concludes that the New Class meets rule 23(b)(3)'s superiority requirement because proceeding with these claims as a Class is a superior mechanism than bringing individual cases.  The Court thus certifies the New Class.

1.    **The New Class Eliminates Individualized Issues Regarding Gas' Price at Each Class Members' Well.**

Under the New Class' definition, ConocoPhillips commingles all of the processed gas from the New Class' wells into one of two pipelines before sale.  FOF ¶ 22 at 43.  As a result, gas' sales price no longer varies well-to-well.  Sales price is no longer an individualized issue across the gas from the New Class' wells; not even an oil-and-gas expert can trace the commingled gas' sales price back to any specific Class members' well.  While gas quality varies well-to-well and that variation causes gas' value and thus sales price to fluctuate well-to-well, the commingling step eliminates those differences.  The sales price become universally the same across all New Class members.  The Court's prior conclusion, therefore, that the "quality of gas as it comes out of the ground" impacts the determination of the highest reasonably obtainable price for gas, no longer holds for the New Class definition.  Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *104.

In contrast, under the Original Class definition, non-commingled gas from Class members' wells has its own value, because those metrics are traceable back to a specific well.  Under the Original Class definition, gas' value at any specific Class members' well, therefore, can vary greatly, because various market factors such as gas quality, existing market conditions, and timing cause gas' value to fluctuate well-to-well, thereby also causing the sales price to fluctuate Class member-to-Class member.  See Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *103-107.  Finding whether ConocoPhillips obtained the highest reasonably obtainable price would have been a "significant undertaking that will involve numerous individualized questions which overwhelm the common questions," Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *105.  The New Class, however, eliminates individualized issues concerning gas' value from each

Class members' well, which in turn eliminate individualized issues with determining the highest reasonably obtainable price of gas. The sales price that is the highest reasonably obtainable price will be common to all Class members; no individual Class member can have a highest reasonably obtainable price for gas from his or her well that is different from the rest of the Class.

## 2.    Individualized Issues Regarding Damages Awards Do Not Defeat Predominance.

The only remaining individualized issue is where along the production stream the value of the gas is calculated for royalties. This lease-by-lease question does not predominate, however, because it only impacts post-class certification calculation of damages awards. The Court makes the same conclusion that individualized issues about damages do not predominate as it does in Section I.B.3. See supra at 150. The Tenth Circuit holds in Chaparral that "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." 923 F.3d at 798 (quoting Menocal v. GEO Grp., Inc., 882 F.3d 905, 922 (10th Cir. 2018)). The Tenth Circuit further explains that "there are ways to preserve the class action model in the face of individualized damages." Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1220 (10th Cir. 2013).

Here, class members receive royalties based on a spectrum of gas values. The Court examined all of the leases or lease excerpts admitted into evidence at the Class Certification Hearing -- including ten full-length oil-and-gas leases, six lease excerpts in the Plaintiffs' Interests in Leases chart, and the 189 lease excerpts in the Lease Number and Language Chart -- and identifies two ways leases calculate royalties. First, some leases have language that explicitly affixes royalty calculations to the "market value at the well" or another variation that indicates the wellhead value before sale; these are known as "market-value leases." Royalty Valuation and

Payment Issues: Where Are We and Where Are We Headed?, 48 Rocky Mt. Min. L. Inst. at §

11.02 (2002).  E.g., Lease SF 078414, Lease Number and Language Chart at 1 (stating a royalty

"equal to 2% of the market value at the wells"); Lease SF 079047, Lease Number and Language

Chart at 1 (stating a royalty "five (5) per cent of the value, at the field market price, at the time of

production"); Oil and Gas Lease at 1 (dated March 19, 1947), admitted on January 24, 2022 as

Defendant's Class Cert. Hearing Exhibit E (stating a royalty based on "the market price for oil of

like grade and gravity prevailing on the day such oil is run into the pipe line, or into the storage

tanker").   Market-value leases comprise the majority of the 204 leases the Court examined.

Second, some leases have language that explicitly affixes royalty calculations to the actual

proceeds or revenue that ConocoPhillips receives for selling gas; these are known as "proceeds

leases."  Royalty Valuation and Payment Issues: Where Are We and Where Are We Headed?, 48

Rocky Mt. Min. L. Inst. at § 11.02 (2002).  For example, one such lease calculates royalties based

on, "if marketed, the proceeds derived from the sale."   Lease SF 078687, Lease Number and

Language Chart at 1, Row 2 Column I.  Proceeds leases can vary in language stating to calculate

royalties based on "net proceeds," "proceeds," "receipts," and "amount realized," Royalty

Valuation and Payment Issues: Where Are We and Where Are We Headed? at § 11.02, or as the

Court identifies in some leases, "gas sold or used," "net proceeds from sale," Lease Summary

Chart at 1-2.  At least one proceeds lease entitles the owner to royalties based on "the first sale of

the affected production to an unaffiliated party." Paid Up Oil and Gas Lease at 1-2 (dated

September 8, 2008), admitted on January 25, 2022, as Defendant's Class Cert. Hearing Exhibit A-

8.

       Some leases incorporate both a wellhead value and gross proceeds as the basis for royalty

calculations, forming a hybrid market-value-proceeds lease.  For example, Anderson retains an

overriding royalty interest in Lease No. SF 078228, which confers "unto Assignor the right (hereinafter called 'oil payment') to receive in cash only and not in kind the market value (or the proceeds of sale if sold) of five percent (5%) of the net oil and gas." Plaintiff's Interests in Leases at 3. New Class members holding hybrid leases will likely join the proceeds leases subclass, since the New Class alleges that ConocoPhillips sold the gas from their wells. Finally, other leases do not expressly indicate market-value or proceeds. For example, one lease describes "an overriding royalty of one per cent (1%) of all oil, gas, casinghead gas, or other hydrocarbons that may be produced and saved from the above described land." Lease SF 078414, Lease Number and Language Chart at 1, Row 6 Column I.

The Plaintiffs will have individualized damages awards based on whether their lease is a market-value lease, proceeds lease, hybrid lease, or an undefined lease, but the Court can certify the New Class on the underpayment claim and leave such damages calculations to later proceedings. See 4 Newberg and Rubenstein on Class Actions § 12:4 at 115 (6th ed. 2022)(quoting Fed. R. Civ. P. 23(c)(4)("When appropriate, an action may be brought or maintained as a class action with respect to particular issues"))("Newberg and Rubenstein"). At class certification, the plaintiffs can meet rule 23(b)(3)'s predominance requirement by demonstrating a "method for quantifying individual damages that applies across the board and hence is common to the class: a common classwide method for calculating individual damages." Newberg and Rubenstein § 12:4 at 112. See also Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013)(holding that the class action plaintiffs present a damages methodology that "falls far short of establishing "that damages are capable of measurement on a classwide basis"). Because the Plaintiffs' gas is commingled, all New Class members' wells are entitled to the same highest reasonably obtainable price. The damages calculation methodology, therefore, is the same for all class members: the highest

reasonably obtainable price, minus the actual price ConocoPhillips paid, multiplied by the volume of gas in the Class members' well, multiplied by the Class members' proportional interest (e.g., one-eighth, twenty percent).  Once the highest reasonably obtainable price is chosen, the common methodology inserts the market-value or sales price of that highest reasonably obtainable price into the calculation, based on whether a lease is a market-value lease, a proceeds lease, a hybrid lease, or an undefined lease.  Both applying the common methodology and deciding which value or price to use within that common methodology can occur after class certification to calculate individualized damage awards.

The common question whether ConocoPhillips breached its implied duty to market and sub-duty to obtain the highest reasonable price for gas from the New Class' wells predominates over individualized damage awards.  It is "black-letter class action law" that individualized damages calculations based on a simple classwide methodology do not render the common liability issue predominant.  Newberg and Rubenstein § 12:4 at 112.  See also Bertulli v. Independent Ass'n of Continental Pilots, 242 F.3d 290, 298 (5th Cir. 2001)(affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); Levya v. Medline Industries, Inc., 716 F.3d 510, 513 (9th Cir. 2013)("The district court applied the wrong legal standard by concluding that individual questions predominate over common questions.  The only individualized factor that the district court identified was the amount of pay owed").  Here, individualized damages calculations do not predominate because a common methodology exists to calculate damages, and no other individualized issues exist.  The New Class, therefore, meets rule 23(b)(3)'s predominance requirement.

### 3.    <u>The New Class Definition is Feasible Administratively</u>.

ConocoPhillips argues that the Class is not feasible administratively "because there is no way to identify those <u>excluded</u> from the class." Opposition at 7 (emphasis in original). ConocoPhillips asserts that, because the Class is not feasible administratively, it is not ascertainable. ConocoPhillips argues that it does not have a list of owners of overriding royalty interests, and only pays royalties based on "owners listed in the division order." Opposition at 8. In the Reply, the Plaintiffs argue that the Class is ascertainable, because ConocoPhillips has evidence of the titles, lease owners, overriding royalty interests, and other transfers, starting from the 1950s. <u>See</u> Reply at 11.

ConocoPhillips' ascertainability argument is about administrative feasibility under rule 23(b)(3)'s predominance requirement. The Court here considers the issue of administrative feasibility as part of the rule 23(b)(3) predominance analysis. <u>See</u> <u>Santa Fe Tobacco</u>, 2023 US. Dist. LEXIS 166820, at *350-351 (predicting that the Tenth Circuit will analyze administrative feasibility under rule 23(b)(3) requirements, rather than rule 23(a)'s requirements). In <u>Santa Fe Tobacco</u>, the Court notes that, while an administrative feasibility requirement is not an express requirement in rule 23's language, it is built into 23(b)(3)(D):

> Rule 23(b)(3) states:
>
> The matters pertinent to [the predominance and superiority] findings include
>
> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Determining whether a proposed class's members will be administratively feasible is a question inherent to the Court's consideration of "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).

See 2023 US. Dist. LEXIS 166820, at *348.  The Court concludes that New Class is feasible administratively to discern.  Even though ConocoPhillips does not have a list of owners of overriding royalty interests, ConocoPhillips has all the underlying royalty agreements: titles, assignments, transfers, royalty interests and overriding royalty interests, and other relevant instruments, that comprise the New Class.  In other words, ConocoPhillips may not have a fully assembled house, but it has all the materials to build one.  The inherent difficulties in building the New Class list do not present a significant burden.  Possession of the royalty agreements is sufficient to demonstrate that identifying those who have royalty agreements with ConocoPhillips is feasible administratively.

### 4.     **The Class Action Meets Rule 23(b)(3)'s Superiority Requirement.**

Finally, the Court determines that the class action device remains superior to the other available procedural forms, namely individual litigation.  The Court's analysis of Rule 23(b)(3)'s Superiority Requirement remains the same as in the Class Cert. Denial Order, because the New Class definition does not change any aspect of the Court's superiority analysis.  See 2023 U.S. Dist. LEXIS 174812, at *107-108.  The Court reaches this determination after having considered the factors in rule 23(b)(3)(A)-(D).  See Fed. R. Civ. P. 23(b)(3)(A)-(D).  First, many proposed class members have an interest in proceeding in a class, and not individually, because their individual claims would be of negative value.  See Fed. R. Crim. P. 23(b)(3)(A).  Second, the Court has not encountered any evidence that suggests any proposed class members have

undertaken individual litigation, which would cut against class certification.  See Fed. R. Crim. P. 23(b)(3)(B).  Third, it is desirable to concentrate this litigation in one forum in an effort to preserve the Court's and the parties' time, energy, and resources.  See Fed. R. Crim. P. 23(b)(3)(C). Concentrating the litigation will also reduce the risk of inconsistent outcomes and incomplete relief.  Finally, the proposed class does not present insurmountable manageability issues.  See Fed. R. Civ. P. 23(b)(3)(D).  For these reasons, the Court determines that the class action device is superior to other litigation forms.

**IV.    FOR DAMAGES CALCULATIONS, THE COURT ACCEPTS THE PLAINTIFFS' PROPOSED FACT THAT THE SAN JUAN BASIN PRICE IS THE HIGHEST REASONABLY OBTAINABLE PRICE.**

The Plaintiffs request that the Court accept the San Juan Basin price as the highest reasonably obtainable price.  See Motion at 24.  This proposed fact would set the common methodology to calculate damage awards as follows:

> [T]he HROP amount in the San Juan Basin ("SJB") less the price paid by COP to all owners behind each plant for residue gas in the SJB (multiplied by) the residue gas volume for the well (multiplied by) the percent (in decimal) of the total class member interest in each well (examples: one eighth, three sixteenths, twenty percent).

Reply at 6.  The Plaintiffs argue that they are "free to stipulate to the amount of their damages claim and the method to calculate them."  Motion at 30.  ConocoPhillips argues that the Plaintiffs are prematurely binding Class members to calculating damages based on the San Juan Basin price at the exclusion of other market location prices that could result in higher damages calculations. See Response at 10-13.

The Court accepts this proposed fact for two reasons.  First, adopting the Plaintiffs' desired San Juan Basin price as the highest reasonably obtainable price benefits ConocoPhillips. ConocoPhillips argues that it sold gas from the Plaintiffs' wells at "multiple market outlets at prices

higher than those obtainable in the San Juan Basin." Response at 13. Previously at summary judgment, ConocoPhillips contends that the market location with the highest reasonably obtainable price is where it sells most of its gas: downstream, in places outside of New Mexico, like California. See Anderson v. ConocoPhillips, 2024 U.S. Dist. LEXIS 177835, at *44. By accepting the Plaintiffs' proposed fact, the Court excludes evidence of higher sales prices in other market locations, such as in California. As a result, the Plaintiffs self-limit the amount recoverable and foreclose potentially higher damages awards. The Plaintiffs leave dollars on the table. ConocoPhillips benefits, because, if the Plaintiffs could prove that an even higher price, such as in California, is the highest reasonably obtainable price, then ConocoPhillips might have to pay higher damages awards. While this approach may not reflect the true highest reasonably obtainable price, it streamlines litigation by reducing the scope of fact-finding required to evaluate sales prices across multiple locations and time periods. The Plaintiffs' proposed fact is a concession, and a concession that benefits both parties, promotes judicial efficiency, and reduces litigation costs for both sides.

Second, there is evidence, albeit limited, that shows the San Juan Basin price was the highest reasonably obtainable price at one point in time. In March, 2011, ConocoPhillips could have sold almost all of the gas it produced from the Plaintiffs' wells in the San Juan Basin. At that time, ConocoPhillips produced over 18,000,000 MMBtu's of gas from the Plaintiffs' wells in the San Juan Basin, see El Paso Natural Gas San Juan Pool March 2011 at 2, and sold over 16,000,000 MMBtu's of gas in the San Juan Basin, see Gas Sales in the El Paso Natural Gas San Juan Pool March 2011 at 3. The Plaintiffs also proffer this evidence at summary judgment. See MSJ MOO 2024 U.S. Dist. LEXIS 177835, at *43. At summary judgment, the Court concludes that there is a genuine factual dispute which market location has the highest reasonably obtainable price, and a

jury must determine that market location.  See MSJ MOO, 2024 U.S. Dist. LEXIS 177835, at *43.

The Court explains in its MSJ MOO:

> "The best price, or the highest obtainable price, is the price that the lessee could reasonably attain under existing market conditions."  Anderson v. ConocoPhillips, 2016 WL 1158341, at *15; TAC Order at 34.  Here, there is a genuine factual dispute about the existing market conditions for ConocoPhillips' gas from the San Juan Wells at the tailgate and at downstream locations like California.  An absolute highest price at the tailgate is not necessarily the highest reasonably obtainable price, and the Court notes that the "highest absolute price may not be available or obtainable in all factual circumstances in which the lessee must market the product."  See Anderson v. ConocoPhillips, 2023 WL 8544171, at *15 n. 13 (citing Smith v. Amoco Prod. Co., 31 P.3d 255, 271 (describing the difference between the "best price" and the "best price possible, or stated another way, the best available price")).  The Court cannot conclude that ConocoPhillips must sell all of the gas from the San Juan Wells at the tailgate as opposed to downstream in California.  The jury must determine whether the highest reasonably obtainable price under existing market conditions is indeed at that tailgate -- or downstream in distant markets such as in California -- such that ConocoPhillips has a duty to mainly market there.

MSJ MOO, 2024 U.S. Dist. LEXIS 177835, at *44-45.  A genuine issue of fact, therefore, is which market location has the highest reasonably obtainable price for the gas from the Plaintiffs' wells. While that market location may be the San Juan Basin, it may also be in California or another location outside of the San Juan Basin.  The Court concludes that, because there is at least some factual evidence supporting that the San Juan Basin price is the highest reasonably obtainable price, and because adopting the San Juan Basin price likely leaves dollars on the table for the Plaintiffs while streamlining litigation, the Court can accept the Plaintiffs' concession.

ConocoPhillips argues that the Plaintiffs "cannot prematurely bind members of a proposed class before the class is certified."  Response at 10 (quoting Std. Fire Ins. Co. v. Knowles, 568 U.S. 558, 592-593 (2013)("Knowles").  Further, accepting the San Juan Basin price defeats the Plaintiffs' ability to adequately represent absent class members, "who would otherwise seek to prove higher prices were available at other outlets."  Response at 13.  The Court has two responses.

First, the Court needs to take the _Knowles_ quote in context.  There, the named plaintiff Knowles

filed a class action in Arkansas State court that includes a unilateral stipulation to limit damages

below $5 million to avoid federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§

1332(d), 1453, 1711-15 ("CAFA").  _Knowles_, 568 U.S. at 590-91.  The Supreme Court concludes

that the district court "wrongly concluded that Knowles' precertification stipulation could

overcome" the five-million-dollar jurisdictional threshold.  _Knowles_, 568 U.S. at 593.  Examining

the case at the time it was filed in State court "[f]or jurisdictional purposes," the Supreme Court

concludes that Knowles "lacked authority to concede the amount-in-controversy issue for the

absent class members."    _Knowles_, 568 U.S. at 593.    The conclusion in _Knowles_ that a

precertification stipulation does not bind anyone but the named plaintiff himself is limited to a

context in which the stipulation serves a removal-avoidance purpose, which is not the issue here.

Second, if absent class members seek to prove a higher price than the San Juan Basin price, they

can opt-out of the class, and litigate their claim separately or in a different class.  While adopting

the San Juan Basin price as the highest reasonably obtainable price binds Class members at class

certification, it does not do so prematurely or improperly.  It benefits both parties, streamlines

litigation, and maintains the ability for absent Class members to opt-out.

The Court notes that the four cases that the Plaintiffs cite as authority are inapposite.  Some

of them discuss individual plaintiffs stipulating to limiting damages and ultimately none of them

are relevant here.  See Motion at 30-31; In re Thornburg Mortg., Inc., 912 F. Supp. 2d 1178, 1240

(D.N.M. 2012)(Browning, J)(granting a class action settlement by way of a stipulation that settles

and releases all claims against the defendants); Varela v. Wal-Mart Stores, E., Inc., 86 F. Supp. 2d

1109, 1112 (D.N.M. 2000)(Baldock, J., sitting by designation)(holding that the plaintiff, who

wishes to avoid removal to federal court, is the "master of her lawsuit" and thus does not have to

stipulate that she seeks damages less than $75,000.00); <u>Blancas v. State Farm Mut. Auto. Ins. Co.</u>, No. 20-1283 KG/LF, 2021 U.S. Dist. LEXIS 118715, at *13-14 (D.N.M. 2021)(Gonzales, J.)(discussing that, although the individual plaintiff does not stipulate to seeking damages less than $75,000.00, the defendants still have the burden to show the amount in controversy exceeds $75,000.00 to remove the case to federal court); <u>Moongate Water Co. v. Doña Ana Mut. Domestic Water Consumers Ass'n</u>, 2004 U.S. Dist. LEXIS 34761 (D.N.M. 2004)(Brack, J.)(discussing issues unrelated to stipulations and damages awards, <u>i.e.</u>, remand and attorney fees and costs).  The Court accepts the Plaintiffs' proposed fact that the San Juan Basin price is the highest reasonably obtainable price.  In doing so, the damages calculation compares only the San Juan Basin price to the actual price ConocoPhillips received for the Plaintiffs' gas, simplifying the work to the benefit of both parties.

## V.   THE COURT ASKS THE PARTIES TO SUBMIT A JOINT STIPULATION DISPOSING OF THE PLAINTIFFS' NEW EVIDENCE CLAIM.

The Plaintiffs argue that ConocoPhillips did not pay Class members their proportionate share of the twenty-five million dollar El Paso Natural Gas settlement funds.  <u>See</u> Motion at 31-35.  In the Response, however, ConocoPhillips explains that, after much discussion among counsel, the Plaintiffs are no longer pursuing this claim, and that a joint stipulation will follow. <u>See</u> Response at 6 fn. 1.  Neither party has filed said joint stipulation.  The Plaintiffs also do not address the new evidence claim in the Reply.  Accordingly, the Court does not address the new evidence claim, because it appears that the parties are not actively litigating it.  The Court asks the parties to submit a joint stipulation disposing of this claim.

**IT IS ORDERED** that: (i) the requests in the Plaintiffs' Opposed Renewed Motion to Certify This Matter as a Class Action and to Narrow the Class Definition and Reconsider Certain

Issues in the Denial of Plaintiffs' Original Certification Motion Under Fed. R. Civ. P. 59(E) and Brief in Support, filed March 19, 2024 (Doc. 402), are denied in part and granted in part; (ii) the Court upon reconsideration denies certifying the Original Class; (iii) the Court upon reconsideration denies the New Mexico Oil and Gas Proceeds Payment Act, NMSA 1978 §§ 70-10-1 to 70-10-6, claim; (iv) the Court grants class certification of those whose leases do not negate the implied duty to market and meet the New Class definition; and (v) the Court accepts the Plaintiffs' proposed fact that the San Juan Basin price is the highest reasonably obtainable price for the gas from the Plaintiffs' wells.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Stan A. Koop
Goolsby | Proctor
Oklahoma City, Oklahoma

-- and --

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

-- and --

Bradley D. Brickell
Brickell & Associates, PC
Norman, Oklahoma

     *Attorneys for the Plaintiffs*

Adam G. Rankin
Mark F. Sheridan
John C. Anderson
Robert J. Sutphin
Holland & Hart LLP
Santa Fe, New Mexico

*Attorneys for the Defendant*