# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

THE ANDERSON LIVING TRUST f/k/a The
James H. Anderson Living Trust, THE
PRITCHETT LIVING TRUST; CYNTHIA W.
SADLER; SHIRLEY L. SCANLON LIVING
TRUST; ROBERT WESTFALL; LEE WILEY
MONCRIEF 1988 TRUST, and NEELY-
ROBERTSON REVOCABLE FAMILY
TRUST,

       Plaintiffs,

vs.                                                                    No. CIV 12-0039 JB/SCY

CONOCOPHILLIPS COMPANY, LLC,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) ConocoPhillips Company's Motion to
Reconsider Memorandum Opinion and Order on Plaintiffs' Motion for Partial Summary Judgment,
filed March 3, 2025 (Doc. 450)("MTR MOO"); and (ii) ConocoPhillips Company's Motion to
Reconsider a Fact Determined in the Memorandum Opinion and Order on Plaintiffs' Motion for
Partial Summary Judgment, filed March 25, 2025 (Doc. 454)("MTR Fact"). The Court holds a
hearing on April 29, 2025. See Clerk's Minutes, filed April 29, 2025 (Doc. 477). The primary
issues are: (i) whether the Court should reconsider its Memorandum Opinion and Order, filed
September 30, 2024 (Doc. 441)("MSJ MOO"), because it holds that the implied duty to market
requires obtaining the highest wellhead value through a netback method; and (ii) whether the Court
should reconsider its MSJ MOO, because it deems undisputed that the Plaintiffs own a royalty
interest in the residue gas that ConocoPhillips produces and sells from the San Juan Wells. The
Court concludes that: (i) reconsideration of the MSJ MOO is warranted only as to the Court's

conclusion that the implied duty to market requires obtaining the highest wellhead value through a netback method, because the United States Court of Appeals for the Tenth Circuit precedent forecloses that result; and (ii) reconsideration of the undisputed fact is unwarranted, because ConocoPhillips admits that the Plaintiffs own a royalty interest in the residue gas. The Court therefore grants the MTR MOO and denies the MTR Fact.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court first introduces the Plaintiffs and then reviews the case's relevant history. This history includes the Memorandum Opinion and Order Granting the Third Amended Complaint, filed March 1, 2016 (Doc. 177)("TAC MOO"), and the Third Amended Complaint, filed April 6, 2016 (Doc. 178)("TAC"). Then, the Court summarizes its Memorandum Opinion and Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment, filed September 30, 2024 (Doc. 441)("MSJ MOO"), which is relevant to the pending MTRs. The Court concludes this section by summarizing the briefing: (i) the MTR MOO; (ii) the Plaintiff's Response to ConocoPhillips' Motion to Reconsider Memorandum Opinion and Order on Plaintiff's Motion for Partial Summary Judgment, filed April 7, 2025 (Doc. 459)("MTR MOO Response"); (iii) ConocoPhillips' Reply in Support of Motion to Reconsider Memorandum Opinion and Order on Plaintiff's Motion for Partial Summary Judgment, filed April 24, 2025 (Doc. 469)("MTR MOO Reply"); (iv) the MTR Fact; (v) the Plaintiff's Response to ConocoPhillips' Motion to Reconsider a Fact Determined in the Memorandum Opinion and Order on Plaintiff's Motion for Partial Summary Judgment, filed April 2, 2025 (Doc. 457)("MTR Fact Response"); and (vi) ConocoPhillips' Corrected Reply in Support of Motion to Reconsider a Fact Determined in the Memorandum Opinion and Order on Plaintiff's Motion for Partial Summary Judgment, filed April 24, 2025 (Doc. 471)("MTR Fact Reply").

1.    **The Plaintiffs.**

The named Plaintiffs are: (i) Plaintiff Anderson Living Trust, formerly known as the James H. Anderson Living Trust; (ii) Plaintiff Prichett Living Trust; (iii) Plaintiff Cynthia W. Sadler; and (iv) Plaintiff Robert Westfall.  See Third Amended Complaint ¶¶ 1-5, at 2, filed April 6, 2016 (Doc. 178)("TAC").  Often the lessor of an oil-and-gas lease is not familiar with industry custom or trade usage.  See Owen L. Anderson, Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?, 37 Nat. Resources J. 611, 611-12 (1997)("[S]eldom [can a] lessor engaged in the oil and gas business . . . be regarded as a 'merchant' knowledgeable about oil and gas production and marketing practices.  Typically, the lessor is a farmer or a laborer, someone engaged in an unrelated business or profession, or a retired person.").  The Plaintiffs own royalty interests in "the revenues derived from the production and sale of hydrocarbons[1] pursuant to the terms of oil and gas leases owned" by ConocoPhillips.  TAC ¶ 9, at 3.

**2.    Memorandum Opinion and Order Granting Leave to File Third Amended Complaint.**

On, March 1, 2016, the Court grants Plaintiffs leave to file their TAC.  See TAC MOO at 1.  Relevant here, the Court addresses the implied duty to market.  The Court holds that Elliott Industries v. BP America Products Co., 407 F.3d 1091 (10th Cir. 2005)("Elliott"), does not preclude recognizing that the implied duty to market imposes obligations on the price that lessees must obtain.  See TAC MOO at 18.  Because Elliott concerns cost deduction, the Court of Appeals for the Tenth Circuit does not consider whether the implied duty to market extends to pricing.  See TAC MOO at 23.  The Court therefore holds that the implied duty to market "requires lessees to

---

[1] A hydrocarbon is an organic chemical compound that is composed exclusively of hydrogen and carbon atoms.  They are naturally-occurring and form the basis of crude oil, natural gas, coal, and other energy sources.  Jason Fernando, Hydrocarbons: Definition, Companies, Types,                    and                    Uses,                    Investopedia, https://www.investopedia.com/terms/h/hydrocarbon.asp#:~:text=The%20term%20hydrocarbon% 20refers%20to%20an%20organic%20chemical,natural%20gas%2C%20coal%2C%20and%20oth er%20important%20energy%20sources (July 15, 2023).

secure the best reasonable sales price for gas being marketed." TAC MOO at 27. The Court allows the Plaintiffs to amend their Complaint to allege that ConocoPhillips breaches this duty by failing to sell the gas for the best possible price, because ConocoPhillips bases the royalties off non-arm's length sales. See TAC MOO at 35.

**3.**     **The Third Amended Complaint.**

On April 6, 2016, the Plaintiffs file their Third Amended Complaint alleging seven causes of action. See TAC at 1. First, the Plaintiffs allege that ConocoPhillips fails to pay royalties on volumes of hydrocarbons, including drip condensate. See TAC ¶ 27, at 11. Second, the Plaintiffs allege that ConocoPhillips breaches the duty of good faith and fair dealing by selling the Plaintiffs' share of hydrocarbons to its affiliates who then realize a higher value for the hydrocarbons than that reported to the Plaintiffs. See TAC ¶ 34, at 14. Third, the Plaintiffs allege violations of the New Mexico Oil and Gas Proceeds Payment Act (NMSA 1978 §§ 70-10-1) and interest due under Colorado law. See TAC ¶ 46, at 14. Fourth, the Plaintiffs allege that ConocoPhillips acts in bad faith and breaches the contract by withholding benefits that it owes to the Plaintiffs under the terms of the leases. See TAC ¶ 52, at 18. Fifth, the Plaintiffs seek declaratory relief in the form of restitution, because they allege ConocoPhillips is enriched unjustly. See TAC ¶ 57, at 19. Sixth, the Plaintiffs allege a breach of the implied covenant to market hydrocarbons on Plaintiff Lee Wiley Moncrief 1988 Trust's behalf. See TAC ¶ 64, at 21. Seventh, the Plaintiffs allege a breach of the implied covenant to market, because ConocoPhillips fails to pay royalties based upon an arm's length sale. See TAC ¶ 68, at 24.

**4.**     **Memorandum Opinion and Order Granting in Part and Denying in Part the Plaintiffs' Motion for Summary Judgment.**

On September 30, 2024, the Court grants in part and denies in part the Plaintiffs' Motion for Summary Judgment. See MSJ MOO at 1. Relevant here, the Plaintiffs seek a ruling that, under

the implied duty to market, the "highest price" refers to the gas' wellhead price and not a downstream market price incorporating post-production or transportation costs.  See MSJ MOO at 28.  The Court agrees, holding that "highest reasonably obtainable price" must be based on the wellhead price, because that value determines the Plaintiffs' royalty payments.  MSJ MOO at 28.  The Court reasons that using the downstream price as a benchmark provides no benefit to royalty owners, because the downstream price is higher only because it includes transportation and processing costs -- costs that ConocoPhillips later deducts under the netback method.  See MSJO MOO at 30-32.  Thus, starting with a higher downstream price and then subtracting those costs leaves royalty owners in the same or worse position.  See MSJ MOO at 30-32.  The Court concludes that the only price that actually reflects the gas' value to the royalty owners -- and therefore satisfies the implied duty to market -- is the wellhead price.  See MSJ MOO at 30-32.

5.    **Motion to Reconsider the MSJ MOO.**

On March 4, 2025, ConocoPhillips files its Motion to Reconsider Memorandum Opinion and Order on Plaintiffs' Motion for Partial Summary Judgment.   See MTR MOO at 1.  ConocoPhillips argues that the MSJ MOO clearly errs, because it contradicts Elliott, where the Tenth Circuit holds that failure to use the netback method properly to obtain the highest wellhead value does not breach the implied duty to market.  See MTR MOO at 8.  ConocoPhillips asserts that the netback method is a means of complying with the lessee's express royalty obligations, which is not a component of the implied duty to market.  See MTR MOO at 14.  Accordingly, ConocoPhillips asks the Court to reconsider the MSJ MOO and deny the Plaintiffs Motion for Summary Judgment.  See MTR MOO at 16.

6.    **The Plaintiffs' Response to the MTR MOO.**

On April 7, 2025, the Plaintiffs file their Response to the MTR MOO.  See MTR MOO Response at 1.  They argue that the Court should deny the motion, because ConocoPhillips

reiterates arguments that ConocoPhillips presents in the prior briefing. <u>See</u> MTR MOO Response at 4. The Plaintiffs further contend that the Court rejects those arguments and should not revisit them. <u>See</u> MTR MOO Response at 6.

7. <u>**ConocoPhillips' Reply to the MTR MOO**</u>.

On April 24, 2025, ConocoPhillips files its Reply to the MTR MOO. <u>See</u> MTR MOO Reply at 1. ConocoPhillips reiterates that the implied duty the MSJ MOO recognizes mirrors the duty that <u>Elliott</u> rejects. <u>See</u> MTR MOO Reply at 1. ConocoPhillips also contends that the Plaintiffs' argument -- that its MTR MOO repeats prior arguments -- is not sound, because the Court had not recognized previously a duty to obtain the highest wellhead value. <u>See</u> MTR MOO Reply at 2. ConocoPhillips argues that given the Court's then-existing view that the implied duty includes only a highest-sales-price component, ConocoPhillips argues that there is no need to offer a detailed explanation why <u>Elliott</u> forecloses the new duty that the Plaintiffs ask the Court to recognize. <u>See</u> MTR MOO Reply at 2. ConocoPhillips maintains that the Court commits clear legal error and urges reconsideration. <u>See</u> MTR MOO Reply at 2.

8. <u>**Motion to Reconsider a Fact Determined in the MSJ MOO**</u>.

On March 25, 2025, ConocoPhillips files its Motion to Reconsider a Fact Determined in the MSJ MOO. <u>See</u> MTR Fact at 1. The MSJ MOO finds it undisputed that the "Plaintiffs have royalty interests for residue gas that ConocoPhillips produces and sells from the San Juan Wells." MTR Fact at 1. ConocoPhillips argues that this finding is inaccurate and that the record does not support that finding. <u>See</u> MTR Fact at 1. ConocoPhillips contends that the Plaintiffs neither allege nor cite evidence establishing the fact that Plaintiffs own a royalty interest in residue gas, that ConocoPhillips repeatedly disputed that fact, and that the royalty instruments must determine Plaintiffs' ownership interests -- an analysis the Court has not conducted. <u>See</u> MTR Fact at 10-12. ConocoPhillips further asserts that its use of the netback method supports the opposite inference:

that Plaintiffs own royalty interests only in unprocessed gas at the wellhead, not in residue gas. <u>See</u> MTR Fact at 12.

**9.     <u>The Plaintiffs' Response to the MTR Fact</u>.**

On April 2, 2025, Plaintiffs file their Response to the MTR Fact. <u>See</u> MTR Fact Response at 1. They argue that the Court should deny the MTR Fact, because ConocoPhillips' repackages arguments the Court addresses in the MSJ MOO. <u>See</u> MTR Fact Response at 2. The Plaintiffs further assert that ConocoPhillips repeatedly admits on the record that Plaintiffs hold a royalty interest in residue gas. <u>See</u> MTR Fact Response at 4-6. Finally, they contend that ConocoPhillips position legally is incorrect, because the Plaintiffs do not own hydrocarbons in kind; rather, they hold a royalty right to a percentage of the value ConocoPhillips receives from selling hydrocarbons produces from their minerals. <u>See</u> MTR Facts Response at 7.

**10.     <u>ConocoPhillips' Reply to the MTR Fact</u>.**

On April 24, 2025, ConocoPhillips files its Reply to the MTR Fact. <u>See</u> MTR Fact Reply at 1. It reiterates that the Plaintiffs' evidence does not support the Court's finding that Plaintiffs' hold an ownership interest in residue gas. <u>See</u> MTR Fact Reply at 3. ConocoPhillips further argues that the Plaintiffs' characterization of a royalty interest as merely a right to payment conflicts with New Mexico law, making the record insufficiently one-sided to preclude a finding in its favor. <u>See</u> MTR Fact Reply at 5-8. Finally, ConocoPhillips contends that the Court's prior finding is improper, because the issue is, and remains, disputed throughout the record. <u>See</u> MTR Fact Reply at 9-11.

## <u>LAW REGARDING MOTIONS TO RECONSIDER INTERLOCUTORY ORDERS</u>

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a

final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider," compounded that baseline confusion. Fed. R. Civ. P. 59(e); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders. <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of

- 8 -

robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment,  see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir.1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir.1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that

post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28–day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir.1998)(departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders. The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer

- 10 -

> than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, *any order or other decision,* however designated, *that adjudicates fewer than all the claims* or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir.2007).  In the Tenth Circuit, "law of the case doctrine has *no* bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir.2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir.1995)).  In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted).  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to

how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction, than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition. . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining

thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the <u>Servants of the Paraclete v. Does</u> grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial

resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for

reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

### LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[2]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary

---

[2]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may

not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Fourth, the court cannot decide any credibility issues. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified-immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the United States Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not

> defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")).  While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING THE IMPLIED DUTY TO MARKET IN OIL AND GAS LEASES

New Mexico has an implied duty to market.  New Mexico recognizes:

[A]n implied covenant on the part of the lessee (in the absence of any expressed on the subject as in [the] lease) that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development for production of oil and gas with reasonable diligence as to the undeveloped portion of the leased land.

Libby v. DeBaca, 1947-NMSC-4976 ¶ 17, 51 N.M. 95, 99, 179 P.2d 263, 265.  In addition, the lessee "must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product."  Libby v. DeBaca, 1947-NMSC-4976 ¶ 17, 51 N.M. at 99, 179 P.2d at 265.[3]  See Elliott Industries Ltd. Partnership v. BP America Production Co., 407 F.3d 1091, 1113 (10th Cir. 2005).  The Supreme Court of New Mexico later characterizes the implied duty to market as an

_____

[3]In Libby v. DeBaca, the Supreme Court of New Mexico says that this duty to market includes building a plant to convert the gas into dry ice, because that plant is the only way the gas can be sold.  See Elliott Industries Ltd. Partnership v. BP America Production Co., 407 F.3d at 1113.

"implied covenant 'to make diligent efforts to market the production in order that the lessor may realize on this royalty interest.'" Darr v. Eldridge, 1959-NMSC-6523, 66 N.M. 260, 263, 346 P.2d 1041, 1044 (citing Wolfe v. Texas Co., 83 F.2d 425, 432 (10th Cir. 1936)).[4]

The Court explains that oil-and-gas leases are construed "like any other contracts." Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d 979, 988 (D.N.M. 2013)(Browning, J.)(citing Elliott Indus Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1108). Additionally, New Mexico implies in law a duty "'to make diligent efforts to market the production in order that the lessor may realize on his royalty interest'" on oil-and-gas producers, "in equity, without looking to the language of the agreements or other evidence of the parties' intentions." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218 P.3d 75 (quoting Darr v. Eldridge, 1959-NMSC-6523, 6 N.M. at 263, 346 P.2d at 1044). This obligation is the "duty to market." Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 147 N.M. 157, 218 P.3d 75. See Anderson Living Trust v. ConocoPhillips Co., 952 F. Supp. 2d at 1022. Under the implied duty to market, the lessee must obtain the best reasonable sales price for gas being marketed. See Anderson Living Trust v. ConocoPhillips Co., 2016 WL 1158341 at *12 (citing Amoco Prod. Co. v. First Baptist of Pyote, 579 S.W.2d 280, 284 (Tex. App. -- El Paso 1979)(concluding that the lessee breaches the implied duty to market, even though it pays royalties based on the amount received pursuant to the lessors' lease agreements, because it does not obtain the best possible price); Bruce M. Kramer & Chris Pearson, The Implied Marketing Covenant in Oil and Gas Leases: Some Needed Changes for the 80's, 46 La. L. Rev. 787, 812 n.151 (1986)). The Court explains how to determine the best reasonable sales price:

---

[4]In Darr v. Eldridge, the court faces a situation where the lessee is holding onto the property without selling the minerals. See Darr v. Eldridge, 1959-NMSC-6523, 6 N.M. at 263, 346 P.2d at 1044.

> Determining the highest or best obtainable price requires ascertaining what a reasonably prudent operator would do in the same situation in marketing its oil. See Watts v. Atl. Richfield Co., 115 F.3d 785, 794 (10th Cir. 1997)(stating that, although a producer has a duty "to obtain the best price and terms available" under Oklahoma's implied duty to market, the producer need only exercise "that degree of diligence exercised by a prudent operator having regard for the interests of both the lessor and lessee"); Cabot Corp. v. Brown, 754 S.W.2d 104, 106 (Tex. 1987)(requiring the lessee to "market the production with due diligence and obtain the best price reasonably possible"); Duhe v. Texaco, 779 So. 2d at 1982 (describing Louisiana's implied duty to market as requiring the lessee to obtain "the best price reasonably possible"). In other words, the best price, or the highest obtainable price, is the price that the lessee could reasonably attain under existing market conditions. It does not impose upon lessees a duty to get the highest price in a vacuum. See Smith v. Amoco Prod. Co., 31 P.3d at 271-72 (explaining that, courts should determine whether a lessee complies with the duty to market with reference to the facts and circumstances surrounding the sale under the reasonably prudent operator standard); Judith M. Matlock, Payment of Gas Royalties in Affiliate Transactions, 48 Inst. on Oil & Gas L. & Tax'n § 9.06[3], at 9-48 (1997). The above cited authority demonstrates, however, that in marketing the product, a reasonably prudent operator will get the best price possible under the circumstances so that operators cannot pay royalties at below market prices.  See 5 Howard Williams & Charles Meyers, Oil & Gas Law §§ 806-08 (2001).

Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *15.  Notably, the Court

makes a distinction between the "highest price" and the "highest obtainable price" or "best price

available," explaining:

> Courts have recognized that the best obtainable or available price differs, because it encompasses an understanding that highest absolute price may not be available or obtainable in all factual circumstances in which the lessee must market the product.  See Smith v. Amoco Prod. Co., 31 P.3d 255, 271 (describing the difference between the "best price" and the "best price possible, or stated another way, the best available price").

Anderson Living Trust v. ConocoPhillips Co., LLC, 2023 WL 8544171 at *15 n. 13.

## ANALYSIS

The Court grants ConocoPhillips' MTR MOO and denies the MTR Fact.  First,

reconsideration of the MSJ MOO is appropriate, because Tenth Circuit precedent forecloses the

conclusion that the implied duty to market requires obtaining the highest wellhead value through

a netback method.  Second, reconsideration of the Court's finding that it is undisputed that the

Plaintiffs own a royalty interest in residue gas is unwarranted, because ConocoPhillips admits that

fact.  Upon reconsideration of only the implied-duty-to-market issue, the Court concludes that the

implied duty to market requires only that the lessee obtain the best reasonable sales price.

Accordingly, the Court denies the Plaintiffs' Motion for Partial Summary Judgment, filed

September 28, 2023 (Doc. 348)("MSJ"), to the extent that it relies on the conclusion that the

implied duty to market requires obtaining the highest wellhead value, and it upholds all remaining

portions of the MSJ MOO.

I.      **THE COURT RECONSIDERS ITS HOLDING REGARDING THE IMPLIED DUTY TO MARKET IN THE MSJ MOO.**

In determining whether to reconsider an order, courts consider three factors.  See WPX

Energy, 312 F.R.D. at 647.  First, the Court restricts its review of a motion to reconsider a prior

ruling in proportion to how thoroughly the earlier ruling addresses the specific findings or

conclusions that the motion to reconsider challenges.  See WPX Energy, 312 F.R.D. at 647.

Second, the Court considers the case's overall progress and posture.  See WPX Energy, 312 F.R.D.

at 648.  Third, the Court considers grounds for reconsideration in Servant of the Paraclete v. Does,

at 1005, and ask whether the movant presents (i) new controlling authority; (ii) new evidence; or

(iii) a clear indication -- apparent without extensive analysis -- that the prior ruling is incorrect.

See WPX Energy, 312 F.R.D. at 648.  As explained below, the Court concludes that reconsideration

is appropriate, because its earlier interpretation of the implied duty to market does not align with

Tenth Circuit precedent.

II.     **THE IMPLIED DUTY TO MARKET REQUIRES AN OBLIGATION TO OBTAIN THE BEST REASONABLE SALES PRICE.**

In the MSJ MOO, the Court holds that under the implied duty to market: (i) the highest

reasonably obtainable price shall be determined using the gas' wellhead value; and (ii) the gas'

wellhead value shall be calculated by the netback method.  See MSJ MOO at 34.  Before

addressing ConocoPhillips' challenge to that interpretation, however, it is important to underscore that the Court already has resolved -- definitively -- how the Court will determine the "best reasonable sales price" in this case. See Memorandum Opinion and Order at 174, filed March 28, 2025, 349 F.R.D. 365, at 464 (Doc. 455)("Certification MOO"). In the Certification MOO, the Court holds:

> Under the New Class' definition, ConocoPhillips commingles all of the processed gas from the New Class' wells into one of two pipelines before sale. FOF ¶ 22, at 43. As a result, gas' sales price no longer varies well-to-well. Sales price is no longer an individualized issue across the gas from the New Class' wells; not even an oil-and-gas expert can trace the commingled gas' sales price back to any specific Class members' well. While gas quality varies well-to-well and that variation causes gas' value and thus sales price to fluctuate well-to-well, the commingling step eliminates those differences. The sales price become universally the same across all New Class members. The Court's prior conclusion, therefore, that the "quality of gas as it comes out of the ground" impacts the determination of the highest reasonably obtainable price for gas, no longer holds for the New Class definition. Class Cert. Denial Order, 2023 U.S. Dist. LEXIS 174812, at *104.

Certification MOO at 174. The Court further holds that the sales price is therefore uniform across the New Class and that the benchmark for the highest reasonable price shall be the San Juan Basin price. See Certification MOO at 181.

Against that backdrop, what ConocoPhillips asks the Court to do here -- revisit the meaning of "highest reasonably obtainable price" -- is academic and a waste of scarce and precious judicial resources. The Certification MOO fixes the operative price benchmark, and the commingling finding eliminates any individualized wellhead-valuation dispute. ConocoPhillips' requests thus seek an abstract doctrinal clarification that has no practical effect on how the Court will determine the price in this case. ConocoPhillips nonetheless argues that the Tenth Circuit's decision in Elliott forecloses the MSJ MOO's interpretation of "highest reasonably obtainable price," because Elliott holds that the implied duty to market is not breached when a lessee fails to obtain the highest wellhead value using the netback method. See MTR MOO at 10. The Court agrees.

In <u>Elliott</u>, the royalty agreement requires the well operator to pay Elliott Industries a royalty on the market value of gas at the well.  <u>See</u> 407 F.3d at 1110.  To establish that value, the operators deduct their post-production costs from the downstream sales price, including thirty-nine percent of the natural gas liquids, which the operators retain as an in-kind fee for their processing services. <u>See</u> 407 F.3d at 1110.  Elliot Industries argues that the operators have an implied duty to market the gas, which also prohibits the operators from deducting post-production costs from the royalty payment.  <u>See</u> 407 F.3d at 1113.  The Tenth Circuit rejects that argument, holding that the operators comply with the implied duty to market under New Mexico law, because the operators were actively producing gas, processing it, and selling the refined natural gas and natural gas liquids. <u>See</u> 407 F.3d at 1113.  Elliott Industries unsuccessfully argues that the implied duty to market forbids the lessees' deduction of either "an unreasonable fee for a legitimate post-production cost or by charging a fee for an illegitimate post-production cost," in calculating the value of the gas at the wellhead under the netback method.  407 F.3d at 1125.

In the MSJ MOO, the Court holds that using the downstream price and subtracting transportation costs under the netback method does not comply with the implied duty to market, because it fails to yield the highest wellhead value.  <u>See</u> MSJ MOO at 31.  Unlike the sales price, which reflects the value of gas at the point of sale and is unaffected by post-production costs, the wellhead value is by definition a netback value that necessarily accounts for those costs.  <u>See</u> MTR MOO at 2.  The Court's earlier reasoning therefore imposes a comparative-netback obligation -- requiring the lessee to calculate and compare multiple netback values -- that the Tenth Circuit rejects in <u>Elliott</u>.  Upon reconsideration, the Court clarifies, as it did in the Certification MOO, that the implied duty to market does not require obtaining the highest theoretical wellhead value, but rather obligates the lessee to act as a reasonably prudent operator in obtaining the best reasonable

sales price for gas.  See Libby v. DeBaca, 1947-NMSC-4976 ¶ 17, 51 N.M. at 99, 179 P.3d at 265.
See Anderson Living Trust v. ConocoPhillips Co., 2016 WL 1158341 at *12.

The Plaintiffs argue that reconsideration is unwarranted, because ConocoPhillips reasserts
arguments that the Court rejects.  See MTR MOO Reply at 4.  The Plaintiffs contend that
reconsideration is proper only where the court misapprehends the facts, a party's position, or
controlling law.  See MTR MOO Reply at 4.  The Court concludes, however, that its prior
interpretation of the implied duty to market is inconsistent with controlling precedent and therefore
revises that holding.  Accordingly, the Court grants ConocoPhillips' MTR MOO and denies the
Plaintiffs' MSJ insofar as it seeks a ruling on the proper definition of the implied duty to market.

### III.    THE COURT WILL NOT RECONSIDER ITS HOLDING REGARDING A FACT THAT THE COURT DEEMS UNDISPUTED IN THE MSJ MOO.

ConocoPhillips asks the Court to reconsider an undisputed fact from the MSJ MOO: that
"[t]he plaintiffs have royalty interest for residue gas that ConocoPhillips produces and sells from
the San Juan Wells."  MTR Fact at 1.  In deciding a motion to reconsider, courts consider three
factors.  WPX Energy, 312 F.R.D. at 647.  First, the Court restricts its review of a motion to
reconsider a prior ruling in proportion to how thoroughly the earlier ruling addresses the specific
findings or conclusions that the motion to reconsider challenges.  See WPX Energy, 312 F.R.D. at
647.  Second, the Court considers the case's overall progress and posture.  See 312 F.R.D. at 648.
Third, the Court considers the grounds for reconsideration in Servant of the Paraclete v. Does, and
ask whether the movant presents (i) new controlling authority; (ii) new evidence; or (iii) a clear
indication -- apparent without extensive analysis -- that the prior ruling is incorrect.  See WPX
Energy, 312 F.R.D. at 648.  Applying these factors, reconsideration is not appropriate.

The first factor -- how thoroughly the Court addresses the point -- does not favor
reconsideration.  A court does not look only to the overall thoroughness of the prior ruling, but to

the thoroughness with which the court addresses the exact point or points that the motion to reconsider challenges. See WPX Energy, 312 F.R.D. at 649. Here, ConocoPhillips challenges that the fact is undisputed. In the MSJ MOO, the Court carefully addresses the precise point ConocoPhillips now reasserts:

> ConocoPhillips purportedly disputes that the Plaintiffs' minerals were leased to ConocoPhillips or its predecessors. See Response to SOF at 4. Although ConocoPhillips argues that the Plaintiffs have insufficient evidence, it does not cite to any contravening evidence in the record. See Response to SOF at 4. The Plaintiffs' Motion does not cite to evidence in the record to support its assertion, and their Reply does not address this dispute. See Reply at 4. The Court concludes that because the Plaintiffs do not support their assertion with any evidence in the record, their assertion lacks merit. This assertion is also not material to the motion because regardless of whether Plaintiffs' minerals were leased, it is undisputed that Plaintiffs have royalty interests for gas produced from the San Juan Wells.

MSJ MOO at 10 n.17. Essentially, although ConocoPhillips contests the sufficiency of the Plaintiffs' evidence, it cites no record evidence to contradict the statement that the Plaintiffs receive royalty payments for residue gas. Thus, the Court already addresses -- and rejects -- the very point ConocoPhillips now seeks to relitigate.

Looking to the second factor -- the case's overall progress and posture -- reconsideration significantly prejudices the Plaintiffs. Although the MTR Fact nominally challenges a fact the Court deems undisputed in the MSJ MOO, the Court recognizes that ConocoPhillips is, in substance, attempting to lodge a backdoor certification argument. ConocoPhillips asserts that, under Abraham v. WPX Prod. LLC, 317 F.R.D. 169 (D.N.M. 2016)(Browning, J.)("Abraham"), a lease's royalty clause defines what the plaintiffs own and therefore the Court could not have found the necessary royalty interest without parsing the underlying lease terms -- an argument that cuts against certification. See MTR Fact at 9. Although ConocoPhillips frames the argument as a factual dispute, ConocoPhillips asks the Court to reach the same conclusion advanced in Abraham: that the claim cannot be certified, because the court must parse through the underlying lease terms

- 28 -

to determine who has the necessary royalty interest.  See Abraham, 317 F.R.D at 260-68.  The Court declines that invitation.  It devotes hundreds of pages in the Certification MOO to determine that class certification is proper based on the Plaintiffs' claims.  Reopening that analysis now upends the case's posture and significantly prejudices the Plaintiffs.  Moreover, as explained below, Abraham is inapposite to the issues here and does not support ConocoPhillips' attempt to unwind certification at this late stage.

Further, none of the Servants of the Paraclete v. Does considerations suggest that the Court should reconsider the prior ruling.  ConocoPhillips presents no new authority or new evidence suggesting that the Court's ruling is no longer correct.  Instead, it insists that it never admits that the Plaintiffs own a royalty interest in residue gas.  See MTR Fact at 8.  Reconsideration requires a clear showing of error -- one that is manifest without prolonged analysis.  See WPX Energy, 312 F.R.D. at 648.  ConocoPhillips makes no such showing.

The crux of ConocoPhillips' argument is that it does not admit that Plaintiffs' own a royalty interest in residue gas, despite stating:

1. From January 1, 2005 to December 31, 2016, COP owned working interest in oil and gas leases in New Mexico in the San Juan Basin, burdened by royalty and/or overriding royalty interests owned by Anderson and Westfall, from which conventional natural gas was produced. Exhibit 1, Affidavit in Support of Motion for Partial Summary Judgment, [filed May 14, 2021 (Doc. 246-1)("MSJ Affidavit")] at ¶ 1.

2. From 2005 to 2016, COP paid royalties to Anderson and Westfall using the netback method. Under this method, COP, which did not sell the conventional natural gas at the well head, calculated the royalty value of the gas by (a) selling (i) the refined natural gas liquids ("NGLs") extracted from the gas through processing and (ii) the refined natural gas that remained after processing ("residue gas"), and (b) deducting from those base sales amounts the costs that COP incurred following production of the gas, including gathering, processing, compressing, treating, dehydrating, and transportation the gas to the delivery point of sale. [MSJ Affidavit] at ¶ 2.

. . . .

4.  The natural gas subject to Anderson's and Westfall's interest was produced from wells on oil and gas leases in the San Juan Basin operated by COP's business unit known as Lower 48. L48 at the tailgate of the processing plant -- either the San Juan Plant or the Ignacio plant. [MSJ Affidavit] at ¶ 4.

5.  Following gathering and processing of the gas produced from its leases in the San Juan Basin, the residue gas rederived to COP at the tailgate of each processing plant was marketed by the COP business unit known as COP Commercial. [MSJ Affidavit] at ¶ 5.

6.  COP is a single corporation in which Lower 48 and COP Commercial are different business units that perform different business functions within the single corporation. **Lower 48 was responsible for producing the residue gas subject to Anderson's and Westfall's royalty interest, and COP Commercial was responsible for marketing the gas.** [MSJ Affidavit] at ¶ 6.

Plaintiff's Motion for Partial Summary Judgment, at Exhibit 2, filed September 28, 2023 (Doc. 348-2)(emphasis added). ConocoPhillips insist that these statements -- explicitly describing Plaintiffs' royalty interest in residue gas and the royalty payments made on that gas -- cannot support an inference that Plaintiffs own a royalty interest in residue gas. See MTR Fact at 9.

For ConocoPhillips' argument to succeed, the Court would have to accept a proposition that is inconsistent with the record: that a producer can admit paying royalties on residue gas for more than a decade while simultaneously denying that the royalty owners have any royalty interest in the residue gas. See MTR Fact at 3. This proposition is not tenable. ConocoPhillips attempts to salvage this position by asserting that a royalty interest "is a grant or reservation of real property," and not a right to payment, and therefore receiving payment does not establish a royalty interest. MTR Fact at 5 (citing Duvall v. Stone, 1949-NMSC-074, ¶ 16, 54 N.M. 27, 32, 213 P.2d 212, 215 (1949)("Duvall"). Duvall forecloses that argument; however, it defines a royalty interest as: "a share of the product or profits (ordinarily 1/8) reserved by the owner for permitting another to develop his property for oil and gas, usually without expense to the property owner." Duvall, 213 P.2d at 215. New Mexico statute confirms this point. Under the New Mexico Oil and Gas Proceeds Payment Act, royalty interests are "oil and gas proceeds," meaning that they are the very

payments "derived from oil and gas production from any well located in New Mexico."  N.M. Stat. Ann. § 70-10-2.  In other words, under New Mexico law, payment flows from -- and confirms -- the underlying royalty interest.  ConocoPhillips' position therefore collapse under both the governing law and its own decade-long course of conduct.

ConocoPhillips next argues that reconsideration is warranted under <u>Abraham</u>, because Plaintiffs fail to show that their leases grant them a royalty interest in residue gas.  <u>See</u> MTR Fact at 6.  It contends that the Court makes clear in <u>Abraham</u> that "the duty to market does not define the lessor's royalty interest; the lease's royalty provision does that," and because the Court does not look to the royalty provision, it cannot determine that the Plaintiffs own a royalty interest in residue gas.  MTR Fact at 6.  This argument fails for two reasons.  First, it reflects ConocoPhillips' misunderstanding of what an undisputed fact is.  The Court did not "determine" the fact; rather, it concludes that the fact is undisputed based on ConocoPhillips' admission that it paid Plaintiffs a royalty interest in residue gas from 2005 to 2016.  <u>See</u> Plaintiff's Motion for Partial Summary Judgment, at Exhibit 2.  Relabeling those admissions as "determinations" does not change their nature.  The Court is not the factfinder; its task is to determine whether facts are undisputed. Second, <u>Abraham</u> is inapposite.  <u>Abraham</u> denies certification where royalty owners fail to produce class-wide evidence that they own royalty interests in refined NGLs and where individualized lease interpretation is necessary.  <u>See Abraham</u>, 317 F.R.D at 260-68.  Here, ConocoPhillips' admissions establish that the Plaintiffs were paid royalties on residue gas; the central dispute concerns whether those payments met the HROP.

Thus, the Court declines ConocoPhillips' invitation to change a fact it treats as undisputed. ConocoPhillips points to no new authority, no new evidence, and no obvious mistake that warrants disturbing this undisputed fact in the MSJ MOO.  Allowing reconsideration now prejudices the

- 31 -

class and forces needless reexamination of issues the Court already resolved after careful analysis. For these reasons, the court denies the MTR Fact.

**IT IS ORDERED** that: (i) ConocoPhillips' Motion to Reconsider Memorandum Opinion and Order on Plaintiffs' Motion for Partial Summary Judgment, filed March 4, 2025 (Doc. 450), is granted; (ii) the Court modifies its prior ruling in the Memorandum Opinion and Order, filed September 30, 2024 (Doc. 441)("MSJ MOO"), to deny the Plaintiffs' Motion for Partial Summary Judgment, filed September 28, 2024 (Doc. 348), only as to seeking a ruling on the proper definition of the implied duty to market; (iii) all other determinations in the MSJ MOO remain unchanged; and (iv) ConocoPhillips' Motion to Reconsider a Fact Determined in the Memorandum Opinion and Order on Plaintiffs' Motion for Partial Summary Judgment, filed March 25, 2025 (Doc. 454), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Brian K. Branch
The Law Office of Brian K. Branch
Albuquerque, New Mexico

-- and --

Bradley D. Brickell
Brickell & Associates, P.C.
Norman, Oklahoma

     *Attorneys for the Plaintiffs*

Mark F. Sheridan
Robert J. Sutphin
John C. Anderson
Adam G. Rankin
Holland & Hart LLP
Santa Fe, New Mexico

   *Attorneys for the Defendant*